Paul L. More, SBN 228589
Kimberly C. Weber, SBN 302894
McCRACKEN, STEMERMAN & HOLSBERRY, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Tel. No.:        (415) 597-7200
Fax No.:        (415) 597-7201
Email:          pmore@msh.law
                kweber@msh.law

*Attorneys for Intervenor UNITE HERE Local 2850*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA HOTEL & LODGING ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF OAKLAND,<br><br>Defendant.<br><br>UNITE HERE LOCAL 2850,<br><br>Intervenor. | Case No.:  19-cv-01232-WHO<br><br>**NOTICE AND MOTION TO DISMISS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Hearing Date:  June 19, 2019<br>Time: 2:00 p.m.<br>Courtroom: 2<br><br>Honorable William H. Orrick |

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ........................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 2

BACKGROUND ............................................................................................................. 4

ARGUMENT .................................................................................................................. 9

I.    Measure Z is not preempted by CalOSHA .......................................................... 9

  A.    The Measure is an overtime law, not a workplace-safety standard. ........................... 9

  B.    The Measure does not "duplicate" or "conflict with" CalOSHA. ............................. 10

  C.    The Measure is not expressly or impliedly field preempted. ................................... 11

II.   Measure Z is not unconstitutionally vague. ....................................................... 13

  A.    Economic regulation like Measure Z is subject to a practical, flexible standard for vagueness, and facial challenges are highly disfavored. ................................... 13

  B.    The Association lacks standing to bring this facial challenge. ................................. 16

  C.    The Measure's workload-compensation provision is sufficiently clear. ................... 17

  D.    Measure Z's definition of "health benefits" is sufficiently clear. .............................. 20

III.  The Court should dismiss the Association's conclusory claim that the Measure's "penalty provision" violates due process. ............................................................. 25

CONCLUSION ............................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Allen v. Sacramento*,
   234 Cal.App.4th 41 (2015) ...............................................................................16

*Amaral v. Cintas Corp. No. 2*,
   163 Cal.App.4th 1157 (2008) .................................................................14, 19, 22, 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..........................................................................................25

*Bone v. State Bd. of Cosmetology*,
   275 Cal.App.2d 851 (1969) ...............................................................................17

*Botosan v. Paul McNally Realty*,
   216 F.3d 827 (9th Cir. 2000) ............................................................................14

*California Grocers Assoc. v. City of Los Angeles*,
   52 Cal.4th 177 (2011) ..............................................................................2, 12, 13

*California Hotel & Lodging Assn. v. City of Long Beach*,
   No. 19LBCV00055 ................................................................................................3

*California Pac. Bank v. Fed. Deposit Ins. Corp.*,
   885 F.3d 560 (9th Cir. 2018) .....................................................................14, 20, 22

*California Teachers Ass'n v. State Bd. of Educ.*,
   271 F.3d 1141 (9th Cir. 2001) ..........................................................................15

*California Veterinary Medical Assn. v. City of West Hollywood*,
   152 Cal.App.4th 536 (2007) ...............................................................................9

*Calop Bus. Sys., Inc. v. City of Los Angeles*,
   984 F.Supp.2d 981 (C.D. Cal. 2013) ...................................................3, 16, 23

*City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.*, 56
   Cal.4th 729 (2013) ..........................................................................................11

*Connor v. First Student, Inc.*,
   5 Cal.5th 1026, 1034 (2018) ............................................................................14

*Diaz v. Grill Concepts Services, Inc.*,
   23 Cal.App.5th 859, 870 (2018) ...............................................................15, 20, 21, 23

ii

*Fang Lin Ai v. United States,*
    809 F.3d 503 (9th Cir. 2015) ...................................................................19

*First Resort, Inc. v. Herrera,*
    860 F.3d 1263 (9th Cir. 2017) .................................................................19

*First Resort, Inc. v. Herrera,*
    No. C 11-5534 SBA, 2012 WL 4497799 (N.D. Cal. Sept. 28, 2012) ...........14

*People ex rel. Gallo v. Acuna,*
    14 Cal.4th 1090 (1997) .............................................................................15

*Garcia v. Four Points Sheraton LAX,*
    188 Cal.App.4th 364 (2010) .................................................................14, 19

*Golden Gate Restaurant v. City & County of San Francisco,*
    512 F.3d 1112 (9th Cir. 2008) ....................................................................3

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ...................................................................................15

*Guerrero v. Whitaker,*
    908 F.3d 541 (9th Cir. 2018) .....................................................................15

*Henry v. Spearman,*
    899 F.3d 703 (9th Cir. 2018) .....................................................................16

*Hightower v. City & Cty. of San Francisco,*
    77 F. Supp. 3d 867 (N.D. Cal. 2014) ..........................................................14

*Hill v. Colorado,*
    530 U.S. 703 (2000) ..............................................................................3, 18

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) .......................................................................................16

*Ivory Educ. Inst. v. Dep't of Fish & Wildlife,*
    28 Cal.App.5th 975 (2018) ...........................................................................3

*Johnson. Ledezma-Cosino v. Sessions,*
    857 F.3d 1042 (9th Cir. 2017) ...................................................................16

*Johnson v. United States,*
    576 U.S. ___, 135 S.Ct. 2551 (2015)..........................................................16

iii

*Nisei Farmers League v. Labor & Workforce Dev. Agency*,
  30 Cal.App.5th 997 (2019) .................................................................15

*People v. Hazelton*
  (1996) 14 Cal.4th 101 ......................................................................19

*People v. Superior Court*,
  —Cal.Rptr.3d—, 2019 WL 1615288 (Apr. 16, 2019).....................16

*Pest Comm. v. Miller*,
  626 F.3d 1097 (9th Cir. 2010) .........................................................19

*Robles v. Domino's Pizza, LLC*,
  913 F.3d 898 (9th Cir. 2019) ...........................................................14

*RUI One Corp. v. City of Berkeley*,
  371 F.3d 1137 (9th Cir. 2004) ...........................................................7

*Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression &
  Criminalization of a Generation v. City of Seattle*,
  550 F.3d 788 (9th Cir. 2008) ...........................................................15

*Sherwin-Williams Co. v. City of Los Angeles*,
  4 Cal.4th 893 (1993) ....................................................................9, 10

*Solus Industrial Innovations, LLC v. Superior Court*,
  4 Cal.5th 316, 330 (2018) ................................................................12

*United States. v. Erickson*,
  75 F.3d 470 (9th Cir. 1996) .............................................................14

*United States v. Bramer*,
  832 F.3d 908 (8th Cir. 2016) ...........................................................16

*United States v. Cherniavsky*,
  732 F. App'x 601 (9th Cir.) ..............................................................24

*United States v. Elias*,
  269 F.3d 1003 (9th Cir. 2001) ....................................................17, 18

*United States v. Harris*,
  705 F.3d 929 (9th Cir. 2013) ...........................................................16

*United States v. Morsette*,
  653 F. App'x 499 (9th Cir. 2016) .....................................................24

iv

*United States v. Persaud*,
    866 F.3d 371 (6th Cir. 2017) .................................................................24

*Valley Vista Services, Inc. v. City of Monterey Park*,
    118 Cal.App.4th 881 (2004) ..................................................................11

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)........................................................................14, 16

*Wal-Mart Stores, Inc. v. City of Turlock*,
    483 F. Supp. 2d 987 (E.D. Cal. 2006).....................................................18

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ..............................................................................15

*Woodfin Suite Hotels LLC v. City of Emeryville*
    No. C-06-1254, 2006 WL 2739309 (N.D. Cal. Aug 23, 2006) .............10, 16, 20

**Federal Statutes**

18 U.S.C. § 24 ............................................................................................23

18 U.S.C. § 669 ..........................................................................................23

18 U.S.C. § 1035 ........................................................................................23

18 U.S.C. § 1347 ........................................................................................23

**State Statutes**

Cal. Gov't Code § 22777 .............................................................................24

Cal. Gov't Code § 22944.2 ..........................................................................24

Cal. Gov't Code § 31693 .............................................................................24

Cal. Health & Safety Code §§ 142.2, 142.3 ...................................................5

Cal. Lab. Code, § 142 ...................................................................................5

Cal. Lab. Code § 144(e).............................................................................12

Cal. Lab. Code § 515(a)..............................................................................17

Cal. Lab. Code § 3212.4 .............................................................................17

MOTION TO DISMISS                                      Case No. 19-cv-01232-WHO

Cal. Lab. Code § 4800 ..................................................................................17

Cal. Lab. Code § 6316 ................................................................................2, 12

Cal. Mil. & Vet. Code § 327 .........................................................................24

Cal. Water Code § 10912 ..............................................................................18

Cal. Welf. & Inst. Code § 14014 ..................................................................24

**Municipal Ordinances**

Berkeley Muni. Code § 13.27.050(A) ...........................................................22

Davis Muni. Code § 15.20.060(a) .................................................................22

Emeryville Muni. Code § 5-32.1.1(c) ...........................................................10

Fairfax Muni. Code § 8.56.020(B), (C) ........................................................22

Hayward Muni. Code § 2-14.010(d) .............................................................22

Los Angeles Muni. Code § 186.04(C)(1) ......................................................22

Marin County Code § 2.50.050(b), (c) ..........................................................22

Oakland Muni. Code, § 2.28.030 ...............................................................9, 21

Oakland Muni. Code § 5.36.020 ...................................................................18

Oakland Muni. Code §§ 5.93.010 *et seq.* .........................................*passim*

Pasadena Muni. Code § 4.11.010(C) .............................................................22

Petaluma Muni. Code § 8.36.060(A) .............................................................23

Richmond Muni. Code § 2.60.060(a) .............................................................23

Sacramento Muni. Code § 3.58.030(A)(1) .....................................................23

Santa Cruz Muni. Code § 5.10.040(2) ...........................................................23

West Hollywood Muni. Code § 3.20.040(d) ..................................................23

MOTION TO DISMISS                                   Case No. 19-cv-01232-WHO

**State Regulations**

8 C.C.R. § 3203 ................................................................................................5, 6

8 C.C.R. § 3345 .................................................................................................*passim*

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on June 19, 2019, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 2 of the United States District Court, Northern District of California, Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable William H. Orrick, presiding, Intervenor-Defendant UNITE HERE Local 2850 (the "Union") will move to dismiss Plaintiff California Hotel & Lodging Association's Complaint for Injunctive and Declaratory Relief pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  The Union's motion is made on the following grounds:

1.      City of Oakland Measure Z (Oakland Municipal Code §§ 5.93.010 *et seq.*) is not preempted by the California Occupational Health & Safety Act ("CalOSHA") because Measure Z, by purpose and design, does not establish a workplace safety standard; does not conflict with CalOSHA; and is not field preempted.

2.      The Association lacks standing to bring a facial vagueness challenge.  Measure Z's provisions requiring additional compensation for hotel room cleaners required to clean more than a prescribed square footage of space and setting a lower minimum-wage if "health benefits" are provided are not unconstitutionally vague.

3.      Measure Z's minimum-wage provision is not preempted by the Employee Retirement Income Security Act.

The motion is based upon this notice, the memorandum of points and authorities and request for judicial notice, which are filed herewith, and on the complete record in this action.

Dated:  May 10, 2019                    Respectfully submitted,

*/s/ Paul L. More*
Paul L. More, SBN 228589
Kimberly C. Weber, SBN 302894
McCRACKEN, STEMERMAN & HOLSBERRY, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Tel. No.:      (415) 597-7200
Fax No.:      (415) 597-7201
*Attorneys for Intervenor UNITE HERE Local 2850*

1

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

The California Hotel & Lodging Association (the "Association") asks the Court to

3

invalidate portions of City of Oakland Measure Z ("Measure Z" or the "Ordinance"), which

4

imposed wage-and-hour and other employment terms on large hotels located in the City. The

5

Association's claims are meritless.

6

The Association argues that Measure Z's requirement that hotels pay extra

7

compensation to housekeepers who are required to clean more than 4,000 square feet during

8

an eight-hour workday is a "health-and-safety" standard preempted by state law. But this

9

requirement is not a workplace-safety regulation. Its purpose is to guarantee fair

10

compensation for hotel housekeepers, to ensure that the Measure's prohibition against

11

mandatory overtime does not lead to hotels increasing workloads during regular work hours,

12

and to protect the *public-health* interest in sanitized rooms.

13

The Association's novel claim is that because years earlier, the California

14

Occupational Safety & Health Standards Board categorically *rejected* a proposal to mandate

15

an *absolute ceiling* on the floor space a housekeeper could be required to clean, municipalities

16

are forever banned from adopting compensation or overtime requirements that are tied to

17

hotel floor space. There is no legal support for this position and accepting it would radically

18

undermine local police-power prerogatives.

19

The Association's field-preemption attack is particularly inappropriate because

20

California's Occupational Health and Safety Act ("CalOSHA") makes clear that except as to

21

the setting of specific workplace health-and-safety standards, CalOSHA does not "deprive the

22

governing body of any county, city, or public corporation, board, or department, of any power

23

or jurisdiction over or relative to any place of employment." Cal. Lab. Code § 6316. The

24

California Supreme Court has rejected a similar attempt to attack a local employment

25

standard as field-preempted by state health standards. *California Grocers Assoc. v. City of*

26

*Los Angeles*, 52 Cal.4th 177, 190-91 (2011).

27

The Association claims that the Measure's workload-compensation provision is

28

unconstitutionally vague. The Association cannot seriously argue that hotels are unable to

2

divine the meaning of the terms "room cleaner," "checkout room," and "additional-bed room," all of which Measure Z defines.  The Association claims that it is unclear "what constitutes the act of cleaning a room" under various hypothetical scenarios.   But a facial void-for-vagueness challenge "cannot prevail 'by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute.'" *Ivory Educ. Inst. v. Dep't of Fish & Wildlife*, 28 Cal.App.5th 975, 982–83 (2018) (internal quotation omitted); *Hill v. Colorado*, 530 U.S. 703, 733 (2000) ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.").  A identical law has been on the books in the City of Emeryville for over a decade, without any claim that these terms are incomprehensible.[1]

The Association also claims that Measure Z's requirement that covered hotels pay employees at least $15 per hour "with health benefits" or $20 per hour "without health benefits" is void-for-vagueness and preempted by the Employee Retirement Income Security Act ("ERISA").  The Association claims that the term "healthcare benefits" is vague, but the term is defined in the Ordinance and is used in many state and federal statutes.  Even if the Association had standing to bring a facial vagueness challenge on this basis, *cf. Calop Bus. Sys., Inc. v. City of Los Angeles*, 984 F.Supp.2d 981, 996 (C.D. Cal. 2013), *aff'd* 614 F. App'x 867, 869 (9th Cir. 2015), the Ordinance is clear.  And, as the City explains in its motion to dismiss, which Intervenor UNITE HERE Local 2850 (the "Union") joins in full, ERISA does not preempt ordinances offering employers a choice between providing healthcare benefits and paying additional money to employees. *Golden Gate Restaurant v. City & County of San Francisco*, 512 F.3d 1112, 1125 (9th Cir. 2008).

The Association's challenges are political disagreement masquerading as constitutional theory.  The Court should dismiss the Complaint with prejudice.

---

[1] The Association filed a similar CalOSHA-preemption and vagueness challenge to Long Beach Measure WW, which contains a workload-compensation provision identical to Measure Z's.  A demurrer to that complaint is pending in Los Angeles Superior Court. *California Hotel & Lodging Assn. v. City of Long Beach*, No. 19LBCV00055.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

*The CalOSHA Regulation*

      The Association bases its CalOSHA-preemption argument in large part on claims about a petition that UNITE HERE, the Union's parent organization, filed with the California Occupational Health and Safety Standards Board (the "CalOSH Board") in 2012. *See* Doc. 1 (Complaint), ¶¶ 41-52.

      The Union's CalOSH petition recited the high rates of housekeeper workplace injury and proposed a new CalOSHA standard. Request for Judicial Notice ("RJN"), Exh. 1.[2] The petition proposed that California hotels with more than 25 guest rooms be required to conduct a "Housekeeping Job Hazard Assessment" and design a "Safe Housekeeping Plan to Reduce Injuries." RJN, Exh. 1, at Exh. A, pp. 2-3. The petition also proposed that specific mandates be imposed on hotels, including that "[h]ousekeepers shall not be required to clean bathroom floors . . . in a stooped, kneeling, extended reach, or other awkward body position" and that they "not be required to move heavy furniture by oneself[.]" RJN, Exh. 1, at Exh. A, p. 5-6.

      The Association focuses on the petition's proposal for an absolute workload ceiling for housekeepers:

> Housekeepers shall not be required to regularly clean more than 5,000 square footage of room space in an eight hour workday. Square footage refers to the entire square footage of the room, including areas beneath beds and furniture, as measured by the perimeter dimensions of the room. For any room cleaner working less than eight full hours per day, this maximum floor space shall be prorated evenly according to the actual number of hours worked. When a room cleaner is assigned in an eight-hour workday to clean any combination of seven or more checkout rooms or rooms with additional beds such as cots or rollaways, this maximum floorspace shall be reduced by 500 square feet for each such checkout or additional bedroom over six.

RJN, Exh. 1, at Exh. A, p. 4; *see* Doc. 1 (Complaint), ¶ 45.

---

[2] As explained in the Union's Request for Judicial Notice, the documents described in this section may be considered on a motion to dismiss because they are subject to judicial notice and are expressly or impliedly incorporated into Plaintiffs' complaint.

4

California Health & Safety Code §§ 142.2 and 142.3 permit the CalOSH Board to adopt new safety and health standards on petition from the public.  After the Union submitted its petition, the Union's proposal was evaluated by both the CalOSH Board and the Division of Occupational Health & Safety ("DOSH").[3]  In its "evaluation of the petition," DOSH stated that the petition did "not provide sufficient information to establish the necessity of each proposed control measure," and recommended that the CalOSHA Board convene an advisory committee "to discuss whether a new standard should be developed[.]"  RJN, Exh. 2, at p. 3.

The CalOSH Board agreed to convene an advisory committee, but in doing so it expressly rejected UNITE HERE's proposed housekeeper-workload ceiling.  The CalOSH Board's staff concluded that the square-foot-based workload ceiling was not the proper subject of a CalOSHA standard:

> The Petitioner's proposal includes a provision that housekeepers not be required to clean more than 5,000 square feet of total room space during an 8-hour shift. . . .  However, these types of quotas or restrictions limiting the amount of work an employee can be assigned *are typically not addressed in Title 8 standards*, but rather are determined as a condition of employment and/or are addressed in collective bargaining agreements.

RJN, Exh. 3, at pp. 4-5 (emphasis added).  The CalOSH Board adopted its staff's conclusion. RJN, Exh. 4, at p. 3.

DOSH held a series of five advisory committee hearings over the period 2012-2015. RJN, Exh. 5.  Consistent with the CalOSH Board's conclusion that the Union's housekeeper-workload proposal was not appropriate in a CalOSHA standard, the draft standards discussed at the hearings omitted any maximum-workload mandate (or any other specific mandate). The "discussion draft" introduced at the February 27, 2014 hearing required that covered hotels adopt a "housekeeping musculoskeletal injury prevention program" in their standard Injury and Illness Prevention Program ("IIPP") required under 8 C.C.R. § 3203.  RJN, Exh. 6,

---

[3] DOSH is a division of the California Department of Industrial Relations and primarily responsible for enforcement of CalOSHA regulations.  Cal. Lab. Code, § 142.

at p. 1.  The draft standard also required injury-prevention training.  *Id*. at p. 3.  But the draft standard contained no requirement that workloads be limited to a particular level of floor space or rooms.  *Ibid*.  Nor did the discussion drafts presented at the hearings on September 24, 2015 (RJN, Exh. 7), December 3, 2015 (RJN, Exh. 8), February 23, 2016, or April 1, 2016 (RJN, Exh. 9), or in the final advisory committee draft standard (RJN, Exh. 10).

The proposed regulation considered by the CalOSH Board—like all of the advisory-committee discussion drafts—did not contain any housekeeper-workload limit.  RJN, Exh. 11.  It required that covered hotels adopt a housekeeper musculoskeletal injury prevention program ("MIPP") as part of the 8 C.C.R. § 3203 Injury and Illness Prevention Program.  *Id.*, at p. 2.  This required hotels to perform an evaluation of the worksite to identify housekeeping hazards in ten categories.  *Id*. at pp. 2-3.  The potential hazards to be evaluated included "slips, trips, and falls," "falling and striking objects," "prolonged or awkward static postures," and "excessive work-rate."  *Id*. at p. 3.  The proposed standard did not mandate that hotels make any particular change in their workplace.  Instead, it required only that hotels (along with housekeepers and their unions) "identify[] and evaluat[e] possible corrective measures[.]"  *Id*. at p. 3.

In its "Initial Statement of Reasons" for adopting the regulation, the CalOSH Board outlined the new regulation's purposes.  "Section 3345" would ensure that hotel employers would "involve housekeepers" in worksite evaluations of housekeeping hazards; identify causes of musculoskeletal injuries; "identify and evaluate possible corrective measures"; establish a "program to prevent musculoskeletal injuries"; and provide training to housekeepers.  RJN, Exh. 12, at p. 3.  The "Initial Statement" included an assessment of Section 3345's economic impact.  The CalOSH Board made clear that "[t]his proposal does not mandate specific equipment, cleaning tools or technologies such as fitted sheets, ergonomic cleaning tools or motorized carts."  *Id*. at p. 16.  Because "the option of maintaining the status quo exists," the proposal's estimated cost was limited to the cost of developing the MIPP, training costs, and recordkeeping costs.  *Id*. at p. 17.

The CalOSH Board issued a "Final Statement of Reasons" that responded to public

6

1   comments.  RJN, Exh. 13.  In one of its comments, the Association argued that "[c]ollective

2   bargaining would be undermined by the proposed rule" because, according to the Association,

3   "'[e]xcessive work rate' is a matter to be decided through collective bargaining."  *Id*. at p. 12.

4   The CalOSH Board responded to this comment by making clear—again—that Section 3345

5   required only that hotel employers conduct a workplace risk analysis and did not mandate any

6   limit on the amount of work a housekeeper could be assigned: "Proposed section 3345 does

7   not prevent or stop an employer or union from entering a collective bargaining agreement,

8   *nor does it establish a limit on the amount of work an employee can be assigned.*"  *Id*. at p. 12

9   (emphasis added).

10       The CalOSH Board adopted, and on March 31, 2017, the Office of Administrative

11   Law approved, the new regulation at 8 C.C.R. § 3345.  RJN, Exh. 14.

12   ***Measure Z***

13       Measure Z is part of a long tradition in California (and others states) of regulating the

14   workplace at the local level.  *See RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1141–43

15   (9th Cir. 2004).  The Measure includes provisions protecting hotel employees who work by

16   themselves from sexual assault by mandating that hotel employers provide them with "panic

17   buttons" and permit them to request reassignment to a different floor from an offending guest.

18   RJN, Exh. 15, § 5.93.020.  It also creates a new Department of Workplace and Employment

19   Standards to enforce Oakland's employment-standard laws and provides for enhanced

20   enforcement tools.  *Id*., § 5.93.080; Sections 3, 4.

21       The Association challenges two mandates contained in the Ordinance: the requirement

22   that large hotel employers pay additional compensation to room cleaners required to clean

23   more than 4,000 square feet of floor space, and a minimum-wage requirement for hotels with

24   more than 50 guest rooms.

25       Ordinance § 5.93.030 contain provisions on the assignment of work at covered hotels.

26   Section 5.93.030(B)—the provision that the Association challenges—requires that hotel

27   employers pay "room cleaners" double-time for the hours worked during any 8-hour workday

28   in which the room cleaner is required to clean more than 4,000 square feet of floor space.

7

The amount of floor space for which this compensation rule applies is pro-rated for workdays

that are less than 8 hours, and reduced when the room cleaner is assigned a large number of

checkout rooms or rooms with additional beds. *Id.*, at § 5.93.030(B). Section 5.93.030(C)

addresses "voluntary overtime" and requires written consent from a hotel employee before the

employee may be required to work more than 10 hours in a workday. *Id.*, at § 5.93.030(C).

The Measure foresees that the City will adopt rules and regulations "necessary for the

implementation of this Chapter" which "may be relied on by hotel employers, hotel

employees and other parties to determine their rights and responsibilities under this Chapter."

*Id.*, at Section 4(K).

The express "purpose" of the mandatory-overtime- and workload-compensation

provisions is not "workplace safety" but *public* health, adequate compensation, and protection

of employees' free time:

> Hotel employees who clean guest rooms are also frequently assigned overly
> burdensome room cleaning quotas and unexpected overtime, which undermines
> the public interest in ensuring that hotel room cleaners can perform their work in
> a manner that adequately protects public health and interferes with their ability to
> meet family and personal obligations.

*Id.*, § 5.93.030(A). The Measure thus includes a provision that "assures that workers receive

fair compensation when their workload assignments exceed proscribed limits and prohibits

hotel employees from assigning employees overtime work . . . without obtaining workers'

informed consent." *Ibid.*

The Ordinance also mandates that hotels in the City with more than 50 guest rooms

pay covered employees "a wage of no less than $15.00 per hour with health benefits . . . or

$20.00 per hour without health benefits[.]" *Id.*, § 5.93.040(A). The Ordinance defines

"health benefits" as payment of the difference between the higher wage and the lower wage

rate ($5.00 per hour, initially) "towards the provision of health care benefits for hotel

employees and their dependents." *Id.*, § 5.93.040(B).

The Ordinance's use of a health-care differential for determining the minimum wage

and its definition of "health benefits" come *verbatim* from the City's living-wage ordinance,

8

1   which the City adopted in 1998.  *See* Oakland Muni. Code, § 2.28.030 (RJN, Exh. 18).

2                                      **ARGUMENT**

3   **I.      Measure Z is not preempted by CalOSHA.**

4         **A.      The Measure is an overtime law, not a workplace-safety standard.**

5         The Association asks the Court to exercise supplemental jurisdiction in order to

6   address the complaint's lead argument: that Measure Z's workload-compensation provision is

7   preempted by CalOSHA.  Doc. 1 (Complaint), ¶¶ 3, 34-55.

8         The general principles governing state preemption of local ordinances are well-

9   established in California.  "[W]hether state law preempts a local ordinance is a pure question

10  of law[.]"  *California Veterinary Medical Assn. v. City of West Hollywood*, 152 Cal.App.4th

11  536, 546 (2007).  Only local laws that "conflict" with state law are preempted.  "A conflict

12  exists if the local legislation "'duplicates, contradicts, or enters an area fully occupied by

13  general law, either expressly or by legislative implication."'"  *Sherwin-Williams Co. v. City of*

14  *Los Angeles*, 4 Cal.4th 893, 897 (1993) (internal citation omitted).

15        The Association's argument fails at a basic level because the Measure's workload-

16  compensation provision is not a workplace-safety law, either in its design or purpose.  The

17  measure requires additional *compensation* for workloads over a prescribed amount; it does

18  not prohibit the assignment of "unsafe" levels of work.  No California workplace-safety

19  standard permits an employer to impose an unsafe working condition on its employees so

20  long as the employer pays them extra compensation for it.  The Measure's workload-

21  compensation provision is a form of overtime protection, and is fundamentally different from

22  a CalOSHA safety standard.

23        The Measure makes clear that its purpose is not to regulate workplace safety.  Rather,

24  the workload-compensation provision's purpose is similar to that of an overtime law: to make

25  sure that "workers receive fair compensation when their workload assignments exceed" the

26  4,000 square foot limit.  In conjunction with the mandatory-overtime provision, the workload-

27  compensation provision also protects the "public interest in ensuring that hotel room cleaners

28  can perform their work in a manner that protects public health" and protects housekeepers

                                           9

1    against work assignments that "interfere[] with their ability to meet family and personal

2    obligations." RJN, Exh. 15, § 5.93.030(A).

3        The Ordinance's workload-compensation provision is necessary to make effective

4    other aspects of Measure Z. If hotels could simply increase room cleaners' workloads during

5    an eight-hour shift without paying additional compensation, then any benefit of the Measure's

6    prohibition against mandatory overtime would be fleeting. Similarly, the Measure sets a

7    minimum wage for hotels that is higher than both the state minimum wage and the generally

8    applicable local minimum wage. RJN, Exh. 15, § 5.93.040. If room cleaners' workloads

9    could be increased without additional compensation, then this minimum-wage rate would be

10   undermined, as hotels would simply assign more work for the same wage.

11       This Court previously recognized that an essentially identical ordinance in the City of

12   Emeryville is form of overtime protection. In 2005, Emeryville voters adopted "Measure C,"

13   which requires that "Employees working as room cleaners shall be paid at least time-and-a-

14   half the minimum average compensation set forth above for all time worked in a day if

15   required to clean rooms amounting to more than five thousand (5,000) square feet of floor

16   space in an eight (8) hour workday." Emeryville Municipal Code § 5-32.1.1(c); *see Woodfin*

17   *Suite Hotels LLC v. City of Emeryville* No. C-06-1254, 2006 WL 2739309, *1 (N.D. Cal. Aug

18   23, 2006).

19       Addressing a hotel's preemption challenge, this Court recognized that Measure C was

20   an overtime provision, but disagreed that it was preempted, stating "Measure C does not alter

21   the overtime premium payment for the number of hours worked, it only adds to as an

22   occasion for which overtime premium must be paid those instances in which an employee is

23   required to clean over 5,000 square feet." *Woodfin Suite Hotels*, 2006 WL 2739309, a *18.

24       **B.    The Measure does not "duplicate" or "conflict with" CalOSHA.**

25       The Association argues that "section 5.93.040(B) duplicates and/or contradicts general

26   law"—and, more specifically, the CalOSHA standard at 8 C.C.R. § 3345—but does not

27   explain how. Doc. 1 (Complaint), ¶ 53. A local law "is 'duplicative' of general law when it

28   is coextensive therewith." *Sherwin-Williams*, *supra*, 4 Cal.4th at 897-898. Section

5.93.030(B) and 8 C.C.R. § 3345 are not "coextensive."  Section 5.93.030(B) requires that hotels pay room cleaners additional compensation if they are required to clean more than 4,000 square-feet of floor space in an 8-hour workday.  Section 3345 requires hotels to identify causes of musculoskeletal injuries, including from "excessive work-rate"; "identify and evaluate possible corrective measures"; and establish a "program to prevent musculoskeletal injuries."  RJN, Exh. 12, at 3.  Section 3345 does not mandate additional compensation if a room cleaner has to clean a specified amount of floor space.  In fact, it does not mandate any work practice at all, other than a collaborative assessment of musculoskeletal-injury risks and a plan to address them.

Nor does Section 5.93.030(B) "contradict" Section 3345.  A state statute does not "contradict" a local law "unless the ordinance directly requires what the state statute forbids or prohibits what state statute demands."  *City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc*., 56 Cal.4th 729, 743 (2013).  A contradiction exists only "when the state and local acts '"are irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation."'" *Valley Vista Services, Inc. v. City of Monterey Park*, 118 Cal.App.4th 881, 888 (2004) (*quoting Big Creek Lumber Co. v. County of Santa Cruz*, 115 Cal.App.4th 952, 989-990 (2004)).

Section 5.93.030(B) does not forbid what Section 3345 permits.  Section 3345 says nothing about additional compensation for heavy workloads during an 8-hour day, and Section 5.93.030(B) does not forbid the development of a plan to address musculoskeletal injuries.  Section 3345 does not prohibit the payment of compensation for particularly heavy workloads during an 8-hour day.  Neither Section 5.93.030(B) nor Section 3345 establish maximum amounts of work that may be assigned.

## C.    The Measure is not expressly or impliedly field preempted.

The Association's other theory is that the administrative process that led to the CalOSHA Board's adoption of Section 3345 "evidences an intent to occupy the field of occupational safety and health, particularly with respect to housekeepers and issues addressed by . . . section 5.93.030(B)."  Doc. 1 (Complaint), ¶ 41.

11

This is a strange assertion.  The CalOSH Board *rejected* the *absolute ceiling* on workloads that UNITE HERE proposed.  In doing so, it stated that "these types of quotas or restrictions limiting the amount of work an employee can be assigned *are typically not addressed in Title 8 standards*."  RJN, Exh. 3, at pp. 4-5 (emphasis added).  It repeatedly made clear that its final regulation—8 C.C.R. § 3345—did not "establish a limit on the amount of work an employee can be assigned."  RJN, Exh. 13, at 12.  Yet, the Association now argues that in *rejecting* a proposal for an absolute ceiling on work assignments as inconsistent with its regulatory jurisdiction, the CalOSH Board somehow preempted a local overtime provision that does not address workplace safety, does not set a limit on the work a room cleaner may be assigned, and instead requires extra pay for heavy workloads.

Neither CalOSHA generally, nor Section 3345 specifically, has a preemptive reach that would disable local governments in this way.  *See Cal. Grocers Assn*., *supra*, 52 Cal.4th at 191.  To the contrary, CalOSHA makes clear that it does not preempt local employment laws that are not "health and safety standards."  Cal. Labor Code § 6316 states that except as to health and safety standards, local governments are not deprived of "any power or jurisdiction over or relative to any place of employment."  *See also* Cal. Labor Code § 144(e) (no limitation on local government authority "as to any matter other than the enforcement of occupational safety and health standards"); *Solus Industrial Innovations, LLC v. Superior Court*, 4 Cal.5th 316, 330 (2018).

Nor is Section 5.93.030(B) impliedly preempted by CalOSHA or 8 C.C.R. § 3345, as is illustrated by the California Supreme Court's decision in *California Grocers Association*, 52 Cal.4th 177.  There, the City of Los Angeles adopted an ordinance requiring the new owners of large grocery stores to retain their predecessors' retail employees for a 90-period after the change in ownership.  *Id*. at 187.  A grocers' association alleged that the ordinance was preempted by the Retail Food Code, under which "the state alone may adopt 'health and sanitation standards for retail food facilities.'"  *Id*. at 189 (*quoting* Cal. Health & Safety Code § 113709).  The Los Angeles ordinance stated in its preamble that one of its purposes was "the maintenance of health and safety standards in grocery establishments."  *Id*. at 190.

12

1  Based on this stated purpose, the appellate court held the ordinance preempted.

2      The Supreme Court reversed, holding that "[t]he Retail Food Code does not preempt

3  all laws that have as their purpose the promotion of food health and safety; it preempts only

4  those that establish 'health and sanitation standards' for retail food establishments, so as to

5  ensure uniformity for such facilities." *Id*. at 191.  The ordinance did not establish a food

6  health and safety standard, but rather individual employment rights.  Requiring the retention

7  of trained retail workers "promotes the same goals as the enactment of a higher governmental

8  authority, but does so without entering the field that enactment preempts, i.e., the setting of

9  specific uniform standards."  *Id*. at 192.

10     This case is even more straightforward.  Like the Retail Food Code, CalOSHA only

11 preempts the setting of occupational health and safety *standards*, which the Measure does not

12 do.  Unlike the ordinance at issue in *California Grocers Association*, however, the Measure

13 does not present its overtime provisions as a means of promoting occupational health and

14 safety.  It makes clear that the provision's purpose is to ensure "fair compensation" for heavy

15 workloads and to protect the public health by ensuring sufficient time for room cleaners to

16 clean guest rooms.

17 **II.     Measure Z is not unconstitutionally vague.**

18     **A.     Economic regulation like Measure Z is subject to a practical, flexible**
19             **standard for vagueness, and facial challenges are highly disfavored.**

20     The Association argues that the workload-compensation provision in Section

21 5.93.030(B) and the minimum-wage provision's reference to "healthcare benefits" are

22 unconstitutionally vague under the U.S. and California Constitutions.  It argues that Section

23 5.93.030(B) is unconstitutionally vague because it does not adequately define: (1) a "room

24 cleaner," "checkout room," or "additional bed room"; (2) the "proper method for calculating

25 square feet of floorspace"; or (3) "what constitutes the act of cleaning a room" in various

26 hypothetical scenarios that the Association raises.  Doc. 1 (Complaint), ¶¶ 59, 67.  The

27 Complaint also alleges that Section 5.93.040(A) does not adequately define what qualifies as

28 a "health benefit."  Doc. 1 (Complaint), ¶¶ 60, 68.

13

1     "Whether [a statute] is unconstitutionally vague is a question of law[.]"  *U.S. v.*

2   *Erickson*, 75 F.3d 470, 475 (9th Cir. 1996).  Constitutional vagueness challenges are therefore

3   appropriately resolved on a motion to dismiss.  *See, e.g., Hightower v. City & Cty. of San*

4   *Francisco*, 77 F. Supp. 3d 867, 887 (N.D. Cal. 2014); *First Resort, Inc. v. Herrera*, No. C 11-

5   5534 SBA, 2012 WL 4497799, at *7 (N.D. Cal. Sept. 28, 2012).  The analysis under the

6   federal and California due-process clauses is the same.  *See, e.g.*, *Garcia v. Four Points*

7   *Sheraton LAX*, 188 Cal.App.4th 364, 386 (2010).

8     Vagueness challenges must meet exacting standards.  "A statute is vague not when it

9   prohibits conduct according 'to an imprecise but comprehensible normative standard, but

10   rather in the sense that no standard of conduct is specified at all.'" *Botosan v. Paul McNally*

11   *Realty*, 216 F.3d 827, 836 (9th Cir. 2000) (*quoting Coates v. City of Cincinnati*, 402 U.S. 611,

12   614 (1971)); *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 906 (9th Cir. 2019).

13     Economic regulation is subject to an especially lenient standard, as explained in

14   *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982):

15   "[E]conomic regulation is subject to a less strict vagueness test because its subject matter is

16   often more narrow, and because businesses, which face economic demands to plan behavior

17   carefully, can be expected to consult relevant legislation in advance of action.  Indeed, the

18   regulated enterprise may have the ability to clarify the meaning of the regulation by its own

19   inquiry, or by resort to an administrative process."  *See also California Pac. Bank v. Fed.*

20   *Deposit Ins. Corp.,* 885 F.3d 560, 571 (9th Cir. 2018); *Connor v. First Student, Inc.*, 5 Cal.5th

21   1026, 1034 (2018); *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157, 1181 (2008)

22   ("[B]ecause the [living-wage ordinance] regulates business behavior, constitutional

23   requirements are more relaxed than they are for statutes that are penal in nature.").

24     In the regulation of economic behavior, no mathematical certainty is required.

25   Because "'few words possess the precision of mathematical symbols, most statutes must deal

26   with untold and unforeseen variations in factual situations, and the practical necessities of

27   discharging the business of government inevitably limit the specificity with which legislators

28   can spell out prohibitions.  Consequently, no more than a reasonable degree of certainty can

1   be demanded.'"  *People ex rel. Gallo v. Acuna*, 14 Cal.4th 1090, 1117 (1997); *Humanitarian*

2   *Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1147 (9th Cir. 2009) ("'Condemned to

3   the use of words, we can never expect mathematical certainty from our language.'")

4   (*quoting Grayned v. Rockford*, 408 U.S. 104, 110 (1972)).  Thus, "it is well established that

5   the mere presence of some degree of ambiguity or uncertainty in the wording of a statute does

6   not make the statute void for vagueness.  'A statute is not unconstitutionally vague merely

7   because its meaning 'must be refined through application.'"  *Nisei Farmers League v. Labor*

8   *& Workforce Dev. Agency*, 30 Cal.App.5th 997, 1013 (2019); *Guerrero v. Whitaker*, 908 F.3d

9   541, 545 (9th Cir. 2018) ("Many statutes provide uncertain standards and, so long as those

10  standard are applied to real-world facts, the statutes are almost certainly constitutional.").  "A

11  law is consequently vague only if it is *impossible* to give the law a 'reasonable and practical

12  construction.'"  *Diaz v. Grill Concepts Services, Inc.*, 23 Cal.App.5th 859, 870 (2018).

13          Moreover, the Association brings a facial vagueness challenge.  Even in cases raising

14  First Amendment issues, which this case does not, "[f]acial invalidation is, manifestly, strong

15  medicine that has been employed by the court sparingly and only as a last resort."  *California*

16  *Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1155 (9th Cir. 2001); *Gonzales v.*

17  *Carhart*, 550 U.S. 124, 167–68 (2007) (admonishing circuit courts for entertaining facial

18  attacks against a state statute, and instructing that "[a]s-applied challenges are the basic

19  building blocks of constitutional adjudication'") (*quoting* Fallon, *As–Applied and Facial*

20  *Challenges and Third–Party Standing*, 113 HARV. L.REV. 1321, 1328 (2000)).  Facial

21  challenges "raise the risk of premature interpretations of statutes on the basis of factually

22  barebones records," and "threaten to short circuit the democratic process by preventing laws

23  embodying the will of the people from being implemented in a manner inconsistent with the

24  Constitution."  *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 450-51

25  (2008); *See also Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression &*

26  *Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 794 (9th Cir. 2008)

27  ("Facial challenges are generally disfavored, both because they may require us to pass

28  judgment on a statute that has not been implemented and because a ruling of

1  unconstitutionality undermines the democratically expressed will of the people.").

2      **B.**    **The Association lacks standing to bring this facial challenge.**

3         The Ninth Circuit and California courts have long held that a plaintiff to whom a

4  statute constitutionally applies may not bring a facial vagueness challenge, so long as the

5  statute does not implicate the First Amendment.  *United States v. Harris*, 705 F.3d 929, 932

6  (9th Cir. 2013) ("'[V]agueness challenges to statutes which do not involve First Amendment

7  freedoms must be examined in the light of the facts of the case at hand.'") (*quoting United*

8  *States v. Mazurie,* 419 U.S. 544, 550 (1975)); *Hoffman*, 455 U.S. at 495 ("A plaintiff who

9  engages in some conduct that is clearly proscribed cannot complain of the vagueness of the

10  law as applied to the conduct of others"); *Holder v. Humanitarian Law Project*, 561 U.S. 1,

11  18–19 (2010); *Allen v. Sacramento*, 234 Cal.App.4th 41, 55 (2015) (no facial challenge to

12  ordinance where ordinance clearly applied to challengers).

13         While the Supreme Court's decision in *Johnson v. United States*, 576 U.S. ___, 135

14  S.Ct. 2551 (2015) has led some litigants to question whether this rule still applies, federal and

15  California appellate courts have continued to adhere to the standard after *Johnson*.  *Ledezma-*

16  *Cosino v. Sessions*, 857 F.3d 1042, 1047 (9th Cir. 2017) (applying rule in rejecting facial

17  vagueness challenge); *United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016) (same);

18  *People v. Superior Court*, —Cal.Rptr.3d—, 2019 WL 1615288 (Apr. 16, 2019), *14 ("In our

19  view, *Johnson* did not put an end to the 'as-applied inquiry first' rule."); *but see Henry v.*

20  *Spearman*, 899 F.3d 703, 708 (9th Cir. 2018) (questioning, without deciding, whether

21  *Johnson* nullified rule).

22         The Association's complaint fails to include any non-conclusory allegations

23  supporting a claim that the Ordinance has been or is threatened with being unconstitutionally

24  applied to any of its members.  Without such allegations, the complaint must be dismissed for

25  lack of standing.  *See Woodfin Suite Hotels, supra*, 2006 U.S. Dist. LEXIS 64827, at *53

26  (finding plaintiff challenging similar ordinance unable to demonstrate as-applied vagueness

27  and dismissing facial vagueness claim on standing grounds); *Calop Bus. Sys.*, 984 F.Supp.2d

28  at 996 (same).

**C.      The Measure's workload-compensation provision is sufficiently clear.**

Even if the Association had standing to challenge the Ordinance on facial vagueness grounds, it has not met its burden of showing that the Measure is the rare species of economic regulation that may be struck down as facially vague.

The Association feigns ignorance of the meaning of "room cleaner," "checkout room," and "additional-bed room," but those terms are adequately defined in the Measure. *See* Doc. 1 (Complaint), ¶ 59.  A "room cleaner" is defined as "a person whose principal duties are to clean and put in order residential guest rooms in a hotel, regardless of who employs the person."  RJN, Exh. 15, at § 5.93.010.  The reference to "regardless of who employs the person" makes clear that a "room cleaner" is an employee.  The reference to "principal duties" is not standardless; statutes frequently define covered occupations in this way.  *See* Cal. Lab. Code § 4800 ("This section applies only to members of the Department of Justice whose *principal duties* consist of active law enforcement[.]"); Cal. Lab. Code § 3212.4.  In fact, the core exemptions from state wage-and-hour regulations are based on similar constructions.  Cal. Lab. Code § 515(a) (employees may be exempt from state overtime law "if the employee is *primarily* engaged in the duties that meet the test of the exemption, [and] *customarily and regularly* exercises discretion and independent judgment in performing those duties") (emphasis added); *Bone v. State Bd. of Cosmetology*, 275 Cal.App.2d 851, 857–58 (1969) ("Courts have found themselves capable of interpreting and applying the word 'primarily' as used in other statutes.").

The term "checkout room" is commonly used in the hotel industry, and the Association's claim not to understand it seems disingenuous.  *See United States v. Elias*, 269 F.3d 1003, 1015 (9th Cir. 2001) (in assessing vagueness, courts must consider if the regulation "applies to 'a select group of persons having specialized knowledge.'") (*quoting United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993)).  The Measure defines a "checkout room" as "a room where the guests are ending their stay."  RJN, Exh. 15, at § 5.93.010.  The reason for reducing the amount of floor space a housekeeper may be required to cleaned without additional compensation when "checkout rooms" are involved—

1    as any traveler knows—is because checkout rooms tend to be messier and to require deeper

2    cleaning.  The term "additional-bed room" is defined in the Measure as "a room with

3    additional beds such as cots or rollaways."  *Ibid*.  The term "additional" and the examples

4    used show that an "additional-bed room" is one with temporary beds in addition to the

5    standard beds in the room (*e.g.* two queen-sized beds or a king-sized bed).

6            The Association also argues that the Measure is vague in "the proper method of

7    calculating square feet of floorspace" and that it "fails to define what constitutes the act of

8    cleaning a room."  Doc. 1 (Complaint), ¶ 59.

9            The Measure adequately explains how the floor-space limitation operates: "[t]he

10   limitations contained herein apply to any combination of spaces, including guest rooms and

11   suites, meeting rooms or hospitality rooms, and apply regardless of the furniture, equipment

12   or amenities in any rooms."  RJN, Exh. 15, § 5.93.030(B).  The term "floorspace" is

13   commonly employed in state and local laws to determine coverage, and is not vague simply

14   because it may be difficult, in some instances, to determine whether a regulated activity takes

15   place within the defined floor space.  *See, e.g.*, Oakland Muni. Code § 5.36.020 (defining

16   regulated massage parlors based on whether "more than 25 percent of the floorspace is

17   devoted to massage"); Cal. Water Code § 10912 ("project" covered by state water assessment

18   law includes "[a] proposed commercial office building employing more than 1,000 persons or

19   having more than 250,000 square feet of floor space."); *Wal-Mart Stores, Inc. v. City of

20   Turlock*, 483 F. Supp. 2d 987, 1021 (E.D. Cal. 2006) (ordinance covering "retail stores [that]

21   exceed 100,000 square feet of gross floor area and devote at least five percent (5%) of the

22   total sales floor area to the sale of non-taxable merchandise" not unconstitutionally vague).

23           Nor can the Association bring a facial challenge by pointing to hypothetical situations,

24   such as a hotel assigning a room cleaner to replace toiletries (and nothing else) or

25   housekeepers cleaning in tandem.  Doc. 1 (Complaint), ¶ 59.  The vagueness challenge here is

26   a facial one.  As the Supreme Court has explained, "speculation about possible vagueness in

27   hypothetical situations not before the Court will not support a facial attack on a statute when

28   it is surely valid in the vast majority of its intended applications."  *Hill*, 530 U.S. at 733

18

1    (internal citation and quotation omitted); *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1275

2    (9th Cir. 2017) ("First Resort's hypothetical examples concerning what the Ordinance covers

3    and who might be punished under its provisions do not render the Ordinance

4    unconstitutionally vague.").  In other words, a statute is not void just because "there may be

5    difficulty in determining whether some marginal or hypothetical act is covered by its

6    language." *People v.* Morgan, 42 Cal.4th 593, 606 (2007) (internal quotations omitted).

7         The appellate court rejected a similar argument in *Garcia v. Four Points Sheraton*

8    *LAX*, *supra*, 188 Cal.App.4th at 389.  There, a Los Angeles ordinance required covered hotels

9    to pay over "service charges" that appear on customers' bills to the hotel workers who

10   actually performed the service.  *Id.* at 388.  The court rejected the argument that the ordinance

11   was unconstitutionally vague because it did not more specifically define who "actually

12   worked" a banquet for which service charges applied: "Hotels contend that determining who

13   'actually works' the banquet, for example, is vague because this might include servers and

14   captains, along with cooks and those employees who provide behind-the-scenes banquet

15   services.  This is an interpretation question, not a constitutional challenge." *Id.* at 387.  The

16   court concluded that "[t]here is a reasonable construction of hotels' responsibilities, which is

17   all that is required for this due process challenge."  (1996) *Garcia*, 188 Cal.App.4th at 387;

18   *see People v. Hazelton*  14 Cal.4th 101, 109 ("[T]he mere fact that a new statute requires

19   interpretation does not make it unconstitutionally vague."); *Pest Comm. v. Miller*, 626 F.3d

20   1097, 1112 (9th Cir. 2010) (fact that statute would require judicial interpretation under

21   standards that "lack[ed] . . . 'perfect clarity and precise guidance' is not a sufficient basis for

22   declaring the provisions unconstitutionally vague.").

23        So too here.  The Measure's provisions are not so "indefinite or esoteric that a person

24   of ordinary intelligence would have to guess at their meaning," *Amaral*, 163 Cal.App.4th at

25   1183, nor "'so vague and indefinite as really to be no rule or standard at all,'" *Fang Lin Ai v.*

26   *United States*, 809 F.3d 503, 514 (9th Cir. 2015) (*quoting Boutilier v. INS,* 387 U.S. 118, 123

27   (1967)).

28        The Measure foresees that the City will adopt regulations that may be "relied on by

                                              19

1   hotel employers . . . to determine their rights and responsibilities under this Chapter."  RJN,

2   Exh. 15, Section 4(K).  While the Measure's definitions stand on their own, if the Association

3   is concerned about its hypothetical scenarios, it may ask the City to address them in

4   rulemaking.  "'[E]xactness can be achieved not just on the face of the statute, but also through

5   limiting constructions given to the statute by the . . . enforcement agency.'" *California Pac.*

6   *Bank*, 885 F.3d at 571.

7           The hotel that challenged Emeryville Measure C argued that various provisions were

8   unconstitutionally vague.  *Woodfin Suite Hotels,* 2006 WL 2739309, at p. *20.  But while it

9   challenged other aspects of the ordinance, the hotel did not find the references to "room

10  cleaners," "additional beds" or "checkout rooms" vague.  Nor did it assert that it was unable

11  to determine how to measure floor space or how to decide if a room cleaner was "cleaning" a

12  room.  *Ibid*.  No other hotel has challenged that ordinance on vagueness grounds over the

13  ensuing decade.  *See Diaz*, 23 Cal.App.5th at 873 ("The unreasonableness of Grill Concepts'

14  vagueness challenge is only confirmed by the absence of any evidence that any other hotelier

15  or restauranteur had any problem reading the ordinance to pay its employees the proper living

16  wage.").

17          **D.     Measure Z's definition of "health benefits" is sufficiently clear.**

18          The Association argues that Measure Z is unconstitutionally vague because "it does

19  not define what qualifies as a 'health benefit.'"  Doc. 1 (Complaint), ¶ 68.  The Association's

20  challenge to this term is hopelessly conclusory.  But in any case, the Ordinance does define

21  the term "health benefit."  It employs the same definition as in the City of Oakland's living-

22  wage ordinance, which has been on the books since 1998 without causing apparent confusion.

23  City agencies enforcing the living-wage ordinance have adopted regulations that further

24  clarify the term, and can be expected to do so in implementing Measure Z as well.  Dozens of

25  state and federal statutes, including most of California's living-wage ordinances, use the term

26  "healthcare benefits" or similar terms without further definition.  The Court should reject the

27  Association's argument that these laws are all facially unconstitutional.

28          Measure Z requires that covered hotels pay covered employees $15.00 "with health

20

1   benefits" or $20.00 "without health benefits."  RJN Exh. 15, § 5.93.040(A).  The Ordinance

2   defines "health benefits" as the "payment of the difference between the higher wage and

3   lower wage under Section 5.93.040(A) towards the provision of health care benefits for hotel

4   employees and their dependents."  *Id.*, § 5.93.040(B).  This provision permits a covered hotel

5   to pay covered employees a lower wage ($15.00 per hour) if it provides at least $5.00 per

6   hour toward health care benefits.  The higher and lower minimum wages set forth in Measure

7   Z will be adjusted for inflation annually (which will impact the differential between them).

8   *Id.*, § 5.93.040(C).

9           The Ordinance's use of a "health-care differential" for setting higher and lower

10   minimum-wage rates and its definition of "health benefits" come directly from the City's

11   living-wage ordinance.  Chapter 2.28 of the City Code requires employers that contract with

12   the City or receive City financial assistance to pay employees a lower minimum wage "with

13   health benefits" or else a higher minimum wage.  Like Measure Z, the living-wage ordinance

14   requires that those who wish to qualify for the lower minimum-wage provide "health

15   benefits," which it defines as the "payment of at least one dollar and twenty five-cents ($1.25)

16   per hour towards the provision of health care benefits for employees and their dependents."

17   Oakland Muni. Code, § 2.28.030(C).  The living-wage ordinance has been in effect since

18   1998 and there is no reported case of a contractor claiming that it is unable to comprehend

19   what this means.

20          Moreover, to the extent that an employer might want further guidance on what

21   qualifies as health care benefits, Oakland agencies have issued interpretive regulations.  The

22   City's regulations define "health benefits" to mean "such medical, dental or other health

23   benefits provided by employer."  RJN, Exh 16, at 8.  The Port of Oakland became covered by

24   the City's living-wage ordinance in 2002, when Oakland voters enacted Measure I.  *See* City

25   Charter, § 728.  As a separate proprietary department of the City, the Port of Oakland issued

26   its own regulations, including a further elaboration of the "health benefits" that qualify for the

27   lower minimum wage: "'Health Benefits' shall mean payment of or contribution towards

28   medical, dental, optical, mental, death or disability insurance premiums or expense account

made available to an Eligible Employee by a Covered Employer as part of employment compensation." RJN, Exh. 17, § 2.7.

Measure Z gives the City authority to issue regulations providing guidance to covered hotels, and makes clear that these regulations have the force of law. RJN, Exh. 15, Section 4(K). Those regulations will surely provide the same definition of qualifying "health benefits" as City agencies have given to the same term in the Charter. *See California Pac. Bank*, 885 F.3d at 571; *Amaral*, 163 Cal.App.4th at 1183. While regulatory guidance on Measure Z is pending, covered hotels may rely on the City's authoritative interpretation of its existing living-wage ordinance.

Oakland is not some anomaly. The healthcare-differential concept and definition of health benefits found in the City's living-wage ordinance and in Measure Z are similar in their generality to those found in local minimum-wage laws throughout the State. *See, e.g.*, Berkeley Muni. Code § 13.27.050(A) (lower wage available if employer offers a "medical benefit plan, which allows employees to receive employer compensated care from a licensed physician equal to or higher than the medical benefit rate requirement"); Davis Muni. Code § 15.20.060(a) (lower wage permissible if "the employer also provides a minimum of one dollar and fifty cents per hour per employee towards an employee health benefits plan or equivalent"); Fairfax Muni. Code § 8.56.020(B), (C) (lower wage permissible with "payment of at least $1.75 per hour toward health insurance for the employee"); Hayward Muni. Code § 2-14.010(d) ("'Health Benefits' means the payment of no less than one dollar and twenty-five cents ($1.25) per hour toward the cost of health and medical care insurance for employees and their dependents."); Los Angeles Muni. Code § 186.04(C)(1) ("AHEZ Hotel Employers shall pay AHEZ Hotel Workers a wage of no less than $11.03 per hour with health benefits"); Marin County Code § 2.50.050(b), (c) ("Health benefits required by this section shall consist of the payment of at least one dollar and fifty cents per hour towards the provision of health care benefits for the employee and his/her dependents."); Pasadena Muni. Code § 4.11.010(C) ("'Health benefits' means the payment of no less than $1.25 per hour toward the cost of health and medical care insurance for employees and their dependents."); Petaluma Muni.

22

Code § 8.36.060(A); Richmond Muni. Code § 2.60.060(a); Sacramento Muni. Code §
3.58.030(A)(1); Santa Cruz Muni. Code § 5.10.040(2); City of West Hollywood Muni. Code
§ 3.20.040(d).

There is, then, extensive and longstanding statewide experience with cities
implementing and employers complying with minimum-wage provisions similar to (and in
some cases, identical to) Measure Z. Those courts that have addressed vagueness challenges
to living-wage ordinances have rejected them. *See Calop Bus. Sys., Inc. v. City of Los
Angeles*, 984 F.Supp.2d 981, 996 (C.D. Cal. 2013) (rejecting facial vagueness challenge to
healthcare differential in living-wage law because the law clearly applied to the defendant's
conduct), *aff'd* 614 F. App'x 867, 869 (9th Cir. 2015); *Amaral*, 163 Cal.App.4th at 1182
(living-wage law upheld over vagueness challenge; definition of health care benefits identical
to Measure Z's not challenged as vague); *Diaz*, 23 Cal.App.5th at 870 (rejecting vagueness
challenge to Los Angeles "Airport Hospitality Enhancement Zone" minimum-wage law
containing healthcare-differential).

Even if the Court did not look to this context in assessing the meaning of "healthcare
benefits," that term is sufficiently clear to pass constitutional muster. Healthcare benefits are
the medical, dental, vision, and similar health-related benefits that an employer provides to
employees, typically through an insurance plan. The term and ones like it are used in many
California and federal statutes without further definition. For example, federal healthcare-
related crimes use the term "health care benefits" without further elaboration. 18 U.S.C. §
1347 (making it a crime to obtain money or property by fraud "in connection with the
delivery of or payment for health care benefits, items, or services"); 18 U.S.C. § 1035
(making it a crime to make false statements "in connection with the delivery of or payment
for health care benefits, items, or services"). Other federal crimes are based on the definition
of a health care benefit program contained in 18 U.S.C. § 24: "the term 'health care benefit
program' means any public or private plan or contract, affecting commerce, under which any
medical benefit, item, or service is provided to any individual." *See, e.g.*, 18 U.S.C. § 669
("Theft or embezzlement in connection with health care"). Although the criminal code

1   contains no further definition of "medical benefit" or "health care benefit," courts have been

2   able to implement these laws. *See, e.g., United States v. Persaud*, 866 F.3d 371, 384 (6th Cir.

3   2017) (18 U.S.C. § 1035); *United States v. Cherniavsky*, 732 F. App'x 601 (9th Cir.), *cert.*

4   *denied*, 139 S.Ct. 609 (2018) (18 U.S.C. § 1347); *United States v. Morsette*, 653 F. App'x

5   499, 502 (9th Cir. 2016) (18 U.S.C. § 669).

6       California's Legislature has also used the phrase "healthcare benefits" in many statutes

7   without believing it necessary to provide further clarification. *See, e.g.*, Cal. Gov't Code §

8   31693 (requiring counties and county retirement systems to give retiree organizations

9   advance notice of, and an opportunity to comment on, "proposed changes in employee health

10  care benefits affecting those retired employees"); Cal. Gov't Code § 22944.2 (contract

11  between participating employer and Public Employees' Retirement System may not create

12  "an obligation for either party to the contract to provide a specific level of postemployment

13  health care benefits or other postemployment benefits to employees . . . .").[4]  To the

14  Association, however, these laws are all facially unconstitutional.

15      Finally, the Association claims that the Measure does not provide "guidance on how

16  this additional [health benefit] compensation should be paid" or "as to the nature or timing of

17  the payments."  Doc. 1 (Complaint), ¶ 17, 60.  But the Ordinance makes clear that the $5.00

18  per hour payment for health benefits must be paid "toward the provision of health care

19  benefits."  RJN, Exh. 15, § 5.93.040(B).  In interpretive regulations on the living-wage

20  ordinance's identical requirement, the Port of Oakland has made clear that if a covered

21  employer does not pay for health benefits on a per-hour basis, then the City will make a

22  reasonable assessment of the employer's average hourly cost to provide the health benefits.

23  RJN, Exh. 17, § 12.3.2.  A similar approach would be a reasonable interpretation of Measure

24  Z.

25      The Association's facial vagueness challenge to the Measure's minimum-wage

26  provision, like its vagueness challenges to the Measure's other terms, is baseless.

27

28  ---
    [4] *See also, e.g.*, Cal. Mil. & Vet. Code § 327; Cal. Welf. & Inst. Code § 14014; Cal. Gov't
    Code § 22777.

**III.    The Court should dismiss the Association's conclusory claim that the Measure's "penalty provision" violates due process.**

The Complaint states, in passing, that "the penalty provision of the initiative violates well-settled due process norms."  Doc. 1 (Complaint), ¶ 62.  It is unclear whether the Association intends this to be an independent due-process claim.  If so, it fails *Iqbal* standards.  *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Complaint provides no explanation of what "penalty" provision it refers to, or how that provision might violate due process.

The Association seems to be basing an argument on the possibility that "[e]mployees may try to aggregate many individual claims" at some point in the future, and that if this happens "the statutory penalties . . . will be punitive in nature."  Doc. 1 (Complaint), ¶ 62.  But this is entirely speculative.  No such scenario is before the Court, and a hypothetical future situation is not a basis for a facial due-process challenge.  If a specific hotel believes that the statutory penalties it faces for its violations of the Ordinance violate its constitutional rights, it may present its argument at the appropriate time.

## CONCLUSION

For the foregoing reasons, the Court should reject the Association's constitutional challenges and dismiss the Complaint with prejudice under Rules 12(b)(1) and 12(b)(6).

Dated:  May 10, 2019                          Respectfully submitted,

*/s/ Paul L. More*

Paul L. More, SBN 228589
Kimberly C. Weber, SBN 302894
McCRACKEN, STEMERMAN & HOLSBERRY, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Tel. No.:      (415) 597-7200
Fax No.:      (415) 597-7201

*Attorneys for Intervenor UNITE HERE Local 2850*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2019, a copy of foregoing **NOTICE AND MOTION TO DISMISS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**  was served electronically through the Notice of Filing from the Northern District of California ECF system or by regular U.S. mail upon the counsel not registered with the electronic system.

| | |
|---|---|
| Aaron Franklin Olsen<br>Fisher & Phillips, LLP<br>4747 Executive Drive<br>Suite 1000<br>San Diego, CA 92121<br>Phone: (858) 597-9600<br>Fax: (858) 597-9601<br>Email: aolsen@fisherphillips.com | Karen Ann Getman<br>Kristen Mah Rogers<br>Remcho, Johansen & Purcell, LLP<br>1901 Harrison Street, Suite 1550<br>Oakland, CA 94612<br>510-346-6200<br>Fax: 510-346-6201<br>Email: kgetman@rjp.com<br>kr@rjp.com |
| Jeffrey Richard Thurrell<br>Spencer W. Waldron<br>Fisher & Phillips LLP<br>2050 Main Street<br>Suite 1000<br>Irvine, CA 92614<br>Phone: (949) 851-2424<br>Fax: (949) 851-0152<br>Email: jthurrell@fisherphillips.com<br>swaldron@fisherphillips.com | Catha Alison Worthman<br>Nina Rachel Wasow<br>Feinberg Jackson Worthman & Wasow LLP<br>2030 Addison Street, Suite 500<br>Berkeley, CA 94704<br>(510) 269-2094<br>Fax: (510) 269-7994<br>Email: catha@feinbergjackson.com<br>nina@feinbergjackson.com |
| *Attorneys for Plaintiff* | Maria Bee<br>Oakland City Attorney's Office<br>One Frank H. Ogawa Plaza, 6th Fl.<br>Oakland, CA 94612-1999<br>(510) 238-3814<br>Email: mbee@oaklandcityattorney.org<br><br>*Attorneys for Defendant* |

Dated:  May 10, 2019

_Katherine Maddux_ _____

Katherine Maddux

1