Paul L. More, SBN 228589
Kimberly C. Weber, SBN 302894
McCRACKEN, STEMERMAN & HOLSBERRY, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Tel. No.:       (415) 597-7200
Fax No.:       (415) 597-7201
Email: pmore@msh.law
              kweber@msh.law

*Attorneys for Intervenor UNITE HERE Local 2850*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA HOTEL & LODGING ASSOCIATION,<br><br>             Plaintiff,<br><br>    vs.<br><br>CITY OF OAKLAND,<br><br>             Defendant.<br><br>UNITE HERE LOCAL 2850,<br><br>             Intervenor. | Case No.:  19-cv-01232-WHO<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Date:  June 19, 2019<br>Time: 2:00 p.m.<br>Courtroom: 2<br><br>Honorable William H. Orrick |

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Evidence 201, UNITE HERE Local 2850 (the "Union") request that this Court take judicial notice of the exhibits described in this Request in support of Defendants' Motions to Dismiss.

## REASONS WHY JUDICIAL NOTICE SHOULD BE GRANTED

In the Ninth Circuit, courts may take judicial notice of documents alleged in a complaint and essential a plaintiff's claims.  *See Johnson v. Federal Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015) (materials referred to in the complaint, but not attached thereto, may be considered on a motion to dismiss, if no one questions their authenticity); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 (9th Cir. 1998) ("A district court ruling on a motion to dismiss may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiffs pleading.") (internal quotations omitted); *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir. 1994); *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295 (9th Cir. 1998).

A court may also "take judicial notice of documents on which allegations in the complaint *necessarily* rely, even if not expressly referenced in the complaint, provided that the authenticity of those documents is not in dispute[,]" *Lacayo v. Donahoe*, No. 14-CV-04077-JSC, 2015 WL 993448, at *9 (N.D. Cal. Mar. 4, 2015); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) ("We have extended the doctrine of incorporation by reference to consider documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance.").

Exhibits 1-14 are official materials related to a petition filed by UNITE HERE with the California Occupational Health & Safety Standards Board ("CalOSH Board").  That petition, and the CalOSH Board's setting of health and safety standards for the hotel industry, are an integral part of Plaintiff's claim that City of Oakland Measure Z is preempted by the California Occupational Health & Safety Act ("CalOSHA").  The petition and the CalOSH Board's consideration of it are referenced in paragraphs 41-52 of the Complaint.  Doc. 1

1  (Complaint), ¶¶ 41-52.

2      A court may also take judicial notice of facts not reasonably in dispute at any stage in

3  the proceeding, including in deciding a motion to dismiss.  *See* Fed.R.Evid. 201(b),

4  (d).  Courts may take judicial notice of the records and reports of administrative bodies and,

5  more generally, of any matters of public record.  *Anderson v. Holder*, 673 F.3d 1089, 1094

6  (9th Cir. 2012); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).  Judicial notice

7  may be taken of public agency reports, reports generated by public entity staff, and the

8  agendas and minutes of the meetings of public bodies, among other matters.  *Lee v. City of*

9  *Los Angeles*, No. CV 13-01410, 2015 WL 12748244, at *3 (C.D. Cal. Feb. 24, 2015).  Thus,

10 in addition to the fact that the exhibits here are all either documents referred to in the

11 complaint or upon which the complaint necessarily relies, the large majority of these exhibits

12 are public records, and this provides an additional reason for the Court to take judicial notice

13 of them.  The CalOSH documents and the local ordinances and regulations that comprise the

14 exhibits to this Request are all judicially noticeable.

15 **DOCUMENTS FOR WHICH JUDICIAL NOTICE IS REQUESTED**

16     <u>Exhibit 1.</u>  Occupational Safety and Health Standards Board Petition No. 526,

17 submitted by Kurt Peterson and Pamela Vossenas, on behalf of UNITE HERE Local 11 and

18 UNITE HERE (Jan. 23, 2012). A copy of this petition may be found at the CalOSH Board

19 website: https://www.dir.ca.gov/oshsb/Hotel-Housekeeping-Musculoskeletal-Injury-

20 Prevention.html (last visited May 10, 2019).  Judicial notice of this document is proper.

21 *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial notice of

22 "the 'records and reports of administrative bodies.'");  *Disabled Rights Action Comm. v. Las*

23 *Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be taken of the

24 records of state agencies).  The Union is not asking the Court to take judicial notice of any

25 disputed fact contained in this Exhibit.  The Complaint expressly refers to this document, but

26 does not append it.  Doc. 1 (Complaint), ¶¶ 42-45.

27

28     <u>Exhibit 2.</u>  Division of Occupational Safety and Health's Evaluation of Petition No.

526, (Mar. 27, 2012).  A copy of this official document may be found at the CalOSH Board website: https://www.dir.ca.gov/oshsb/Hotel-Housekeeping-Musculoskeletal-Injury-Prevention.html (last visited May 10, 2019).  Judicial notice of this document is proper. *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be taken of the records of state agencies).  The Union is not asking the Court to take judicial notice of any disputed fact contained in this Exhibit.  The Complaint necessarily relies on this document because Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's proceedings on hotel housekeeper health and safety standards.  Doc. 1 (Complaint), ¶ 46.

Exhibit 3.  Exhibit 3: Occupational Health & Safety Standards Board, Board Staff's Review of Petition File No. 526 (April 9, 2012).  A copy of this official document may be found at the CalOSH Board website: https://www.dir.ca.gov/oshsb/petition526.html (last visited May 10, 2019). Judicial notice of this document is proper.  *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be taken of the records of state agencies). The Union is not asking the Court to take judicial notice of any disputed fact contained in this Exhibit.  The Complaint necessarily relies on this document because Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's proceedings on hotel housekeeper health and safety standards.  Doc. 1 (Complaint), ¶ 46.

Exhibit 4.  Occupational Safety and Health Standards Board decision regarding Petition No. 526 (June 21, 2012).  A copy of this official document may be found at the CalOSH Board website: https://www.dir.ca.gov/oshsb/Hotel-Housekeeping-Musculoskeletal-Injury-Prevention.html (last visited May 10, 2019).  Judicial notice of this document is proper. *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial

3

notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be taken of the records of state agencies).  The Union is not asking the Court to take judicial notice of any disputed fact contained in this Exhibit.  The Complaint expressly refers to this document, and necessarily relies on this document because Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's proceedings on hotel housekeeper health and safety standards.  Doc. 1 (Complaint), ¶ 46.

Exhibit 5.  Housekeeping in the Hotel and Hospitality Industry, Advisory Committee Meetings, screen shot from Department of Industrial Relations, Division of Occupational Health and Safety website, detailing advisory committee meetings, at https://www.dir. ca.gov/dosh/DoshReg/Hotel_Housekeeping.html (last visited May 10, 2019).  Judicial notice of this document is proper.  *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be taken of the records of state agencies).  The Union is not asking the Court to take judicial notice of any disputed fact contained in this Exhibit.  The Complaint necessarily relies on this document because Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's proceedings on hotel housekeeper health and safety standards and expressly refers to the advisory committee deliberations.  Doc. 1 (Complaint), ¶¶ 47-48.

Exhibit 6.  Advisory Committee Discussion Draft, February 27, 2014 Advisory Meeting. This discussion draft is available on the Department of Industrial Relations, Division of Occupational Health & Safety website: https://www.dir.ca.gov/dosh/DoshReg/ Hotel_Housekeeping.html (last visited May 10, 2019).  Judicial notice of this document is proper.  *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be

4

taken of the records of state agencies).  The Union is not asking the Court to take judicial

notice of any disputed fact contained in this Exhibit.  The Complaint necessarily relies on this

document because Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's

proceedings on hotel housekeeper health and safety standards, and expressly refers to the

advisory committee deliberations.  Doc. 1 (Complaint), ¶¶ 47-48.


Exhibit 7.  Advisory Committee Discussion Draft, September 24, 2015 Advisory

Meeting. This discussion draft is available on the Department of Industrial Relations,

Division of Occupational Health & Safety website: https://www.dir.ca.gov/dosh/DoshReg/

Hotel_Housekeeping.html (last visited May 10, 2019).  Judicial notice of this document is

proper.  *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial

notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action*

*Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be

taken of the records of state agencies).  The Union is not asking the Court to take judicial

notice of any disputed fact contained in this Exhibit.  The Complaint necessarily relies on this

document because Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's

proceedings on hotel housekeeper health and safety standards, and expressly refers to the

advisory committee deliberations.  Doc. 1 (Complaint), ¶¶ 47-48.


Exhibit 8.  Advisory Committee Discussion Draft, December 3, 2015 Advisory

Meeting. This discussion draft is available on the Department of Industrial Relations,

Division of Occupational Health & Safety website: https://www.dir.ca.gov/dosh/DoshReg/

Hotel_Housekeeping.html (last visited May 10, 2019).  Judicial notice of this document is

proper.  *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial

notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action*

*Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be

taken of the records of state agencies).  The Union is not asking the Court to take judicial

notice of any disputed fact contained in this Exhibit.  The Complaint necessarily relies on this

document because Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's proceedings on hotel housekeeper health and safety standards, and expressly refers to the advisory committee deliberations.  Doc. 1 (Complaint), ¶¶ 47-48.

Exhibit 9.  Advisory Committee Discussion Draft, April 1, 2016 Advisory Meeting. This discussion draft is available on the Department of Industrial Relations, Division of Occupational Health & Safety website: https://www.dir.ca.gov/dosh/DoshReg/ Hotel_Housekeeping.html (last visited May 10, 2019).  Judicial notice of this document is proper.  *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be taken of the records of state agencies).  The Union is not asking the Court to take judicial notice of any disputed fact contained in this Exhibit.  The Complaint necessarily relies on this document because Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's proceedings on hotel housekeeper health and safety standards, and expressly refers to the advisory committee deliberations.  Doc. 1 (Complaint), ¶¶ 47-48.

Exhibit 10.  Final Advisory Committee Draft, May 31, 2016. This final draft is available on the Department of Industrial Relations, Division of Occupational Health & Safety website: https://www.dir.ca.gov/dosh/DoshReg/Hotel_Housekeeping.html (last visited May 10, 2019).  Judicial notice of this document is proper.  *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be taken of the records of state agencies).  The Union is not asking the Court to take judicial notice of any disputed fact contained in this Exhibit.  The Complaint necessarily relies on this document because Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's proceedings on hotel housekeeper health and safety standards, and expressly refers to the advisory committee deliberations.  Doc. 1

1    (Complaint), ¶¶ 47-48.

2

3         Exhibit 11.  Proposed State Standard, Title 8, Division 1, Chapter 4.  A copy of this

4    official document may be found at the CalOSH Board website: https://www.dir.ca.gov/

5    oshsb/Hotel-Housekeeping-Musculoskeletal-Injury-Prevention.html (last visited May 10,

6    2019).  Judicial notice of this document is proper.  *United States v. Ritchie*, 342 F.3d 903, 909

7    (9th Cir. 2003) (courts may take judicial notice of "the 'records and reports of administrative

8    bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th

9    Cir. 2004) (judicial notice may be taken of the records of state agencies).  The Union is not

10   asking the Court to take judicial notice of any disputed fact contained in this Exhibit.  The

11   Complaint expressly refers to this document, and necessarily relies on it because Plaintiff's

12   CalOSHA-preemption claim is based on the CalOSH Board's proceedings on hotel

13   housekeeper health and safety standards.  Doc. 1 (Complaint), ¶¶ 49-50.

14

15        Exhibit 12.  Hotel Housekeeping Musculoskeletal Injury Prevention, Initial Statement

16   of Reasons.  A copy of this official document may be found at the CalOSH Board website:

17   https://www.dir.ca.gov/oshsb/Hotel-Housekeeping-Musculoskeletal-Injury-Prevention.html

18   (last visited May 10, 2019).  Judicial notice of this document is proper.  *United States v.*

19   *Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial notice of "the 'records

20   and reports of administrative bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events,*

21   *Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be taken of the records of state

22   agencies).  The Union is not asking the Court to take judicial notice of any disputed fact

23   contained in this Exhibit.  The Complaint necessarily relies on this document because

24   Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's proceedings on hotel

25   housekeeper health and safety standards.  Doc. 1 (Complaint), ¶¶ 49-52.

26

27        Exhibit 13.  Final Statement of Reasons, Title 8: New Section 3345 of the General

28   Industry Safety Orders Hotel Housekeeping Musculoskeletal Injury Prevention. A copy of

7

this official document may be found at the CalOSH Board website: https://www.dir.ca.gov/ oshsb/Hotel-Housekeeping-Musculoskeletal-Injury-Prevention.html (last visited May 10, 2019).  Judicial notice of this document is proper.  *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be taken of the records of state agencies).  The Union is not asking the Court to take judicial notice of any disputed fact contained in this Exhibit.  The Complaint necessarily relies on this document because Plaintiff's CalOSHA-preemption claim is based on the CalOSH Board's proceedings on hotel housekeeper health and safety standards.  Doc. 1 (Complaint), ¶¶ 49-52.

Exhibit 14.  Endorsed, Approved 8 C.C.R. § 3345, Hotel Housekeeping Musculoskeletal Injury Prevention (March 31, 2017). A copy of this official document may be found at the CalOSH Board website: https://www.dir.ca.gov/oshsb/Hotel-Housekeeping-Musculoskeletal-Injury- Prevention.html (last visited May 10, 2019).  Judicial notice of this document is proper.  *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (courts may take judicial notice of "the 'records and reports of administrative bodies.'"); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004) (judicial notice may be taken of the records of state agencies).  The Union is not asking the Court to take judicial notice of any disputed fact contained in this Exhibit.  The Complaint refers expressly to this document.  Doc. 1 (Complaint), ¶ 52.

Exhibit 15.  City of Oakland Measure Z, Oakland Municipal Code §§ 5.93.010 *et seq*. Municipal ordinances are proper subjects for judicial notice.  *See Santa Monica Food Not Bombs v. City of Santa Monica,* 450 F.3d 1022, 1025 n. 2 (9th Cir. 2006).

Exhibit 16.  City of Oakland, Living Wage Ordinance Rules and Regulations (March 15, 2000).  A copy of this official document may be found at the City of Oakland website:

https://www.oaklandca.gov/documents/living-wage-ordinance-rules-and-regulations (last visited May 10, 2019).  Local regulations are proper subjects for judicial notice.  *See Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1026 (9th Cir. 2009) (taking judicial notice of a local ordinance, a local regulation, and a local municipal code); *Jonna Corp. v. City of Sunnyvale*, No. 17-CV-00956-LHK, 2017 WL 2617983, at *4 (N.D. Cal. June 16, 2017).

Exhibit 17.  Port of Oakland, Rules and Regulations for the Implementation and Enforcement of Port of Oakland Living Wage Requirements.  A copy of this official document may be found at the Port of Oakland website: https://www.portofoakland.com/wp-content/uploads/2016/07/Port-Living-Wage-Rules-Regulations-PDF.pdf (last visited May 10, 2019).  Local regulations are proper subjects for judicial notice.  *See Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1026 (9th Cir. 2009) (taking judicial notice of a local ordinance, a local regulation, and a local municipal code); *Jonna Corp. v. City of Sunnyvale*, No. 17-CV-00956-LHK, 2017 WL 2617983, at *4 (N.D. Cal. June 16, 2017).

Exhibit 18.  The following municipal code provisions: Berkeley Muni. Code § 13.27.050(A); Davis Muni. Code § 15.20.060(a); Fairfax Muni. Code § 8.56.020(B), (C); Hayward Muni. Code § 2-14.010(d); Los Angeles Muni. Code § 186.04(C)(1);  Marin County Code § 2.50.050(b), (c); Oakland Municipal Code § 2.28; Pasadena Muni. Code § 4.11.010(C); Petaluma Muni. Code § 8.36.060(A); Richmond Muni. Code § 2.60.060(a); Sacramento Muni. Code § 3.58.030(A)(1); Santa Cruz Muni. Code § 5.10.040(2); City of West Hollywood Muni. Code § 3.20.040(d).  Municipal ordinances are proper subjects for judicial notice.  *See Santa Monica Food Not Bombs v. City of Santa Monica,* 450 F.3d 1022, 1025 n. 2 (9th Cir. 2006).

///

///

REQUEST FOR JUDICIAL NOTICE                                    Case No. 19-cv-01232-WHO

Dated:  May 10, 2019

Respectfully submitted,

*/s/ Paul L. More*
Paul L. More, SBN 228589
Kimberly C. Weber, SBN 302894
McCRACKEN, STEMERMAN & HOLSBERRY, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Tel. No.:      (415) 597-7200
Fax No.:      (415) 597-7201

*Attorneys for Intervenor UNITE HERE Local 2850*

REQUEST FOR JUDICIAL NOTICE                                      Case No. 19-cv-01232-WHO

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on May 10, 2019, a copy of foregoing **REQUEST FOR JUDICIAL**

3

**NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT FOR**

**DECLARATORY AND INJUNCTIVE RELIEF** was served electronically through the

4

Notice of Filing from the Northern District of California ECF system or by regular U.S. mail

5

upon the counsel not registered with the electronic system.

6

Aaron Franklin Olsen                          Karen Ann Getman

7

Fisher & Phillips, LLP                         Kristen Mah Rogers

4747 Executive Drive                         Remcho, Johansen & Purcell, LLP

8

Suite 1000                                         1901 Harrison Street, Suite 1550

San Diego, CA 92121                          Oakland, CA 94612

9

Phone: (858) 597-9600                        510-346-6200

Fax: (858) 597-9601                           Fax: 510-346-6201

10

Email: aolsen@fisherphillips.com          Email: kgetman@rjp.com

11

                                                                    kr@rjp.com

12

13

Jeffrey Richard Thurrell                       Catha Alison Worthman

Spencer W. Waldron                           Nina Rachel Wasow

14

Fisher & Phillips LLP                          Feinberg Jackson Worthman & Wasow

2050 Main Street                               LLP

15

Suite 1000                                        2030 Addison Street, Suite 500

Irvine, CA 92614                               Berkeley, CA 94704

16

Phone: (949) 851-2424                       (510) 269-2094

Fax: (949) 851-0152                          Fax: (510) 269-7994

17

Email: jthurrell@fisherphillips.com        Email: catha@feinbergjackson.com

18

         swaldron@fisherphillips.com                 nina@feinbergjackson.com

19

20

*Attorneys for Plaintiff*                        Maria Bee

Oakland City Attorney's Office

21

One Frank H. Ogawa Plaza, 6th Fl.

Oakland, CA 94612-1999

22

(510) 238-3814

23

Email: mbee@oaklandcityattorney.org

24

*Attorneys for Defendant*

25

26

Dated:  May 10, 2019

27

Katherine Maddux

28

1

# Exhibit 1

# DAVIDOWELL BROWIL

Counselors and Attorneys at Law

January 23, 2012

**San Francisco**

595 Market Street, Suite 1400
San Francisco, California 94105
415.597.7200
Fax 415.597.7201

Barry S. Jellison (CA)
Steven L. Stemerman (CA, NV)
Richard G. McCracken (CA, NV)
W. David Holsberry (CA)
Elizabeth Ann Lawrence (CA, NV, AZ)
Andrew J. Kahn (CA, NV, AZ)
John J. Davis, Jr. (CA)
Florence E. Culp (CA, NV)
Kristin L. Martin (CA, NV, HI)
Eric B. Myers (CA, NV)
Paul L. More (CA, NV, MA)
Sarah Varela (CA, AZ)
Sarah Grossman-Swenson (CA, NV)
Adam J. Zapala (CA)
Elizabeth Q. Hinckle (CA)
Yuval Miller (CA)

Robert P. Cowell (1931-1980)

of counsel:
Philip Paul Bowe (CA)

**McCracken, Stemerman & Holsberry**

1630 S. Commerce Street, Suite A-1
Las Vegas, Nevada 89102
702.386.5107
Fax 702.386.9848

*VIA FACSIMILE (916-274-5743) & UPS OVERNIGHT*

RECEIVED

JAN 2 4 2012

OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD

Marley Hart
Executive Officer
Occupational Safety & Health Standards Board
2520 Venture Oaks Way, Suite 350
Sacramento, California 95833

RE: *Petition for Promulgation of a Safety and Health Standard for the Protection of Hotel Housekeepers*

Dear Ms. Hart:

On behalf of Petitioner UNITE HERE, please find enclosed herewith a petition for the Occupational Safety and Health Standards Board to promulgate a safety and health standard to address the occupational hazards faced by housekeepers in the hotel and hospitality industry.

Petitioner is a labor organization that represents thousands of California workers who are employed in the hotel and hospitality industry through its affiliated local unions. Petitioner is fully prepared to assist in the presentation of testimony and evidence in favor of the proposed petition. The contact persons on behalf of the Petitioner will be:

Kurt Peterson
UNITE HERE Local 11
464 South Lucas Avenue, Suite 201
Los Angeles, CA 90017
213-840-3589 (tel)
213-481-0352 (fax)
kpetersen@unitehere.org

Pamela Vossenas, MPH
Workplace Safety & Health Coordinator/Staff Epidemiologist
UNITE HERE International Union
275 Seventh Avenue, 11th Floor
New York, NY 10001
212-332-9318 (tel)
212-489-0598 (fax)
pvossenas@unitehere.org

WHS, COTWELL & BOWE, LI

Marley Hart
January 23, 2012
Page 2 of 2

Petitioner requests that public hearings in this matter be conducted in the Los Angeles area. This is because there are substantial numbers of housekeepers particularly in the Los Angeles area who have indicated their desire to participate in these proceedings as observers and, as necessary, as witnesses. Conducting public hearings in the Los Angeles-area will serve to maximize public understanding and participation in the rulemaking process, and assist the Standards Board in gathering information necessary to devising an effective rule.

Should you have any questions concerning this petition, please contact Mr. Peterson or Ms. Vossenas. You may also reach them through me.

Very truly yours,

Eric B. Myers

CC:  Marty Morgenstern
Secretary
State of California Labor & Workforce Development Agency

Christine Baker
Director
Department of Industrial Relations

Ellen Widess
Chief
Division of Occupational Safety and Health

Kurt Petersen
Pamela Vossenas

STATE OF CALIFORNIA
DIVISION OF INDUSTRIAL RELATIONS
OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD

| | | |
|---|---|---|
| UNITE HERE, | ) | Petition for the Promulgation of |
| | ) | a Safety and Health Standard |
| Petitioner | ) | For the Protection of |
| | ) | Hotel Housekeepers |

Pursuant to California Labor Code Sections 142.2, 142.3 and 142.4, UNITE HERE petitions the Occupational Safety and Health Standards Board (OSHSB) for the promulgation of a safety and health standard to address the occupational hazards faced by housekeepers in the hotel and hospitality industry.

## I.    **Introduction**

Hotel housekeepers are exposed to serious occupational risks in the course of their normal work duties.  Housekeeping duties include changing bed linen, scrubbing bathroom floors and fixtures, polishing, dusting, vacuuming, and pushing heavy linen carts.  These tasks are frequently performed under great time pressure.  The majority of housekeepers are women, people of color, and/or immigrants.  These groups have been repeatedly identified as having excessive exposure to occupational risks.[1]

Housekeepers suffer the highest injury rate among all classifications of hotel employees.[2] They are more likely to suffer musculoskeletal disorders than all other hotel employees.[3]  They are injured at a rate far exceeding the average injury rate for employees in the service sector as a whole.[4] These injuries decrease employee productivity and increase workers compensation costs for employers.  They diminish the quality of life for housekeepers.

Both the hotel industry and academic researchers have recognized hazards associated with hotel housekeeping going back several years.  More recently, worker protection agencies, including Cal-OSHA, have recommended simple solutions and systems already in place in other industries and by certain hotel employers who are investing in safe workplaces.  But existing

1

occupational safety standards do not adequately address the unique hazards that lead to high injury rates among these employees.

The proposed standard comprises a balance of performance and prescriptive requirements to address the factors that contribute to occupational injuries among housekeepers. It focuses on the opportunity for employee input and training to promote best practices in the industry. Adoption of the standard is critical to prevent the often debilitating injuries suffered by housekeepers and to contain the financial costs that these injuries impose on employers, insurers, and society-at-large.

## II.   The Growing Occupational Hazards Faced by Housekeepers

Hotel housekeeping is a physically arduous task. Workers in this industry have long confronted occupational hazards attributable to the array of cleaning tasks they perform. The situation has grown more critical in recent years. During the past decade, hotel operators have increasingly competed on the basis of the level of luxury of their room offerings. This includes luxury bedding consisting of oversize mattresses and opulent bed linen, together with other upgraded room and bathroom amenities.

One industry observer has aptly described the competition to introduce more luxurious beds and room amenities as the "bed-race."[5] The trend started in the late nineties when Starwood Hotel Corporation introduced the "Heavenly Bed" at its Westin-branded properties. Other companies followed suit with their own luxury bedding programs: Hyatt the "Grand Bed," Marriott the "Marriott Bed," Radisson the "Sleep Number Bed," Hilton the "Serenity Collection," and others. Although first confined to upper-end hotels, the new bedding and room packages are now commonplace throughout the hotel industry.

The new bedding packages are characterized by heavy, plush mattresses weighing in excess of 100 pounds. They typically feature a bulky "duvet" or quilted comforter, triple sheeting using flat (instead of a fitted) bottom sheet, up to six pillows on a bed, pillow cases that fit tightly over plump pillows, and other amenities such as decorative pillows and blankets.

Major players in California's hotel and lodging industry have acknowledged the hazards that the new bedding packages pose to housekeepers:

In March 2011, HEI Hotels & Resorts and Cadence Keen Innovations Inc. announced the introduction at HEI hotel properties of a tool designed to alleviate the physical strain and risk of injury during bedmaking. (Exhibit 1.) The statement noted the "serious and often disabling repetitive motion injuries that are associated with changing linens on beds that now weigh in excess of 115 pounds on average." It read:

> Mattress lifting, by nature, puts the back in its weakest position and the repeated lifting required for a housekeeper can stress the upper-body's muscles, joints and tendons. Without enough time between exertions for the body to heal itself, muscles, tendons and joints can be damaged. In fact, recent studies indicate housekeepers are 48% more likely to be injured than any other job in the service sector and are 50% more likely to incur serious, disabling injuries. According to Jim Stover, Vice President of Loss Prevention for AJ Gallagher Hospitality Division, repetitive motion injuries account for nearly "29% of all housekeeping injuries" and cost the hospitality industry more than $500 million in compensation claims and lost workdays every year.[6]

In 2009, Hyatt Hotels Corporation was awarded a patent for a device to assist housekeepers in the arduous task of lifting heavy mattresses to tuck sheets. (Exhibit 2.) In its patent application, the product designers (including one of Hyatt's occupational safety specialists) described the hazards of bedmaking as follows: "the process of making a bed, including lifting a bed mattress and/or tucking in bed covers between the bed mattress and box spring mattress, or other support structure, can by physically taxing." Current bed-making methods—including making beds unaided by any tool—"requir[es] strenuous bed-making activity potentially resulting in fatigue and injury, requir[es] excessive time to make the bed, lead[s] to poor quality made-beds, and/or other types of problems."[7]

In 2005, Hilton Hotels Corporation performed an ergonomic analysis on its then-new bedding package. (Exhibit 3.) The report concluded that "[t]here is excessive lifting of the bed corners to tuck in sheets and blanket;" "there is excessive handling of the sheets and blankets;" and "[t]here is excessive walking from one side of the bed to the other." The report concluded that the "new bed components added additional handling to a job that already requires repetitive activity."[8] The Hilton study advised that housekeepers should avoid spreading bed sheets by using a "fluffing" or throwing motion with their shoulders and arms, but instead should lay the sheets on the bed and unfold them. One Hilton property manager explained that the hotel did not

3

enforce these corporate recommendations because housekeepers "complain that it takes too much time to do all the unfolding." [9] As discussed below, the problem of housekeepers not having sufficient time to work safely is a major factor in housekeeper injury and is part of the employer's legal responsibility to provide a safe workplace.

In addition to equipping hotel rooms with heavier and more luxurious beds, the hotel industry has made other upgrades to room packages that pose new occupational hazards to workers. For example, hotel operators have equipped hotel bathrooms with larger and heavier bath linen. The new linen is more labor intensive to fold and handle, leading to greater and more frequent exertions. The new linen also occupies more space on the typical linen cart, requiring housekeepers to load their carts more heavily or to make more frequent trips to the linen room to replenish their stock. Hotel operators have also equipped rooms with a greater number of amenities that require cleaning. These include numerous and larger mirrored surfaces, chrome-plated amenities such as ice buckets or tissue holders, large flat-screen televisions, and other items that require greater cleaning by the housekeeper.

The combined effects of these changes have been to increase the occupational hazards associated with room cleaning, leading to a high frequency of occupational injuries among this classification of employees.

### III.    Occupational Hazards Lead to Housekeeper Injuries

Housekeeping exposes housekeepers to risk of a range of injuries. Housekeepers must frequently adopt unsafe body postures as they twist their torsos to lift mattresses, bend to gather heavy linen, or get down on their hands and knees to scrub bathroom floors. Housekeepers balance precariously on unsecure surfaces such as tub rims as they reach to scrub walls or remove shower curtains. They rush over wet surfaces or around items left on the floor. They push and turn heavily-laden linen carts over uneven surfaces. All these tasks are performed under time pressure, often with insufficient rest breaks and without proper tools, thereby increasing the likelihood of injury. They are also performed under the pressure of discipline for not performing well enough or quickly enough.

Predictably, these factors contribute to a high rate of injuries among housekeepers. Housekeepers suffer the highest overall injury rate and the highest rate of musculoskeletal injury

among all classifications of hotel employees.  Their injury rate far exceeds the average injury rate for employees in the service sector.[10]

The following examples taken from the OSHA 300 logs of a Los Angeles-area Hyatt property from 2006 through part of 2010 demonstrate the spectrum of injuries that housekeepers can suffer and illustrate the circumstances that lead to them:[11]

| Date of injury | Description | In the job transfer or restriction (days) | Away from work (days) |
|---|---|---|---|
| 8/29/2010 | *Left ankle sprain due to missing a step on stairs* | | 2 |
| 5/25/2010 | *Right wrist sprain, due to lifting a mattress* | | 36 |
| 4/25/2010 | *Contusion on left side of face fell on stool* | | |
| 4/25/2010 | *Contusion left hand due to cleaning a tub* | 7 | |
| 2/6/2010 | *Left knee contusion/strain due to slip and fall* | | 205 |
| 1/14/2010 | *Left shoulder strain due to improper lifting* | 5 | 18 |
| 8/5/2009 | *Lumbar and right knee strain from bending while cleaning guestroom* | 29 | |
| 6/1/2009 | *Overuse syndrome of both hands - from making beds* | 54 | |
| 3/24/2009 | *L knee strain from repetitive bending and walking* | 57 | |
| 3/15/2009 | *Contusion to L elbow - vacuuming and hit elbow on the door* | 72 | |
| 3/11/2009 | *Left arm and left wrist sprain - struck with on cart linen hook* | 110 | |
| 1/10/2009 | *Right knee contusion tripped over sheets* | | |
| 12/17/2008 | *EE picked up hair from floor and cut her 3rd finger with glass that was on the floor* | 12 | |

| | | | |
|---|---|---|---|
| 12/10/2008 | *EE tried locking panel door but was too hard to move. She closed the panel door and sprained her L thumb.* | 6 | |
| 10/14/2008 | *Sprain to the left wrist due to lifting and tucking in bed sheets* | 14 | |
| 9/21/2008 | *Contusion to the left knee from hitting a chair while making the bed* | 22 | |
| 8/24/2008 | *Fracture to right 4th finger from being caught in the door* | 42 | |
| 8/21/2008 | *Fracture to the left foot from tripping and rolling down the ramp twice* | | 105 |
| 8/10/2008 | *Sprain/strain to the left knee due to making a bed and cleaning the bathtub* | 39 | |
| 6/20/2008 | *Contusion on head from entry door* | 10 | |
| 5/12/2008 | *Puncture to left thumb from a small needle stick to a piece of tape at the bottom of trash can* | 0 | |
| 1/23/2008 | *Left foot sprain from having phone cord wrapped around ankle* | 35 | |
| 12/27/2007 | *Kneeling on the floor making a bed and strained her left ankle* | 4 | |
| 12/12/2007 | *Making beds and caused a strain in her left hand* | 10 | |
| 12/12/2007 | *Stocking the Housekeeping carts and a very small object cut under her left ring finger fingernail* | 0 | |
| 12/10/2007 | *Both wrists strain from doing normal duties* | 21 | |
| 12/7/2007 | *Head contusion from door hitting her* | 4 | |
| 11/21/2007 | *Pushing a chart and sprained her left shoulder* | 40 | |
| 10/19/2007 | *Lumbar strain due to improper moving of a bed* | 1 | |
| 9/24/2007 | *Left eye bone contusion due to hitting toilet handle* | 1 | |
| 9/7/2007 | *Strain/sprain right arm due to lifting a mattress* | 17 | |

6

| | | | |
|---|---|---|---|
| 9/7/2007 | *R knee sprain due to kneeling* | 17 | |
| 8/31/2007 | *Low back strain due to improper lifting of mattress* | 25 | |
| 8/29/2007 | *Fell in AB stairwell north side by laundry. Resulted in a low back strain* | | |
| 6/30/2007 | *Needle stick injury* | | |
| 5/22/2007 | *Sprain right wrist while tucking in the bed sheets* | 54 | 126 |
| 4/29/2007 | *Trip and fell backwards on a vacuum cord.  Tail bone contusion* | 58 | |
| 4/27/2007 | *Strain to right knee while going down the stairs* | 7 | |
| 4/11/2007 | *Strain right shoulder while sorting linen* | 14 | |
| 4/10/2007 | *Strain left foot by walking prolonged time and bending* | 15 | |
| 3/11/2007 | *Contusion left knee while moving a rollaway* | 0 | |
| 2/22/2007 | *Strain left leg and hip while making the beds* | 14 | 166 |
| 2/7/2007 | *Strain/right shoulder/arm repetitive work* | 180 | |
| 1/24/2007 | *Repetitive motion injury right wrist/hand* | 48 | |
| 1/16/2007 | *Repetitive motion injury right shoulder strain* | 174 | 6 |
| 1/9/2007 | *Lumbar strain/left knee sprain due to removing sheets* | 165 | |
| 12/17/2006 | *3rd finger, left hand sprain* | 19 | |
| 12/8/2006 | *Lumbar sprain and right wrist sprain due to improper lifting of the mattress* | 23 | |
| 11/27/2006 | *EE was drying the tub and slipped resulting in a sprain to the right foot* | 8 | |
| 11/2/2006 | *Sprain due to improper lifting of a mattress* | 2 | |

7

| | | | |
|---|---|---|---|
| 10/18/2006 | *EE hit an ottoman and has a contusion and sprain* | 2 | |
| 9/21/2006 | *EE slipped in bath and has a lumbar sprain* | 6 | |
| 8/20/2006 | *R wrist sprain due to lifting a mattress improperly* | 5 | |
| 8/18/2006 | *R wrist sprain due to lifting a mattress improperly* | 10 | |
| 8/2/2006 | *Mild R wrist sprain due to improper lifting* | 12 | |
| 7/27/2006 | *EE was changing the trash and got pricked with a needle.  Puncture of skin on left index finger* | 0 | |
| 6/22/2006 | *R thumb sprain due to slip and fall* | 4 | |
| 6/20/2006 | *R wrist sprain due to lifting a mattress improperly* | 5 | |
| 6/7/2006 | *Carpel Tunnel syndrome from repetitive motion* | 38 | 88 |
| 3/28/2006 | *Sprain/strain due to a fall in the elevator* | | 14 |
| 3/24/2006 | *Lumbar sprain due to cleaning a bathroom* | 1 | |
| 3/9/2006 | *Lumbar sprain from lifting mattress* | 15 | |
| 2/11/2006 | *Right wrist sprain, due to lifting a mattress* | 41 | |
| 1/30/2006 | *Laceration of left thumb due to guest razor on sink* | 0 | |

Reviewing OSHA 300 logs does not fully disclose the scope of the problem because many housekeepers suffer persistent pain that they do not report as injuries.  But the prevalence of pain and discomfort among employees can lead to a loss of productivity and job satisfaction that impose substantial costs on both employees and employers alike.

8

## IV.   Scientific Recognition of the Occupational Hazards of Housekeeping

A growing body of academic literature deriving from scientific fields ranging from epidemiology to human biomechanics has shed significant light on the occupational hazards of hotel housekeeping.

- A 2010 peer-reviewed study published in the *American Journal of Industrial* examined the incidence of hotel worker injury at fifty properties operated by five major hotel companies.[12]   The study determined that housekeepers suffer the highest rate of injuries of all kinds (7.9 per 100 worker-years) and the highest rate of musculoskeletal disorders (3.2 per 100 worker-years) among all classifications of hotel workers.  (Exhibit 4.)

- In a 1999 study, researchers at the University of California at San Francisco conducted a survey of over two hundred room cleaners.  They reported that more than 75% of room cleaners experienced work-related pain.  Of those reporting pain, the pain was severe enough for 73% to visit a doctor and 53% to take time off work to recover.[13]

- The San Francisco study's results were reaffirmed in a 2002 survey of nearly one thousand Las Vegas room cleaners.[14]  This study found that in a given month:
  - 95% of housekeepers reported physical pain;
  - 47% of housekeepers reported severe or very severe physical pain;
  - Severe or very severe pain was most often reported in the lower back (63%), followed by upper back (59%) and neck (43%);
  - 84% of housekeepers reported having taken medication for pain suffered at work;
  - 83% of the participants reported constant time pressure.

- An Australian government-sponsored evaluation of hotel work showed that the physical stress on workers' backs from hotel bedmaking tasks is equivalent to the "ultimate compressive strength" for lower back movements defined in the study as "the limits of human tolerance."  The researchers argued, "Where possible, tasks should be performed slowly, without rapid movement."[15]

- Dr. William Marras, Professor and Director of the Institute for Ergonomics at Ohio State University, examined the hotel housekeeper job using a unique technology that combines both the tasks performed and the speed at which they must be performed into one analysis.  Using a patented tool called the Lumbar Motion Monitor, he found that the

9

likelihood that a housekeeper is at high risk for lumbar injury is greater than any of the 20 manufacturing jobs—including auto and truck assembly—that he also studied. The risk also exceeds that of nursing/patient handing.[16]

- The Canadian Center for Occupational Safety and Health, the federal government's primary information center on workplace safety, reports that:

> A hotel housekeeper changes body positions every three seconds while cleaning a room. If we assume that the average cleaning time for each room is twenty-five minutes, we can estimate that a housekeeper assumes 8,000 different body postures every shift. In addition, forceful movements while using awkward body positions include lifting mattresses, cleaning tiles, and vacuuming every shift. Housekeeping is a physically demanding and very tiring job.[17]

- In Canada, the British Columbia Workers Compensation Board found that among hotel workers, "overexertion" was responsible for 27% of worker compensation claims, the single largest cause. It also found that housekeepers accounted for 39% of overexertion cases—more than any other job title.[18]

CalOSHA and federal OSHA have recognized the scope of the problem through both enforcement actions and consultative services.

- In 2011, Cal-OSHA issued hazard alert memoranda to the Hyatt Century Plaza and the Hyatt Andaz—West Hollywood in Los Angeles, California, after identifying instances of housekeepers who suffered injuries while making beds and cleaning bathroom floors on hands and knees. Cal-OSHA recommended that Hyatt consider implementing fitted sheets and tools among other measures to prevent such injuries to housekeepers. (Exhibit 5.)

- In 2011, the Hawaii Occupational Safety and Health Division (HIOSH) issued a hazard alert letter to the Hyatt Regency Waikiki Beach Resort & Spa. (Exhibit 6.) The letter was based upon an ergonomic evaluation of the room cleaning operation. It identifies several of the control options that are set forth in this proposed standard including motorized carts.

10

- Cal-OSHA issued citations to at least two hotel operators alleging violations of the repetitive motion standard, Title 8, Section 5110.  These include the Hilton LAX in Los Angeles in 2007 and the Hyatt Fisherman's Wharf in San Francisco in 2011.
- Cal-OSHA Consultation Service/Research and Education Unit has recognized many of the hazards associated with hotel housekeeping in its publication *Working Safer and Easier for Janitors, Custodians, and Housekeepers* (California Dept of Industrial Relations 2005) (Select pages attached as Exhibit 7.)  It identifies several of the controls set forth in this proposed standard.

## V.     The Hazards That an Industry-Specific Housekeeping Standard Should Address

A comprehensive standard is necessary to mitigate the industry specific hazards that housekeepers confront.  The standard must address the following issues:  safe bedmaking, safe cleaning practices for bathrooms and guest rooms, workload and work pacing, and safe linen carts.  It must also provide opportunities for employee involvement, training, protection of employee rights, access to information, and other elements common to occupational health standards.  The proposed standard accomplishes all of these objectives.

### A.  Safe bed-making practices

To make a bed, the housekeeper first removes dirty linens, gathering them on the bed and lifting them off.  This frequently requires the housekeeper to separate the heavy duvet from the entangled bed sheets by grasping and pulling one away from the other.  These duvets can weigh 14 pounds or more, are bulky, and require great exertion to manipulate.  The housekeeper removes dirty pillow case by grasping the pillows firmly and pulling them away from the case grasped firmly in the other hand, a motion which housekeepers note causes pain in the hands and fingers.  The housekeeper applies clean linen onto the bed in layers, with each layer tucked in beneath the heavy mattress on both sides and at the foot of the bed with "hospital style" corners.  First, she applies a bottom sheet, often snapping it out onto the bed using a throwing motion, spreading it, and pulling it so that it hangs from the edges of the bed.  Many hotels require hospital folds that must be tucked tightly beneath the mattress.  In order to tuck the linen, the housekeeper typically lifts the heavy mattress at various places with one arm, and—as she is doing so—twisting and driving the linen beneath the mattress using her other arm and hand.

11

After the bottom sheet is applied, the housekeeper applies a second sheet, which is spread, pulled and tucked in the same manner as the bottom sheet. The housekeeper then lays on the duvet and a top covering, which at some hotels are spread, pulled and tucked beneath the mattress. The housekeeper applies new pillow linen by grasping the pillow in some manner (sometime by the knees) and pushing or pulling the tight case over the pillow until it fits. The housekeeper applies the pillows and the decorative blanket to the assembled bed. The task of bed-making involves numerous lifts using the back and waist, and continuous exertions using the arms, shoulders, hips, wrists and hands.

The proposed standard addresses the hazards associated with bedmaking in a number of ways. It requires employers to perform a hazard assessment evaluation by an appropriately trained professional to identify hazards and to consider proper engineering and administrative controls with respect to bedmaking. It requires employers to adopt a safe housekeeping plan to address these hazards. It requires all employers to adhere to certain practices to reduce the exposure to bedmaking hazards. These consist of the following:

- Elimination of unsafe bedmaking practices. The proposed standard eliminates the practice of laying on and removing bed linen through the use of forceful exertions and extended, awkward postures of the lower and upper extremities. It minimizes the number of mattress lifts necessary to change the bed as described below.

- Use of a properly sized fitted bottom sheet. Some hotels use flat sheets and require housekeepers to make "hospital folds" instead of using a fitted bottom sheet. The use of a properly sized fitted bottom sheet eliminates as many as four to eight mattress lifts per bed change, reduces awkward postures associated with mattress lifting, and avoids unnecessary manipulation of bed linen to make hospital corners. Cal-OSHA and HIOSH have both recommended the use of flat sheets as bottom sheets. [19]

- Elimination of practice of tucking top duvet assembly under the mattress. Some hotels that use duvet/comforters require housekeepers to tuck the duvet under the mattress. Allowing the duvet assembly and top sheet to hang off the side of the beds eliminates several mattress lifts per bed change and reduces the risk of injury

12

to fingers, hands and wrists while tucking the duvet.  It is a stylistic choice already adopted by many hotel operators.[20]

- Elimination of the practice of shaking the duvet to spread it out on the bed. Duvets can weigh over 14 pounds and are often applied with the use of several snapping movements to fluff them evenly on the bed, causing strain to the shoulders and arms. The duvets are required to be placed on the bed and unfolded.

- Elimination of tight-fitting pillow cases.  Housekeepers must frequently stuff pillows into tight-fitting pillow cases or tug at pillows to remove them from the cases.  There are as many as six pillows on a bed in luxury bedding programs. Pillow cases should be sized so that they may be readily removed and put on.[21]

- Requirement for adequate clearance between beds and obstacles that prevent housekeepers from adopting neutral positions in changing the bed.  Beds positioned too close to walls or furniture cause housekeepers to perform lifts or manipulate linen with their trunks twisted in awkward positions.  Adequate clearances should be maintained to avoid such body mechanics. [22]   Adequate clearance is also required for the placement of rollaway beds that result in bedmaking in tight spaces.

B.  Safe cleaning practices for bathrooms and guest rooms

To clean bathrooms, the housekeeper must scrub the floor, shower walls and glass doors, tub, toilet and sink.  In order to reach high areas, the housekeeper extends her arms high while performing scrubbing motions, sometimes balancing preciously on the tub, sink or toilet.  In order to clean low areas, the housekeeper often bends her back or gets down on hands and knees, again using reaching and scrubbing motions with her arms.  At times, housekeepers do not have long-handled tools such as mops or scrub brushes to perform their work, forcing them to get down on their hands and knees to clean the floors or climb up on fixtures to clean the shower walls.  Even when they are provided with the option to use a swiffer or similar device, housekeepers often feel compelled to work on hands and knees for fear of discipline should they miss any item that needs cleaning.

To clean the guest room, the housekeeper must engage in a diversity of actions.  She may have to move furniture to their correct location.  She may have to move a rollaway bed to its

proper position. She cleans glass surfaces such as mirrors, pictures, patio doors, and large screen televisions by reaching with her arms and performing a polishing motion. She cleans amenities such as trays and holders. She cleans table and desk surfaces and polishes wood armoires. She cleans other room amenities such as telephones, remote control devices, and other items. She vacuums the entire floor surface, often having to move furniture along the way.

Bathroom and room cleaning exposes housekeepers to numerous hazards as they adopt awkward body mechanics to clean hard-to-reach areas, particularly when they do so without the use of proper equipment. The proposed standard addresses these hazards by eliminating the requirement for housekeepers to stoop, kneel, reach, or adopt other awkward body positions to clean bathrooms and guest rooms. Instead, it requires the availability of appropriately designed safe housekeeping equipment, including ergonomically designed long reach, adjustable tools, dusters and vacuum cleaners. In doing so, the proposed standard adopts the recommendations of Cal-OSHA and HIOSH for the elimination of unsafe cleaning practices and the utilization of appropriately designed equipment.[23]

C. Safe workload and work pacing

Work pacing is a significant factor in the hazards of housekeeping. Tasks that may be less hazardous when performed at a moderated pace become more hazardous when performed under intense time pressure. The introduction of new bedding and amenity packages has frequently exacerbated these time pressures because it now requires more work to clean the same number of rooms. Intense time demands increase the risk of injury because housekeepers do not have the time to adopt safe body positions. Housekeepers also face an unacceptable risk of injury caused by slips, trip and falls [to same level], and harmful contact with objects owing to accelerated work pacing. Pushing heavy linen carts down hall ways and onto and off of elevators is another source of injury that is exacerbated by time demands.

Despite the increasing difficulty of cleaning a hotel room brought on by the new bed and room amenities, the industry's response has been inconsistent. While some employers have modified work expectations to account for the increase in the complexity of room cleaning tasks, other employers have implemented cleaning protocols that have actually increased the number of rooms and beds that housekeepers must clean on a daily basis. For example, under its so-called "Refresh Program," Hyatt requires housekeepers at some of its properties to clean as many as 30

rooms per day.  This is as much as twice the top number of rooms that housekeepers clean at hotels where such programs are not in place.

The proposed standard addresses the need for safe work pacing in two ways.  First, it requires employees to perform a written evaluation with the opportunity for employee input to determine what the appropriate expectation should be for room credits considering an array of factors, including the number of check out versus stay over rooms, the number of rooms requiring additional work, and other factors that contribute to work load variation.  The evaluation will be repeated when conditions such as mattress style, linen style, room amenities or other changes to the room layout or complement are effectuated.  The proposed standard adopts the recommendation of HIOSH in this regard.[24]

Second, the proposed standard also places a ceiling of 5,000 square footage of total room space that an employer may regularly assign housekeepers to clean during an 8-hour shift.  This requirement is prorated for housekeepers who work shifts of less than 8-hours, and is reduced when the housekeeper has additional factors such as a high number of checkout rooms or rooms with cots and rollaway beds to clean.  This square footage equates to 15 rooms for hotels with rooms sizes of 325 square feet.  For many employers, this limitation will impose no practical difference since the work assignments are already at or below this threshold.  For a few, it will eliminate the practice of assigning room quotas that require housekeepers regularly to clean in excess of 20 and as many as 30 rooms in a day.  This will allow housekeepers exposed to these conditions greater time to clean rooms safely while limiting their exposure to hazards.

D.  Safe linen carts

Housekeepers use linen carts to transport supplies to the rooms that they will clean.  They supply their carts in a linen room.  This requires folding of numerous items of bath and bed linen so that the necessary work material fits tightly onto the cart.  Other cleaning items are loaded onto the cart as well, such as vacuum cleaners, dusters, rags, chemical sprays and other cleaning supplies. The cart also transports guest items such as soaps, shampoos, and other room amenities. Time pressure creates an incentive for the housekeeper to load the cart as full as possible to avoid having to make repeat trips from the guest room to the linen room to replenish supplies. Linen carts, fully loaded, are heavy and cumbersome to wheel over carpeted surfaces.  The new linen program has added a significant burden in this regard because the larger and thicker linens

15

take up more space than the old linen, thus requiring hotels to provide larger linen carts (with added weight), over-loading their carts, or hurrying back and forth to the linen room more often. The hazard of cart handling is increased by the ongoing problem of lack of wheel maintenance and the use of poorly designed carts—constructed of heavy materials, either too high or too low, fixed shelving—which add additional risks as housekeepers repeatedly bend to find items on the shelves.

The proposed standard addresses the hazard by requiring employers to use motorized linen carts, a recommendation made by HIOSH.[25] Available on the market and in use at hotels for many years, motorized linen carts eliminate the exertion involved in pushing linen carts over carpeted areas and ease the effort to turn them around as needed. These carts are highly maneuverable and easily steered by housekeepers and come with the latest ergonomic features such as adjustable shelving and built-in trash receptacles. Included in the Cal-OSHA citation against the Hyatt San Francisco Fisherman's Wharf, was a recommendation for improved cart design.[26]

E.  Monitoring, Training, and Employee Rights

The proposed standard emphasizes the importance of three factors to reduce risk of injuries among housekeepers.

First, it requires the employer to develop, implement, and monitor a safe housekeeping plan to reduce injuries that is based on a housekeeping job hazard assessment. It requires the employer to obtain input from housekeepers both in the development and the implementation of the plan. It establishes the requirement for a safe housekeeping committee to conduct annual evaluations of the employer's performance under the plan. It requires the identification of a competent person who is especially trained to address hazards that housekeepers face.

Second, the proposed standard emphasizes employee training into the requirements of the standard; the employer's safe housekeeping plan; the risk factors for housekeeping-related injuries and injury prevention; safe body mechanics for housekeepers; the use of safeworking practices; use of safe housekeeping equipment; and reporting protocols.

Third, the proposed standard guarantees housekeepers specific rights not to perform housekeeping duties using unsafe work practices as defined in the standard, as well as rights to

16

bring forward concerns to the employer or to a Cal-OSHA inspector during the course of an investigation without threat or fear of retaliation.

## VI.   CONCLUSION

The OSHSB should adopt the proposed standard that is included here as Appendix A. The proposed standard addresses the hazards discussed above through an appropriate mixture of performance standards and prescriptive requirements.  It involves employee input and involvement in the development of safe housekeeping programs, and it provides for appropriate employee training.  The standard will serve to reduce the risk of injuries suffered by housekeepers, thereby improving their productivity and wellbeing.  It will reduce the financial costs that these injuries impose upon employers, insurers and society-at-large.  It should be adopted.

---

[1] Frumkin H, Pransky G., Special Populations in Occupational Health, *Occup Med* 14(3), 479-484 (1999); Frumkin H, Walker ED, Friedman-Jimenez G., Minority workers and communities. *Occup Med* 14(3): 495-517 (1999); Improving Health and Safety Conditions for California's Immigrant Worker, Report and Recommendations of the California Working Immigrant Safety and Health Coalition, Berkeley, California (Nov. 2002); Kauppinen K, Kumpulainen R, Copsey S., Gender issues in safety and health at work--A review. Finland:  European Agency for Safety and Health at Work (2003); Messing K., Physical exposures in work commonly done by women. *Can J Appl Physiol* 29(5): 639-656 (2004); National Institute for Occupational Safety and Health, National Occupational Research Agenda:  Special Populations at Risk.  Cincinnati, OH: DHHS (NIOSH) Publication No. 96-115 (1996); Stellman JM, Women workers:  The social construction of a special population.  *Occup Med* 14(3):  559-580 (1999); Treaster DE, Burr D, Gender differences in prevalence of upper extremity musculoskeletal disorders. *Ergonomics* 47(5): 495-526 (2004).

[2] Buchanan S, Vossenas P, Krause N, Moriarty J, Frumin E, Shimek J, Mirer F, Orris P, Punnett L.  Occupational injury disparities in the US hotel industry.  *American Journal of Industrial Medicine.* 53: 116-125 (2010).  The study calculated the housekeeper injury rate at 7.9 per 100 worker-years over a three-year period.  The injury rate for hotel workers was 5.8 per 100 FTEs during 2004, the mid-year of the dataset used in the study.

[3] *Id.*

[4] The average service sector injury rate was 4.2 per 100 FTEs in 2004.

[5] Gabi Bauman, *The Bed Race, Hotel Companies Everlasting Pursuit of Differentiation*, HVS International (April 13, 2006).

[6] Hotel Interactive, *HEI Hotels & Resorts Raises its Safety Standards Literally With the Bed MadeEZ Mattress Lifter By CKI Solutions—HEI Institutes New Bed Making Safety Guidelines Using CKI Solution's Innovative Bed MadeEZ Mattress Lifter, Designed to Alleviate the Strain and Risk of Injury While Making the Bed* (March 24, 2011), available at http://www.hotelinteractive.com/article.aspx?articleid=20151. *See also* http://www.facebook.com/CkiSolutions?sk=app_7146470109.

[7] United States Patent 7,596,822, assigned October 6, 2009 to Hyatt Corporation of Chicago, IL, and PreCare, Inc. of Sonoma, CA.

[8] Memorandum from Hilton Corporation to Hilton properties, April 28, 2005.

[9] October 24, 2007 letter from Hilton LAX Human Resource Director to Cal-OSHA.

[10] Buchanan, *et al.*

[11] The cases descriptions were recorded on OSHA 300 logs from the Hyatt Regency Century Plaza in Los Angeles, California from January 2006 through August 2010.

[12] Buchanan S, Vossenas P, Krause N, Moriarty J, Frumin E, Shimek J, Mirer F, Orris P, Punnett L. Occupational injury disparities in the US hotel industry. *American Journal of Industrial Medicine.* 53: 116-125 (2010).

[13] Lee PT, Krause N. The impact of a worker health study on working conditions. *Journal of Public Health Policy.* 2002; 23 (3): 268-85.

[14] Krause N, Scherzer T, Rugulies R. Physical workload, work intensification and prevalence of pain in low wage workers: results from a participatory research project with hotel room cleaners in Las Vegas. *American Journal of Industrial Medicine.* 2005. 48: 326-37.

[15] Milburn, PD, Barrett, RS. *Lumbosacral loads in bedmaking. Applied Ergonomics.* 1999; 30: 263-73.

[16] Marras, WS. Filed applications of the lumbar motion monitor. 2006. *Biodynamics Laboratory, Department of Industrial and Systems Engineering,* Ohio State University. Available at http://biodynamics.osu.edu/research.html#tools; downloaded Aril 2, 2006.

[17] Canadian Centre for Occupational Health and Safety. *Occupations & workplaces: Hotel housekeeping.* Available at: http://www.ccohs.ca/oshanswers/occup_workplace/hotel_ housekeeping.html.

[18] Worker's Compensation Board of British Columbia. *Preventing Injuries to Hotel and Restaurant Workers.* 1998.

[19] *See* Cal-OSHA Memoranda to Hyatt Regency Century Plaza and Hyatt Andaz—West Hollywood; HIOSH letter to Hyatt Regency Waikiki, p. 7; Cal-OSHA Consultation Services, *Working Safer and Easier for Custodians, Janitors and Housekeepers* (Cal-OSHA, 2005), p. 29.

[20] HIOSH letter to Hyatt Regency Waikiki, p. 7.

[21] *Id.*, p. 4.

[22] *Id.*, p. 6.

[23] Cal-OSHA Memoranda to Hyatt Regency Century Plaza and Hyatt Andaz—West Hollywood; HIOSH letter to Hyatt Regency Waikiki, p. 3; *Working Safer and Easier for Custodians, Janitors and Housekeepers*, pp. 23-24, 27-28.

[24] HIOSH letter to Hyatt Regency Waikiki, p. 9.

[25] HIOSH letter to Hyatt Regency Waikiki, p. 8.

[26] Inspection Number 312690969, Citation 2, Item 1.

# Attachment

# A

<u>**Proposed Standard**</u>

**§ 0001        Scope and application**

This Article applies to any person, firm, corporation or other entity that operates or manages a hotel, motel, inn, or other short-term or transitional lodging with more than twenty-five guest rooms and that employs housekeepers to clean such rooms.

This Article applies to any operator, owner or manager of such establishments described above, whether the operator, owner or manager directly employs housekeeping employees or contracts for such employees through another entity such as a leasing firm or temporary agency.

Entities covered by this standard shall be referred to in this section as "employer."

**§ 0002        Definitions**

**Safe housekeeping practices**. "Safe housekeeping practices" refers to processes that use a combination of hazard controls such as engineering and administrative controls including, but not limited to, safe housekeeping equipment; safe work practices; safe work loads; and work organization methods to reduce musculoskeletal and other injuries as a result of hotel room cleaning.

**Safe housekeeping equipment**. "Safe housekeeping equipment" includes adjustable long-handled cleaning tools such as mops, scrubbers and dusters; fitted sheets; laundry hampers on wheels; motorized carts; carts with adjustable-height shelves in carts; ergonomically-designed vacuum cleaners and other equipment that reduces awkward postures, forceful lifting, forceful exertions, and extended reaches.

**Housekeeping**. "Housekeeping" refers to the activity of cleaning guest rooms, including bed-making, room cleaning, bathroom cleaning, furniture moving, stocking and transporting linen, supplies and cleaning tools (e.g. dusters, vacuum cleaners) on linen carts, and related activities such as scrubbing, dusting, mopping, polishing, vacuuming, and folding and unfolding linen.

**Housekeeping employees**. "Housekeeping employees" are employees whose assigned tasks includes cleaning guest rooms, or assisting those who clean guest rooms, and includes such job titles as housekeepers, maids, room attendants, guest services attendants, runners, housemen, inspectors and inspectresses.

**Safe bedmaking practices**. "Safe bedmaking practices" means bed making practices that allow

1

for the application and removal of bed linens through the use of neutral body postures by the housekeeping employee or which reduce the need for forceful exertions and extended, awkward postures of the upper and lower extremities, shoulder and/or trunk to perform these actions.

**Checkout room**.  "Checkout rooms" mean rooms in which the guest staying the prior night has departed or will depart, and which must be cleaned for a new incoming guest.

**Stayover room**.  "Stayover rooms" mean rooms in which the guest staying the prior night has not departed or will not depart during the ensuing day.

**High hazard room**.  "High hazard rooms" mean rooms that due to the size and purpose of the room contain additional hazards than a standard guest room with a king-size bed, e.g. a room with two double beds or suites that include additional furniture such as sofa beds or additional square footage that contains kitchens, extra bathrooms, floor space or patios all of which require extra work.

**Unsafe bedmaking practices**.  "Unsafe bedmaking practices" means the use of forceful exertions and extended, awkward postures of the upper and lower extremities, shoulder and/or trunk to remove or apply bed linens to beds.  It also includes stylistic practices that result in the aforementioned hazards such as tucking duvets beneath the mattress instead of allowing them to hang freely off the bed.

**Safe Vacuuming Practice**. "Safe vacuuming practice" means that housekeepers will have sufficient time to clean a room that allows them to move furniture first and then vacuum so as to prevent unsafe straining and postures as a result of combining furniture moving tasks with vacuuming tasks. Housekeepers will be trained in the correct postures for use with vacuums and as needed, vacuum models that are ergonomically-designed will be the preferred safe equipment purchased for this task.

### § 0003      Housekeeping Job Hazard Assessment

(a)      Each employer shall perform a written evaluation of the tasks involved in housekeeping to identify potential hazards that may cause housekeepers to suffer musculoskeletal injuries and other foreseeable injuries.  The evaluation shall include an identification of those tasks that require housekeepers regularly to engage in the following body mechanics:  bending of the back, bending of the trunk, twisting of the back, twisting of the trunk, side to side motion of the back and/or trunk, forward extension of the arms, upward or lower extension of the arms, kneeling, squatting, forceful exertions and lifting, pushing heavy objects, and pulling heavy objects. The evaluation shall identify engineering and/or administrative controls that the employer has determined are

2

necessary or appropriate to mitigate the risk of injury posed by the identified tasks. The evaluation shall be performed by a person professionally qualified to identify hazards known to cause musculoskeletal disorder injuries (MSDs).

(b)     Such an evaluation shall consider engineering and/or administrative controls such as but not limited to:

    (i)     workload and work organization;

    (ii)    safe housekeeping equipment;

    (iii)   elimination of unsafe bedmaking and room cleaning practices;

    (iv)    evaluation of design features and weights of materials housekeepers work with daily such as vacuum cleaners, duvets, number of bed pillows in consideration of increased risk of musculoskeletal disorder such factors pose;

    (v)     implementation of safe housekeeping practices; and

    (vi)    recommendations of injury control experts knowledgeable about causation and control of musculoskeletal injuries and other related injuries of housekeeping work.

### § 0004     Safe Housekeeping Plan to Reduce Injuries

As part of the injury and illness prevent programs required by Section 3203, employers shall adopt a written injury prevention plan for the protection of housekeeping employees. This plan shall:

(a)     Incorporate the written hazard assessment described in Section 0003.

(b)     Provide for the purchase, use, and maintenance of safe housekeeping equipment in an adequate supply and in adequate condition; and identify the procedure for housekeeping employees to report lack of safe housekeeping equipment or the need for repairs.

(c)     Identify a timeline for regular training of housekeeping employee(s) per the requirements described in Section 0009.

(d)     Require the employer to obtain housekeeping employee input on:

    (i)     identification of hazards of hotel housekeeping work;

    (ii)    selection of safe housekeeping practices and safe housekeeping equipment appropriate to address the hazards identified; and

    (iii)   continued compliance with section (b) above.

3

(e)    Require the creation of a Safe Housekeeping Committee that will:

    (i)    meet quarterly with advanced notice to all housekeeping employees;

    (ii)    make recommendations on the purchase, use, and maintenance of an adequate supply of appropriate safe housekeeping equipment;

    (iii)    make recommendations on training of housekeepers and other affected workers on use of safe housekeeping equipment and on safe housekeeping practices;

    (iv)    conduct annual evaluations of the employer's performance under the safe housekeeping plan and recommend changes thereto; and

    (v)    when remodeling of hotel rooms is planned by the hotel, evaluate if new designs will allow for safe housekeeping practices and work organization methods or if such designs will increase housekeeping work hazards; if there is a collective bargaining agent, then agent shall be notified at the same time as the safe housekeeping committee.

(f)    Require the identification of a "competent person".  A competent person shall be a housekeeping employee who is knowledgeable about this standard and about the employer's Safe Housekeeping Plan; who is capable of identifying site-specific workplace hazards; who has received specialized training on the types of injuries suffered by housekeepers and the adoption of safe housekeeping and bedmaking practices to avoid such injuries; and who has authority to take corrective actions when unsafe practices are identified.  The competent person shall be a member of the Safe Housekeeping Committee.

## § 0005    Requirements:

In addition to complying with its safe housekeeping plan described in section 0004, covered employees shall also comply with the following requirements:

(a)    Housekeepers shall not be required to regularly clean more than 5,000 square footage of room space in an eight hour workday.  Square footage refers to the entire square footage of the room, including areas beneath beds and furniture, as measured by the perimeter dimensions of the room.  For any room cleaner working less than eight full hours per day, this maximum floor space shall be prorated evenly according to the actual number of hours worked.  When a room cleaner is assigned in an eight-hour workday to clean any combination of seven or more checkout rooms or rooms with additional beds such as cots or rollaways, this maximum floorspace shall be reduced by 500 square feet for each such checkout or additional bedroom over six.

(b)    Housekeepers shall not be required to clean bathroom floors, toilets, walls and other

4

bathroom surfaces in a stooped, kneeling, extended reach, or other awkward body position.  Appropriately designed safe housekeeping equipment shall be available for use at all times.

(c)     Housekeepers shall not be required to stand on any uneven surface to perform cleaning tasks, including tub rims, sink tops or toilets.  Appropriately designed safe housekeeping equipment shall be available for use at all times.

(d)     Housekeepers shall not be required to clean guest room walls, mirrors, headboards, and other surfaces in a stooped, kneeling, extended reach, or other awkward body position.  Appropriately designed safe housekeeping equipment shall be available for use at all times.  Safe vacuuming practices will be applied at all times.

(e)     Housekeepers shall not be required to lift bed mattresses in a trunk-twisted or other awkward body position.  Adequate clearance between the side of the bed and other surfaces such as walls and furniture shall be maintained to eliminate such practice.

(f)     A fitted sheet shall be used in lieu of a flat sheet as the bottom sheet on all mattresses.

(g)     Housekeepers shall not be required to use unsafe bedmaking practices in order to complete their room quota. Unsafe bedmaking practices include the use of forceful exertions and extended, awkward postures of the upper and lower extremities, shoulder and/or trunk to remove or apply bed linens to beds.  It shall be the sole responsibility of the hotel employer and its managers, supervisors, and housekeeping supervisors to ensure that safe bedmaking practices are in use. A safe bedmaking practice includes that bed linens should be regularly laid on the bed and pulled towards the edge of the bed rather than regularly shaken out using hands and arms.  Bed linens should be removed in a similar process by having the linens removed from one side of the bed by worker standing at same side of the bed, then walk to the opposite side of the bed and remove the linens and finish by standing at the foot of the bed to gather up the linens in a bundle while maintaining neutral postures. This prevents the unsafe practice of standing at one side of the bed and over reaching by the trunk and arms using forceful movements to tug the sheets off the bed.

(h)     Duvets and comforters (or similar top covering) shall not be shaken out but shall be placed on the bed and unfolded.  Duvets, comforters (or similar top covering) and top sheets shall be allowed to hang off the sides of beds and shall not be tucked beneath the mattress

(i)     Pillows shall not be encased in tight-fitting pillow cases where more than minimal force is required to remove the pillow from the case or to insert the pillow into the case.  Pillow cases shall be sized so that pillows are easily removed and inserted into the case.

5

(j)     Motorized or self-propelled linen carts shall be provided. Linen carts shall be kept in good working condition to ensure that wheels function properly with adjustments made for traversing carpeting.  Linen carts shall include adjustable shelves.

(k)     Housekeepers shall not be required to move heavy furniture by oneself such as armoires, sofa beds; instead teams of two shall perform the move and where possible, safe lifting techniques and appropriate moving equipment such as dollies and/or addition of coasters or rolling wheels place on bottom of furniture shall be utilized with proper training provided before use.

## § 0006      Administrative Controls

Each employer shall perform a written evaluation to determine what the appropriate expectation should be for the number of room credits assigned to housekeeping employees during a work shift.  The evaluation should consider the impact on a housekeeper's workload of daily variations in rooms assignments and work organization such as the effect of number of check out rooms versus stay over rooms, the number of high hazard rooms versus rooms with one king-size bed, the number of different floors to which the housekeeper must travel, do-not-disturb requests and other events that contribute to workload variations.  The evaluation must be based upon input from employees or their authorized collective bargaining agent where such agent exists.  The evaluation must be repeated when conditions such as the mattress style, linen style, room amenities, or other changes to the room layout or complement are effectuated; and when changes due to hotel renovation or when changes to current hotel policies occur or new policies are implemented such as green policies that impact housekeeper's workload, work organization or job task are also effectuated.

## § 0007      Light Duty Assignments

An employer shall provide alternative light duty opportunities for housekeeping employees who have suffered musculoskeletal injuries as a result of housekeeping duties wherever possible. Such light duty assignment duties shall be less demanding than regular work so as to not aggravate the employee's injury.

## § 0008      Monitoring and Evaluation

(a)     Each employer will engage in quarterly monitoring to ensure that it is in compliance with the requirements of its plan and this Article.

(b)     The employer will evaluate the effectiveness of the plan on an annual basis with input from the safe housekeeping committee.  The results will be reported to the committee and made available to employees.

6

**§ 0009        Communication and training**

(a)     Each employer shall provide regular training to housekeepers concerning:

   (i)      the requirements of this Article;

   (ii)     the definitions in § 0002;

   (iii)    the hazards identified in § 0003;

   (iv)    the employer's plan described in § 0004;

   (v)     safe work practices designed to reduce the risk of musculoskeletal injuries and other housekeeping-related injuries including:

      1.      risk factors for housekeeping-related injuries and injury prevention;

      2.      neutral postures and body mechanics for housekeeping tasks;

      3.      how to use safe working practices related to bedmaking and room cleaning and how they prevent injuries; and

      4.      the use of safe housekeeping equipment; reporting mechanisms for the lack of available equipment; and reporting mechanism for the repair and maintenance of such equipment;

   (vi)    how to report injuries suffered as a result of housekeeping activities.

(b)     Training shall occur:

   (i)      when a housekeeping employee is hired; and

   (ii)     when a hotel employee is transferred into the housekeeper job title; and

   (iii)    when new equipment arrives at the hotel or when new safe work practice is identified; and

   (iv)    when changes due to hotel renovation or when changes to current hotel policies occur or new policies are implemented such as green policies that impact housekeeper's workload, work organization or job task are also effectuated.

   (v)     annually thereafter.

7

## § 0010        Recordkeeping

Each employer shall maintain records showing its compliance with the requirements of this Article.  Copies of such records shall be made available to employees or their authorized collective bargaining representative upon request.

## § 0011        Employee Rights

(a) A housekeeping employee who refuses to perform housekeeping tasks because of the employer's failure to provide appropriate tools or the employer's requirement to engage in unsafe housekeeping practices shall not, based upon the refusal, be the subject of disciplinary action by the employer or its agents.

(b) Housekeeping employees shall be allowed to inspect the worksite at reasonable times in order to identify hazardous conditions and bring their concerns to the employer or its agents, to the competent person, or to the Safe Housekeeping Committee.

(c) During any inspection conducted by the Division, housekeeping employees shall have the right:

  (i)     to speak with an inspector outside the presence of the employer or its agents either on or off property;

  (ii)    to accompany an inspector during an inspection to provide input into hazards that exist in the housekeeper's work area;

  (iii)   to receive copies of documents the employer or its agents provides to the Division concerning the existence or non-existence of hazardous conditions in their work areas.

8

Exhibit 2

State of California
Department of Industrial Relations

**RECEIVED**

# Memorandum

MAR 2 9 2012

OCCUPATIONAL SAFETY AND HEALTH
STANDARDS BOARD

To :     Marley Hart, Executive Officer                              Date:     March 27, 2012
         Occupational Safety and Health Standards Board
         2520 Venture Oaks Way, Suite 350
         Sacramento, CA 95833

From :   Ellen Widess, Chief  *Ellen Widess*
         Division of Occupational Safety and Health

Subject: Division Evaluation of Petition 526
         *Kurt Peterson, UNITE HERE Local 11*

This memorandum is written in response to your request for the Division's evaluation of Petition 526
received by the Occupational Safety and Health Standards Board (Board) on January 23, 2012 from Kurt
Peterson, representing UNITE HERE Local 11 (Petitioner). The Petitioner requested that the Occupational
Safety and Health Standards Board (Board) adopt a new health and safety standard to address the
occupational hazards faced by housekeepers in the hotel and hospitality industry that may cause
musculoskeletal injuries. The Petitioner also requested that hearings on this matter be conducted in the Los
Angeles Area to permit greater participation by affected workers.

Labor Code Section 142.2 permits interested persons to propose new or revised standards concerning
occupational safety and health, and requires the Board to consider such proposals, and render a decision no
later than six months following receipt. Further, as required by Labor Code Section 147, any proposed
occupational safety or health standard received by the Board from a source other than the Division must be
referred to the Division for evaluation, and the Division has 60 days after receipt to submit a report on the
proposal.

The Division has prepared this memorandum as an evaluation of the petition.

Actions Requested by the Petitioner

The petitioner has requested that the Board adopt a standard to address occupational hazards that have
resulted in repetitive motion and acute injuries suffered by housekeepers in the hotel and hospitality industry.
The Petitioner submitted language for a proposed industry specific standard comprised of both performance
and prescriptive requirements.  The proposed requirements include:
- A Job Hazard Assessment which would include an evaluation of housekeeping workloads and tasks
  such as bed making, vacuuming and other cleaning duties.
- A Safe Housekeeping Plan that would include a safe housekeeping committee, the identification of a
  "competent person" and the obtainment of employee input.
- Workload and Work Pacing Requirements which would cap the amount of square footage of room
  space to be cleaned, limit stooped, kneeling or awkward body postures while cleaning, and require
  the use of appropriately designed safe housekeeping tools and equipment such as motorized or self-
  propelled carts or fitted sheets. Administrative controls including limited work schedules are also part
  of the petitioner's proposal.
- Monitoring and Evaluation including quarterly monitoring to ensure compliance with these
  requirements.

- Communication, Training, Recordkeeping and Employee Rights, including the right to receive copies of documents the employer or its agents provide to the Division concerning the existence or non-existence of a hazardous condition in the workplace.

Existing Title 8 Regulations

Section 3203 Injury and Illness Prevention Program (IIPP) requires that the employer develop, implement and maintain an effective written program that includes procedures for identifying, evaluating and correcting work place hazards. It is a standard of general application and does not specifically identify any required corrective measures to prevent musculoskeletal injuries.

Section 5110 Repetitive Motion Injuries (RMIs) requires a program that includes worksite evaluation, control of exposures and employee training. However, employers are not subjected to these requirements unless or until more than one repetitive motion injury, meeting certain conditions, occurs at their workplace within a twelve month period. This Section only addresses repetitive motion injuries and does not specify the control measures an employer must implement in this industry.

Other Relevant Regulations and Guidelines

There are no comparable federal regulations that specifically address repetitive motion injuries or the specific occupational hazards affecting housekeepers in the hotel and hospitality industry. There are a number of general guidelines addressing how to reduce the risks of injury to the back and upper extremities, including guidelines published by the National Institute for Occupational Safety and Health (NIOSH).

California State Senate Bill 432, which addresses the control of hazards related to hotel housekeeping, was introduced in 2011 by Senator De Leon. It was passed in the Senate in May, has been amended in the Assembly, and is currently in suspense awaiting approval by the Assembly Appropriations Committee.

Discussion

In 2011, the Division investigated musculoskeletal injuries to hotel housekeepers in three inspections. The Division arranged for ergonomic evaluations in two of these inspections. Federal OSHA provided an ergonomic analysis in a Southern California hotel[1], and the Division contracted with an ergonomist from the Ohio State University Ergonomics Institute[2] to perform an analysis in a San Francisco hotel. Both ergonomists found injury risk factors associated with the housekeeping tasks, some of which were considered to be potential contributors to repetitive motion or acute injuries. In one case, the Division issued an information memorandum regarding compliance with Section 5110 to control the risk of repetitive motion injuries, and in another, citations were issued for violations of Section 5110[3]. The citations are under appeal.

Based on the Division's investigations in these and other cases, a report from an ergonomist at Hawaii OSHA[4], information provided by the Petitioner, and a peer reviewed article on hotel housekeeper injury

---

[1] Besser B. Evaluation of House Keeping Operations at the Hyatt Andaz, West Hollywood, California. June 17, 2011

[2] Allread WG. San Francisco Hyatt at Fisherman's Wharf An Ergonomics Assessment of Housekeeper Guest Room Cleaning Tasks and Recommended Controls to Reduce Repetitive Motion Injuries. November 14, 2011.

[3] Application of Section 5110 requires identification of two or more repetitive motion injuries within a 12 month period at a given workplace that meet certain conditions. Therefore Division policy is to issue an information memorandum if one qualifying injury has occurred to inform the employer of their responsibilities if a second injury does occur.

[4] Hawaii Occupational Safety and Health Division. Ergonomic Evaluation of Hyatt Regency Waikiki Beach Resort and Spa. August 23, 2011.

Division Evaluation of Petition 526                           *March 27, 2012*
*Kurt Peterson, Unite Here Local 11*                          Page **3** of **3**

rates[5], the Division believes that hotel housekeepers may be at increased risk of occupational musculoskeletal injuries, and that appropriate control measures can reduce that risk.

Section 3203 establishes a general framework for the identification, evaluation, and correction of hazards, but it does not establish specific requirements to address the risks identified by the Petitioner. Nor does Section 3203 require the specific control measures advocated by the Petitioner, such as establishment of a safety committee, although subsection 3203(c) establishes certain requirements for labor/management committees used to meet the requirements of subsection 3203(a)(3). While the musculoskeletal injuries recorded for hotel housekeepers are both acute and cumulative in nature, Section 5110 only addresses the repetitive motion injuries. Also, even when the threshold for application of the standard is met, it does not specify the control measures advocated by the Petitioner.

The petition identifies a number of risks and a number of control measures. However, the Division believes that the Petition does not provide sufficient information to establish the necessity of each proposed control measure, nor does it specifically analyze alternative measures that may be as effective. An advisory committee would provide an opportunity for all interested parties to discuss and assess musculoskeletal risks involved in hotel housekeeping, and to further evaluate measures that will be effective in controlling those risks. It will also permit a full discussion of alternatives, in accordance with the Government Code.

Conclusion

The Division recommends that the Board grant the petition to the extent that it request the Division to convene an advisory committee to address the musculoskeletal injury hazards to hotel housekeepers and to discuss whether a new standard should be developed to address those risks, and what should be included in such a standard.

cc:     Amalia Neidhardt
        Steve Smith
        Deborah Gold
        Suzanne Marria

Attach:  Besser B. Evaluation of House Keeping Operations at the Hyatt Andaz, West Hollywood, California. June 17, 2011
         Allread WG. San Francisco Hyatt at Fisherman's Wharf: An Ergonomics Assessment of Housekeeper Guest Room Cleaning Tasks and Recommended Controls to Reduce Repetitive Motion Injuries. November 14, 2011.
         Hawaii Occupational Safety and Health Division, Ergonomic Evaluation of Hyatt Regency Waikiki Beach Resort and Spa. August 23, 2011.
         Buchanan S et al. *Occupational Injury Disparities in the US Hotel Industry.* American Journal of Industrial Medicine 53:116–125 (2010).

---

[5] Buchanan S et al. Occupational Injury Disparities in the US Hotel Industry. American Journal of Industrial Medicine 53:116–125 (2010).

Exhibit 3

STATE OF CALIFORNIA - DEPARTMENT OF INDU~   ~AL RELATIONS                                    Edmund G. Brown Jr., Governor

OCCUPATIONAL SAFETY
AND HEALTH STANDARDS BOARD
2520 Venture Oaks Way, Suite 350
Sacramento, CA 95833
(916) 274-5721
FAX (916) 274-5743
Website address www.dir.ca.gov/oshsb



OCCUPATIONAL SAFETY AND HEALTH
STANDARDS BOARD

BOARD STAFF'S REVIEW OF
PETITION FILE NO. 526

Petitioner: Unite Here

Submitted by:  George Hauptman
Title:  Senior Engineer-Standards
Date:  April 9, 2012

*Petition File No. 526*
*Petition for Safety and Health Standards*
*for the Protection of Hotel Housekeepers*

OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD

Staff Review of Petition No. 526 submitted by
Unite Here

Petition for the Promulgation of Safety and Health Standards
For the Protection of Hotel Housekeepers

INTRODUCTION

The Occupational Safety and Health Standards Board (Board) received a petition dated January 23, 2012 recommending that the Board adopt safety and health standards for the protection of hotel housekeepers. The Petitioner notes that Unite Here is a labor organization that represents thousands of California workers who are employed in the hotel and hospitality industry through its affiliated local unions.

The Petition states that hotel housekeepers are exposed to serious occupational risks in the course of their normal work duties. Housekeeping duties include activities such as, changing bed linen, scrubbing bathroom floors and fixtures, polishing, dusting, vacuuming, and pushing heavy linen carts. The Petition indicates that housekeepers suffer the highest injury rate among all classifications of hotel employees and that they are more likely to suffer musculoskeletal disorders than all other hotel employees.

The Petitioner states that the proposed standard (Appendix A, of the Petition) is comprised of a balance of performance and prescriptive requirements that address the factors that contribute to occupational injuries among housekeepers.

Labor Code Section 142.2 permits interested persons to propose new or revised regulations concerning occupational safety and health and requires the Board to consider such proposals and to render its decision no later than six months following their receipt.

REASON FOR THE PETITION

Some of the primary reasons noted by staff for the Petitioner's proposal are outlined in the several paragraphs that follow:

The Petitioner states that, during the past decade, hotel operators have increasingly competed in the type of luxury rooms offered. Room upgrades include luxury bedding consisting of oversized, heavier mattresses and bedding packages that have large, quilted comforters that can be bulky and include up to six pillows and other amenities such as heavier bath linens. The Petitioner comments

*Petition File No. 526*
*Petition for Safety and Health Standards*
*for the Protection of Hotel Housekeepers*

that the new linen requires housekeepers to load their carts heavily or to make more trips to linen rooms to replenish cart supplies. Also, some hotels are providing larger linen carts that are heavy and cumbersome to wheel over carpeted areas. The use of motorized linen carts with adjustable shelving would be required in the recommended proposal to mitigate exertion involved in pushing manual linen carts.

The Petitioner states that, in some cases, employers have implemented cleaning protocols that have increased the number of rooms and beds that must be cleaned on a daily basis. The proposal would place limitations on the total square footage space that may be assigned to housekeepers to clean during an 8-hour shift based on factors that would include the type of amenities in rooms and the number of rooms scheduled for check-out.

Making beds, lifting mattresses and the tucking of loose sheets/linen presents lifting hazards according to the Petitioner and indicate the need for fitted sheets and the availability of special tools to assist with the lifting of mattresses. The Petitioner comments that the use of a properly sized fitted bottom sheet eliminates the number of mattress lifts per bedding change, further reduces awkward postures associated with mattress lifting, and avoids unnecessary manipulation of bed linens.

In order to reduce awkward postures, forceful lifting and exertions, and extended reaches in hotel cleaning activities, safe housekeeping equipment would be either required or available to include adjustable long-handled cleaning tools such as mops, scrubbers and dusters; fitted sheets; laundry hampers on wheels; motorized carts with adjustable height shelves; ergonomically designed vacuum cleaners, and other equipment. The proposal also includes hazard assessments, safe cleaning and work practices, and monitoring and training requirements for employers. The Petitioner urges adoption of the proposed standards in order to prevent debilitating injuries suffered by housekeepers and contain the financial costs that result from these injuries.

## HISTORY

The Board has not received any similar petition seeking to promulgate standards specific the safety and health of hotel housekeepers. However, hotel and housekeeping employers are subject to provisions in the General Industry Safety Orders (GISO) Section 3203 (effective July 1, 1991) that require every employer to maintain an effective Injury and Illness Prevention Program (IIPP). Hotel and housekeeping employers are also subject to compliance with GISO Section 5110 "Repetitive Motion Injuries" (RMIs). Section 5110 of Title 8 requires among other things, that action be taken to reduce RMIs when more than one employee in a 12 month period incurs an RMI injury while performing the same repetitive motion task.

## FEDERAL OSHA STANDARDS

Federal OSHA does not have standards that are specific to hotel housekeeping and hospitality worker provisions outlined in the petition.

*Petition File No. 526*
*Petition for Safety and Health Standards*
*for the Protection of Hotel Housekeepers*

## STAFF EVALUATION

The petition documents include a list of injuries incurred by housekeeping employees at one hotel property for an approximate three-year period, from 2006 to part of 2010.   There are strain and sprain type injuries to various body areas that occur to hotel staff in the performance of housekeeping duties.  The injury descriptions emphasize the need for hotel employers to take actions specific to their operations to mitigate the frequency and severity of potential injuries.  It is evident in health and safety literature and by observation that hotel housekeeping duties include arduous cleaning work and bedding/linen changes that are subject to time constraints triggered by factors such as, guest check-in times.

The petition includes information that Hawaii OSHA (HIOSHA) in 2011 issued a Hawaii Hyatt Hotel property an informational letter subsequent to an ergonomic evaluation of housekeeping operations.  The letter identified a number of potential ergonomic hazards and possible control options for the employer to consider.  HIOSHA concluded that, since HIOSHA has no standard that applies to ergonomics, no citations would be issued.  Voluntary measures were recommended to reduce ergonomic related hazards.

The petition also includes information that Region IV of the California Division of Occupational Safety and Health (Division) had issued an Informational Memorandum to a Los Angeles hotel property in 2011.  Reference was made to the provisions of GISO Section 5110 to mitigate ergonomic exposures.  Staff also learned that the Division's San Francisco office issued Section 5110 related ergonomic citations to a San Francisco Hotel in 2011.  The citations stated in part, that the employer had not implemented engineering and administrative controls for housekeeping tasks that included bed making, bathroom cleaning, vacuuming, and other surface cleaning.  Additionally, in one citation, the Division stated that training programs in accordance with several Section 5110 provisions had not been implemented for employees involved in housekeeping activities.   Thus, the Division has the ability currently to issue hotel employers citations for violations of the California ergonomics standard.

The Petitioner's proposed standard includes primary categories such as the development of a Safe Housekeeping Plan, Administrative Controls, Monitoring and Evaluation, Communication and Training, Record Keeping and Employee Rights.  Board staff believes that a stakeholder's advisory committee should be convened to determine to what extent there may be duplication and overlap with existing Title 8 standards and the Petitioner's proposal.  For example, when the ergonomics standard, Section 5110, is triggered by RMIs, it also requires worksite evaluation, control of exposures including engineering and administrative considerations, training and methods to minimize RMIs.  However, as a performance standard, Section 5110 does not prescribe the specific control measures denoted in the petition that an employer must implement for specific industries, such as the hotel and lodging industry.

The proposed standard would require the use of certain housekeeping tools and equipment.  One provision would require that a fitted sheet be used in lieu of a flat sheet for the bottom sheet on all mattresses.  There is pending legislation regarding fitted sheets (Senate Bill 432).  This bill was passed in the Senate and last amended in August of 2011.  It is currently in suspense pending

3

*Petition File No. 526*
*Petition for Safety and Health Standards*
*for the Protection of Hotel Housekeepers*

approval by the Assembly Appropriations Committee.  This bill would require the Board to adopt a standard no later than December 15, 2012, relating to housekeeping in hotel and lodging establishments requiring the use of a fitted sheet, instead of a flat sheet as the bottom sheet on beds, or the use of equipment (e.g. wedge, or other device) or alternative work practice or method to assist in the installation of sheets.  The bill further specifies the use of long-handled tools for cleaning bathrooms in order to eliminate the need for housekeepers to work in stooped, kneeled, or squatting positions.

Board staff finds differing opinions within the lodging and hotel/housekeeping industry regarding the ergonomic benefit of flat versus fitted sheets.  Some say that fitted sheets require more mattress lifting and sheet tucking than loose fitted sheets.  The Division contracted with several ergonomists to assist with the analysis of several California hotels, and their findings, with respect to the use of fitted sheets, is that control measures such as the use of fitted sheets, can reduce the amount of lifting, reaching and bending.  However, an evaluation dated August, 2011, prepared for the California Hotel and Lodging Association by Steven F. Wiker, Ph.D., CPE of the Ergonomic Design Institute, concluded that the use of fitted sheets would not benefit housekeepers from a health and safety standing point, and their use would produce a small increase in housekeeper physical burden and fatigue.

The Petitioner also points out that Cal/OSHA Consultation Service Publication, "Working Safer and Easier" under the heading "Tips and improvement ideas" recommends the use of a fitted bottom bed sheet over the mattress.  More discussion and evaluation is necessary regarding this issue including input from stakeholders.  An advisory committee of stakeholders should evaluate the extent to which certain tools and housekeeping equipment specified in the proposal are currently available to workers and whether there is necessity to consider rulemaking amendments.

The Petition does not provide cost estimates for the types of "safe housekeeping equipment" defined in Section 0002 of the proposed standard, including such items as ergonomically designed vacuum cleaners, fitted sheets as the bottom sheet on all California hotel mattress beds and the mandated use of motorized or self-propelled linen carts.  It is unclear from the proposed language whether manually-pushed linen carts would continue to be permitted.

Motorized housekeeping linen carts are available, but are not frequently used in the hotel industry today.  During check out times, many hotels are busy with guests, housekeeping workers and their linen carts, and guest services staff all sharing tight hallways with blind corners simultaneously.  There may be potential for employees or hotel guests to be struck by a motorized cart, and contact with a heavier, power-driven cart would be more severe than with a manual cart.  Further, it is unclear whether motorized carts could be accommodated in older properties that cannot utilize standard or larger-sized carts because they have smaller elevators and tighter hallway corners.

The Petitioner's proposal includes a provision that housekeepers not be required to clean more than 5,000 square feet of total room space during an 8-hour shift.  This limit is subject to modifications in light of factors such as the number of check-out rooms or rooms with additional beds.  However, these types of quotas or restrictions limiting the amount of work an employee can be assigned are

*Petition File No. 526*
*Petition for Safety and Health Standards*
*for the Protection of Hotel Housekeepers*

typically not addressed in Title 8 standards, but rather are determined as a condition of employment and/or are addressed in collective bargaining agreements.

The Petition indicates that hotel housekeeping employees are subject to occupational musculoskeletal injuries, and the Petitioner's proposal would require a number of control measures that include specific safe housekeeping tools and equipment, as well as administrative and procedural requirements to reduce risks. However, the petition does not sufficiently discuss the extent to which these controls may already be available or provided as an option, nor does the petition provide enough information to establish the necessity of the items outlined in the proposal's definition of "safe housekeeping equipment."

Several of the documents referenced in the petition conclude that hotel housekeepers have an increased risk of developing occupational musculoskeletal injuries. Board staff agrees that a significant number of musculoskeletal injuries occur in this industry and that appropriate control measures can reduce those risks. However, additional information, discussion, and clarification from industry stakeholders is necessary in order to sufficiently evaluate the necessity for undertaking a rulemaking action that includes both performance based standards and prescriptive control measures specific to hotel housekeeping operations.

RECOMMENDATIONS

For the reasons stated above, Board staff recommends that the petition be granted to the extent that an advisory committee be convened by the Division to determine if a rulemaking action should be initiated and what control measures may be necessary to address musculoskeletal injury hazards to hotel housekeeping employees. The Petitioner should be invited to participate in the committee deliberations.

Exhibit 4

STATE OF CALIFORNIA
DEPARTMENT OF INDUSTRIAL RELATIONS
OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD
2520 Venture Oaks Way, Suite 350
Sacramento, California 95833
(916) 274-5721

| | |
|---|---|
| In the Matter of a Petition by:<br><br>Kurt Peterson,<br>UNITE HERE Local 11<br>464 South Lucas Avenue, Suite 201<br>Los Angeles, CA 90017<br>and<br>Pamela Vossenas, MPH Workplace<br>Coordinator/Staff Epidemiologist<br>UNITE HERE International Union<br>275 Seventh Avenue, 11th Floor<br>New York, NY 10001<br>Applicant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     PETITION FILE NO. 526<br>)     DECISION |

The Occupational Safety and Health Standards Board hereby adopts the attached
PROPOSED DECISION.

OCCUPATIONAL SAFETY AND HEALTH
STANDARDS BOARD

JOHN D. MACLEOD, Chairman

DAVID HARRISON, Member

WILLIAM JACKSON, Member

HANK MCDERMOTT, Member

BARBARA SMISKO, Member

LAURA STOCK, Member

DAVID THOMAS, Member

By: _____
Marley Hart, Executive Officer

DATE: 6/21/2012
Attachment

STATE OF CALIFORNIA - DEPARTMENT OF INDUSTRIAL RELATIONS                                          Edmund G. Brown Jr., *Governor*

**OCCUPATIONAL SAFETY**
**AND HEALTH STANDARDS BOARD**
2520 Venture Oaks Way, Suite 350
Sacramento, CA 95833
(916) 274-5721
FAX (916) 274-5743
Website address: www.dir.ca.gov/oshsb



## REVISED PROPOSED PETITION DECISION OF THE OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD (PETITION FILE NO. 526)—VERSION 1

### INTRODUCTION

The Occupational Safety and Health Standards Board (Board) received a petition on January 24, 2012, from Kurt Peterson and Pamela Vossenas representing Unite Here (Petitioner). The Petitioner requests the Board to amend Title 8, California Code of Regulations, to address the occupational hazards that may cause musculoskeletal injuries to housekeepers in the hotel and hospitality industry.

Labor Code section 142.2 permits interested persons to propose new or revised regulations concerning occupational safety and health and requires the Board to consider such proposals, and render a decision no later than six months following receipt. Further, as required by Labor Code section 147, any proposed occupational safety or health standard received by the Board from a source other than the Division of Occupational Safety and Health (Division) must be referred to the Division for evaluation, and the Division has 60 days after receipt to submit a report on the proposal.

### SUMMARY

The Petitioner states that, during the past decade, hotel operators have increasingly competed on the basis of the level of luxury of their room offerings. Room upgrades include luxury bedding consisting of oversized, heavier mattresses and bedding packages that have large, quilted comforters that can be bulky and include up to six pillows and other amenities such as heavier bath linens. The new linen requires housekeepers to load their carts heavily or to make more trips to linen rooms to replenish cart supplies. Also, some hotels are providing larger linen carts that are heavy and cumbersome to wheel over carpeted areas.

The Petitioner recommended a number of provisions in its proposal, and some of the primary concerns raised in the petition are as follows:

> The Petitioner states that, in some cases, employers have implemented cleaning protocols that have increased the number of rooms and beds that must be cleaned on a daily basis. The proposal would place limitations on the total square footage space that may be assigned to housekeepers to clean during an 8-hour shift based on factors that would include the type of amenities in rooms and the number of rooms scheduled for check-out.

> According to the Petitioner, making beds, lifting mattresses and the tucking of loose sheets/linen presents lifting hazards and indicates the need for fitted sheets and for the

availability of special tools to assist with the lifting of mattresses. The use of a properly sized fitted bottom sheet eliminates the number of mattress lifts per bedding change, further reduces awkward postures associated with mattress lifting, and avoids unnecessary manipulation of bed linens.

In order to reduce awkward postures, forceful lifting and exertions, and extended reaches in hotel cleaning activities, safe housekeeping equipment should be either required or available. Such equipment includes adjustable long-handled cleaning tools such as mops, scrubbers and dusters; fitted sheets; laundry hampers on wheels; motorized carts with adjustable height shelves; ergonomically designed vacuum cleaners, and other equipment. The proposal also includes hazard assessments, safe cleaning and work practices, and monitoring and training requirements.

The Petitioner urges adoption of the proposed standards in order to prevent debilitating injuries suffered by housekeepers and in order to contain the financial costs that result from these injuries.

## DIVISION'S EVALUATION

The Division's evaluation dated March 27, 2012, states that in 2011, the Division investigated musculoskeletal injuries to hotel housekeepers. The Division arranged for ergonomic evaluations. The ergonomists found injury risk factors associated with the housekeeping tasks, some of which were considered to be potential contributors to repetitive motion or acute injuries. Based on the Division's investigations in these and other cases, the Division believes that hotel housekeepers may be at increased risk of occupational musculoskeletal injuries and that appropriate control measures can reduce that risk.

The Division noted that Section 3203 establishes a general framework for the identification, evaluation, and correction of hazards, but it does not establish specific requirements to address the risks identified by the Petitioner. Nor does Section 3203 require the specific control measures advocated by the Petitioner.

The Division also stated that Section 5110, Repetitive Motion Injuries (RMIs), requires a program that includes worksite evaluation, control of exposures and employee training. However, employers are not subjected to these requirements unless or until more than one repetitive motion injury, meeting certain conditions, occurs at their workplace within a twelve month period. This section only addresses repetitive motion injuries and does not specify the control measures an employer must implement in this industry.

The Division believes that the petition does not provide sufficient information to establish the necessity of each proposed control measure, nor does it specifically analyze alternative measures that may be as effective. Therefore, the Division recommends that the Board grant the petition to the extent that it requests the Division to convene an advisory committee to address the musculoskeletal injury hazards to hotel housekeepers, to discuss whether a new standard should be developed to address those risks, and to discuss what should be included in such a standard.

## STAFF'S EVALUATION

The petition documents include a list of injuries incurred by housekeeping employees at one hotel property during a three-year period, from 2006 to part of 2010. There are strain and sprain type injuries to various body areas of hotel staff that occur during the performance of housekeeping duties. The injury descriptions emphasize the need for hotel employers to take actions specific to their operations to mitigate the frequency and severity of potential injuries. It is evident in health and safety literature and by observation that hotel housekeeping duties include arduous cleaning work and bedding/linen changes that are subject to time constraints triggered by such factors as guest check-in times.

The Petitioner's proposed standard includes primary categories, such as the development of a safe housekeeping plan, administrative controls, monitoring and evaluation, communication and training, record keeping and employee rights. Board staff believes that a stakeholder's advisory committee should be convened to determine to what extent there may be duplication and overlap with existing Title 8 standards and the Petitioner's proposal. For example, when the ergonomics standard, Section 5110, is triggered by RMIs, it also requires worksite evaluation, control of exposures including engineering and administrative considerations, training and methods to minimize RMIs. However, as a performance standard, Section 5110 does not prescribe the specific control measures denoted in the petition that an employer must implement for specific industries, such as the hotel and lodging industry.

The petition does not provide cost estimates for the proposed types of "safe housekeeping equipment," such as ergonomically designed vacuum cleaners, fitted sheets as the bottom sheet on all California hotel mattress beds and the mandated use of motorized or self-propelled linen carts. It is unclear from the proposed language whether manually-pushed linen carts would continue to be permitted.

The Petitioner's proposal includes a provision that housekeepers not be required to clean more than 5,000 square feet of total room space during an 8-hour shift. This limit is subject to modifications in light of factors such as the number of check-out rooms or rooms with additional beds. However, these types of quotas or restrictions limiting the amount of work an employee can be assigned are typically not addressed in Title 8 standards, but rather are determined as a condition of employment and/or are addressed in collective bargaining agreements.

The petition indicates that hotel housekeeping employees are subject to occupational musculoskeletal injuries, and the Petitioner's proposal would require a number of control measures that include specific safe housekeeping tools and equipment, as well as administrative and procedural requirements to reduce risks. However, the petition does not sufficiently discuss the extent to which these controls may already be available or provided as an option, nor does the petition provide enough information to establish the necessity of the items outlined in the proposal's definition of "safe housekeeping equipment."

Several of the documents referenced in the petition conclude that hotel housekeepers have an increased risk of developing occupational musculoskeletal injuries. Board staff agrees that a significant number of musculoskeletal injuries occur in this industry and that appropriate control

measures can reduce those risks. However, clarification from industry stakeholders is necessary in order to evaluate sufficiently the necessity for undertaking a rulemaking action that includes both performance based standards and prescriptive control measures specific to hotel housekeeping operations.

For the reasons stated above, Board staff recommends that the petition be granted to the extent that an advisory committee be convened by the Division to determine if a rulemaking action should be initiated and what control measures may be necessary to address musculoskeletal injury hazards to hotel housekeeping employees. The Petitioner should be invited to participate in the committee deliberations.

## PROCEEDINGS CONDUCTED ON MAY 17, 2012

At its May 17, 2012 business meeting, the Board considered the following Board staff recommendation:

> The Board has considered the petition and the recommendations of the Division and Board staff. For reasons stated in the preceding discussion, the petition is hereby GRANTED to the extent that the Division is requested to convene a representative advisory committee to determine whether a rulemaking action should be initiated and what control measures may be necessary to address musculoskeletal injury hazards to hotel housekeeping employees. The Petitioners should be invited to participate in the committee deliberations.

By a vote of four to two (one Board member being absent), the Board rejected that recommendation and took no further action to either grant or deny the petition. The concerns of the Board members who voted against the recommendation included, but were not necessarily limited to, to the following:

- The petition did not establish the necessity of the proposed rulemaking, and the Board staff recommendation did not ensure adequately that the advisory committee would consider the issue of necessity.

- The hazards of concern to the Petitioner are already addressed by such standards as California Code of Regulations, Title 8, Sections 3203 and 5110.

- A bad precedent would be set by carving out special repetitive motion standards for specific industries, and if standards are needed in such areas as bed making and bathroom cleaning, there is no rationale for limiting such standards to hotel housekeeping, and excluding such persons as janitors from the scope of the proposal.

- The Petitioner's proposal is too expansive in terms of the remedies it provides.

- The Division might not conduct the advisory committee as a neutral fact finder.

## FURTHER DISCUSSION IN LIGHT OF THE BOARD'S MAY 17, 2012 PROCEEDING

The Division and the Board are separate entities. Neither has control over the other's personnel and resources. Neither can compel the other to take action regarding advisory committees and rulemaking. For this reason, when the Board wishes the Division to convene an advisory committee, the Board makes a request, which the Division is free to respond to as it deems appropriate.

Ergonomics-related matters are regarded as health, as opposed to safety, issues, and there is no federal occupational safety and health ergonomics standard. The Division has primary authority over health matters of this sort, in that Labor Code Section 147.1(c) states that the Division shall:

> On occupational health issues not covered by federal standards maintain surveillance, determine the necessity for standards, develop and present proposed standards to the board.

Based on such authority, the Division could well convene an advisory committee and develop a rulemaking proposal on the basis of this petition even if the Board never asks the Division to do so and even if the Board expressly denies the petition.

Since May 17, 2012, however, there has been a major change in the composition of the Board, and Board staff recognizes that the newly-constituted Board might favor the Board staff's original recommendation in this matter and should have the opportunity to resolve this matter in that manner.

## CONCLUSION AND ORDER

The Board has considered the petition and the recommendations of the Division and Board staff. For reasons stated in the preceding discussion, the petition is hereby GRANTED to the extent that the Division is requested to convene a representative advisory committee to determine whether a rulemaking action should be initiated and what control measures may be necessary to address musculoskeletal injury hazards to hotel housekeeping employees. The Petitioners should be invited to participate in the committee deliberations.

# Exhibit 5

*CA*

# Department of
# Industrial Relations

Press room    Índice en español     Settings

Cal/OSHA  ›  Advisory Meetings  ›  Housekeeping in the Hotel and Hospitality Industry

# Housekeeping in the Hotel and Hospitality Industry
## Advisory Committee Meetings

General Industry Safety Orders
Chapter 4, subchapter 7,
Occupational hazards regarding housekeepers in the hotel and hospitality industry

If you have questions regarding these meetings, please contact Amalia Neidhardt at (916) 574-2993.

---

**March 30, 2017**

The Standards Board is currently in the rulemaking process on Hotel Housekeeping Musculoskeletal Injury Prevention and no further advisory meetings are anticipated at this time unless needed to resolve issues that arise during rulemaking.

For the latest status of the rulemaking, visit the **Standards Board** web page for: New Section 3345

---

**May 31, 2016**

**Final Advisory Committee Draft**

On May 31, 2016 a draft of a possible regulation was submitted to the Standards Board staff for their review. This is not a rulemaking proposal at this time, and has not been noticed for public comment. For the latest status of the upcoming rulemaking process visit the Standards Board website. If you have questions regarding this draft document and the advisory process, please contact Amalia Neidhardt or Steve Smith at (916) 574-2993.

- Final Advisory Committee Draft

---

**April 1, 2016**

The linked revised discussion draft was made available on February 23, 2016 for review and the linked comments were received. At this time the advisory process is concluded and the discussion draft is being revised in response to comments and developed into final rulemaking proposal for submittal to the Standards Board by June 1, 2016.

- Revised discussion draft
- Comments

**February 23, 2016**

The following revised discussion draft was developed in response to comments received on the 12/3/15 draft. Please provide any additional comments on this draft by March 15, 2016 at which time we will conclude the advisory process and develop a final rulemaking proposal for submittal to the Standards Board by June 1, 2016.

- Revised discussion draft

**December 3, 2015**
10:00 am - 3:30 pm

Elihu Harris State Building
1515 Clay St. 2nd floor, Room 1
Oakland, CA

**Meeting Documents**

- Agenda
- Revised discussion draft
- Minutes
- Comments

**September 24, 2015**

The linked revised discussion draft was made available on August 14, 2015 for review and the linked comments were received.

- Revised discussion draft
- Comments

**May 13, 2015**
9:30 am - 3:30 pm

Elihu Harris State Building
1515 Clay St. 2nd floor, Room 1
Oakland, CA

**Meeting Documents**

- Agenda
- Minutes
- Petition 526

---

**February 27, 2014**
10:00 am - 3:30 pm

Elihu Harris State Building
1515 Clay St. 2nd floor, Room 1
Oakland, CA

### Meeting Documents

- Agenda
- Minutes
- Discussion draft
- Comments

---

**March 19, 2013**
10:00 am - 3:30 pm

Cal/Trans State Building
100 S. Main St.
Los Angeles, CA

### Meeting Documents

- Agenda
- Minutes
- Presentations and handouts
- Other documents:
  - CH&LA Housekeeping Final Report: *Cover Page*
  - CH&LA Housekeeping Final Report
    (large document, over 6 MB)

---

**October 23, 2012**
10:00 am - 3:30 pm

Elihu Harris State Building
1515 Clay St. 2nd floor, Room 1
Oakland, CA

### Meeting Documents

- Agenda
- Minutes
- Comments, handouts and other documents
- Petition 526

March 2017

---

Cal/OSHA

---

## Quick Links

▶ File a workplace safety complaint

▶ Obtain a free consultation

▶ Important Cal/OSHA updates

▶ Public records requests

---

Cal/OSHA Branches & Units

## Branches

▶ Enforcement

▶ Consultation Services

## Units

▶ Amusement Ride and Tramway

▶ Asbestos and Carcinogen

▶ Census of Fatal Occupational Injuries

▶ Communications Program

▶ Crane

▶ Elevator

▶ Heat and Agriculture Coordination Program

▶ High Hazard

▶ Labor Enforcement Task Force

▶ Legal and BOI

▶ Mining and Tunneling

▶ Pressure Vessel

▶ Process Safety Management

▶ Research and Standards

▸ Other Units

## Educational Materials

▸ Cal/OSHA publications

▸ Consultation eTools

## About Cal/OSHA

▸ Contact Us

▸ Locations - *Consultation offices*

▸ Locations - *Enforcement offices*

▸ Get Cal/OSHA email notices

▸ Cal/OSHA Jurisdiction

## Career Opportunities at Cal/OSHA

▸ Work for Cal/OSHA

▸ Recruiting Health and Safety Inspectors

  • Associate Safety Engineer (Amusement Rides) Exam Bulletin

  • Junior Safety Engineer Exam Bulletin

▸ Recruiting Elevator Safety Engineers

## About DIR

Who we are

DIR Divisions,
Boards &
Commissions

## Work with Us

Jobs at DIR

Licensing,
registrations,
certifications &
permits

Contact DIR

Required Notifications

Public Records
Requests

## Learn More

Acceso al
idioma

Frequently
Asked
Questions

Site Map

Back to Top

Conditions of Use

Disclaimer

Privacy Policy

Accessibility

Site Help

Contact DIR



Copyright © 2019 State of California

Exhibit 6

**This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal.**

**(a) Scope and Application**. This Section shall apply in all hotels, motels and other lodging establishments when employees are performing housekeeping activities.

NOTE to subsection (a): This section does not preclude the application of other sections of Title 8, including but not limited to Sections 3203 and 5110, to housekeeping activities in lodging establishments.

**(b) Definitions.**

**Housekeeping** means cleaning, tidying, stocking, and preparation tasks or activities such as changing linen, making beds, dusting, vacuuming, cleaning bathrooms, mirrors, floors and other surfaces,  moving furniture, using linen carts or cleaning tools (e.g. mops, scrubbing tools) and disposing of trash.

**Lodging establishment** means an establishment that contains sleeping room accommodations that are rented or otherwise provided to the public, such as hotels, motels, resorts, and bed and breakfast inns. Lodging for the purposes of this regulation does not include long term and licensed accommodations such as hospitals, nursing homes, prisons, jails, homeless shelters, boarding schools, worker housing and single family dwellings.

**(c) Housekeeping musculoskeletal injury prevention program.** In accordance with Section 3203, each employer covered by this section shall establish, implement and maintain an effective, written, musculoskeletal injury prevention program (Program) that addresses hazards specific to housekeeping. The Program may be incorporated into an existing Injury and Illness Prevention Program or may be maintained as a separate program. The Program shall include, at a minimum, all of the following:

> (1)The names and/or job titles of the persons with authority and responsibility for implementing the Program at each individual worksite.
> (2) Effective procedures for conducting a job hazard analysis for the purpose of identifying and evaluating housekeeping hazards.
> > (A) The procedures shall include an effective means of involving housekeepers and/or their representatives in the job hazard analysis. A labor/management safety and health committee that meets the requirements of Section 3203(c) may be used for this purpose.
> > (B) The analysis shall address, at a minimum, hazards related to the design, material handling and performance of tasks related to the following housekeeping activities:
> > > 1.Bed Making
> > > 2.Cleaning, scrubbing and polishing of floors, bathroom and bedroom fixtures and surfaces
> > > 3.Supply cart
> > > 4.Vacuuming

**This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal.**

5. Trash Collection

(C) At a minimum, the analysis shall assess injury risk related to the following factors: acute trauma related to slips, trips and falls; prolonged or awkward static postures; extreme reaches and repetitive reaches above shoulder height, torso bending, lifting, kneeling or squatting; forceful pushing and pulling; over-exertion or fatigue related to workload imbalance or inadequate physical (musculoskeletal) recovery between tasks.

(D) Housekeepers shall be notified of the results of the job hazard analysis in writing.

(E) The job hazard analysis shall be reviewed annually, and updated as necessary. The analysis shall also be reviewed and updated:
1. Whenever the employer becomes aware of a new or previously unrecognized hazard.
2. Whenever new processes, procedures, or equipment are introduced that may increase the hazards identified in subsection (c)(2)(B).
3. Based on an evaluation of the activities, tasks or other workplace factors that have contributed to workplace injuries and illnesses.
NOTE to subsection (c)(2): Additional information regarding job hazard analysis can be found in publications listed in Appendix A.

(3)  Procedures to investigate musculoskeletal injuries to housekeepers, including all of the following:
   (A) The procedures or tasks that were involved in the injury and whether any identified control measures were available and in use.
   (B) If required tools or other control measures were not used, a determination of why those measures were not used, or were not used appropriately.
   (C) The employee's and supervisor's opinions regarding whether any other control measure, procedure, or tool would have prevented the injury.

(4) Include methods and/or procedures for correcting hazards identified in the job hazard analysis. This shall also include procedures for assessing whether identified corrective measures are used appropriately. These procedures shall include:
   (A) An effective means of involving housekeepers and/or their representatives in identifying and evaluating possible corrective measures. A labor/management safety and health committee that complies with Section 3203(c) may be used for this purpose.
   (B) The means by which housekeeping tools or other appropriate equipment will be identified evaluated and implemented.
   (C) How sufficient and appropriate housecleaning equipment and tools will be made available to each housekeeper. This shall include procedures for procurement,

**This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal.**

> inspection, maintenance, repair, and replacement of appropriate housecleaning tools and equipment;
>
> (5) Procedures to ensure that supervisory and non-supervisory employees comply with the Program, follow the employer safe workplace housecleaning practices, and use the housekeeping tools or equipment deemed appropriate for each cleaning task.
>
> (6) Include a system for communicating with employees in a form readily understandable by all affected employees on matters relating to occupational safety and health, including provisions designed to encourage employees to inform the employer of hazards at the worksite without fear of reprisal.  A labor/management safety and health committee meeting the requirements of Section 3203(c) may be used for this purpose.
>
> (7) Procedures for reviewing, at least annually, the program at each worksite, to determine its effectiveness and make any corrections when necessary.  The program shall include an effective procedure for obtaining the active involvement of employees in reviewing and updating the program.  A labor/management safety and health committee meeting the requirements of Section 3203(c) may be used for this purpose.

**(d) Training**. The employer shall provide training to housekeeping employees and their supervisors, in a language easily understood by employees.
> (1) Frequency of training. Housekeeping employees and their supervisors shall be trained on the topics covered in subsection (d) (2) as follows:
>> (A) Initial training shall be provided when the program is first established; to all new employees and supervisors, and to all employees given new job assignments for which training has not been previously received;
>> (B) At least annually thereafter.
>> (C) Employers shall provide additional training when new equipment or work practices are introduced.  The additional training may be limited to addressing the new equipment or work practices.
>
> (2) Training shall include at least the following elements as applicable to the employee's assignment:
>> (A) The elements of the employer's program and how the written program will be made available to employees.
>> (B The process for reporting concerns regarding equipment availability, condition, storage, and maintenance.
>> (C) Body mechanics and safe practices including: identified hazards at the work place, how those hazards are controlled during each task, the appropriate use of cleaning tools

3

**This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal.**

and equipment, the importance of using these practices in order to prevent injuries, and the importance of reporting symptoms and injuries to the employer.
(D) In addition to the training described above, managers and supervisors shall be trained on how to identify hazards, the employer's hazard correction procedures, how defective equipment can be identified and replaced, how to obtain additional equipment, how to observe housekeepers' practices and how to effectively communicate with housekeepers regarding any problems needing correction.

**(e) Records**.
(1) Any measurements made in the course of the job hazard analysis shall be recorded. Those records shall be maintained and made available as employee exposure records in accordance with Section 3204.
(2) Records of the steps taken to implement and maintain the Program shall be created, maintained and made available in accordance with Section 3203(b).
(3) Records required by Division 1, Chapter 7, Subchapter 1, Occupational Injury or Illness Reports and Records, of these orders shall be created and maintained in accordance with those orders.
(4) A copy of the Program shall be available at the worksite for review and/or copying by employees and their representatives in accordance with Section 3204(e)(1)(A).
(5) All records shall be made available to the Chief or designee within 72 hours of request.

Appendix A (Non-Mandatory)
Reference Materials for Job Hazard Analysis

The following are examples of materials that can be used in performing a job hazard analysis for housekeeping.

Ohio State University.  Ergonomic Resources for Housekeeping.
https://ergonomics.osu.edu/Housekeeper%20Training%20Materials

State Fund.  Tips for Hotel Room Attendants.
http://www.statefundca.com/safety/ErgoMatters/RoomAttendants.asp

Department of Industrial Relations. Working Safer and Easier for Janitors, Custodians and Housekeepers, 2005.  www.dir.ca.gov/dosh/dosh_publications/janitors.pdf

British Columbia, Injury Prevention Resources For Tourism and Hospitality-Accommodation.  https://www2.worksafebc.com/Portals/Tourism/Prevention-Accommodation.asp.

4

Exhibit 7

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal.*

## Hotel Housekeeping Musculoskeletal Injury Prevention

**(a) Scope and Application**. This section is intended to control the risk of musculoskeletal injuries and disorders to housekeepers in hotels and other lodging establishments. It does not preclude the application of other sections of Title 8.

**(b) Definitions.**

"Housekeeper" means an employee who performs housekeeping tasks and may include employees referred to as housekeepers, guest room attendants, room cleaners, maids, guest services runners, and housepersons.

"Housekeeping tasks" means tasks related to cleaning and maintaining sleeping room accommodations including bedrooms, bathrooms, kitchens, living rooms, and balconies. Housekeeping tasks include, but are not limited to, the following: (1) sweeping, dusting, cleaning, scrubbing, mopping and polishing of floors, tubs, showers, sinks, mirrors, walls, fixtures, and other surfaces; (2) making beds; (3) vacuuming; (4) loading, unloading, pushing, and pulling linen carts; (5) removing and supplying linen and other supplies in the rooms, (6) collecting and disposing of trash; and (7) moving furniture.

"Job hazard analysis" means an assessment that focuses on job tasks as a way to identify potential hazards. It examines the relationship between the worker, the task, the tools, and the work environment. For purposes of this section, a job hazard analysis is an assessment to evaluate housekeeping tasks with respect to potential causes of musculoskeletal injury to housekeepers.

"Lodging establishment" means an establishment that contains sleeping room accommodations that are rented or otherwise provided to the public, such as hotels, motels, resorts, and bed and breakfast inns. For the purposes of this section, "lodging establishment" does not include hospitals, nursing homes, residential retirement communities, prisons, jails, homeless shelters, boarding schools, or worker housing.

"Musculoskeletal injury" means acute injury or cumulative trauma of the muscles, tendons, ligaments, bursa, peripheral nerves, joints, bone or blood vessels.

"Representative" means a recognized or certified collective bargaining agent representing housekeepers.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 76 of 270

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal.*

(c) **Housekeeping musculoskeletal injury prevention program.** As part of the Injury and Illness Prevention Program (IIPP) required by Section 3203, each employer covered by this section shall establish, implement, and maintain an effective, written, musculoskeletal injury prevention program (MIPP) that addresses hazards specific to housekeeping. The written MIPP may be incorporated into the written IIPP, or may be maintained as a separate program. The MIPP shall include:

(1) Names or job titles of the persons with authority and responsibility for implementing the MIPP at each worksite;

(2) A system for ensuring that supervisors and housekeepers comply with the MIPP, follow the employer's safe workplace housecleaning practices, and use the housekeeping tools or equipment deemed appropriate for each cleaning task;

(3) A system for communicating with housekeepers in a form readily understandable by all housekeepers on matters relating to occupational safety and health, as required in Section 3203, including provisions designed to encourage housekeepers to inform the employer of hazards at the worksite, and injuries or symptoms that may be related to such hazards, without fear of reprisal;

(4) Procedures for identifying and evaluating housekeeping hazards through a job hazard analysis:
(A) The initial job hazard analysis shall be completed within three months after the effective date of this Section or within three months after the opening of a new lodging establishment.
(B) The procedures shall include an effective means of involving housekeepers and their representative in designing and conducting the job hazard analysis.
(C) Housekeepers shall be notified of the results of the job hazard analysis in writing or by posting it in a location readily accessible to them. The results of the job hazard analysis shall be in a language easily understood by housekeepers.
(D) The job hazard analysis shall be reviewed and updated:
1. Whenever new processes, practices, procedures, or renovation of guest rooms or equipment are introduced that may change or increase housekeeping hazards;
2. Whenever the employer becomes aware of a new or previously unrecognized housekeeping hazard;
3. At least annually for each worksite.

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal.*

(E) The job hazard analysis shall address at a minimum:

1. An assessment of the potential injury risks to housekeepers including but not necessarily limited to: (1) slips, trips and falls; (2) prolonged or awkward static postures; (3) extreme reaches and repetitive reaches above shoulder height, (4) torso bending, twisting, lifting, kneeling, and squatting; (5) pushing and pulling; (6) falling and striking objects; (7) pressure points where a part of the body presses against an object or surface; (8) excessive work-rate; and (9) inadequate recovery time between tasks; and

2. A safe work-rate for housekeepers expressed in the number of rooms cleaned per shift. The safe work-rate may vary depending on the number of checkout rooms cleaned and other factors.

NOTE: Additional information regarding job hazard analyses can be found in publications listed in Appendix A.

(5) Procedures to investigate musculoskeletal injuries to housekeepers, including the following:

(A) The procedures or tasks being performed at the time of the injury and whether any identified control measures were available and in use;

(B) If required tools or other control measures were not used appropriately, a determination of why those measures were not used or were not used appropriately; and

(C) Opinions of the injured housekeeper, the housekeeper's representative, and the housekeeper's supervisor regarding whether any other control measure, procedure, or tool would have prevented the injury.

(6) Methods or procedures for correcting, in a timely manner, hazards identified in the job hazard analysis or in the investigation of musculoskeletal injuries to housekeepers, including procedures for determining whether identified corrective measures are used appropriately. These procedures shall include:

(A) An effective means of involving housekeepers and their representative in identifying and evaluating possible corrective measures;

(B) A means by which appropriate equipment or other corrective measures will be identified, assessed, implemented, and then reevaluated after introduction and while used in the workplace; and

(C) A means of providing appropriate housecleaning equipment, protective equipment, and tools to each housekeeper, including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate housecleaning tools and equipment.

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition
526. This draft is for discussion purposes only, and is not a rulemaking proposal.*

(7) Procedures for reviewing, at least annually, the MIPP at each worksite, to determine its
effectiveness and make any corrections when necessary, including an effective procedure
for obtaining the active involvement of housekeepers and their representative- in
reviewing and updating the MIPP. The procedures shall include a review of the
Cal/OSHA Form 300 log and other relevant records such as Cal/OSHA Form 301
incident reports.

**(d) Training**. The employer shall provide training to housekeepers and their supervisors in a
language easily understood by housekeepers.

(1) Frequency of training. Housekeepers and their supervisors shall be trained as follows:
   (A) When the MIPP is first established;
   (B) To all new housekeepers and supervisors;
   (C) To all housekeepers given new job assignments for which training was not previously
       provided;
   (D) At least annually thereafter; and
   (E) Employers shall provide additional training when new equipment or work practices
       are introduced. The additional training may be limited to addressing the new
       equipment or work practices.

(2) Training shall include at least the following elements as applicable to the housekeeper's
assignment:
   (A) The elements of the employer's MIPP and how the written MIPP will be made
       available to housekeepers;
   (B) The process for reporting safety and health concerns without fear of reprisal;
   (C) Body mechanics and safe practices including: identified hazards at the work place,
       how those hazards are controlled during each task, the appropriate use of cleaning
       tools and equipment, the importance of following safe work practices and using
       appropriate tools and equipment to prevent injuries, and the importance of reporting
       symptoms and injuries to the employer;
   (D) Practice using the types and models of equipment that the housekeeper will be
       expected to use;
   (E) An opportunity for interactive questions and answers with a person knowledgeable
       about hotel housekeeping equipment and procedures; and
   (F) Training of managers and supervisors on how to identify hazards, the employer's
       hazard correction procedures, how defective equipment can be identified and

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal.*

> replaced, how to obtain additional equipment, how to evaluate the safety of housekeepers' work practices, and how to effectively communicate with housekeepers regarding any problems needing correction.

**(e)  Records**.

(1)  Records of the steps taken to implement and maintain the MIPP, including any measurements taken or evaluations conducted in the job hazard analysis process, shall be created, maintained, and made available in accordance with Section 3203(b).

(2)  A copy of the MIPP and all records required by Subsection (1) shall be available at the worksite for review or copying by housekeepers and their representatives in accordance with Section 3204(e)(1).

(3)  All records shall be made available to the Chief or designee within 72 hours of request.

(4)  Records of occupational injuries and illnesses shall be created and maintained in accordance with Division 1, Chapter 7, Subchapter 1 of these orders.

Appendix A (Non-Mandatory)
Reference Materials for Job Hazard Analysis

The following are examples of materials that can be used in performing a job hazard analysis for housekeeping:

Ohio State University.  Ergonomic Resources for Housekeeping.
https://ergonomics.osu.edu/Housekeeper%20Training%20Materials

State Fund.  Tips for Hotel Room Attendants.
http://www.statefundca.com/safety/ErgoMatters/RoomAttendants.asp

Department of Industrial Relations. Working Safer and Easier for Janitors, Custodians and Housekeepers, 2005. www.dir.ca.gov/dosh/dosh_publications/janitors.pdf

British Columbia, Injury Prevention Resources For Tourism and Hospitality- Accommodation.
https://www2.worksafebc.com/Portals/Tourism/Prevention-Accommodation.asp

Ergonomics Study of Custodial, Housekeeping and Environmental Services Positions at University of California. May 2011. The UC System-wide Ergonomics Team.
http://ucanr.org/sites/ucehs/files/97141.pdf

Appendix B (Non-Mandatory)
Reserved for Model IIPP Developed by HESIS Stakeholders
[Possible new addition if all stakeholders collaborate with HESIS to create a Model IIPP]

Exhibit 8

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal. Changes to the 9/24/15 version are shown in strikeout/underline text.*

## Hotel Housekeeping Musculoskeletal Injury Prevention

**(a)  Scope and Application**. This section is intended to control the risk of musculoskeletal injuries and disorders to housekeepers in hotels and other lodging establishments. It does not preclude the application of other sections of Title 8.

**(b)  Definitions.**

"Housekeeper" means an employee who performs housekeeping tasks and may include employees referred to as housekeepers, guest room attendants, room cleaners, maids, ~~guest services runners,~~ and housepersons.

"Housekeeping tasks" means tasks related to cleaning and maintaining sleeping room accommodations including bedrooms, bathrooms, kitchens, living rooms, and balconies. Housekeeping tasks include, but are not limited to, the following: (1) sweeping, dusting, cleaning, scrubbing, mopping and polishing of floors, tubs, showers, sinks, mirrors, walls, fixtures, and other surfaces; (2) making beds; (3) vacuuming; (4) loading, unloading, pushing, and pulling linen carts; (5) removing and supplying linen and other supplies in the rooms, (6) collecting and disposing of trash; and (7) moving furniture.

~~"Job hazard analysis" means an assessment that focuses on job tasks as a way to identify potential hazards. It examines the relationship between the worker, the task, the tools, and the work environment. For purposes of this section, a job hazard analysis is an assessment to evaluate housekeeping tasks with respect to potential causes of musculoskeletal injury to housekeepers.~~

"Lodging establishment" means an establishment that contains sleeping room accommodations that are rented or otherwise provided to the public, such as hotels, motels, resorts, and bed and breakfast inns. For the purposes of this section, "lodging establishment" does not include hospitals, nursing homes, residential retirement communities, prisons, jails, homeless shelters, boarding schools, or worker housing.

"Musculoskeletal injury" means acute injury or cumulative trauma of the muscles, tendons, ligaments, bursa**e**, peripheral nerves, joints, bone**s** or blood vessels.

"**Union** Representative" means a recognized or certified collective bargaining agent representing housekeepers.

"**Worksite evaluation" means the identification and evaluation of workplace hazards in each housekeeping task, process, or operation of work with respect to potential causes of musculoskeletal injuries to housekeepers, that is specific to each workplace.**

**(c)  Housekeeping musculoskeletal injury prevention program.** As part of the Injury and Illness Prevention Program (IIPP) required by Section 3203, each employer covered by this section shall

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal. Changes to the 9/24/15 version are shown in strikeout/underline text.*

establish, implement, and maintain an effective, written, musculoskeletal injury prevention program (MIPP) that addresses hazards specific to housekeeping. The written MIPP may be incorporated into the written IIPP, or may be maintained as a separate program. The MIPP shall include:

(1) Names or job titles of the persons with authority and responsibility for implementing the MIPP at each worksite;

(2) A system for ensuring that supervisors and housekeepers comply with the MIPP, follow the employer's safe workplace housecleaning practices, and use the housekeeping tools or equipment deemed appropriate for each ~~cleaning~~ **housekeeping** task;

(3) A system for communicating with housekeepers in a form readily understandable by all housekeepers on matters relating to occupational safety and health, as required in Section 3203, including provisions designed to encourage housekeepers to inform the employer of hazards at the worksite, and injuries or symptoms that may be related to such hazards, without fear of reprisal;

(4) Procedures for identifying and evaluating housekeeping hazards through ~~a job hazard analysis~~ **a worksite evaluation**:

    (A) The initial ~~job hazard analysis~~ **worksite evaluation** shall be completed within three months after the effective date of this Section or within three months after the opening of a new lodging establishment.

    (B) The procedures shall include an effective means of involving housekeepers and their **union** representative in designing and conducting the **worksite evaluation**.

    (C) Housekeepers shall be notified of the results of the ~~job hazard analysis~~ **worksite evaluation** in writing or by posting it in a location readily accessible to them. The results of the ~~job hazard analysis~~ **worksite evaluation** shall be in a language easily understood by housekeepers.

    (D) The ~~job hazard analysis~~ **worksite evaluation** shall be reviewed and updated:

        1. Whenever new processes, practices, procedures, or renovation of guest rooms or equipment are introduced that may change or increase housekeeping hazards;

        2. Whenever the employer becomes aware of a new or previously unrecognized housekeeping hazard;

        3. **Based on the findings and recommendations of injury investigations conducted in accordance with subsection (c)(5);**

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal. Changes to the 9/24/15 version are shown in strikeout/underline text.*

    4.  At least annually for each worksite.

(E) The ~~job hazard analysis~~ **worksite evaluation** shall address, at a minimum**,** the potential injury risks to housekeepers including but not necessarily limited to: (1) slips, trips and falls; (2) prolonged or awkward static postures; (3) extreme reaches and repetitive reaches above shoulder height, (4) torso bending, twisting, lifting, kneeling, and squatting; (5) pushing and pulling; (6) falling and striking objects; (7) pressure points where a part of the body presses against an object or surface; (8) excessive work-rate; and (9) inadequate recovery time between **housekeeping** tasks.~~; and~~

~~**2. A safe work-rate for housekeepers expressed in the number of rooms cleaned per shift. The safe work-rate may vary depending on the number of checkout rooms cleaned and other factors.**~~

NOTE: Additional information regarding ~~job hazard analyses~~ **worksite evaluations** can be found in publications listed in Appendix A.

(5)  Procedures to investigate musculoskeletal injuries to housekeepers, including the following:

(A) The procedures or **housekeeping** tasks being performed at the time of the injury and whether any identified control measures were available and in use;

(B) If required tools or other control measures were not used**, or not used** appropriately, a determination of why those measures were not used or were not used appropriately; and

(C) ~~Opinions~~ **Input** of the injured housekeeper, the housekeeper's **union** representative, and the housekeeper's supervisor as to whether any other control measure, procedure, or tool would have prevented the injury.

(6) Methods or procedures for correcting, in a timely manner, hazards identified in the ~~job hazard analysis~~ **worksite evaluation** or in the investigation of musculoskeletal injuries to housekeepers, including procedures for determining whether identified corrective measures are ~~used~~ **implemented** appropriately. These procedures shall include:

(A) An effective means of involving housekeepers and their **union** representative in identifying and evaluating possible corrective measures;

(B) A means by which appropriate equipment or other corrective measures will be identified, assessed, implemented, and then reevaluated after introduction and while used in the workplace; and

(C) A means of providing appropriate housecleaning equipment, protective equipment, and tools to each housekeeper, including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate housecleaning tools and equipment.

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal. Changes to the 9/24/15 version are shown in strikeout/underline text.*

(7) Procedures for reviewing, at least annually, the MIPP at each worksite, to determine its effectiveness and make any corrections when necessary, including an effective procedure for obtaining the active involvement of housekeepers and their **union** representative in reviewing and updating the MIPP. The procedures shall include a review of the Cal/OSHA Form 300 log and other relevant records such as Cal/OSHA Form 301 incident reports.

**(d) Training**. The employer shall provide training to housekeepers and their supervisors in a language easily understood by ~~housekeepers~~ **these employees**.

(1) Frequency of training. Housekeepers and their supervisors shall be trained as follows:

(A) When the MIPP is first established;

(B) To all new housekeepers and supervisors;

(C) To all housekeepers given new job assignments for which training was not previously provided;

(D) At least annually thereafter; and

(E) Employers shall provide additional training when new equipment or work practices are introduced. The additional training may be limited to addressing the new equipment or work practices.

(2) Training shall include at least the following elements as applicable to the housekeeper's assignment:

(*A*) *__The signs, symptoms, and risk factors for musculoskeletal injuries,__*

(~~A~~*B*)   The elements of the employer's MIPP and how the written MIPP will be made available to housekeepers;

(~~B~~*C*)   The process for reporting safety and health concerns without fear of reprisal;

(~~C~~*D*)   Body mechanics and safe practices including: identified hazards at the work place, how those hazards are controlled during each **housekeeping** task, the appropriate use of cleaning tools and equipment, and the importance of following safe work practices and using appropriate tools and equipment to prevent injuries; ~~and~~

(E)   T~~he~~*the* importance of, *__and process for, early__* reporting of symptoms and injuries to the employer;

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal. Changes to the 9/24/15 version are shown in strikeout/underline text.*

(~~D~~*F*)    Practice using the types and models of equipment that the housekeeper will be expected to use;

(~~E~~*G*)    An opportunity for interactive questions and answers with a person knowledgeable about hotel housekeeping equipment and procedures; and

(~~F~~*H*)    Training of managers and supervisors on how to identify hazards, the employer's hazard correction procedures, how defective equipment can be identified and replaced, how to obtain additional equipment, how to evaluate the safety of housekeepers' work practices, and how to effectively communicate with housekeepers regarding any problems needing correction.

**(e) Records**

(1)  Records of the steps taken to implement and maintain the MIPP, including any measurements taken or evaluations conducted in the **worksite evaluation** ~~job hazard analysis~~ process, shall be created, maintained, and made available in accordance with Section 3203(b).

(2)  A copy of the MIPP and all records required by Subsection (1) shall be available at the worksite for review or copying by housekeepers and their **designated** representative in accordance with Section 3204(e)(1).

(3)  All records shall be made available to the Chief or designee within 72 hours of request.

(4)  Records of occupational injuries and illnesses shall be created and maintained in accordance with Division 1, Chapter 7, Subchapter 1 of these orders.


Appendix A (Non-Mandatory)


Reference Materials for ~~Job Hazard Analysis~~ **the Worksite Evaluation**

The following are examples of materials that can be used in performing a ~~job hazard analysis~~ **worksite evaluation** for housekeeping:

Ohio State University. Ergonomic Resources for Housekeeping.
https://ergonomics.osu.edu/Housekeeper%20Training%20Materials

State Fund. Tips for Hotel Room Attendants.
http://www.statefundca.com/safety/ErgoMatters/RoomAttendants.asp

Department of Industrial Relations. Working Safer and Easier for Janitors, Custodians and Housekeepers, 2005. www.dir.ca.gov/dosh/dosh_publications/janitors.pdf

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. This draft is for discussion purposes only, and is not a rulemaking proposal. Changes to the 9/24/15 version are shown in strikeout/underline text.*

British Columbia, Injury Prevention Resources For Tourism and Hospitality- Accommodation.
https://www2.worksafebc.com/Portals/Tourism/Prevention-Accommodation.asp

Ergonomics Study of Custodial, Housekeeping and Environmental Services Positions at University of California. May 2011. The UC System-wide Ergonomics Team.
http://ucanr.org/sites/ucehs/files/97141.pdf

***Government of Western Australia, Checklist and information- Accommodation industry.***
***https://www.commerce.wa.gov.au/sites/default/files/atoms/files/accommodation_industry_2013.pdf***


Appendix B (Non-Mandatory)

Reserved for Model IIPP Developed by HESIS Stakeholders

[Possible new addition if all stakeholders collaborate with HESIS to create a Model IIPP]

Exhibit 9

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. Changes to the 12/3/15 version are shown in double strikeout/underline text.*

**Hotel Housekeeping Musculoskeletal Injury Prevention**

**(a) Scope and Application**. This section is intended to control the risk of musculoskeletal injuries and disorders to housekeepers in hotels and other lodging establishments. It does not preclude the application of other sections of Title 8.

**(b) Definitions.**

"Housekeeper" means an employee who performs housekeeping tasks and may include employees referred to as housekeepers, guest room attendants, room cleaners, maids, ~~guest services runners~~, and housepersons.

"Housekeeping tasks" means tasks related to cleaning and maintaining sleeping room accommodations including bedrooms, bathrooms, kitchens, living rooms, and balconies. Housekeeping tasks include, but are not limited to, the following: (1) sweeping, dusting, cleaning, scrubbing, mopping and polishing of floors, tubs, showers, sinks, mirrors, walls, fixtures, and other surfaces; (2) making beds; (3) vacuuming; (4) loading, unloading, pushing, and pulling linen carts; (5) removing and supplying linen and other supplies in the rooms, (6) collecting and disposing of trash; and (7) moving furniture.

~~"Job hazard analysis" means an assessment that focuses on job tasks as a way to identify potential hazards. It examines the relationship between the worker, the task, the tools, and the work environment. For purposes of this section, a job hazard analysis is an assessment to evaluate housekeeping tasks with respect to potential causes of musculoskeletal injury to housekeepers.~~

"Lodging establishment" means an establishment that contains sleeping room accommodations that are rented or otherwise provided to the public, such as hotels, motels, resorts, and bed and breakfast inns. For the purposes of this section, "lodging establishment" does not include hospitals, nursing homes, residential retirement communities, prisons, jails, homeless shelters, boarding schools, or worker housing.

"Musculoskeletal injury" means acute injury or cumulative trauma of the muscles~~,~~ tendons~~,~~ ligaments, bursa**e**, peripheral nerves~~,~~ joints~~,~~ bone**s** or blood vessels~~.~~

"**Union** Representative" means a recognized or certified collective bargaining agent representing housekeepers.

**"Worksite evaluation" means the identification and evaluation of workplace hazards in each housekeeping task, process, or operation of work with respect to potential causes of musculoskeletal injuries to housekeepers, that is specific to each workplace.**

**(c) Housekeeping musculoskeletal injury prevention program.** As part of the Injury and Illness Prevention Program (IIPP) required by Section 3203, each employer covered by this section shall establish, implement, and maintain an effective, written, musculoskeletal injury prevention program

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. Changes to the 12/3/15 version are shown in double strikeout/underline text.*

(MIPP) that addresses hazards specific to housekeeping. The written MIPP may be incorporated into the written IIPP, or may be maintained as a separate program**, and must be readily accessible during each work shift to employees when they are in the lodging establishment where they work. (Electronic access and other alternatives to maintaining paper copies of the MIPP are permitted as long as no barriers to employee access are created by such options.)** The MIPP shall include:

(1) Names or job titles of the persons with authority and responsibility for implementing the MIPP at each worksite;

(2) A system for ensuring that supervisors and housekeepers comply with the MIPP, follow the employer's safe workplace housecleaning practices, and use the housekeeping tools or equipment deemed appropriate for each ~~cleaning~~ **housekeeping** task;

(3) A system for communicating with housekeepers in a form readily understandable by all housekeepers on matters relating to occupational safety and health, as required in Section 3203, including provisions designed to encourage housekeepers to inform the employer of hazards at the worksite, and injuries or symptoms that may be related to such hazards, without fear of reprisal;

(4) Procedures for identifying and evaluating housekeeping hazards through ~~a job hazard analysis~~ **a worksite evaluation**:

   (A) The initial ~~job hazard analysis~~ **worksite evaluation** shall be completed within three months after the effective date of this Section or within three months after the opening of a new lodging establishment.

   (B) The procedures shall include an effective means of involving housekeepers and their **union** representative in designing and conducting the **worksite evaluation**.

   (C) Housekeepers shall be notified of the results of the ~~job hazard analysis~~ **worksite evaluation** in writing or by posting it in a location readily accessible to them. The results of the ~~job hazard analysis~~ **worksite evaluation** shall be in a language easily understood by housekeepers.

   (D) The ~~job hazard analysis~~ **worksite evaluation** shall be reviewed and updated:

      1. Whenever new processes, practices, procedures, or renovation of guest rooms or equipment are introduced that may change or increase housekeeping hazards;

      2. Whenever the employer becomes aware of a new or previously unrecognized housekeeping hazard;

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. Changes to the 12/3/15 version are shown in double strikeout/underline text.*

3. **Based on the findings and recommendations of injury investigations conducted in accordance with subsection (c)(5);**

4. At least annually for each worksite.

(E) The ~~job hazard analysis~~ **worksite evaluation** shall address, at a minimum**,** the potential injury risks to housekeepers including but not necessarily limited to: (1) slips, trips and falls; (2) prolonged or awkward static postures; (3) extreme reaches and repetitive reaches above shoulder height, (4) **lifting or forceful whole body or hand exertions; (5)** torso bending, twisting, ~~lifting~~, kneeling, and squatting; (5**6**) pushing and pulling; (6**7**) falling and striking objects; (7**8**) pressure points where a part of the body presses against an object or surface; (8**9**) excessive work-rate; and (9**10**) inadequate recovery time between **housekeeping** tasks.~~; and~~

~~2. A safe work-rate for housekeepers expressed in the number of rooms cleaned per shift. The safe work-rate may vary depending on the number of checkout rooms cleaned and other factors.~~

NOTE: Additional information regarding ~~job hazard analyses~~ **worksite evaluations** can be found in publications listed in Appendix A.

(5) Procedures to investigate musculoskeletal injuries to housekeepers, including the following:

(A) The procedures or **housekeeping** tasks being performed at the time of the injury and whether any identified control measures were available and in use;

(B) If required tools or other control measures were not used**, or not used** appropriately, a determination of why those measures were not used or were not used appropriately; and

(C) ~~Opinions~~ **Input** of the injured housekeeper, the housekeeper's **union** representative, and the housekeeper's supervisor as to whether any other control measure, procedure, or tool would have prevented the injury.

(6) Methods or procedures for correcting, in a timely manner, hazards identified in the ~~job hazard analysis~~ **worksite evaluation** or in the investigation of musculoskeletal injuries to housekeepers, including procedures for determining whether identified corrective measures are ~~used~~ **implemented** appropriately. These procedures shall include:

(A) An effective means of involving housekeepers and their **union** representative in identifying and evaluating possible corrective measures;

(B) A means by which appropriate equipment or other corrective measures will be identified, assessed, implemented, and then reevaluated after introduction and while used in the workplace; and

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. Changes to the 12/3/15 version are shown in double strikeout/underline text.*

      **(C)** A means of providing **and making readily available** appropriate housecleaning equipment, protective equipment, and tools to each housekeeper, including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate housecleaning tools and equipment.

(7) Procedures for reviewing, at least annually, the MIPP at each worksite, to determine its effectiveness and make any corrections when necessary, including an effective procedure for obtaining the active involvement of housekeepers and their **union** representative in reviewing and updating the MIPP. The procedures shall include a review of the Cal/OSHA Form 300 log and other relevant records such as Cal/OSHA Form 301 incident reports.

**(d) Training**. The employer shall provide training to housekeepers and their supervisors in a language easily understood by ~~housekeepers~~ **these employees**.

(1) Frequency of training. Housekeepers and their supervisors shall be trained as follows:

    (A) When the MIPP is first established;

    (B) To all new housekeepers and supervisors;

    (C) To all housekeepers given new job assignments for which training was not previously provided;

    (D) At least annually thereafter; and

    (E) Employers shall provide additional training when new equipment or work practices are introduced **or whenever the employer becomes aware of a new or previously unrecognized hazard**. The additional training may be limited to addressing the new equipment or work practices.

(2) Training shall include at least the following elements as applicable to the housekeeper's assignment:

    (*A*) ***The signs, symptoms, and risk factors*** ~~*for*~~ **commonly associated with** *musculoskeletal injuries,*

    (A*B*)   The elements of the employer's MIPP and how the written MIPP will be made available to housekeepers;

    (B*C*)   The process for reporting safety and health concerns without fear of reprisal;

    (C*D*)   Body mechanics and safe practices including: identified hazards at the work place, how those hazards are controlled during each **housekeeping** task, the appropriate use of cleaning

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. Changes to the 12/3/15 version are shown in double strikeout/underline text.*

tools and equipment, and the importance of following safe work practices and using appropriate tools and equipment to prevent injuries; ~~and~~

(E)   T~~t~~he importance of, ***and process for, early*** reporting of symptoms and injuries to the employer;

(~~D~~*F*)   Practice using the types and models of equipment that the housekeeper will be expected to use;

(~~E~~*G*)   An opportunity for interactive questions and answers with a person knowledgeable about hotel housekeeping equipment and procedures; and

(~~F~~*H*)   Training of managers and supervisors on how to identify hazards, the employer's hazard correction procedures, how defective equipment can be identified and replaced, how to obtain additional equipment, how to evaluate the safety of housekeepers' work practices, and how to effectively communicate with housekeepers regarding any problems needing correction.

**(e) Records**

(1)   Records of the steps taken to implement and maintain the MIPP, including any measurements taken or evaluations conducted in the **worksite evaluation** ~~job hazard analysis~~ process, shall be created, maintained, and made available in accordance with Section 3203(b).

(2)   A copy of the MIPP and all records required by Subsection (1) shall be available at the worksite for review or copying by housekeepers and their **designated** representative in accordance with Section 3204(e)(1).

(3)   All records shall be made available to the Chief or designee within 72 hours of request.

(4)   Records of occupational injuries and illnesses shall be created and maintained in accordance with Division 1, Chapter 7, Subchapter 1 of these orders.

Appendix A (Non-Mandatory)

Reference Materials for ~~Job Hazard Analysis~~ **Worksite Evaluations**

The following are examples of materials that can be used in performing a ~~job hazard analysis~~ **worksite evaluation** for housekeeping:

Ohio State University. Ergonomic Resources for Housekeeping.
https://ergonomics.osu.edu/Housekeeper%20Training%20Materials

*This is a draft of possible language regarding Occupational Safety and Health Standards Board Petition 526. Changes to the 12/3/15 version are shown in double strikeout/underline text.*

State Fund. Tips for Hotel Room Attendants.
http://www.statefundca.com/safety/ErgoMatters/RoomAttendants.asp

Department of Industrial Relations. Working Safer and Easier for Janitors, Custodians and Housekeepers, 2005. www.dir.ca.gov/dosh/dosh_publications/janitors.pdf

British Columbia, Injury Prevention Resources For Tourism and Hospitality- Accommodation.
https://www2.worksafebc.com/Portals/Tourism/Prevention-Accommodation.asp

Ergonomics Study of Custodial, Housekeeping and Environmental Services Positions at University of California. May 2011. The UC System-wide Ergonomics Team.
http://ucanr.org/sites/ucehs/files/97141.pdf

***Government of Western Australia, Checklist and information- Accommodation industry.***
***https://www.commerce.wa.gov.au/sites/default/files/atoms/files/accommodation_industry_2013.pdf***

**~~Appendix B (Non-Mandatory)~~**

**~~Reserved for Model IIPP Developed by HESIS Stakeholders~~**

**~~[Possible new addition if all stakeholders collaborate with HESIS to create a Model IIPP]~~**

# Exhibit 10

STANDARDS PRESENTATION
TO
CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD

---

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

---

Add new Title 8 Section 3345 to read:

## § 3345. Hotel Housekeeping Musculoskeletal Injury Prevention

**(a) Scope and Application**. This section is intended to control the risk of musculoskeletal injuries and disorders to housekeepers in hotels and other lodging establishments. It does not preclude the application of other sections of Title 8.

**(b) Definitions.**

"Control measures" means effective tools, equipment, devices, work practices, and administrative controls to correct or minimize workplace hazards that may cause musculoskeletal injuries to housekeepers.

"Housekeeper" means an employee who performs housekeeping tasks and may include employees referred to as housekeepers, guest room attendants, room cleaners, maids, and housepersons.

"Housekeeping tasks" means tasks related to cleaning and maintaining sleeping room accommodations including bedrooms, bathrooms, kitchens, living rooms, and balconies. Housekeeping tasks include, but are not limited to, the following: (1) sweeping, dusting, cleaning, scrubbing, mopping and polishing of floors, tubs, showers, sinks, mirrors, walls, fixtures, and other surfaces; (2) making beds; (3) vacuuming; (4) loading, unloading, pushing, and pulling linen carts; (5) removing and supplying linen and other supplies in the rooms, (6) collecting and disposing of trash; and (7) moving furniture.

"Lodging establishment" means an establishment that contains sleeping room accommodations that are rented or otherwise provided to the public, such as hotels, motels, resorts, and bed and breakfast inns. For the purposes of this section, "lodging establishment" does not include hospitals, nursing homes, residential retirement communities, prisons, jails, homeless shelters, boarding schools, or worker housing.

"Musculoskeletal injury" means acute injury or cumulative trauma of the muscle, tendon, ligament, bursa, peripheral nerve, joint, bone or blood vessel.

"Union Representative" means a recognized or certified collective bargaining agent representing the employer's housekeepers.

"Worksite evaluation" means the identification and evaluation of workplace hazards including scheduled periodic inspections and the procedures described in subsection (c)(4) to identify unsafe

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

---

conditions and work practices in each housekeeping task, process, or operation of work with respect to potential causes of musculoskeletal injuries to housekeepers, that is specific to each workplace.

(c) **Housekeeping musculoskeletal injury prevention program.** As part of the Injury and Illness Prevention Program (IIPP) required by Section 3203, each employer covered by this section shall establish, implement, and maintain an effective, written, musculoskeletal injury prevention program (MIPP) that addresses hazards specific to housekeeping. The written MIPP may be incorporated into the written IIPP, or may be maintained as a separate program, and must be readily accessible during each work shift to employees when they are in the lodging establishment where they work. (Electronic access and other alternatives to maintaining paper copies of the MIPP are permitted as long as no barriers to employee access are created by such options.) The MIPP shall include:

(1) Names or job titles of the persons with authority and responsibility for implementing the MIPP at each worksite;

(2) A system for ensuring that supervisors and housekeepers comply with the MIPP, follow the employer's safe workplace housecleaning practices, and use the housekeeping tools or equipment deemed appropriate for each housekeeping task; substantial compliance with this provision includes recognition of employees who follow the employer's safe workplace housecleaning practices and use the appropriate tools and equipment, training and retraining programs, disciplinary actions, or other means that ensures employee compliance with the MIPP.

(3) A system for communicating with housekeepers in a form readily understandable by all housekeepers on matters relating to occupational safety and health, as required in Section 3203, including provisions designed to encourage housekeepers to inform the employer of hazards at the worksite, and injuries or symptoms that may be related to such hazards, without fear of reprisal;

(4) Procedures for identifying and evaluating housekeeping hazards through a worksite evaluation:

(A) The initial worksite evaluation shall be completed within three months after the effective date of this Section or within three months after the opening of a new lodging establishment.

(B) The procedures shall include an effective means of involving housekeepers and their union representative in designing and conducting the worksite evaluation.

(C) Housekeepers shall be notified of the results of the worksite evaluation in writing or by posting it in a location readily accessible to them. The results of the worksite evaluation shall be in a language easily understood by housekeepers.

(D) The worksite evaluation shall be reviewed and updated:

STANDARDS PRESENTATION
TO
CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

1. Whenever new processes, practices, procedures, or renovation of guest rooms or equipment are introduced that may change or increase housekeeping hazards;

2. Whenever the employer is made aware of a new or previously unrecognized housekeeping hazard, based on information such as, but not limited to, the findings and recommendations of injury investigations conducted in accordance with subsection (c)(5);

3. At least annually for each worksite.

(E) The worksite evaluation shall identify and address potential injury risks to housekeepers including, but not necessarily limited to: (1) slips, trips and falls; (2) prolonged or awkward static postures; (3) extreme reaches and repetitive reaches above shoulder height, (4) lifting or forceful whole body or hand exertions; (5) torso bending, twisting, kneeling, and squatting; (6) pushing and pulling; (7) falling and striking objects; (8) pressure points where a part of the body presses against an object or surface; (9) excessive work-rate; and (10) inadequate recovery time between housekeeping tasks.

NOTE: Additional information regarding worksite evaluations can be found in publications listed in Appendix A.

(5) Procedures to investigate musculoskeletal injuries to housekeepers, including the following:

(A) The procedures or housekeeping tasks being performed at the time of the injury and whether any identified control measures were available and in use;

(B) If required tools or other control measures were not used, or not used appropriately, a determination of why those measures were not used or were not used appropriately; and

(C) Input of the injured housekeeper, the housekeeper's union representative, and the housekeeper's supervisor as to whether any other control measure, procedure, or tool would have prevented the injury.

(6) Methods or procedures for correcting, in a timely manner, hazards identified in the worksite evaluation or in the investigation of musculoskeletal injuries to housekeepers, including procedures for determining whether identified corrective measures are implemented appropriately. These procedures shall include:

(A) An effective means of involving housekeepers and their union representative in identifying and evaluating possible corrective measures;

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

(B) A means by which appropriate equipment or other corrective measures will be identified, assessed, implemented, and then reevaluated after introduction and while used in the workplace; and

(C) A means of providing and making readily available appropriate housecleaning equipment, protective equipment, and tools to each housekeeper, including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate housecleaning tools and equipment.

(7) Procedures for reviewing, at least annually, the MIPP at each worksite, to determine its effectiveness and make any corrections when necessary, including an effective procedure for obtaining the active involvement of housekeepers and their union representative in reviewing and updating the MIPP. The procedures shall include a review of the Cal/OSHA Form 300 log and other relevant records such as Cal/OSHA Form 301 incident reports.

(d) Training. The employer shall provide training to housekeepers and their supervisors in a language easily understood by these employees.

(1) Frequency of training. Housekeepers and their supervisors shall be trained as follows:

(A) When the MIPP is first established;

(B) To all new housekeepers and supervisors;

(C) To all housekeepers given new job assignments for which training was not previously provided;

(D) At least annually thereafter; and

(E) When new equipment or work practices are introduced or whenever the employer becomes aware of a new or previously unrecognized hazard. The additional training may be limited to addressing the new equipment or work practices.

(2) Training shall include at least the following elements as applicable to the housekeeper's assignment:

(A)  The signs, symptoms, and risk factors commonly associated with musculoskeletal injuries,

(B) The elements of the employer's MIPP and how the written MIPP and all records in subsection (e)(1) will be made available to housekeepers;

(C) The process for reporting safety and health concerns without fear of reprisal;

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

(D) Body mechanics and safe practices including: identified hazards at the work place, how those hazards are controlled during each housekeeping task, the appropriate use of cleaning tools and equipment, and the importance of following safe work practices and using appropriate tools and equipment to prevent injuries;

(E) The importance of, and process for, early reporting of symptoms and injuries to the employer;

(F) Practice using the types and models of equipment that the housekeeper will be expected to use;

(G) An opportunity for interactive questions and answers with a person knowledgeable about hotel housekeeping equipment and procedures; and

(H) Training of managers and supervisors on how to identify hazards, the employer's hazard correction procedures, how defective equipment can be identified and replaced, how to obtain additional equipment, how to evaluate the safety of housekeepers' work practices, and how to effectively communicate with housekeepers regarding any problems needing correction.

**(e) Records**

(1) Records of the steps taken to implement and maintain the MIPP, including any measurements taken or evaluations conducted in the worksite evaluation process required by subsection (c) and the training required by subsection (d), shall be created and maintained in accordance with Section 3203(b).

(2) A copy of the MIPP and all worksite evaluation records required by subsection (e)(1) shall be available at the worksite for review in accordance with subsection (c) and copying by housekeepers and their designated representative in accordance with Section 3204(e)(1).

(3) All records shall be made available to the Chief or designee within 72 hours of request.

(4) Records of occupational injuries and illnesses shall be created and maintained in accordance with Division 1, Chapter 7, Subchapter 1 of these orders.

Authority: Labor Code Section 142.3. Reference: Labor Code Section 142.3.

**STANDARDS PRESENTATION**
**TO**
**CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD**

---

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

---

Appendix A (Non-Mandatory)

Reference Materials for Worksite Evaluations

The following are examples of materials that can be used in performing a worksite evaluation for housekeeping:

Ohio State University. Ergonomic Resources for Housekeeping.
https://ergonomics.osu.edu/Housekeeper%20Training%20Materials

State Fund. Tips for Hotel Room Attendants.
http://www.statefundca.com/safety/ErgoMatters/RoomAttendants.asp

Department of Industrial Relations. Working Safer and Easier for Janitors, Custodians and Housekeepers, 2005. www.dir.ca.gov/dosh/dosh_publications/janitors.pdf

British Columbia, Injury Prevention Resources For Tourism and Hospitality- Accommodation.
https://www2.worksafebc.com/Portals/Tourism/Prevention-Accommodation.asp

Ergonomics Study of Custodial, Housekeeping and Environmental Services Positions at University of California. May 2011. The UC System-wide Ergonomics Team.
http://ucanr.org/sites/ucehs/files/97141.pdf

Government of Western Australia, Checklist and information- Accommodation industry.
https://www.commerce.wa.gov.au/sites/default/files/atoms/files/accommodation_industry_2013.pdf

Authority: Labor Code Section 142.3. Reference: Labor Code Section 142.3.

Exhibit 11

**STANDARDS PRESENTATION**
**TO**
**CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD**

---

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

---

Add new Title 8 Section 3345 to read:

§3345. **Hotel Housekeeping Musculoskeletal Injury Prevention.**

**(a)** **Scope and Application**. This section is intended to control the risk of musculoskeletal injuries and disorders to housekeepers in hotels and other lodging establishments. It does not preclude the application of other sections of Title 8.

**(b)** **Definitions.**

"Control measures" means effective tools, equipment, devices, work practices, and administrative controls to correct or minimize workplace hazards that may cause musculoskeletal injuries to housekeepers.

"Housekeeper" means an employee who performs housekeeping tasks and may include employees referred to as housekeepers, guest room attendants, room cleaners, maids, and housepersons.

"Housekeeping tasks" means tasks related to cleaning and maintaining sleeping room accommodations including bedrooms, bathrooms, kitchens, living rooms, and balconies. Housekeeping tasks include, but are not limited to, the following: (1) sweeping, dusting, scrubbing, mopping and polishing of floors, tubs, showers, sinks, mirrors, walls, fixtures, and other surfaces; (2) making beds; (3) vacuuming; (4) loading, unloading, pushing, and pulling linen carts; (5) removing and supplying linen and other supplies in the rooms; (6) collecting and disposing of trash; and (7) moving furniture.

"Lodging establishment" means an establishment that contains sleeping room accommodations that are rented or otherwise provided to the public, such as hotels, motels, resorts, and bed and breakfast inns. For the purposes of this section, "lodging establishment" does not include hospitals, nursing homes, residential retirement communities, prisons, jails, homeless shelters, boarding schools, or worker housing.

"Musculoskeletal injury" means acute injury or cumulative trauma of a muscle, tendon, ligament, bursa, peripheral nerve, joint, bone, spinal disc or blood vessel.

"Union Representative" means a recognized or certified collective bargaining agent representing the employer's housekeepers.

"Worksite evaluation" means the identification and evaluation, specific to each, of workplace hazards including scheduled periodic inspections and the procedures described in subsection (c)(4) to

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

identify unsafe conditions and work practices in each housekeeping task, process, or operation of work with respect to potential causes of musculoskeletal injuries to housekeepers.

(c) **Housekeeping musculoskeletal injury prevention program.** As part of the Injury and Illness Prevention Program (IIPP) required by Section 3203, each employer covered by this section shall establish, implement, and maintain an effective, written, musculoskeletal injury prevention program (MIPP) that addresses hazards specific to housekeeping. The written MIPP may be incorporated into the written IIPP, or may be maintained as a separate program, and must be readily accessible during each work shift to employees when they are in the lodging establishment where they work. (Electronic access and other alternatives to maintaining paper copies of the MIPP are permitted as long as no barriers to employee access are created by such options.) The MIPP shall include:

(1) Names or job titles of the persons with authority and responsibility for implementing the MIPP at each worksite;

(2) A system for ensuring that supervisors and housekeepers comply with the MIPP, follow the employer's safe workplace housecleaning practices, and use the housekeeping tools or equipment deemed appropriate for each housekeeping task. Substantial compliance with this provision includes recognition of employees who follow the employer's safe workplace housecleaning practices and use the appropriate tools and equipment, training and retraining programs, disciplinary actions, or other means that ensures employee compliance with the MIPP;

(3) A system for communicating with housekeepers in a form readily understandable by all housekeepers on matters relating to occupational safety and health, as required by Section 3203, including provisions designed to encourage housekeepers to inform the employer of hazards at the worksite, and injuries or symptoms that may be related to such hazards without fear of reprisal;

(4) Procedures for identifying and evaluating housekeeping hazards through a worksite evaluation:

(A) The initial worksite evaluation shall be completed within three months after the effective date of this section or within three months after the opening of a new lodging establishment.

(B) The procedures shall include an effective means of involving housekeepers and their union representative in designing and conducting the worksite evaluation.

(C) Housekeepers shall be notified of the results of the worksite evaluation in writing or by posting it in a location readily accessible to them. The results of the worksite evaluation shall be in a language easily understood by housekeepers.

(D) The worksite evaluation shall be reviewed and updated:

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

1. Whenever new processes, practices, procedures, equipment or renovation of guest rooms are introduced that may change or increase housekeeping hazards;

2. Whenever the employer is made aware of a new or previously unrecognized housekeeping hazard based on information such as, but not limited to, the findings and recommendations of injury investigations conducted in accordance with subsection (c)(5);

3. At least annually for each worksite.

(E) The worksite evaluation shall identify and address potential injury risks to housekeepers including, but not limited to: (1) slips, trips and falls; (2) prolonged or awkward static postures; (3) extreme reaches and repetitive reaches above shoulder height, (4) lifting or forceful whole body or hand exertions; (5) torso bending, twisting, kneeling, and squatting; (6) pushing and pulling; (7) falling and striking objects; (8) pressure points where a part of the body presses against an object or surface; (9) excessive work-rate; and (10) inadequate recovery time between housekeeping tasks.

NOTE TO (C)(4)(E): Additional information regarding worksite evaluations can be found in the publications listed in Appendix A.

(5) Procedures to investigate musculoskeletal injuries to housekeepers, including the following:

(A) The procedures or housekeeping tasks being performed at the time of the injury and whether any identified control measures were available and in use;

(B) If required tools or other control measures were not used, or not used appropriately, a determination of why those measures were not used or were not used appropriately; and

(C) Input of the injured housekeeper, the housekeeper's union representative, and the housekeeper's supervisor as to whether any other control measure, procedure, or tool would have prevented the injury.

(6) Methods or procedures for correcting, in a timely manner, hazards identified in the worksite evaluation or in the investigation of musculoskeletal injuries to housekeepers, including procedures for determining whether identified corrective measures are implemented appropriately. These procedures shall include:

(A) An effective means of involving housekeepers and their union representative in identifying and evaluating possible corrective measures;

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

(B) A means by which appropriate equipment or other corrective measures will be identified, assessed, implemented, and then reevaluated after introduction and while used in the workplace; and

(C) A means of providing and making readily available appropriate housecleaning equipment, protective equipment, and tools to each housekeeper, including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate housecleaning tools and equipment.

(7) Procedures for reviewing, at least annually, the MIPP at each worksite, to determine its effectiveness and make any corrections when necessary, including an effective procedure for obtaining the active involvement of housekeepers and their union representative in reviewing and updating the MIPP. The procedures shall include a review of the Cal/OSHA Form 300 log and other relevant records such as Cal/OSHA Form 301 incident reports.

**(d) Training**. The employer shall provide training to housekeepers and their supervisors in a language easily understood by these employees.

(1) Frequency of training. Housekeepers and their supervisors shall be trained as follows:

(A) When the MIPP is first established;

(B) To all new housekeepers and supervisors;

(C) To all housekeepers given new job assignments for which training was not previously provided;

(D) At least annually thereafter; and

(E) When new equipment or work practices are introduced or whenever the employer becomes aware of a new or previously unrecognized hazard. The additional training may be limited to addressing the new equipment or work practices.

(2) Training shall include at least the following elements as applicable to the housekeeper's assignment:

(A) The signs, symptoms, and risk factors commonly associated with musculoskeletal injuries,

(B) The elements of the employer's MIPP and how the written MIPP and all records in subsection (e)(1) will be made available to housekeepers;

(C) The process for reporting safety and health concerns without fear of reprisal;

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

(D) Body mechanics and safe practices including: identified hazards at the workplace, how those hazards are controlled during each housekeeping task, the appropriate use of cleaning tools and equipment, and the importance of following safe work practices and using appropriate tools and equipment to prevent injuries;

(E) The importance of, and process for, early reporting of symptoms and injuries to the employer;

(F) Practice using the types and models of equipment and tools that the housekeeper will be expected to use;

(G) An opportunity for interactive questions and answers with a person knowledgeable about hotel housekeeping equipment and procedures; and

(H) Training of managers and supervisors on how to identify hazards, the employer's hazard correction procedures, how defective equipment can be identified and replaced, how to obtain additional equipment, how to evaluate the safety of housekeepers' work practices, and how to effectively communicate with housekeepers regarding any problems needing correction.

**(e) Records.**

(1) Records of the steps taken to implement and maintain the MIPP, including any measurements taken or evaluations conducted in the worksite evaluation process required by subsection (c) and the training required by subsection (d), shall be created and maintained in accordance with Section 3203(b).

(2) A copy of the MIPP and all worksite evaluation records required by subsection (e)(1) shall be available at the worksite for review in accordance with subsection (c) and copying by housekeepers and their designated representative in accordance with Section 3204(e)(1).

(3) All records shall be made available to the Chief of the Division or designee within 72 hours of request.

(4) Records of occupational injuries and illnesses shall be created and maintained in accordance with Division 1, Chapter 7, Subchapter 1 of these Orders.

NOTE: Authority cited: Section 142.3, Labor Code. Reference: Section 142.3, Labor Code.

STANDARDS PRESENTATION
TO
CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD

---

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

---

Appendix A (Non-Mandatory)

Reference Materials for Worksite Evaluations

The following are examples of materials that can be used in performing a worksite evaluation for housekeeping:

Ohio State University. Ergonomic Resources for Housekeeping.
https://ergonomics.osu.edu/Housekeeper%20Training%20Materials

State Fund. Tips for Hotel Room Attendants.
https://content.statefundca.com/safety/ErgoMatters/RoomAttendants.asp

Department of Industrial Relations. Working Safer and Easier for Janitors, Custodians and Housekeepers, 2005. www.dir.ca.gov/dosh/dosh_publications/janitors.pdf

British Columbia, Injury Prevention Resources For Tourism and Hospitality- Accommodation.
https://www2.worksafebc.com/Portals/Tourism/Prevention-Accommodation.asp

Ergonomics Study of Custodial, Housekeeping and Environmental Services Positions at University of California. May 2011. The UC System-wide Ergonomics Team.
http://ucanr.org/sites/ucehs/files/97141.pdf

Government of Western Australia, Checklist and information- Accommodation industry.
https://www.commerce.wa.gov.au/sites/default/files/atoms/files/accommodation_2016.pdf

NOTE: Authority cited: Section 142.3, Labor Code. Reference: Section 142.3, Labor Code.

Exhibit 12

STATE OF CALIFORNIA - DEPARTMENT OF INDUSTRIAL RELATIONS                    EDMUND G. BROWN JR., *Governor*

**OCCUPATIONAL SAFETY
AND HEALTH STANDARDS BOARD**
2520 Venture Oaks Way, Suite 350
Sacramento, CA 95833
(916) 274-5721
FAX (916) 274-5743
www.dir.ca.gov/oshsb



## INITIAL STATEMENT OF REASONS

CALIFORNIA CODE OF REGULATIONS
TITLE 8: New Section 3345
of the General Industry Safety Orders

Hotel Housekeeping Musculoskeletal Injury Prevention

## SUMMARY

Pursuant to California Labor Code Section 142.3, the Occupational Safety and Health Standards Board (Board) may adopt, amend, or repeal occupational safety and health standards or orders. Section 142.3 permits the Board to prescribe suitable protective equipment and control or technological procedures to be used in connection with occupational hazards and to provide for monitoring or measuring employee exposure for the protection of employees.

In January 2012, Kurt Peterson and Pamela Vossenas, on behalf of UNITE HERE, filed Petition No. 526 requesting the Board to promulgate a safety and health standard to address the occupational hazards faced by housekeepers in the hotel and hospitality industry.  UNITE HERE, a labor organization representing thousands of California workers employed in the hotel and hospitality industry, proposed adopting a comprehensive standard that would prevent debilitating injuries and reduce the high injury rates suffered by housekeepers.

The petitioner affirms that hotel housekeeping is a physically arduous task and that hotel housekeepers are exposed to serious occupational risks in the course of their normal work duties. During the past decade, hotel operators have increasingly competed on the luxury of their room offerings, consisting of oversized, heavier mattresses, bulky duvets and heavier bed linen together with other upgraded room and bathroom amenities.  These tasks are frequently performed under demanding time restraints, further increasing the worker's risk of suffering debilitating injuries.  In addition, this workforce includes vulnerable groups with a significant percentage of women, persons of color, and/or immigrants that are less inclined to report workplace hazards or violations and suffer from higher occupational injury rates than the general population.  The petitioner asserts that a growing body of academic literature deriving from scientific fields ranging from epidemiology to human biomechanics has shed significant light on the occupational hazards of hotel housekeeping.

The Division of Occupational Safety and Health (Division or Cal/OSHA) and the Board's staff evaluated the petition in March 2012 and recommended granting the petition.  In May 2012, however, the Board rejected the recommendations and took no further action to grant or deny the petition.  In June 2012, the Board reconsidered recommendations made by Division and Board staff and adopted a revised petition.  Based on the high prevalence of musculoskeletal injuries, the Board requested the Division convene an advisory committee to determine what control

measures would be necessary to address the musculoskeletal injury hazards faced by hotel housekeeping employees.

From October 2012 through December 2015, the Division held five advisory committee meetings where the Division, hospitality employers and labor advocates gave presentations and housekeepers shared their experiences.  In addition, the Division presented multiple discussion drafts and received input from stakeholders.  The input and data gathered at these advisory meetings overwhelmingly confirmed the existence of a high number of injuries and illnesses caused by acute injury or cumulative trauma, supporting the need to address these occupational hazards and illustrating how existing regulations do not adequately address the housekeeping hazards faced by these workers.  Participating stakeholders repeatedly referenced injuries to the back, shoulder and upper extremities and injuries due to falls, slips and trips.  The injuries can disable workers, sometimes preventing them from returning to work, and impose high financial costs on the injured workers and their families, employers and insurers.

Hotel housekeepers in California face higher numbers of injuries and illnesses caused by acute injury or cumulative trauma when compared to other industries in California, and appropriate control measures can reduce the risk.  As summarized in a report by Department of Industrial Relations (DIR) research staff in 2016, California Workers' Compensation Information System (WCIS) data from 2010 to 2014 (document 9 from the list of Documents Relied Upon, listed below) shows a steady increase in the number of worker injury claims, from 4,990 in 2010 to 6,116 in 2014, when focused specifically on housekeepers within the accommodation industry.  A steady increase is also seen in musculoskeletal disorder (MSD) injury claims filed by hotel housekeepers, from 3,278 in 2010 to 4,089 in 2014.  Furthermore, falls, slips and trips; pushing and pulling; and stationary object injuries occurred at a higher percentage rate among hotel housekeepers when compared to all industries.  Falls, slips and trips make up 20.5% of hotel housekeeper worker injury claims and repetitive motion injuries make up 7% of the injury claims.  Additionally, the federal fiscal year 2015-2016 High Hazard Industry List, established pursuant to Labor Code 6401.7(e)(3)(A), identifies the accommodation industry as a high hazard industry due to its high DART (days away, restricted and transferred) rate.  Housekeeping cleaners are also within the top 10 occupations in terms of their DART rate (document 5 from the list of Documents Relied Upon, listed below).

At the March 19, 2013, stakeholder advisory meeting, the Division presented preliminary information based on WCIS data from 2009 to 2012 (document 18 from the list of Documents Relied Upon, listed below), identifying the tasks associated with the most frequent injuries.  Additionally, data from OSHA logs and inspections conducted by the Division, federal OSHA and Hawaii OSHA identified injuries and risk factors associated with housekeeping tasks.  These data also confirm that hotel housekeepers are at increased risk of developing occupational musculoskeletal disorders, including injuries to upper extremities and back due to exposure to hazards present in housekeeping tasks.

Existing occupational health and safety standards do not adequately address the hazards associated with housekeeping tasks.  Section 3203, the Injury and Illness Prevention Program (IIPP), establishes a general framework for the identification, evaluation, and correction of

hazards, but it does not establish specific requirements to address the hazards or assess the risk factors which lead to the development of musculoskeletal injuries.

Section 5110, Repetitive Motion Injuries (RMIs), requires a program that includes worksite evaluation, control of exposures and employee training.  However, employers are not subjected to these requirements unless or until more than one repetitive motion injury, meeting certain conditions, occurs at their workplace within a twelve month period.  Additionally, this section only addresses repetitive motion injuries and does not take into consideration other musculoskeletal injuries such as strains or sprains which are a result of acute trauma or other acute injuries caused by falls, slips or trips.

Adoption of a standard is critical to preventing the often debilitating injuries suffered by housekeepers and to containing the financial costs of these injuries on the injured employees and their families, employers and insurers.  The new regulation will address these hazards more effectively, clarifying and directing employers to mitigate the risk factors and minimizing the injuries associated with jobs/tasks specifically related to hotel housekeeping.

## SPECIFIC PURPOSE AND FACTUAL BASIS OF PROPOSED ACTION

This regulatory proposal is intended to improve and provide worker safety in hotel and hospitality worksites by requiring employers to establish and implement programs to address and minimize the high number of acute, repetitive and chronic musculoskeletal injuries occurring to housekeepers.  This regulation would also provide for a worksite evaluation requiring effective involvement of housekeepers, methods of correction, including the availability of housecleaning tools and equipment, and effective training on injury prevention associated with housecleaning tasks.

Section 3345 is necessary to ensure that employers of housekeepers:

- Involve housekeepers in designing and conducting worksite evaluations of housekeeping hazards,
- Identify the causes of musculoskeletal injuries,
- Identify and evaluate possible corrective measures,
- Establish and keep up to date a program to prevent musculoskeletal injuries
- Provide training for housekeepers and supervisors on risk factors, safe practices, and the elements of the employer's program to prevent musculoskeletal injuries.

This proposal is not duplicative of Section 5110, RMI because the proposal does not focus solely on injuries that have been medically diagnosed as an RMI.  By focusing the injury prevention requirements to housekeeper related issues, Section 3345 will reduce the number of acute, repetitive and cumulative injuries to housekeepers.

This proposed rulemaking action:

- Is based on the following authority and reference: Labor Code Section 142.3, which states, at subsection (a)(1) that the Board is "the only agency in the state authorized to adopt occupational safety and health standards." When read in its entirety, Section 142.3 requires that California have a system of occupational safety and health regulations that are at least as effective as the corresponding federal regulations, but may be more protective of worker health and safety than the federal occupational safety and health regulations. In addition, Section 142.3 permits the Board to prescribe suitable protective equipment and control or technological procedures to be used in connection with occupational hazards and provide for monitoring or measuring exposure for the protection of employees.

- Differs from existing federal regulations, in that federal OSHA does not have a counterpart standard to specifically address the occupational hazards affecting housekeepers in the hotel and hospitality industry.

- Is not inconsistent or incompatible with the system of existing occupational safety and health state regulations. The proposal is consistent and compatible with federal law and the California Labor Code, which require state regulations to be at least as effective as their federal counterparts, and the requirement that all state occupational safety and health rulemaking be channeled through a single entity (the Board).

- Will enhance the safety of housekeeping employees with the implementation of a Hotel Housekeeping Musculoskeletal Injury Prevention Program which will identify and evaluate housekeeping hazards through a worksite evaluation and provide for effective involvement of housekeepers and their union representatives. The proposed regulation also provides for methods of correcting hazards including: 1) ensuring the availability of housecleaning tools and equipment, and 2) providing effective training on the prevention of injuries associated with housecleaning tasks.

The purpose and factual basis of the standard proposed to be adopted as a permanent rule are outlined below:

### New Section 3345. Hotel Housekeeping Musculoskeletal Injury Prevention.

<u>Subsection (a) Scope and Application.</u>
Proposed subsection (a) establishes the scope of workplaces required to comply with the provisions of this section. This provision is necessary to identify those employers required to implement a prevention program to control the risk of musculoskeletal injuries and disorders.

Subsection (b) Definitions.
Several definitions are proposed for new section 3345.  They are necessary to clarify that the terms, as used, may have more specific meaning for the protection of housekeepers and prevention of musculoskeletal injuries than they would in general usage.

Subsection (c) Housekeeping Musculoskeletal Injury Prevention Program.
Subsection (c) requires each employer covered by this section to establish, implement, and maintain an effective written Musculoskeletal Injury Prevention Program (MIPP) that is in effect at all times and is specific to addressing the hazards faced by hotel housekeeping employees. The MIPP is the most effective and efficient method for reducing housekeeping injuries.  The subsection allows the written MIPP to be incorporated into the employer's written IIPP, or kept as a separate document, and requires the MIPP to be readily accessible to employees during each work shift.  Subsection (c) establishes the basic elements that an employer is responsible for incorporating into their IIPP, or maintaining as a separate document, under Section 3203, as required by LC Section 6401.7.  They are as follows:

Subsection (c)(1) requires that the names and/or the job titles of the individuals responsible for implementing the MIPP are included.  This is necessary to ensure that there are specific individuals who have the responsibility for administering the program and to allow other administrators and employees to know who should be contacted if there are questions or difficulties with carrying out the MIPP.  This is also required to be consistent with Section 3203(a)(1).  The benefit of this is to ensure that someone assumes responsibility for implementing the MIPP.

Subsection (c)(2) requires the employer to ensure that supervisors and housekeeping employees comply with the MIPP, follow the employer's safe workplace practices and use the housekeeping tools or equipment deemed appropriate for each housekeeping task.  This subsection lists examples of methods that constitute substantial compliance.  Subsection (c)(2) is necessary to ascertain and to make clear to housekeepers and supervisors that the established employer's MIPP, safe work practices and corrective procedures are the required job duties that supervisors and housekeepers must follow.  This subsection is consistent with subsection 3203(a)(2).  The benefits of the requirements include an increased likelihood of a successful implementation of the MIPP and a reduction in the high number of musculoskeletal injuries and disorders.

Subsection (c)(3) requires a system for communicating with housekeeping employees in a form readily understandable by all housekeepers, including provisions to encourage employees to inform the employer of hazards at the worksite and injuries or symptoms without fear of reprisal. Employees usually will not report hazards if they fear reprisal which would deprive the employer of valuable information in the establishment of an effective MIPP.  This provision is necessary to ensure that all employees, regardless of their own primary language, receive critical information and obtain a clear understanding of the specific procedures they are to follow to avoid suffering a musculoskeletal injury, and report early symptoms or injuries.  This subsection is consistent with subsection 3203(a)(3).  The benefits of the requirements include ensuring housekeepers have critical information to protect themselves and are not retaliated against for informing the employer of the presence of hazards or for reporting early symptoms or injuries.

Subsection (c)(4) requires the employer to have procedures for identifying and evaluating housekeeping hazards through a worksite evaluation. This provision is necessary to make certain that the employer evaluates each housekeeping task with respect to potential causes of musculoskeletal injuries in order to effectively control the risk of musculoskeletal injuries and disorders. This subsection is consistent with subsection 3203(a)(4).

Subsection (c)(4)(A) establishes the timeframe for completing the initial worksite evaluation. This requirement is necessary to ensure that housekeeping employees are protected against musculoskeletal injuries and disorders by having the employer implement an effective MIPP without delay.

Subsection (c)(4)(B) requires that the employer establish procedures to include effective means of involving housekeepers and their union representative in designing and conducting the worksite evaluation. This requirement is necessary to ensure that the employer will have procedures for the active involvement of employees and their representatives, including participation in the identification and evaluation of hazards to obtain valuable input based on the housekeepers' experiences and observations. The benefits of employee and employee representative involvement include more effective worksite evaluations, greater success in the identification of housekeeping hazards, implementation of effective corrective measures, and injury reduction.

Subsection (c)(4)(C) requires housekeepers to be notified of the results of the worksite evaluation in writing or by posting and requires the results be in a language easily understood by the housekeepers. The requirements of the subsection are necessary to ensure that appropriate communication of evaluation results is made so that all employees, regardless of their primary language, receive critical information with respect to the hazards specific to housekeeping present in their work environment which must be controlled to prevent musculoskeletal injuries. The benefits of this provision include ensuring housekeepers have critical information to help protect themselves and prevent musculoskeletal injuries.

Subsections (c)(4)(D)(1-3) require the worksite evaluation to be reviewed and updated and specifies when employers are required to comply with the provisions of this subsection. The requirements are necessary to ensure that the employer reevaluates risk factors whenever new processes, practices, procedures, equipment or renovations are introduced; when the employer is made aware of new or previously unrecognized hazards, based on but not limited to the findings and recommendations of injury investigations; and at least annually for each worksite. This provision is needed to ensure that employers and employees are made aware of new or previously unrecognized hazards. The benefit of the subsections includes providing the employer with multiple means of discovering potential workplace hazards for the purpose of preventing musculoskeletal disorders or injuries.

Subsection (c)(4)(E) requires the worksite evaluation to identify and address potential injury risks to housekeepers and lists various potential sources of injury to be considered. The requirements are necessary to ensure that the employer addresses all potential sources of injury,

including but not limited to: slips, trips and falls; prolonged or awkward static postures; extreme reaches and repetitive reaches above shoulder height; lifting or forceful whole body or hand exertions; torso bending, twisting, kneeling, and squatting; pushing and pulling; falling and striking objects; pressure points where a part of the body presses against an object or surface; excessive work-rate; and inadequate recovery time between housekeeping tasks. The benefits of the subsection include ensuring that all probable sources of injury are being addressed, so as to effectually prevent musculoskeletal injuries to housekeepers. A note following subsection (c)(4)(E) references Appendix A, which provides additional information regarding worksite evaluations.

Subsection (c)(5) requires the employer to have procedures consistent with Section 3203(a)(5) to investigate musculoskeletal injuries to housekeepers. This requirement is necessary to ensure that the employer investigates each musculoskeletal injury and that appropriate steps are taken to address the cause of the injury and prevent additional musculoskeletal injuries. The rationale for the required procedures is as follows:

Subsection (c)(5)(A) requires the employer to include in the injury investigation the procedures or housekeeping tasks being performed at the time of the injury and determine whether control measures were available and in use. This requirement is necessary to ensure the employer investigates each musculoskeletal injury, to ensure the employer assesses the housekeeping tasks or procedures being performed at the time of the injury, and to make certain that appropriate corrective steps are taken to address the cause of the injury and prevent additional musculoskeletal injuries. It is also needed to reevaluate housekeeping tasks to identify new or previously unidentified hazards and find an appropriate corrective solution. The benefits include ensuring that all probable sources of injury are addressed and all control measures are considered, so as to effectually prevent musculoskeletal injuries to housekeepers.

Subsection (c)(5)(B) requires the employer to determine during the injury investigation, if required tools or other control measures were not used or not used appropriately and the rationale for why those measures were not used or were not used appropriately. This requirement is necessary to ensure that information about the injuries is assessed by the employer to take corrective steps and implement the best preventive measures to avert additional musculoskeletal injuries to housekeepers. The requirement is also necessary to ensure that previously unrecognized corrective measures be considered and adopted by the employer to effectually prevent further musculoskeletal injuries.

Subsection (c)(5)(C) requires the employer to include in its injury investigation, input of the injured housekeeper, the housekeeper's union representative, and the housekeeper's supervisor as to whether any control measure, procedure, or tool would have prevented the injury. This requirement is necessary to ensure that all valuable information about the injuries, including the observations and experiences of the housekeepers, is assessed by the employer to effectively identify and implement new or previously unrecognized corrective measures. The benefits include considering all potential solutions or corrective measures so as to effectually prevent musculoskeletal injuries to housekeepers.

Subsection (c)(6) requires the employer to establish methods or procedures for correcting, in a timely manner, hazards identified in the worksite evaluation or in the investigation of musculoskeletal injuries to housekeepers. This subsection is consistent with Section 3203(a)(6). The employer must include procedures for determining whether identified corrective measures are implemented appropriately to effectively protect employees from musculoskeletal injuries. The rationale for the required procedures is as follows:

Subsection (c)(6)(A) requires the employer to establish effective means of involving housekeepers and their union representative in identifying and evaluating possible corrective measures. This requirement is necessary to ensure that affected employees are given a chance to provide valuable input, based on their experiences and observations, in the identification and evaluation of possible corrective measures. This requirement is advantageous to employers and employees by allowing better cooperation and integration of corrective measures. The benefits include identification and implementation of corrective measures to reduce the high number of musculoskeletal injuries and disorders.

Subsection (c)(6)(B) requires the employer to establish means by which appropriate equipment or other corrective measures will be identified, assessed and implemented. This subsection will also ensure that the identified equipment or corrective measure be reevaluated after introduction and while being used in the workplace. This requirement is necessary to ensure that employers have multiple options and ample opportunity for selecting the most appropriate solution, corrective measures or equipment that best fits their specific worksite. The requirement is also needed to ensure the regular use and frequent application of the identified equipment or corrective measure and ensure the reevaluation of selected equipment or corrective measures after introduction to determine whether the corrective measure is effective and if additional correction or substitution is warranted. The benefits of this provision include allowing better selection, implementation and integration of equipment or corrective measures to improve the successful prevention and reduction of musculoskeletal injuries and disorders.

Subsection (c)(6)(C) requires the employer to provide and make readily available appropriate housecleaning equipment, protective equipment, and tools, including procedures for procuring, inspecting, maintaining, repairing and replacing the housecleaning tools and equipment. This requirement is necessary to ensure that employers implement corrective measures in a timely manner, make certain that affected employees are not placed in a situation where needed equipment is not available, avoid situations where the equipment provided is broken or in disrepair, and ensure their regular and frequent use. The benefits include ensuring that housekeepers have access to and utilize appropriate housecleaning tools and equipment to effectually prevent musculoskeletal injuries to housekeepers.

Subsection (c)(7) requires the employer to have procedures for reviewing the MIPP at least annually, at each worksite. The review of the MIPP is intended to determine its effectiveness and make any corrections when necessary. This subsection requires that the employer include an effective procedure to obtain the active involvement of housekeepers and their union representative in the review and update of the MIPP. The subsection also requires that the Cal/OSHA Form 300 log or other relevant records such as Cal/OSHA Form 301 incident reports

be included in the review.  This provision is necessary to ensure that employers conduct a review and update of their MIPP, involve housekeepers and their union representative in the reviewing process and make certain critical documents associated with these musculoskeletal injuries are taken into consideration so as to address the cause of injuries and prevent future ones.  The involvement of employees and their representatives will improve the review process by including additional viewpoints and experiences in determining the effectiveness of the MIPP and determining where improvements or changes are needed.  The benefits of this subsection include identifying and correcting deficiencies in the MIPP to ensure the program is effective in preventing musculoskeletal injuries to housekeepers.

<u>Subsection (d) Training.</u>
Subsection (d) requires each employer covered by this section to provide training to housekeepers and their supervisors consistent with Section 3203(a)(7).  Training must be provided in a language easily understood by employees.  This subsection is necessary to inform employers on the required frequency of training and the necessary components of their training programs.

Subsection (d)(1) establishes clear guidelines on the frequency of housekeepers and supervisor training in accordance with Section 3203(a)(7).  This subsection is necessary to ensure that employees acquire the necessary knowledge to understand and follow the employer's injury prevention procedures, recognize potential sources of injury, and know how to use the appropriate housekeeping tools or equipment to effectually prevent musculoskeletal disorders and injuries. The subsection is needed to ensure housekeepers and supervisors maintain and update their knowledge, especially when changes to the MIPP have been made to correct problems or improve procedures.  The rationale for the requirements is as follows:

Subsection (d)(1)(A) requires employers to provide initial training to employees when the MIPP is first established consistent with Section 3203(a)(7).  This provision is necessary to inform employees about possible hazards related to housekeeping duties, the existence of employer's MIPP and procedures to minimize hazards to effectually prevent musculoskeletal disorders and injuries.

Subsection (d)(1)(B) requires employers to provide training to all new housekeepers and supervisors.  This subsection is consistent with Section 3203(a)(7)(B).  This provision is necessary to ensure that housekeepers and supervisors hired after the employer's MIPP was first established, also acquire the necessary knowledge to understand and follow the employer's prevention procedures, recognize potential sources of injury and their proper preventive measures, and know how to use the appropriate housekeeping tools or equipment to effectually prevent musculoskeletal disorders and injuries.

Subsection (d)(1)(C) requires employers to provide training to all housekeepers given new job assignments for which training was not previously provided. This subsection is consistent with 3203(a)(7)(C). New job assignments may expose employees to different and unrecognized hazards increasing the risk of injuries.  To prevent injuries, employees must be knowledgeable of

the hazards and knowledgeable of how to minimize the hazards so proper preventative measures are utilized prior to any signs and symptoms of musculoskeletal disorders occurring.

Subsection (d)(1)(D) requires employers to provide training at least annually. This subsection is necessary to ensure that housekeepers and supervisors maintain and update their knowledge on housekeeping hazards especially when changes to the MIPP have been made to correct problems or improve procedures.

Subsection (d)(1)(E) requires employers to provide training when new equipment or work practices are introduced or whenever the employer becomes aware of a new or previously unrecognized hazard. This subsection is necessary to ensure employees are up-to-date and able to protect themselves against newly discovered hazards or other sources of injuries; safely use new equipment and correctly perform new work practices to effectually prevent musculoskeletal disorders and injuries. This subsection allows the additional training to be limited to addressing the new equipment or work practices to minimize the disruption and cost to the employers. The subsection is consistent with Section 3203(a)(7)(D).

Subsection (d)(2) establishes clear guidelines on the elements and contents of the training program. The requirements are necessary to ensure employers provide effective training applicable to the housekeeper's assignment. The rationale for the required elements is as follows:

Subsection (d)(2)(A) requires that the employer provide training on the signs, symptoms, and risk factors commonly associated with musculoskeletal injuries. Employees are able to protect themselves against injury when knowledgeable of the causes, symptoms, diagnosis, and treatment of musculoskeletal injuries. The requirements improve the employee's ability to recognize and promptly report symptoms of musculoskeletal disorders to effectually reduce the high number of musculoskeletal injuries.

Subsection (d)(2)(B) requires that the employer provide training on the elements of the employer's MIPP and how the written MIPP and all records in subsection (e)(1) will be made available to housekeepers. This is consistent with Section 3203(a)(7). This provision is necessary to ensure employees understand the MIPP and its elements, such as recognizing potential sources of injury, learning the employer's corrective measures, and knowing about reporting symptoms or injuries without fear of reprisal. The subsection is also necessary to ensure employers train their workers on how to access or refer to the MIPP for questions to effectually prevent musculoskeletal disorders and injuries.

Subsection (d)(2)(C) requires that the employer provide training on the process of reporting safety and health concerns without fear of reprisal. Employees will not report hazards if they fear reprisal, which would deprive the employer of valuable information in the establishment of an effective MIPP. The requirement benefits employers and employees by reducing costly musculoskeletal injuries through the prompt identification and correction of new or previously unrecognized hazards and sources of injury.

Subsection (d)(2)(D) requires that the employer provide training on body mechanics and safe practices including: identified hazards at the workplace, how those hazards are controlled during each housekeeping task, the appropriate use of cleaning tools and equipment, and the importance of following safe work practices and using appropriate tools and equipment to prevent injuries. The information required by this subsection includes the causes of injury and controlling the hazards which lead to injury.  Employees need this information to enable them to protect themselves from housekeeping hazards.  The requirement benefits employers and employees by reducing costly musculoskeletal injuries through the proper use of body mechanics, safe work practices, and appropriate cleaning tools or equipment.

Subsection (d)(2)(E) requires employers to provide training on the importance of, and process for, early reporting of symptoms and injuries to the employer.  Disabling injuries can be prevented if corrections are made when the first symptoms of musculoskeletal problems arise.  In addition, if an employee suffers an injury, corrections can be made to prevent injuries to other employees.  The requirement benefits employers and employees by reducing costly musculoskeletal injuries through the early recognition and prompt reporting of signs and symptoms of musculoskeletal disorders.

Subsection (d)(2)(F) requires employers to include in their training, the opportunity to practice using the types and models of equipment and tools that housekeepers will be expected to use on the job. This provision ensures employees will know how to safely use the cleaning tools and equipment to avert musculoskeletal injuries.  The requirement benefits employers and employees by reducing costly musculoskeletal injuries through the proper use of appropriate cleaning tools and equipment.

Subsection (d)(2)(G) requires employers to include in their training, an opportunity for interactive questions and answers with a person knowledgeable about hotel housekeeping equipment and procedures.  This provision ensures that employees will have the ability to ask for clarification about the training content, housekeeping hazards and control measures to reduce injuries.  The opportunity to ask questions and receive answers is necessary to ensure the information is properly understood by employees.  A misunderstanding of the information may lead to improper work practices, misuse of tool and potential injuries.  The ability of employees to acquire crucial knowledge to protect themselves and avert musculoskeletal injuries is enhanced by this subsection.  The requirement benefits employers and employees by reducing costly musculoskeletal injuries through the expansion of the housekeepers' health and safety knowledge and effective implementation of the employer's preventive measures.

Subsection (d)(2)(H) requires employers to provide training to managers and supervisors on how to identify hazards, the employer's hazard correction procedures, how defective equipment can be identified and replaced, how to obtain additional equipment, how to evaluate the safety of housekeepers' work practices, and how to effectively communicate with housekeepers regarding any problems needing correction.  Managers and supervisors need to be knowledgeable of the hazards faced by housekeeping employees and control measures to prevent injuries, to assist in the implementation of the MIPP, to take proper action when problems are reported or discovered and to correct unsafe work practices or conditions.  This provision is necessary to ensure

managers and supervisors maintain their knowledge of the employer's prevention procedures and carry out the necessary actions to reduce musculoskeletal injuries.  The requirements benefit employers and employees by reducing costly musculoskeletal injuries through the effective implementation of the employer's MIPP and proper action of supervisors and managers.

Subsection (e) Records.
Subsection (e) establishes clear guidelines on the recordkeeping requirements that employers need to follow to comply with this section.  This subsection is necessary to establish the requirements for creating and maintaining the records that have been identified within this proposed standard.  This is also required to be consistent with Section 3203(b) and Section 3204.

Subsection (e)(1) requires that records of the steps taken to implement and maintain the MIPP, including measurements taken or evaluations conducted in the worksite evaluation process required by subsection (c), and the training required by subsection (d), be created and maintained.  This subsection is necessary to ensure that employers will have adequate documentation which can be used to assess the effectiveness of the MIPP.  These records are also necessary for the Division to be able to effectively enforce this section and to be consistent with Section 3203(b).  The benefit of this is to ensure the proper implementation of the employer's MIPP through the corroboration and review of all required records and to ascertain its effectiveness in preventing musculoskeletal injuries.

Subsection (e)(2) requires that a copy of the MIPP and all worksite evaluation records required by subsection (e)(1) be made available at the worksite for review and copying by housekeepers and their designated representative in accordance with Section 3204(e)(1).  This subsection is necessary so that each employee and designated representative may have access to needed information, exposure records, and also ensure that employers will have adequate documentation of their control measures.  These records are also necessary so that the employer, employees and the Division can review the effectiveness of the MIPP.

Subsection (e)(3) requires that all records be made available to the Chief of the Division or designee within 72 hours of request.  This subsection is necessary to establish that records required by this subsection shall be made available to the Chief, so that the Division can effectively enforce this section and review and assess the effectiveness of the employer's MIPP.  This provides clarity to employers.

Subsection (e)(4) requires that the employer create and maintain records of occupational injuries and illnesses as required by California Code of Regulations, Title 8, Division 1, Chapter 7, Subchapter 1, Occupational Injury or Illness Reports and Records.  These include the Cal/OSHA Form 300, Log of Work Related Injuries and Illnesses; the Cal/OSHA Form 300A, Summary of Work-Related Injuries and Illnesses; the Cal/OSHA Form 301, Injury and Illness Incident Report; or equivalent forms, as well as the Form 5020, Employer's Report of Occupational Injury or Illness Form; and Form 5021, Rev. 4, Doctor's First Report of Occupational Injury or Illness.  This subsection is necessary to ensure consistency with Title 8 regulations, make certain that employers, employees and the Division can review injury information and to allow the Division to determine if an employer is complying with the requirements of this section.

Appendix A – Reference Materials for Worksite Evaluation (Non-Mandatory)

This proposed appendix is intended to identify useful references and list examples of materials that can be utilized to conduct a worksite evaluation as required by this section.  This is necessary to identify and reference materials which can be used in performing a worksite evaluation for housekeeping.  This is to ensure that employers have references and examples to assist with complying with this section without having to hire health and safety professionals and increase their costs.  The rationale for the recommended references is as follows:

— The Ohio State University reference provides bilingual ergonomic resources including practices that can improve health and safety for housekeepers and managers. (See link #10 below)

— The State Fund, Tips for Hotel Room Attendants reference is a concise list of tips and recommendations geared towards room attendants. (See link #11 below)

— The 2005 Department of Industrial Relations, Working Safer and Easier for Janitors, Custodians and Housekeepers reference provides general guidelines and tips for a variety of workers including housekeepers. (See link #12 below)

— The British Columbia, Injury Prevention Resources for Tourism and Hospitality-Accommodation reference includes a video series in various languages that demonstrate safe work procedures specific to housekeepers. (See link #13 below)

— The 2011 Ergonomics Study of Custodial, Housekeeping and Environmental Services Positions at the University of California references an ergonomic study conducted on custodians/housekeepers and environmental service workers. (See link #14 below)

— The Government of Western Australia reference is specific to the Accommodation industry and includes a checklist and guidance for conducting hazard identification and risk assessment. (See link #15 below)

**TECHNICAL, THEORETICAL AND/OR EMPIRICAL STUDIES, REPORTS OR DOCUMENTS RELIED ON BY THE BOARD**

1. Occupational Safety and Health Standards Board Petition No. 526, submitted by Kurt Peterson and Pamela Vossenas, on behalf of UNITE HERE (Jan. 23, 2012).

2. Division of Occupational Safety and Health's evaluation of Petition No. 526, (Mar. 27, 2012).

3. Occupational Safety and Health Standards Board decision regarding Petition No. 526 (June 21, 2012).

4. Issue Brief: Workplace Injuries in Hotel Housekeeping in California prepared by the DIR - Office of the Director, Research Unit, May 13, 2016.

5. The Federal Fiscal Year 2015-2016 High Hazard Industry List, established pursuant to Labor Code 6401.7 (e)(3)(A), identifies Accommodation and Food Services as a High Hazard Industry due to its DART (Days Away, Restricted and Transferred) rate. https://www.dir.ca.gov/dosh/hhu_list.pdf

6. October 23, 2012, March 19, 2013, February 27, 2014, May 13, 2015 and December 3, 2015, Advisory Committee minutes and attendance sheets.

7. Information for the Economic Impact Analysis obtained from the 2015 California Hotel and Lodging Association Comment Letters: https://www.dir.ca.gov/dosh/doshreg/comments/Hotel-Housekeeping.CHLA-Comments-Sept2015.pdf) (page 1,

https://www.dir.ca.gov/dosh/doshreg/Hotel-Housekeeping/Comments.Hotel-and-Lodging-Association-12-31-2015.pdf)
8. Information entitled "The Health of the Hotel Industry – It's Financials" obtained from the December 28, 2015 Unite Here comment letter, page 12-14
https://www.dir.ca.gov/dosh/doshreg/Hotel-Housekeeping/Comments.Unite-Here.pdf.
9. Email transmission from Glenn Shor, Research and Policy Adviser / Office of the Director, DIR, sent May 18, 2016, with the subject "RE: 2013 WCIRB Data for Class 9050-Hotels".
10. Ohio State University. Ergonomic Resources for Housekeeping.
https://ergonomics.osu.edu/Housekeeper%20Training%20Materials
11. State Fund. Tips for Hotel Room Attendants.
https://content.statefundca.com/safety/ErgoMatters/RoomAttendants.asp
12. Department of Industrial Relations. Working Safer and Easier for Janitors, Custodians, and Housekeepers, 2005. www.dir.ca.gov/dosh/dosh_publications/janitors.pdf
13. British Columbia, Injury Prevention Resources for Tourism & Hospitality - Accommodation.
https://www2.worksafebc.com/Portals/Tourism/Prevention-Accommodation.asp
14. Ergonomics Study of Custodial, Housekeeping, and Environmental Services Positions at the University of California. May 2011. The UC System-wide Ergonomics Project Team.
http://ucanr.org/sites/ucehs/files/97141.pdf
15. Government of Western Australia, Department of Commerce, Checklist and information-Accommodation industry.
https://www.commerce.wa.gov.au/sites/default/files/atoms/files/accommodation_2016.pdf
16. California Employment Development Department. Table 2A: Third Quarter Payroll and Number of Businesses by Size Category Classified by North American Industry Classification System (NAICS) for California Third Quarter, 2015.
http://www.labormarketinfo.edd.ca.gov/file/indsize/2A-15-3-FINAL.xls
17. California Employment Development Department. List of Occupations Employed in Accommodation. http://www.labormarketinfo.edd.ca.gov/iomatrix/Staffing-Patterns3.asp?IOFlag=Ind&SIC=721000
18. California Workers Compensation Information System (WCIS) Preliminary Data. Occupational Hazards Faced by Housekeepers within the Hotel and Hospitality Industry.  March 19, 2013
http://www.dir.ca.gov/dosh/doshreg/Housekeeping_Advisory_Meeting_WCIS_Claims_Injuries.pdf#zoom=100

These documents are available for review Monday through Friday from 8:00 a.m. to 4:30 p.m. at the Standards Board Office located at 2520 Venture Oaks Way, Suite 350, Sacramento, California.

## PETITION

Petitioner: Kurt Peterson and Pamela Vossenas, on behalf of UNITE HERE.
File No.: 526

The Occupational Safety and Health Standards Board received a petition dated January 23, 2012, to amend Title 8, California Code of Regulations, to address the occupational hazards that may

cause musculoskeletal injuries to housekeepers in the hotel and hospitality industry.  On May 17, 2012, the Occupational Safety and Health Standards Board rejected the Division's and Board staff's recommendations to grant the petition and took no further action to either grant or deny the petition.  In June 2012, a newly-constituted Board reconsidered the petition and the recommendations of the Division and Board staff and GRANTED the petition to the extent that the Division was requested to convene a representative advisory committee to determine whether a rulemaking action should be initiated and what control measures may be necessary to address musculoskeletal injury hazards to hotel housekeeping employees.

A copy of the petition, the Division's evaluation, and the Board's petition decision are included as Documents Relied Upon.

## ADVISORY COMMITTEE

This proposal was developed with the assistance of an advisory committee. (A list of advisory committee minutes and attendance sheets are included as Documents Relied Upon.)

## FIRE PREVENTION STATEMENT

This proposal does not include fire prevention or protection standards.  Therefore, approval of the State Fire Marshal pursuant to Government Code Section 11359 or Health and Safety Code Section 18930(a)(9) is not required.

## SPECIFIC TECHNOLOGY OR EQUIPMENT

This proposal will not mandate the use of specific technologies or equipment.

## ECONOMIC IMPACT ANALYSIS/ASSESSMENT

The Board has made a determination that this proposal should not result in a significant, statewide adverse economic impact directly affecting businesses, including the ability of California businesses to compete with businesses in other states.  The Board anticipates that any potential costs in reasonably complying with the proposed action would be balanced by avoiding or minimizing the costs inherent in workers' compensation claims, lost work time, reduced absenteeism and productivity losses that would have been caused by acute, repetitive and chronic musculoskeletal injuries to hotel housekeeping employees.

The four major elements of the proposal – (1) housekeeping musculoskeletal injury prevention program (with a worksite evaluation, program review and employee participation), (2) methods of correction (could include implementation of safe work practices and/or the provision of appropriate housecleaning tools), (3) training and (4) recordkeeping – are broadly covered in existing regulations.

This new standard, while more tailored to a specific industry, is based on a pre-existing standard (Section 3203) requiring all employers to establish, implement and maintain an effective IIPP.

This would include identifying hazards, implementing corrective measures, and providing training specific to preventing acute, cumulative or repetitive musculoskeletal disorders, including injuries to upper extremities and back, worksite evaluation, correction, training and recordkeeping to minimize the injuries to hotel housekeepers.

(1) Implementation of subsection (c): Housekeeping musculoskeletal injury prevention program and worksite evaluations.
The MIPP is not expected to impose any significant costs because it does not mandate specific hazard-analysis, technologies, tools or equipment, or that a health, safety or medical professional be hired. In addition, the costs of the proposal are calculated to be less than the benefits.

The California Hotel and Lodging Association (CHLA) represents employers in California affected by the proposal. In a memorandum to the Division dated December 29, 2015 (document number 7 from the Documents Relied Upon, listed above), CHLA estimated it would take up to 8 hours for lodging establishments to review and update their IIPPs to meet the requirements of the proposed MIPP for a cost of approximately $200 per establishment. The total cost statewide for the approximately 5,500[1] lodging establishments is a one-time cost of $1.1 million.

The proposed regulation does not require a health, safety or medical professional to conduct the worksite evaluation. The Board estimates that it would take a maximum of 4 hours for establishments annually to conduct worksite evaluations and a program review/update as required by the proposal. The cost would be $100 per establishment and a total statewide cost of $550,000 using the same assumption as provided by CHLA for the cost of establishing the MIPP.

In addition, the proposal requires employers to involve housekeeping employees in the worksite evaluation and program review. The proposal does not mandate a specific number or percentage of employees to participate in the evaluation. The proposal only requires that employees be allowed to participate. For purposes of the cost estimates, the Board will assume up to 50 percent of housekeeping employees will participate, although the Board notes this assumption likely overestimates the actual number of employees who will participate. According to CHLA there are approximately 66,000 housekeepers in California lodging establishments who earn an average of $10.40[2] per hour. The Board estimates that employee involvement would take a maximum of 2 hours per housekeeping employee. The cost of 2 hours for 50 percent (or 33,000) of all housekeepers is $686,400. The total annual statewide cost for the worksite evaluations and MIPP review/update including employee participation ($550,000 plus $686,400) is $1,236,400.

(2) Methods of Correction.
This proposal does not mandate specific equipment, cleaning tools or technologies such as fitted sheets, ergonomic cleaning tools or motorized carts. In the course of doing business, this industry is already providing and maintaining clean accommodations and incurring ongoing

---

[1] CHLA stated there were fewer than 5,500 lodging establishments in California in 2015.
[2] This hourly rate will rise in subsequent years until it reaches $15/hour for all employers in 2023; but some of the increases may be deferred based on downturns in the economy. See Labor Code Section 1182.11.

expenses with regards to cleaning supplies and equipment.  Employers are not required to utilize the most modern cleaning equipment or ergonomic tools, though the Board believes that the employer would benefit economically from an improved or better cleaning tool and that some of these options may be less expensive or of similar cost as the ones already being incurred. Because the option of maintaining the status quo exists, no economic impact is anticipated from the proposal regarding equipment and tools.

(3) Implementation of subsection (d): Training.
The Board estimates that the training requirements of the proposal would take up to 2 hours per year for each housekeeping employee and an establishment manager or supervisor to provide the training.  According to information provided by CHLA, there are approximately 66,000 housekeepers in California who earn an average of $10.40 per hour.  The total statewide cost for 2 hours of housekeeper time would be an estimated $1,372,800.  A housekeeping manager at a full service establishment earns approximately $21 per hour and a general manager at a limited service establishment earns approximately $24 per hour.  The total cost statewide for a manager to provide training to housekeeping employees is approximately $264,000 (using $24 per hour). The combined cost for 2 hours of time for all housekeepers and one manager is calculated at $1,636,800 annually.

(4) Implementation of subsection (e): Records.
CHLA stated that the recordkeeping requirements of the proposed regulation would take each establishment approximately 4 hours.  The cost would be $100 per establishment and a total statewide cost of $550,000 using the same assumptions as provided by CHLA for the cost of establishing the MIPP.  This may be an overestimate of costs as the proposal requires records be kept in accordance with existing regulations (Sections 3203, 3204 and Chapter 7 Subchapter 1 of Title 8) and adds no new requirements for retaining records.

Total cost of proposal:
The cost of the proposal for all establishments in California as discussed above is shown in the table below.

| Table 1: Total Statewide Cost of Proposal | | |
|---|---|---|
| Requirement | First Year | Annual Cost Thereafter |
| MIPP Program | $1,100,000 | $0 |
| Worksite Evaluation, Program Review & employee participation | $1,163,250 | $1,236,400 |
| Training | $1,636,800 | $1,636,800 |
| Recordkeeping | $550,000 | $550,000 |
| **Total** | **$4,450,050** | **$3,423,200** |

The combined total cost statewide of all the requirements in the regulation is approximately $4.5 million in the first year including setup cost.  The total statewide annual cost thereafter is

approximately $3.4 million per year.  This cost is more than offset by the savings described below.

Small Business Cost:

Approximately 45 percent of hotels, motels and other lodging establishments employ less than 9 total employees based on data retrieved from the California Employment Development Department (EDD).  Approximately 40 percent of the employees in the accommodation industry are housekeeping employees based on additional EDD data.  Accordingly, a small business with less than 9 employees would employ a maximum of 4 housekeepers.  The cost to an individual small business with 4 housecleaning employees is calculated in Table 2 below using the costs described above.

| Table 2: Maximum Individual Small Business Cost (4 housekeeping employees) | | |
|---|---|---|
| Requirement | First Year Cost | Annual Cost Thereafter |
| MIPP Program | $200 | $0 |
| Worksite Evaluation, Program Review & employee participation | $140 | $140 |
| Training | $100 | $100 |
| Recordkeeping | $130 | $130 |
| **Total** | **$570** | **$370** |

Typical Business Cost:

The average total number of employees in a lodging establishment, calculated from the EDD data sources, is 38 employees with approximately 15 housekeeping employees (40 percent of 38).  The cost to an individual lodging establishment with 15 housekeepers is calculated in Table 3 below using the costs described above.

| Table 3: Typical Business Cost (15 housekeeping employees) | | |
|---|---|---|
| Requirement | First Year Cost | Annual Cost Thereafter |
| MIPP Program | $200 | $0 |
| Worksite Evaluation, Program Review & employee participation | $270 | $270 |
| Training | $360 | $360 |
| Recordkeeping | $100 | $100 |
| **Total** | **$930** | **$730** |

Cost Savings:

According to the 2016 DIR summary of Workers' Compensation Insurance Rating Bureau of California, the Total Incurred Losses (including indemnity and medical costs) for all worker injury claims in 2013, amounted to $84,714,747 (with a total of 8,516 number of claims- See 9050 Hotels 2013 Cause of Injury Claim) for the Hotel Sector (code 9050) alone.  Similarly, this database shows that the average cost of a claim under code 97-Strain by-Repetitive Motion was $12,500 (the average cost for an injury filed under Strain by Pushing or Pulling was $11,000 and under Fall, Slip or Trip was $11,713).

According to the WCIS data, for the year 2013, there were 16,731 musculoskeletal injury claims filed under the Traveler-Accommodation industry code, of which 5,551 musculoskeletal injury claims corresponded to hotel housekeepers.  From 2010 to 2014, an average of 33.5% of all the injury claims within the accommodation industry, were from housekeeping related codes. Therefore, we can estimate that out of the total incurred losses for 2013, the cost for acute, cumulative or repetitive musculoskeletal injuries for employers would be 33% of $84,714,747 or about $28 million.  If employers establish an effective MIPP, including implementing a worksite evaluation to identify hazards, corrective measures, training and recordkeeping, even a resulting modest or conservative reduction of 30% of the occurrences of injury total annual savings of $8.4 million for employers in the accommodation industry.

Many hotel housekeeping employees commented during the advisory committee process on their loss of income due to occupational musculoskeletal injuries and the detrimental economic impact to themselves and their families.  The current analysis is not able to quantify the economic benefit of the proposal to employees from injury prevention due to a lack of data.  However, the Board notes that hotel housekeepers are low wage earners and prevention of injuries will be a significant economic benefit to them.  Low wage workers are less able to absorb economic losses resulting from injuries than the general population, so regulations which prevent economic losses to these workers has a larger benefit than regulations that protect higher wage earners.

**Creation or Elimination of Jobs Within the State of California:** The Division does not anticipate any jobs in California will be eliminated due to the financial impact of the proposed regulatory action.  It is not anticipated that significant costs or expenses will be incurred by the businesses to comply with the proposed regulation that would result in either creation or elimination of jobs within California.

**Creation of New Business, Elimination of Existing Business or the Expansion of Business in California:** The Division does not anticipate any business in California will be created or eliminated or affect the expansion of existing California businesses due to the financial impact of the proposed regulatory action.  The Division does not anticipate that there would be sufficient fiscal impact to reduce the number of health practices in the state, or to create new industries to address requirements created by the proposal.  The proposal also does not mandate new construction or extensive remodeling.  Increasing or decreasing the existing workforce should not be an outcome of the requirements.

## BENEFITS OF THE PROPOSED ACTION

This proposal should reduce the number of acute, repetitive and chronic musculoskeletal injuries suffered by hotel housekeeping employees with the implementation of a musculoskeletal injury prevention program, corrective measures and training.  Consequently, the number of workers' compensation claims against hotels and other travel accommodation establishments should also decrease.  This proposal creates an enforceable regulation that provides clear guidance to employers and employees regarding how to implement this law.

This rulemaking proposal has no effect on the state's environment.

## EVIDENCE SUPPORTING FINDING OF NO SIGNIFICANT STATEWIDE ADVERSE ECONOMIC IMPACT DIRECTLY AFFECTING BUSINESSES

The Board has determined that the proposed amendments may affect small businesses.  Small businesses such as small motels may incur minor costs involved in ensuring that their existing prevention program under section 3203 includes a worksite evaluation and training which meets the specific requirements in this section.  The proposed regulation provides the employer with a range of options and does not require a health, safety or medical professional to conduct the worksite evaluation or training.  These costs would be offset by reduced indemnification and fewer workers' compensation claims.  The Board does not anticipate that there would be sufficient fiscal impact to reduce the number of hotels or other travel accommodation establishments currently in existence in the state.

## REASONABLE ALTERNATIVES TO THE PROPOSAL AND THE BOARD'S REASONS FOR REJECTING THOSE ALTERNATIVES

No reasonable alternatives have been identified by the Board or have otherwise been identified and brought to its attention that would be more effective in carrying out the purpose for which the action is proposed, or would be as effective and less burdensome to affected private persons than the proposed action, or would be more cost-effective to affected private persons and equally effective in implementing the statutory policy or other provision of law.

Exhibit 13

OCCUPATIONAL SAFETY
AND HEALTH STANDARDS BOARD
2520 Venture Oaks Way, Suite 350
Sacramento, CA 95833
(916) 274-5721
FAX (916) 274-5743
www.dir.ca.gov/oshsb



## FINAL STATEMENT OF REASONS

## CALIFORNIA CODE OF REGULATIONS

### TITLE 8: New Section 3345
### of the General Industry Safety Orders
### Hotel Housekeeping Musculoskeletal Injury Prevention

## MODIFICATIONS AND RESPONSE TO COMMENTS RESULTING FROM
## THE 45-DAY PUBLIC COMMENT PERIOD

There are no modifications to the information contained in the Initial Statement of Reasons (ISOR).

**Summary and Response to Written and Oral Comments:**

**I. Written Comments Received During the 45-Day Public Comment Period:**

1. **Lynn Mohrfeld, California Hotel and Lodging Association (CHLA), and Justin Epner, Gibson, Dunn & Crutcher LLP on behalf of CHLA, by letters dated May 16, 2017**

Comment #CHLA1: On May 17, 2012, the Board rejected this union-driven attempt to initiate a hotel housekeeping rule. The Board determined that the proposed rule's backers "did not establish the necessity of the proposed rulemaking," that hotel housekeeping injuries "are already addressed by . . . sections 3203 and 5110," and that "[a] bad precedent would be set by carving out . . . hotel housekeeping." The Board must do again what it did once before, almost exactly five years ago: reject this proposed rule.

Response: Although on May 17, 2012, the Occupational Safety and Health Standards Board (Board) did reject recommendations of the Division of Occupational Safety and Health (Division or Cal/OSHA) and its own staff to send the matter to a Division-convened advisory committee, the Board later reconsidered the recommendations and on June 21, 2012, granted Petition 526 to the extent that the Division was requested to convene a representative advisory committee to determine whether a rulemaking action should be initiated and what control measures may be necessary to address musculoskeletal injury hazards to hotel housekeeping employees.

The following quotes: "did not establish the necessity of the proposed rulemaking," that hotel housekeeping injures "are already addressed by…sections 3203 and 5110," and that "[a] bad precedent would be set by carving out…hotel housekeeping" are not contained in any declaration, decision, document or oral statement adopted by the Board and it does not represent any adopted Board determination from May 12, 2012, or other date. The language comes from an un-adopted draft that the Board considered, but rejected.

<u>Comment #CHLA2:</u> A rule that addresses only hotel housekeepers is irreconcilable with the existing regulations and would invite regulatory balkanization through a patchwork of job- and workplace-specific regulations. Existing regulations – Title 8 sections 5110 and 3203 – protect all workers in California's workplaces by mandating, respectively, (1) procedures to abate individual workplaces' known injury concerns related to the musculoskeletal activities such as those conducted by housekeepers and (2) forward-looking inquiry into potential hazards. Section 3345 blurs the line between the abatement of actual injuries mandated by section 5110 and the proactive preventative hazard analyses mandated by section 3203.

<u>Response:</u> There are many existing regulations that address specific hazards in specific industries, similar to this proposal. The Board believes the proposal is not irreconcilable with other Title 8 regulations nor with Title 8 as a whole. Examples of existing regulations specific to a hazard in one industry include, but are not limited to the following sections: 3342 "Workplace Violence in Health Care;" 5120 "Health Care Worker Back and Musculoskeletal Injury Prevention;" 5189.1 "Process Safety Management for Petroleum Refineries;" 3456 "Hand-Held Tools" (in agricultural operations); 3426 "Hand Tools" (in tree trimming operations); 3289 "Tools" (window cleaning); 1699 "Hand Tools" (in construction), 6263 "Hand Tools" (in logging operations); 6607 "Handling Heavy Tools at Drilling Wells;" 6646 "Miscellaneous Tools and Equipment" (petroleum drilling and production); 8384 "Tools and Equipment" (shipyards); and 8609 "Other Tools and Personal Protective Equipment" (telecommunications).

Section 5110 "Repetitive Motion Injuries" can be applied to the work conducted by housekeeping employees. However, section 5110 is based on responding to injuries that have already occurred rather than providing methods of injury prevention and addresses only repetitive motion injuries and not other musculoskeletal injuries such as strains or sprains that are a result of acute trauma, or caused by falls, slips or trips.

Section 3203 "Injury and Illness Prevention Program" (IIPP) is intended to prevent injuries and illnesses in all industries, including the accommodation industry. However, it does not specifically address the prevention of musculoskeletal injuries, nor does it require employee involvement in updating the employer's IIPP and in evaluating and correcting hazards.

Hotel housekeepers in California face a high number of injuries and illnesses caused by acute injury, repetitive or cumulative trauma. The issue brief entitled "Workplace Injuries in Hotel Housekeeping in California" contains Workers' Compensation Information System (WCIS) data from 2010 to 2014 (please see document number four in the documents relied upon) that show a steady increase in the number of worker injury claims, from 4,990 in 2010 to 6,116 in 2014, when focused specifically on housekeepers within the accommodation industry. The existing regulations have not been effective in reducing these injuries.

Furthermore, the injury data shows that the industry has not been able to identify and voluntarily implement effective strategies to reduce the incidence of injuries. When a specific industry has a significantly higher rate of injuries or illnesses, it is not unusual for a health and safety regulation to be promulgated to protect against specific hazards or protect a specific category of workers. Such

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 132 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 3 of 56*

standards are intended to address the hazards that are posed by the unique working conditions in a given industry. Therefore, the Board believes the rulemaking proposal is necessary and has developed a flexible performance-based regulation through the advisory process.

Proposed section 3345 would address hotel housekeepers' high injury rates similar to how existing section 5120 addresses the hospital care workers' previously high rate of back and musculoskeletal injuries. Both section 5120 and proposed section 3345 are consistent with each other and section 3203.

Comment #CHLA3: Clarifying proposed section 3345 with linguistic fixes would not solve its intrinsic flaw: a special rule for hotel housekeepers and not for all hotel workers and not for all who perform housekeeping tasks and would result in particular rules for all manner of jobs in all manner or workplaces. Enacting this proposed rule would invite similar rules for others who perform housekeeping tasks, e.g., in hospitals, nursing homes, rehabilitation centers, and assisted-living facilities and would invite similar rules for all workplaces and all jobs that involve any form of manual labor, which would undermine the existing regulatory framework.

Response: The proposed rulemaking is based on the high rate of injuries suffered by hotel housekeepers and existing regulations have not been sufficient to reduce these injury rates. Through the advisory process, a proposed regulation that is performance based and reasonable has been drafted. Please also see the response to Comment #CHLA2.

Comment #CHLA4: The Occupational Safety and Health Standards Board "must determine that no reasonable alternative would be as effective and less burdensome to affected private persons than the proposed action" (Government Code section 11346.5(a)(13)). The Board cannot meet this mandate. Sections 5110 and 3203 are sufficient to protect hotel housekeepers from known injury risks and to identify and abate potential injury risks.

Response: The Board does not believe that the existing regulations, sections 3203 and 5110, are sufficient or a reasonable alternative to the proposal to reduce the high rate of acute, repetitive and cumulative injuries suffered by housekeepers. Please see the responses to Comments #CHLA2 and CHLA5 regarding sections 3203 and 5110.

Comment #CHLA5: Sections 5110 and 3203 impose methods that are plainly superior to those proposed by section 3345. Section 5110(a)(3) mandates that California employers, including hotels, address injuries "that a licensed physician objectively identified and diagnosed." By contrast, the proposed new rule (section 3345(c)(5)(C)) mandates "[i]nput [from] the injured housekeeper, the housekeeper's union representative, and the housekeeper's supervisor as to [the causes of] the injury." The proposed rule would harm housekeepers' wellbeing by replacing expert medical analysis with subjective, anecdotal, and union-driven "input."

Response: The Board believes that the proposal will be more specific and comprehensive than sections 5110 and 3203 and thus better able to reduce musculoskeletal injuries in housekeepers in the accommodation industry.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 133 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 4 of 56*

Section 5110 has not been effective in preventing housekeeper musculoskeletal injuries. Under section 5110, an employer is not required to take any measures to protect employees until after the occurrence of two or more repetitive motion injuries (RMIs) resulting from an identical work activity are objectively diagnosed by a licensed physician. The physician has no role in evaluating or correcting hazards in section 5110. The "diagnosis by a licensed physician" portion of section 5110 is only used to determine when the regulation applies. Section 5110 also does not apply to non-repetitive musculoskeletal injuries. However, proposed section 3345 is preventative as its provisions apply prior to the occurrence of both repetitive and non-repetitive musculoskeletal injuries. Section 5110 shifts the burden to employees to trigger the applicability of the regulation by reporting their injuries (section 5110(a)(4)), whereas section 3345 has the pro-active requirement that employers develop a musculoskeletal injury prevention program (MIPP).

Section 3203 is nonspecific and does not provide for methods or procedures to reduce the high rate of housekeeper musculoskeletal injuries in the accommodation industry. Whereas section 3345 provides performance-based requirements to employers specifically to reduce such housekeeper injuries.

The proposal requires employers to have a procedure to investigate housekeepers' musculoskeletal injuries. Proposed section 3345(c)(5)(C) requires such procedures to include input from the injured housekeeper, the housekeeper's union representative, and the housekeeper's supervisor as to whether any control measure, procedure, or tool would have prevented the injury (not diagnose it). Worker involvement is critical to effectively prevent musculoskeletal injuries to housekeepers, as they are knowledgeable on the details of the work tasks and work practices. The observations and experiences of the housekeepers are necessary to help identify all potential solutions or corrective measures. Please also see responses to Comments #CHLA2, CHLA3 and CHLA4.

<u>Comment #CHLA6:</u> If promulgated, section 3345 would undermine sections 3203 and 5110 through needless repetition and overlap; direct contradiction of the existing rule, presupposing a relationship between certain actions and injuries, and undermining collective bargaining.

<u>Response:</u> Proposed section 3345 does not prevent, undermine, stop or interfere with an employer or union from entering into a collective bargaining agreement. Please see the responses to Comments #CHLA2 through CHLA5 with regards to sections 3203 and 5110.

<u>Comment #CHLA7:</u> The proposed rule is redundant with existing sections 3203, 5110 and 3273.

<u>Response:</u> The Board does not believe that section 3345 is redundant with existing sections 3203, 5110, and 3273. In the Division's enforcement experience, these existing regulations are not sufficient to address the acute, repetitive, and cumulative injuries suffered by housekeepers. Please see the responses to Comments #CHLA2 and CHLA3 on the need for proposed section 3345.

Regarding sections 3203 and 5110, please see responses to Comments #CHLA2 through CHLA5. Regarding section 3273, please see the response to Comment #CHLA10.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 134 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 5 of 56*

Comment #CHLA8: Everything that section 3345 hopes to accomplish is already mandated by section 3203. Whereas section 3203 mandates "investigat[ion of] occupational injury," the proposed rule would mandate "investigat[ion of] musculoskeletal injuries," which is merely a subset of what is already prescribed. The first seven subsections of existing section 3203 are nearly identical to proposed section 3345: they both mandate (i) identification of responsible authorities; (ii) systems to ensure compliance; (iii) communication systems; (iv) hazard identification procedures; (v) injury investigation procedures; (vi) methods for correcting identified hazards; (vii) recordkeeping; and (viii) periodic employee training.

Response: Although the proposal is consistent with section 3203 as both contain similar subsection titles, the proposal contains specific procedures to reduce musculoskeletal injuries in housekeeping operations in the accommodation industry, which are not addressed by section 3203. Please also see responses to Comments #CHLA2 and CHLA5.

Comment #CHLA9: Section 5110 and the proposed rule both seek to prevent "musculoskeletal injuries." Both define that term the same way. See sections 5120(b) and 3345(b). Section 5110 mandates evaluation of "work activities . . . which have caused" musculoskeletal injuries. Similarly, section 3345 would mandate an assessment of ten particular types of work activities or working conditions "with respect to potential causes of musculoskeletal injuries to housekeepers." Therefore, the proposed rule's overlap with Section 5110—and hence its redundancy—is apparent. Indeed, at least one citation was issued in 2012 against a CH&LA member under section 5110 for precisely the same conduct covered under the proposed hotel housekeeping rule.

Response: Please see responses to Comments #CHLA2 through CHLA5. The Board agrees that the definition of musculoskeletal injury in existing section 5120 "Health Care Worker Back and Musculoskeletal Injury Prevention" is consistent with the definition of musculoskeletal injury in proposed section 3345, but does not believe that such consistency creates redundancy or overlap with section 5110 "Repetitive Motion Injuries."

Comment #CHLA10: Section 3273 already complements section 5110 by mandating certain procedures to prevent "slips, trips and falls," and "falling and striking objects" - the very same things that the proposed rule purports to guard against. Section 3273 already mandates that employers keep work surfaces "free of dangerous projections or obstructions, maintained in good repair, and reasonably free of oil, grease, or water." Moreover, the rule even contemplates workplaces where damp surfaces are common as part of the job: "Where the type of operation necessitates working on slippery floors, such surfaces shall be protected against slipping by using mats, grates, cleats, or other methods which provide equivalent protection." Subsection 3273(e) also ensures that workplaces feature sufficient "[p]rotection from falling objects." Accordingly, the proposed regulation's attempts to prevent "slips, trips and falls" and "falling and striking objects" are redundant. A prevention program for wet floors would be extraneous; all that is required is adequate enforcement of the existing regulations.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 135 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 6 of 56*

Response: Section 3273 requires certain general conditions be maintained and certain equipment be provided to prevent slips and falls, but does not require the development of procedures, processes, or the use of safe work practices. Thus, the Board finds no redundancy.

Proposed section 3345 will not be limited to only providing appropriate equipment when needed, but will ensure that processes, practices, procedures, or other corrective measures be considered, to effectively reduce housekeeper musculoskeletal injuries. Please also see response to Comment #CHLA7 on the Division's enforcement experience and concerns about redundancy with section 5110.

Comment #CHLA11: The proposed rule contradicts and conflicts with existing Title 8 regulations sections 3203 and 5110. The proposed section 3345 aims to add a new "part [to] the Injury and Illness Prevention Program (IIPP) required by section 3203," namely a "musculoskeletal injury prevention program (MIPP) that addresses hazards specific to housekeeping." The proposal overlaps and contradicts the existing rule.

Response: The Board has found no conflicts or contradictions between the proposal and existing sections 3203 or 5110. The Board believes the proposal is consistent with section 3203, but does not overlap the existing regulation. Please see responses to Comments #CHLA2 through CHLA5.

Comment #CHLA12: Sections 3203 and 5110 feature flexible performance standards, but the proposed rule forces "required tools" upon housekeepers. Both section 3203 and the proposed rule impose systems to ensure compliance, but the proposed rule would mandate that hotel housekeepers use specific "tools or equipment deemed appropriate for each housekeeping task." Housekeepers who do not use the "required tools" must be "investigate[d]," and are subject to "disciplinary actions."

Response: The proposal does not mandate that employers require a specific tool, group of tools, or certain equipment for a task. Under the proposal, the employer may provide multiple methods, procedures, and/or tools for accomplishing tasks safely as determined by the employer's evaluation. The proposal is a performance based regulation and does not contain prescriptive requirements for tools or methods. The proposal does not state that housekeepers who do not use required tools must be investigated. Please also see the response to Comment #CHLA14 regarding disciplinary action.

Comment #CHLA13: This mandatory one-size-fits-all approach contradicts the existing rules, which allow for a range of "safe and healthy work practices," and multiple "measures" that satisfy an injury-minimization plan. The existing rules permit any work practice as long as it is safe. By contrast, the proposed rule requires employees to "follow the employer's safe workplace housecleaning practices." Specifically, the proposed rule mandates that employers implement "appropriate equipment or other corrective measures" (such as "effective tools [and] work practices"). Housekeepers who do not adhere to the specific processes and mandates are subject to discipline. Section 3203 presumes that a practice is safe unless it is shown to cause injury. But the proposed rule presumes that a practice is unsafe unless it is specifically permitted by the employer. The two are in direct conflict.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 136 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 7 of 56*

Response: The employer is not required by the proposal to establish specific prescriptive work practices for employees. Please also see the response to Comment #CHLA12. The proposal allows employers to establish any variety of work practices that are safe for employees, which is consistent with section 3203. Please also see the responses to Comments #CHLA2 through CHLA5 and CHLA14.

Comment #CHLA14: The contradiction between section 3203 and the proposal is dangerous for at least three reasons. First, when housekeepers face punishment for deviating from the one-size-fits-all practices imposed by their employer, they are less likely to report injury. Second, the proposed rule presumes that a uniformly safe practice exists in the first place; forcing healthy housekeepers to alter their routines after years of performing certain tasks in certain ways is more likely to cause complaints, discomfort, and reports of injury. Finally, a legal mandate to investigate and discipline housekeepers who deviate from their employer's scripted cleaning methods is certain to cause labor strife. Instituting mechanisms that put employees and employers at odds with each other is not conducive to the collaborative problem solving for which Section 3345 strives. Accordingly, guidance- rather than regulatory mandates- is more likely to accomplish those goals.

Response: The Board does not believe that section 3345 contradicts Section 3203 or causes a labor strife. Please see the responses to Comments #CHLA2 through CHLA5. The proposal does not require "one-size fits-all practices." The proposal does not restrict employers from using various methods or procedures for performing tasks safely, does not assume there is a single, uniform scripted safe work practice, and does not force alteration of existing safe practices used by housekeepers. The proposal also does not require the employer to establish highly prescriptive work practices. Please also see responses to Comments #CHLA12 and CHLA13.

The Board believes that the proposal will not deter housekeepers from reporting injuries as a result of this performance based regulation. On the contrary, section 3345(c)(3) of the proposal requires employers to include in their MIPP, "A system for communicating with housekeepers… including provisions designed to encourage housekeepers to inform the employer of hazards at the worksite, and injuries or symptoms that may be related to such hazards without fear of reprisal;"

Proposed section 3345 will require employers to conduct a worksite evaluation to assess housekeeping tasks with respect to potential causes of musculoskeletal injuries. Employers (with employee input), given their knowledge and familiarity with their particular facility, job operations and cleaning procedures, are the best resource to identify a variety of safe workplace housecleaning practices and select appropriate housekeeping tools or equipment (when needed) for housekeeping tasks. Additionally, section 3345 fosters employer and employee collaboration. Housekeepers and employers will work together to identify and evaluate hazards along with appropriate corrective measures.

To mitigate the risk factors and minimize the injuries associated with tasks specifically related to hotel housekeeping jobs, the employer must have a system for ensuring that supervisors and housekeepers comply with the MIPP. Proposed section 3345(c)(2) provides flexibility, and notes

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 137 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 8 of 56*

that substantial compliance with this provision includes recognition of employees who follow the employer's safe workplace housekeeping practices and use the appropriate tools and equipment, training and retraining programs, disciplinary actions or other means that ensures employee compliance. These requirements are consistent with existing section 3203.

With regards to the recommendation to use guidelines, rather than a regulatory mandate, the injury data shows that the industry has not been able to identify and voluntarily implement effective strategies to reduce musculoskeletal injuries. Please see the response to Comment #CHLA2. Additionally, given its voluntary nature, guidelines create an unfair disadvantage to employers that are willing to commit the necessary time and resources to prevent musculoskeletal injuries and who must compete against employers that disregard or ignore voluntary guidelines. Thus, the Board believes it is necessary to go forward with this rulemaking.

Comment #CHLA15: The proposed regulation conflicts with section 3203 and the existence of a special rule for a particular type of work is irreconcilable with existing regulations. The purpose of section 3203 is to identify hazards. However, the proposed rule purports to have concluded that injuries are a foregone conclusion – an inexorable result of hotel housekeeping work (not hotel work, and not housekeeping work, but hotel housekeeping work). An injury prevention rule that applies to one job in one workplace necessarily presumes that that job in that setting is uniquely dangerous. By listing routine housekeeping motions and actions alongside "slips, trips, and falls," and "striking objects," presumes, without justification, that common tasks performed by all of us, from mothers and fathers to mail carriers, like "lifting" and "pushing and pulling" cause injury.

Response: The Board does not believe that the proposal conflicts with section 3203 and the Board does not believe that a rule for a particular type of work in irreconcilable with existing regulations. Please see the responses to Comments #CHLA2 through CHLA5.

Regarding the comment that "…the proposed rule purports to have concluded that injuries are a foregone conclusion…" the WCIS data demonstrates that housekeepers in the accommodation industry are experiencing a large number of injuries and the goal of the proposal is to reduce the existing injury rate using performance based requirements. Please see the response to Comment #CHLA2.

The Board recognizes that housekeeper injuries are sometimes the result of common motions and actions, but notes that there are additional variables that may affect housekeeping employees more than some other occupations such as, but not limited to, the following: prolonged or awkward static postures; excessive exertion; extreme reaches and repetitive reaches above shoulder height; lifting or forceful whole body or hand exertions; excessive work-rate; and inadequate recovery time between tasks.

Comment #CHLA16: There is no basis for singling out a particular type of employer or a particular job description. Even if there were, there are appropriate ways to address individual jobs, such as the job-specific ergonomic advice published by Federal OSHA. The presumption that housekeeping tasks are necessarily dangerous when performed in hotels is a problem.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 138 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 9 of 56*

Response: With regarding to establishing a regulation that applies only to housekeeping work in the accommodation industry, please see the responses to Comments #CHLA2 and CHLA3. With response to using guidelines or advice in lieu of a regulation, please see the response to Comment #CHLA14.

Comment #CHLA17: It defies common sense that tasks are dangerous in hotels but not in other workplaces. The study of housekeeping tasks, "Evaluation of Musculoskeletal Disorder Risk in Hotel Housekeeping Jobs," by Dr. Steven Wiker disproves that housekeeping tasks are inherently dangerous. Dr. Wiker's study concluded that exposures were sufficiently low that the job was compliant with NIOSH guidelines for prevention of occupational musculoskeletal injuries and disorders. The Board staff wrote they did not see mention of the "CHLA NIOSH lifting equation study" that countered all of the testimony and that it was important to "mention the NIOSH study that the industry had conducted which did not show excess risk for [musculoskeletal injury] in housekeeping work, using the NIOSH lifting equation."

Response: Please see the responses to Comments #CHLA2 and CHLA3 regarding the scope of the proposal.

The unpublished study of Dr. Wiker, which ignored injury data, was neither conducted with, nor approved by NIOSH. Several stakeholders (including health professionals) in the advisory process disputed Dr. Wiker's findings (see pages 8, 9, 11, 12, 14, 27, 28 of the March 19, 2013, advisory meeting minutes – document six from the documents relied upon in the ISOR).

The Wiker study consisted of a controlled, laboratory-type simulation that took place in a hotel suite in Washington State. Additionally, the simulation did not involve actual housekeeping work, and did not accurately depict the complex and full range of motions involved in hotel housekeeping work. The selected hotel room and conditions, equipment used, and the speed and duration of tasks did not accurately represent hotel housekeeping work in California.

There are numerous factors that will impact musculoskeletal risk for housekeeping workers including but not limited to work rate, total working hours, frequency and duration of tasks, frequency and duration of rest breaks, degree of filth (especially in bathtubs, showers and toilets), clearance around furniture, availability of appropriate equipment used for cleaning, the condition of the equipment used for cleaning, type and condition of flooring, weight of mattresses and furniture lifted or moved, and additional non-housekeeping work tasks. These important factors were either not considered or not well addressed in the Wiker study. The NIOSH lifting equation referenced in the Wiker study is not pertinent to musculoskeletal injuries resulting from a wide array of non-lifting work tasks in hotel housekeeping. Ultimately, the Wiker study results are not consistent with the actual high number of musculoskeletal injuries to hotel housekeepers.

This proposal addresses the wide range of musculoskeletal injuries suffered by housekeepers and is not solely focused on the injuries caused by lifting. The Board staff's concerns regarding omission of the CHLA study were resolved prior to the commencement of formal rulemaking. Ultimately, the

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 139 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 10 of 56*

Board did not rely on the Wiker study because it is not peer reviewed, not published and contains the deficiencies discussed in the previous paragraph. Other peer reviewed, published studies have shown hotel housekeeping workers have high injury rates (please see document one in the documents relied upon in the ISOR).

Comment #CHLA18: The proposed rule clashes with the very premise of the existing regulation, which is to "find and fix" risk factors. The proposal presumes that the risk factors have already been "found." The proposed rule purports to be "based on section 3203," but this fundamental difference conflicts with the heart of section 3203's focus on objective inquiry.

Response: The Board does not believe that the proposal clashes or conflicts with section 3203. Please see the responses to Comments #CHLA2 through CHLA5.

Proposed section 3345 does not presume the existence of hazards, rather it requires that the employer assess each housekeeping task with respect to potential causes of musculoskeletal injuries to housekeepers. Such potential risks were identified by the Board in the documents relied upon and explained in the ISOR.

Comment #CHLA19: Section 3345 is arbitrary in its application because privately owned "lodging establishments" with "sleeping room accommodations" would be bound by the rule, but government-owned or -operated establishments such as prisons and jails would not be bound by it, nor would any type of inpatient medical facility, whether privately or publicly owned. Neither the proposed rule nor the documents that explain it offer any reason why the same housekeeping tasks are dangerous in hotels but not in other workplaces. By contrast, California's Violence Prevention in Health Care rule, section 3342, applies to both private and state health facilities and addresses a problem that is unique to the health care industry.

Response: The Board does not believe that the proposal is arbitrary, as the high number of injuries among housekeepers in the accommodation industry necessitates going forward with this rulemaking. Please also see the response to Comment #CHLA2.

The proposal is also not arbitrary in its application because it covers all lodging establishments (defined as establishments that contain sleeping room accommodations that are rented or otherwise provided to the public, such as hotels, motels, resorts, and bed and breakfast inns) in the accommodation industry without regards to the type of ownership of the lodging establishment.

Comment #CHLA20: In addition to presuming to have "found" risk factors inherent in hotel housekeeping activities, the proposed rule's "fix" is inherently and fatally flawed. Section 5110 mandates expert medical opinions, whereas the proposed rule mandates the subjective input of laypersons. Section 5110 imposes minimal evidentiary standards: if just two employees report work-related repetitive motion injuries (RMIs) at any point in a 12-month window, the injury minimization program becomes mandatory. Instead of "a licensed physician [who] objectively identified and diagnosed" an injury, the new "[p]rocedures to investigate musculoskeletal injuries"

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 140 of 270

Hotel Housekeeping Musculoskeletal Injury Prevention
Final Statement of Reasons
Public Hearing: May 18, 2017
Page 11 of 56

must include "[i]nput of the injured housekeeper, the housekeeper's union representative, and the housekeeper's supervisor" about what caused the injury.

Response: Please see responses to Comments #CHLA2 through CHLA5.

Comment #CHLA21: The proposed rule's methods to abate the injury risk are also flawed. Whereas section 5110(c) contains a safe-harbor provision to prevent employers from incurring "additional unreasonable costs," the new section 3345 would eviscerate that and expose employers to uncapped liability. Separately, just as the proposed rule disposes of expert opinions in diagnosing injuries, it disposes of expert opinions in abating them, as well. Whereas section 5110(b)(2) mandates "engineering controls," the proposed section 3345 requires "involving housekeepers and their union representatives" in determining what "corrective measures" to implement. The proposed rule even contradicts guidance from federal OSHA. OSHA suggests "[a]n ergonomic job hazard analysis . . . [that] focuses on the relationship between the worker, the task, the tools, and the work environment." By contrast, the proposed rule mandates "a worksite evaluation" that "involve[es] housekeepers and their union representative in designing and conducting" it. Housekeepers and union representatives are not qualified to assess or implement "engineering controls" or the complex relationships between the human body, its movements, and its environment. As the Wiker study concluded, "[a]ny changes made to housekeeping tasks, tools, or paradigms . . . should be evaluated using standard industrial engineering and ergonomics methods to determine their worthiness before implementation." Union representatives are not capable of doing so. As the Board staff summarized, the proposed rule "ask[s] most-likely uneducated employees (employee, union rep, and supervisor) to give advice on whether or not an additional measure would have prevented the injury."

Response: The proposal requires "procedures for identifying and evaluating housekeeping hazards through a worksite evaluation" (Section 3345(c)(4)) to identify injury risks to housekeeping employees. This is consistent with federal OSHA guidance and existing section 3203. There is no contradiction between conducting a worksite evaluation with employee and employee representative input, and the federal OSHA recommendation to "focus on the relationship between the worker, the task, the tools and the work environment."

Involving employees and their representatives in the worksite evaluation does not serve to dispose of expert opinion or federal OSHA guidelines as there is no prohibition or restriction on using expert opinion or following the guidelines. Employers are free to use expert opinion and follow federal OSHA guidelines if they wish, although, the use of expert opinion and federal OSHA guidelines are not required. The Board notes that given the direct and actual knowledge of their jobs, tasks and workplace, employee input is valuable and effective for problem solving and as such a critical prevention element.

With regard to costs, proposed section 3345 will not require state-of-the-art technology, unreasonable costs, or infeasible control measures. The proposal does not mandate specific hazard-analysis, technologies, tools or equipment, or that a health, safety, or medical professional be hired

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 141 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 12 of 56*

to conduct the worksite evaluation. Please also see the responses to Comments #CHLA12 through CHLA14.

Regarding section 5110, please see the responses to Comments #CHLA2 through CHLA5. Regarding the Wiker study, please see the response to Comment #CHLA17.

Comment #CHLA22: Collective bargaining would be undermined by the proposed rule. Just as the proposed rule presumes that routine motions are necessarily injurious, section 3345(c)(4)(E) presumes that there is a particular "work-rate" that is "excessive" for all housekeepers, notwithstanding differences in physical fitness. "Excessive work-rate" is a matter to be decided through collective bargaining. The union is attempting to accomplish through regulatory mechanisms—quotas on the number of rooms that a housekeeper may clean—what it has been unable to accomplish in collective bargaining. However, dressing up a simple matter of collective bargaining as a health and safety regulation proved unavailing: the Board, as it was constituted at that time, was not deceived by this ploy and concluded "quotas or restrictions limiting the amount of work an employee can be assigned . . . are addressed in collective bargaining agreements."

Response: Proposed section 3345 is performance oriented and requires that the employer conduct a worksite evaluation to identify and assess potential sources of injury. Excessive work rate is one of several known risk factors that poses a risk of injury to housekeepers. As such, it is one of the elements that the employer needs to consider in their worksite evaluation, to assist in the identification of unsafe conditions, work practices, process, or operations. Proposed section 3345 does not prevent or stop an employer or union from entering a collective bargaining agreement, nor does it establish a limit on the amount of work an employee can be assigned.

Comment #CHLA23: Expert medical analysis would be replaced with subjective speculation under the new regulatory regime. Cal/OSHA guidance indicates that IIPPs should involve health professionals at all steps of the process. Yet the proposed rule reflects a preference for individualized information-gathering, assessment, and treatment. One of the three mandatory investigative procedures would be soliciting "[i]nput of the injured housekeeper . . . as to whether any other control measure, procedure, or tool would have prevented the injury." In other words, the subjective opinions of a single housekeeper could trump the objective views of physicians and ergonomists. In sum, the dissonance between the programmatic requirements of section 3203 and the prescriptive requirements of the MIPP could not be clearer.

Response: The Cal/OSHA guidance document referred by the commenter was based on principles and techniques developed by occupational safety and health professionals. However, the Cal/OSHA guidance document does not indicate that employers should involve health professionals when developing or implementing an IIPP. Equally, section 3203 contains no preference for expert medical input.

The opinion of housekeepers and their representatives does not take priority over the objective views of physicians and ergonomists in proposed section 3345. Please see responses to Comments #CHLA5 and CHLA21.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 142 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 13 of 56*

The proposed section is a non-prescriptive performance based standard consistent with section 3203. Please see responses to Comments #CHLA2 and CHLA5.

Comment CHLA24: Section 3203's preference for expert medical input is somewhat attenuated. One must comb through Cal/OSHA guidance materials to find it. Section 5110's mandate for expert medical input, however, is explicit. A "[p]rogram designed to minimize [repetitive motion injuries (RMI)]" is mandatory only when "a licensed physician objectively identified and diagnosed" injuries, and even then only if there is work-related causation (that is, when the injuries "were predominantly caused (i.e. 50% or more) by" work), among other criteria. For this same reason, as it is with the existing section 3203, the proposed rule is both redundant of and contradictory to the existing section 5110. By presuming the existence of a hazard, the proposed rule would eliminate the determinative medical professional role that section 5110 mandates.

Response: There is no preference for expert medical input in section 3203 or in related guidance materials. Please see response to Comment #CHLA23. With regards to section 5110 and the diagnosis of RMIs by a licensed physician, please see response to Comment #CHLA5.

The Board does not believe that proposed section 3345 is redundant or contradictory to existing sections 3203 or 5110. Please see the responses to Comments #CHLA 2 through CHLA5. Proposed section 3345 is preventive and requires that an employer take action before a musculoskeletal injury occurs and needs to seek the opinion of a physician or other medical professional. Proposed section 3445 does not presume the existence of a hazard, rather it requires that the employer assess each housekeeping task with respect to potential causes of musculoskeletal injuries to housekeepers. Please also see the response to Comment #CHLA18.

Comment #CHLA25: The proposed rule is at odds with common sense. Section 3345 does not comport with everyday layperson common sense in at least two crucial ways. The proposed rule seeks to "control the risk" of injuries that are primarily repetitive motion injuries, for example from "repetitive reaches above shoulder height." Ignoring the inherently progressive nature of these injuries, the proposed rule would mandate three types of investigative assessments of the causes of a housekeeper's injury. The first mandatory procedure is investigating the "tasks being performed at the time of the injury." By definition, there is no "time of the injury" in repetitive motion injuries.

Response: Proposed section 3345 is not primarily for, nor specific to repetitive motion injuries. The proposal protects employees equally against acute, cumulative trauma, and repetitive motion injuries.

The proposal also does not require employers to identify the specific time when an injury occurred. The proposal requires employers to identify tasks being performed when an employee recognizes an injury. For all injuries, including those that result from repetitive motions or cumulative trauma, employers are required to have procedures to investigate such injuries under proposed section 3345. This requirement is consistent with section 3203 that requires an investigation of all occupational injuries and illnesses, including repetitive motion injuries and cumulative trauma injuries, and

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 143 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 14 of 56*

sections 14300 through 14300.48 that require employers to record certain injuries and illnesses including repetitive motion injuries and cumulative trauma injuries.

Also, please note that repetitive and cumulative musculoskeletal injuries do have a "time of injury," even though the injury does not occur at one specific instance, but rather the injury occurs over a period of time that an employee could describe to his or her employer, if such description is helpful to understanding of the cause of the injury or prevention of future injuries. Many occupational injuries, illnesses and diseases occur due to prolonged exposures, but employers are required to investigate such cases and take measures to prevent reoccurrence.

<u>Comment #CHLA26:</u> Repetitive motion injuries (or "cumulative trauma," section 3345(b)) are at the core of the proposed rule. But repetitive motion injuries cannot occur without repetitive motion. Unlike, for example, a worker in a poultry processing plant who stands in one place and repeats the same chopping motion ad nauseam, hotel housekeepers use a variety of muscle groups, are not stationary, use multiple tools, work on multiple work surfaces, and walk between hotel rooms. In many ways this is the opposite of "repetitive motion:" "Housekeepers perform a variety of different tasks that are short in duration (most less than 2 minutes) before moving onto different activity, and activities are peppered with . . . short breaks between exertions that allow adequate perfusion of contracting tissues. The breaks permit adequate supply of nutrients and washout of metabolic end-products from working muscle."

<u>Response:</u> Regarding repetitive motion injuries being the core of the proposed rule, please see the response to Comment #CHLA25. Based on testimony from numerous housekeepers during the advisory committee meetings and a review of the injury data, the Board believes that housekeeping employees in lodging establishments perform some repetitive motion tasks and that both repetitive tasks and non-repetitive tasks are causing injury. Cumulative injuries can result over time from movement and forces that are not identical.

The Board believes that the assertion that breaks between housekeeping tasks are sufficient to prevent injury is not correct. The Wiker study is not representative of actual workplace experience of California housekeeping employees in lodging establishments as the Wiker study consisted of a short duration simulations of some housekeeping tasks. Please see the response to Comment #CHLA17.

The injury rates of housekeeping employees in lodging establishments and statements of the workers themselves provide a more representative assessment of actual workplace experiences of California housekeeping employees. Please see the response to Comment #CHLA2 and the following documents relied upon in the ISOR: "Occupational Safety and Health Standards Board Petition No. 526, submitted by Kurt Peterson and Pamela Vossenas, on behalf of UNITE HERE (Jan. 23, 2012)" (document number one in the list of documents relied upon), "Issue Brief: Workplace Injuries in Hotel Housekeeping in California prepared by the DIR - Office of the Director, Research Unit, May 13, 2016" (document number four in the list of documents relied upon), and "California Workers Compensation Information System (WCIS) Preliminary Data. Occupational Hazards Faced by Housekeepers within the Hotel and Hospitality Industry. March 19,

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 144 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 15 of 56*

2013" (document number eighteen in the list of documents relied upon). The injury rates confirm worker statements that housekeeping employees are experiencing excessive numbers of injuries from the physical tasks of their job.

The Board agrees that housekeepers perform a variety of housecleaning tasks and use a diversity of muscle groups, but does not agree with CHLA's statement that these injuries cannot occur or that the proposal is at odds with common sense. The high rate of injuries suffered by housekeepers necessitates the Board move forward with this performance-based proposal. Likewise, the Board is confident its efforts to address the reduction of occurrence of musculoskeletal injuries among housekeepers are appropriate.

Comment #CHLA27: The economic implications of the proposed rule weigh against its enactment. Section 3345 would impose unpredictable yet significant costs on California's hotel and lodging industry. The proposed new rule would result in substantial ongoing costs, as shown in the following table. Please note that these estimates do not include any equipment or changes to operations, nor do they address the liability to employers for implementing changes without any scientific evidence to demonstrate the existence of the alleged hazards or the effectiveness of mandated interventions.

The ISOR guesses the proposed rule would cause a "modest or conservative reduction of 30% of the occurrences of injury," which would result in "annual savings of $8.4 million" for hotels. It also calculates $3.4 million in annual costs imposed on the industry. These estimates are defective. First, like companies in all industries, hotels seek financial profitability. Thus, if it were true that the industry stood to gain $5 million per year – that it could spend $3.4 million in order to save $8.4 million each year – then the industry would obviously already be doing what section 3345 seeks to mandate. No rational for-profit enterprise would do otherwise. Relatedly, the estimate of a "30% reduction" in injuries is pure guesswork and would represent a dramatic decrease. Yet that estimate is the key variable in the economic impact analysis.

The following costs are merely an introduction to the more concerning factor, which is that the record simply ignores CH&LA's economic analysis.

Table 1 Comment CHLA#27 Estimated Costs

| Cal/OSHA Housekeeping in the Hotel and Hospitality Industry Proposed Rule § 3345 Economic Impact Analysis (Source: Smith Travel Research, Wage Watch (2012)) | | | |
|---|---|---|---|
| **Proposed Standard** | **Costs Per Segment** | | **Total Cost** |
| | **Full Service** | **Limited Service** | |
| 1. Job Hazard Analysis | $2.5 mil | $6.8 mil | **$9.3 mil** |

| | | | |
|---|---|---|---|
| 2. Musculoskeletal Injury & Illness Program | $425,000 | $659,000 | **$1.1 mil** |
| 3. Housekeeper Training | $3.25 mil | $3.16 mil | **$1.9 mil** |
| 4. Monitoring & Evaluation | $1.7 mil | $2.6 mil | **$4.3 mil** |
| 5. Recordkeeping | $212,500 | $329,700 | **$542,200** |
| | **Total Costs** | | **$21.6 mil** |
| | **5 Year Total Cost** | | **$108.2 Million** |

Row 1. Costs are estimated at between $2,000 - $5,000 per property to hire a professional qualified to evaluate Musculoskeletal Disorders (MSD) hazards. For estimation purposes, $2,000 per property was utilized.

Row 2. Estimations are for eight hours to complete such a plan. Cost estimates are for a Human Resources Manager at a full service property or the General Manager at a limited service property. Formula: 8 hours x $42.80 (HR hourly wage) = $342.40; 8 hours x $24.20 (GM hourly wage) = $193.60.

Row 3. It is estimated there would be four housekeepers and the General Manager involved in training with a total meeting time of four hours per year. Formula:

    -Limited Service: (1 housekeeper per eight rooms x $10.40 average salary per hour x 8 hours) + (1 GM x $24.20 average salary per hour limited service hotel x 8 hours = $193.60);

    -Full Service: (1 housekeeper per eight rooms X $10.40 salary per hour x 8 hours) + (1 GM x $73.55 average salary per hour full service hotel x 8 hours = $588.40)

Row 4. It is estimated this will take the Human Resources Manager at a full service property or the General Manager at a limited service property four days per year (32 hours).

Row 5. It is estimated this will take the Human Resources Manager at a full service property or the General Manager at a limited service property four hours per year. Formula: 4 hours x $42.80 (HR hourly wage full service) = $171.20 4 hours x $24.20(GM hourly wage limited service) = $96.80.

<u>Response:</u> The proposal will be the first regulatory effort to reduce musculoskeletal injuries in the accommodation industry and as a result, the Board believes that a good-faith implementation of the proposal will significantly reduce musculoskeletal injuries as described in the ISOR. Please see the responses to Comments #CHLA2 through CHLA5 on why existing regulations have not been effective in preventing musculoskeletal injuries. Please see the response to Comment #CHLA14 on why guidelines are not effective in preventing musculoskeletal injuries.

The Board did not ignore CHLA's economic analysis. CHLA's estimate calculated for reviewing and updating a MIPP (row 2 from the table provided in Comment #CHLA27) was accepted and utilized. However, the cost in row 1 from table 1 in Comment #CHLA27, entitled "job hazard analysis" does not exist in the proposed regulation. Proposed section 3345 does not require lodging

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 146 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 17 of 56*

establishments to hire a professional to evaluate musculoskeletal disorder hazards or perform a job hazard analysis. Accordingly, cost estimates for row 1 from table 1 provided in Comment #CHLA27 were not utilized.

The Board estimated costs for the proposal as follows (see table 2 below for summary):

Establish MIPP: the Board estimates for the cost to establish an MIPP (row 2 from table 1 in Comment #CHLA27) are the same as the CHLA estimate ($1.1 million). The cost is shown below in row 1 of table 2 (total statewide cost of proposal as estimated by the Board).

Worksite evaluations and MIPP review: Although the proposal does not require a job hazard analysis, the proposal does require employers to conduct annual worksite evaluations and an annual review of their MIPP. The Board estimates it would take a maximum of 4 hours for establishments annually to conduct worksite evaluations and a program review/update as required by the proposal. The cost would be $100 per establishment and a total statewide cost of $550,000 using the same hourly wages as provided by CHLA for the cost of establishing the MIPP (row 2 of the table in Comment #CHLA27). In addition, the proposal requires employers to involve housekeeping employees in the worksite evaluation and program review. The proposal does not mandate a specific number or percentage of employees to participate in the evaluation. The proposal only requires that employees be allowed to participate. For purposes of the cost estimates, the Board assumed up to 50 percent of housekeeping employees will participate, although the Board notes this assumption likely overestimates the actual number of employees who will participate. The Board estimates that employee involvement would take a maximum of 2 hours per housekeeping employee. The cost of 2 hours for 50 percent of all housekeepers (using the same hourly wages as provided by CHLA) is approximately $700,000. The total annual statewide cost for the worksite evaluations and annual MIPP review/update including employee participation is calculated at approximately $1.25 million. Please see row 2 of the estimated costs by the Board in table 2 below. This is lower than the $4.3 million by CHLA (row 4 of table 1 in Comment #CHLA27) because CHLA estimates employers will need 32 hours per year per establishment to conduct evaluations and program reviews. The Board believes this is an overestimate.

Training: the Board estimates the training requirements of the proposal will take up to 2 hours per year for each housekeeping employee and an establishment manager or supervisor to provide the training for an estimated total cost for all lodging establishments in California of approximately $1.6 annually. This is slightly lower than the CHLA estimate of $1.9 million annually for training.

Recordkeeping: the Board estimates an annual cost of $550,000 for recordkeeping, which is approximately the same as the CHLA estimate. This may be an overestimate of recordkeeping costs as the proposal requires records be kept in accordance with existing regulations (Sections 3203, 3204 and 14300 – 14300.48) and adds no new requirements for retaining records.

The costs as estimated by the Board are shown in table 2 below. The costs for both the worksite evaluation and program review are combined in row 2.

| Table 2: Total Statewide Cost of Proposal as Estimated by the Board | | |
|---|---|---|
| Requirement | First Year | Annual Cost Thereafter |
| 1. MIPP Program | $1.1M | $0 |
| 2. Worksite Evaluation and Program Review | $1.25M | $1.25M |
| 3. Training | $1.6M | $1.6M |
| 4. Recordkeeping | $0.55M | $0.55M |
| **Total** | **$4.5 million** | **$3.4 million** |
| **5 year cost:** | **$18.1 million** | |

Proposed section 3345 does not mandate specific hazard-analysis, technologies, tools or equipment, or that a health, safety, medical professional or other expert be hired. Therefore, the Board does not agree with CHLA's statement that the estimates are defective or that proposed section 3345 will impose unpredictable or substantial ongoing costs on the California's hotel and lodging industry.

Comment #CHLA28: Promulgating the proposed rule would violate California law due to the flawed rulemaking process. The foregoing analysis explains why, as a substantive matter, the proposed section 3345 is both unnecessary and counterproductive. The proposed rule is also procedurally flawed beyond repair. Notwithstanding the serious substantive concerns with the proposed rule, the rule cannot move forward in its present state because section 3345 and its supporting documents reflect five serious errors in the process of studying, drafting, and presenting the proposed rule. First, the proposed rule alternates between ignoring and misrepresenting CH&LA's economic analysis. Second, the explanatory documents reflect disregard for the Board staff's comments pointing out one-sided justifications for the rule. Third, the core premise of the proposed rule – that housekeeping tasks are inherently dangerous – defies common sense. Fourth, there is no consistent explanation for the relationship between housekeeping tasks and musculoskeletal injuries. And fifth, there is no consistent explanation for what the proposed rule would actually require, which makes it impossible for employers to satisfy their obligations. These five shortcomings mean that it would be both unwise and illegal for the Board to submit the proposed rule for promulgation before the Office of Administrative Law.

Response: The Board adhered to the requirements of the Administrative Procedure Act. The Board does not believe that proposed section 3345 is unnecessary, counterproductive, one-sided, or unclear. Please see responses to Comments #CHLA2, CHLA3, CHLA5, CHLA6, CHLA10, CHLA14, CHLA17, CHLA19, CHLA21, CHLA 22, CHLA23, and CHLA26.

The Board addresses CHLA's five points as follows:

Regarding the first point (CH&LA's economic analysis), please see the response to Comment #CHLA27.

Regarding the second point (Board staff's comments), please see the responses to Comments #CHLA17 and CHLA31.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 148 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 19 of 56*

Regarding the third point, the proposed regulation does not assume all housekeeping tasks are inherently dangerous. The proposal requires employers to evaluate potential risks and investigate injuries and make changes to address any problems discovered, which is consistent with other regulations such as sections 3203(a)(6) and 5120(c)(7). Please also see response to Comment #CHLA5.

Regarding the fourth point (relationship between housekeeping tasks and musculoskeletal injuries); please see the response to Comment #CHLA2.

Regarding the fifth point (no explanation of what the proposed rule would require), the proposal is a performance-based regulation and not a prescriptive regulation. As a result, it does not require employers to purchase any specific equipment, use a specific type of hazard analysis methodology, or have employees follow any specific work practice. It requires employers to evaluate hazards and make changes as needed to prevent injuries. This is consistent with other regulations such as sections 3203 and 5120.

The Board is confident that the requirements of the Labor Code and the Government Code have been met with respect to this rulemaking. Additionally, the Board is convinced that its efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers are appropriate.

Comment #CHLA29: The proposed rule does not "take into account" CH&LA's Economic Analysis. The economic analysis submitted by CH&LA on December 29, 2015, stands unrebutted by any other stakeholder and by the Division. This alone is fatal to the proposed rule because the Board must "tak[e] into account the totality of the record" in order for the proposed rule to be promulgated. California Government Code section 11349(a). As the Board staff's comments make clear, the record and its presentation are distorted.

Response: Please see the response to Comment #CHLA27 regarding the CH&LA economic analysis. The Board has taken into account the totality of the record and complied with the Administrative Procedures Act, including Government Code section 11349(a).

Comment #CHLA30: The ISOR misstates CH&LA's economic analysis. The ISOR states that "CHLA estimated it would . . . cost approximately $200 per establishment" for hotels to "review and update their" IIPPs. This is a misquote of the December 29, 2015, CH&LA submission. As the Board staff mentioned in a comment to the draft ISOR, "CHLA also quoted a cost of approximately $350 for a Human Resources Manager to complete the plan. . . . Why are only the lower costs stated?" This comment was ignored, and the final version of the ISOR is identical in that respect to the draft version. The following paragraph of the ISOR repeated the same type of error. It states that worksite evaluations would cost "$100 per establishment . . . using the same assumption as provided by CHLA." The Board staff pointed out the error, to no avail: in fact, the Staff pointed out, "CHLA estimates the costs to be between $2,000-$5,000 per property," not $100. The ISOR also quotes CH&LA that the recordkeeping requirement "cost would be $100 per establishment."

This is also false, as the Board staff pointed out on the draft version: "Why was the lower wage of $24.20 used vs. the higher wage of $171.20?"

Response: Please see the response to Comment #CHLA27 regarding the CH&LA economic impact analysis. Wages used in the Board cost estimates were from CHLA or the U.S Bureau of Labor Statistics. The CHLA estimate of $2,000 to $5,000 per property to conduct a worksite evaluation was the cost to hire a professional qualified to evaluate musculoskeletal disorders and perform a job hazard analysis. The proposal does not require the hiring of a qualified professional or a job hazard analysis, so this cost was not used.

Comment #CHLA31: Summarizing the question of the economic impact of the proposed rule, the ISOR states "this proposal should not result in a significant, statewide adverse economic impact." Commenting on the draft version, the Board staff noted, "This doesn't seem accurate." Similarly, the ISOR states, "no economic impact is anticipated from the proposal regarding equipment and tools." Board staff challenged this, commenting, "The text and the language above refer to 'required' tools and 'appropriate' tools. Depending on who determines what these are (the union, the employee, the employer, DOSH) there will be costs." All of these Staff comments were ignored.

Response: Please see response to Comment #CHLA27 regarding the CH&LA economic impact analysis. Changes, replies, or explanations were provided in response to all Board staff comments prior to the proposal going out on notice to the public. No Board staff comments were ignored. The proposal does not require employers to purchase specific tools. Please also see responses to Comments #CHLA12, CHLA13, CHLA14, CHLA15 and CHLA32.

Comment #CHLA32: These inaccuracies are exacerbated by the fact that another explanatory memorandum states "[f]rom input during the advisory process . . . staff was not able to ascertain significant adverse economic (cost) impact." This ignores both CH&LA's detailed calculation of the economic impacts and the Staff's repeated attempts to draw attention to CH&LA's unrebutted analysis. In response, instead of addressing or contemplating CH&LA's submissions, the Economic and Fiscal Impact Statement surmises "that the employer would benefit economically from an improved or better cleaning tool and that some of these options may be less expensive or of similar cost as the ones already being incurred."

Response: Please see responses to Comments #CHLA27 and CHLA30 regarding the CH&LA economic impact analysis.

Please see the responses to Comments #CHLA17 and CHLA31 regarding the Board staff's comments. Regarding the issuance of equipment and tools, as stated in the ISOR, proposed section 3345 does not mandate specific equipment, cleaning tools, or technologies such as fitted sheets, ergonomic cleaning tools, or motorized carts. In the course of doing business, this industry is currently providing and maintaining clean accommodations and incurring ongoing expenses with regards to cleaning supplies, tools, and equipment. Because the option of maintaining the status quo exists, no economic impact is anticipated from the proposal regarding equipment and tools. Please also see the responses to Comments #CHLA12, CHLA13, CHLA14, and CHLA15.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 150 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 21 of 56*

Comment #CHLA33: The Board staff's input was ignored. As part of the process of drafting the proposed rule, the Board staff submitted comments and provided feedback on draft versions of section 3345 and the related explanatory materials. The draft version of the ISOR circulated to the Board staff for their comments stated "The input and data gathered at the advisory meetings overwhelmingly confirmed the existence of a high number of injuries and illnesses caused by acute injury or cumulative trauma . . . . Participating stakeholders repeatedly referenced injuries to the back, shoulder and upper extremities and injuries due to falls, slips and trips." The Board staff disagreed with this assessment. They noted that 'Overwhelmingly confirmed' seems a bit one sided, especially in light of the CHLA study [conducted by Dr. Wiker]. . . . 'Participating stakeholders' may overstate the breadth of support for the regulation." Indeed, many of the hotel housekeepers who spoke at the advisory meetings read from scripts written by the union petitioner. These comments were ignored: the final version of the ISOR reflects no edits to the passages in question. Similarly, there was no response to the Staff's comment that there "is a general tone that exists throughout the ISOR that should be addressed. . . . [P]lease read through the documents and evaluate whether or not something shows a bias or is not supported by objective data."

Response: Changes, replies, or explanations were provided in response to all Board staff comments prior to the proposal going out on notice to the public. No Board staff comments were ignored. Please see the response to Comment #CHLA31. Please see the response to Comment #CHLA17 regarding the limitations of the Wiker study and Board staff comments regarding the Wiker study.

The participating stakeholders (hotel housekeepers) primarily spoke of their own personal experience with workplace injuries and these personal accounts did not appear to be prepared ahead of time by the union petitioner.

Comment #CHLA34: In at least one instance, the absence of any response to a Board staff comment is indicative of a fatal flaw in the proposed rule. For a proposed rule to be promulgated, California state law mandates that "[i]n the record of the rulemaking proceeding (record), the agency must state the specific purpose of each regulatory provision and explain why the provision is reasonably necessary to accomplish that purpose." The proposed rule mandates annual trainings and reevaluations. Commenting on the draft ISOR, the Board staff wondered, "Should you explain why this must be done annually? Why is it necessary to provide training annually when IIPP doesn't? Need rationale." The published ISOR does not answer the question. Accordingly, a key provision of the proposed rule remains unexplained, which means that the record fails to satisfy the legal mandate to explain the necessity of that provision.

Response: The Board adhered to the requirements of the Administrative Procedure Act. The specific purpose and necessity of each regulatory provision of the proposal are explained in the ISOR. Changes, replies, or explanations were provided in response to all Board staff comments prior to the proposal going out on notice to the public. No Board staff comments were ignored.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 151 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 22 of 56*

Regarding the issue of annual training, the ISOR explains that housekeepers and supervisors need annual training to maintain and update their knowledge on housekeeping hazards especially when changes to the MIPP have been made to correct problems or improve procedures.

Comment #CHLA35: Section 3345 lacks factual support. A portion of the ISOR is devoted to explaining the factual basis for the proposed rule. Since there is no apparent reason to single out hotel housekeepers for a special regulation, the ISOR attempts to explain why this specific occupation—not all hotel workers, not all housekeepers, but *hotel housekeepers*—requires its own rule. One of the chief sources cited in the ISOR simply does not say what the ISOR purports it to say.

Response: Please see response to Comment #CHLA2 regarding the necessity of the proposal for housekeeping employees at lodging establishments.

Comment #CHLA36: Citing the Federal Fiscal Year 2015-2016 High Hazard Industry List, the ISOR states, "[h]ousekeeping cleaners are within the top 10 occupations in terms of their DART rate," which measures work days missed. The High Hazard Industry List, as its name indicates, does not list "occupations." Rather, it lists "Industry Activities." Nothing about the Industry List says anything about housekeeping activities. The listing for the "Accommodation" (NAICS code 721) industry activity is the closest that the Industry List comes to mentioning hotel housekeeping. This "industry activity" includes many workplaces that are not covered by the proposed rule, such as recreational vehicle parks and recreational camps. Moreover, the federal government notes that just 50.3% of employees in the Accommodation industry are housekeepers. This portrayal of the High Hazard Industry List is an evident misrepresentation.

Response: The Board recognizes the high hazard industry listing of the accommodation industry contains employees who are not housekeepers. According to the U.S. Bureau of Labor Statistics, the injury rate of housekeepers is higher than the injury rate of the accommodation industry in general. Thus, the days away, restricted and transferred (DART) rate would be higher if limited to only housekeeping employees in lodging establishments. In addition, the high hazard industry list was not the only document relied upon to establish the necessity for the proposal. For injury statistics, the Board relied upon "Issue Brief: Workplace Injuries in Hotel Housekeeping in California prepared by the DIR - Office of the Director, Research Unit, May 13, 2016," (document number four in the list of documents relied upon), and "California Workers Compensation Information System (WCIS) Preliminary Data. Occupational Hazards Faced by Housekeepers within the Hotel and Hospitality Industry. March 19, 2013," (document number eighteen in the list of documents relied upon). In addition, the need for the proposal is supported by statements from housekeeping employees (document six from the list of documents relied upon) and the Division evaluation on the petition to establish the proposal (document two from the list of documents relied upon). The Standards Board decision regarding the petition (document number three from the list of documents relied upon) found that Standards Board staff agreed that a significant number of musculoskeletal injuries occur in this industry and that appropriate control measures can reduce those risks.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 152 of 270

Hotel Housekeeping Musculoskeletal Injury Prevention
Final Statement of Reasons
Public Hearing: May 18, 2017
Page 23 of 56

<u>Comment #CHLA37:</u> The misrepresentation does not end there. The "Accommodation" industry listing is *not* even within the "top 10." Rather, the Accommodation industry listing is tied for 13th-highest DART rate on a listing of twenty industry activities. It is telling that the primary substantiation for a hotel housekeeping regulation is a cavalier misstatement. As the Board staff pointed out in its own comments on the draft ISOR, "I do not see this statistic on the 2015/16 HH Industry list."

<u>Response:</u> Please see the response to Comment #CHLA36 regarding the high hazard industry list and the accommodation industry. The Board agrees that the accommodation industry DART rate is the 13th highest in the list and not within the top ten. However, the accommodation industry is number one (1) (highest number of injuries) on the high hazard list regarding the total number of employees suffering from injuries resulting in days away, restricted and transferred. Please also see the response to Comment #CHLA2.

<u>Comment #CHLA38:</u> The proposed rule is unclear because it lacks consistent explanations for the premise and the effect of the rule. A proposed rule must be sufficiently clear in order for the state Office of Administrative Law to promulgate the regulation. A regulation fails the clarity standard when "[t]he regulation has more than one meaning" or when "[t]he language of the regulation conflicts with the description of its effect," among other reasons. The proposed rule fails the clarity test because the explanations of the link between hotel housekeeping and musculoskeletal injury in the proposed rule are inconsistent with the explanations in the explanatory documents. The proposed rule also fails the clarity test because discrepancies between what the proposed rule mandates and what the explanatory documents say make the proposed rule susceptible to more than one meaning.

<u>Response:</u> The Board believes the proposal to be clear and complies with the requirements of the Administrative Procedure Act. It is a non-prescriptive performance based regulation and therefore does not contain specific instructions for employers, but requires employers to establish a program and procedures to reduce musculoskeletal injuries to housekeeping employees. The program and procedures are clear and consistent with other existing regulations such as sections 3203 and 5120. Housekeeping employees at lodging establishments are suffering from high injury rates. Please see response to Comment #CHLA2.

<u>Comment #CHLA39:</u> The proposed rule presumes that certain motions and actions inherent in housekeeping tasks are dangerous. By listing them alongside "slips, trips, and falls," and "striking objects," section 3345(c)(4)(E) presumes that they lead to injury. Indeed, as the ISOR notes, "hotel housekeepers are *exposed to serious occupational risks* in the course of their *normal work duties*" due to "heavier mattresses, bulky duvets and heavier bed linen together with other upgraded room and bathroom amenities." As a result, "supervisors need to be knowledgeable of *the hazards faced* by housekeeping employees." Similarly, the draft version of the October 24, 2016, memorandum explaining the proposed rule explains that the proposed rule "contains requirements to protect employees from musculoskeletal injuries and acute trauma *resulting from exposure to hazards present in housekeeping tasks*" because "existing regulations . . . are not focused on *the particular hazards of this occupation*."

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 153 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 24 of 56*

Response: Please see the response to Comment #CHLA2 regarding the high rate of injuries suffered by housekeeping employees in the accommodation industry. Please see the response to Comment #CHLA36 for documents relied upon that provide evidence of potential injury risks to housekeeping employees in lodging establishments. Please see response to Comment #CHLA18 regarding the Board's opinion that the proposal does not presume the existence of hazards.

Based on the documents relied upon and input from stakeholders (including health professionals), the proposal requires employers to conduct a worksite evaluation to identify and address potential injury risks such as: (1) slips, trips and falls; (2) prolonged or awkward static postures; (3) extreme reaches and repetitive reaches above shoulder height, (4) lifting or forceful whole body or hand exertions; (5) torso bending, twisting, kneeling, and squatting; (6) pushing and pulling; (7) falling and striking objects; (8) pressure points where a part of the body presses against an object or surface; (9) excessive work-rate; and (10) inadequate recovery time between housekeeping tasks.

Comment #CHLA40: The documents hedge and do not presume a definitive causal link between hotel housekeeping and injury. The ISOR states that there are "identified injuries and risk factors *associated with* housekeeping tasks" and the proposed rule mandates "that the employer evaluates each housekeeping task with respect to *potential* causes of musculoskeletal injuries." The Notice of the proposed rule states the "proposed rulemaking will require employers in hotels . . . to identify *potential* hazards that lead to the development of musculoskeletal injuries." The proposed rule and its explanatory materials are inconsistent and contradictory. Thus, "[t]he language of the regulation conflicts with the description of its effect," and the proposed rule cannot be promulgated.

Response: The Board believes the ISOR and proposal do not equivocate and are clear on what employers are to include in their worksite evaluation to identify and address potential musculoskeletal injury risks. The use of the words 'potential' or 'associated' is not an equivocation on the causal link between musculoskeletal injuries housekeeping work at lodging establishments. It is a recognition that even if a significant number of workers may be injured, not all housekeeping workers will be injured while performing a high-risk task. This is the case for many workplace hazards and not unique to this proposal.

Please also see the responses to Comments #CHLA2, CHLA15, CHLA18 and CHLA39. The Board believes that the proposed rule and its explanatory materials are consistent, clear, not contradictory and comply with the requirements of the Administrative Procedure Act.

Comment #CHLA41: There is no coherent explanation of what the proposed rule actually mandates. By way of explaining the need for the proposed rule, the ISOR laments that section 3203 "does not establish *specific requirements;*" as a result, the ISOR explains the proposed rule "would also . . . requir[e] . . . the availability of housecleaning tools and equipment." The ISOR goes on to explain the "proposed regulation . . . ensur[es] the availability of housecleaning tools and equipment" and it mandates use of "required tools." The draft version of the October 24, 2016, memorandum explaining the proposed rule states "[n]ew Section 3345 . . . *contains requirements* to protect employees from musculoskeletal injuries and acute trauma resulting from exposure to

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 154 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 25 of 56*

hazards present in housekeeping tasks." The proposed rule "*require[s]* that employers establish a musculoskeletal injury prevention program (MIPP) that includes a worksite evaluation *requiring* . . . methods of correction including the availability of housecleaning tools and equipment."

Response: The Board believes the proposal to be clear and complies with the requirements of the Administrative Procedure Act. It is a performance-based regulation consistent with existing section 3203. Please see the response to the fifth point in Comment #CHLA28. Regarding the provision of tools and equipment, please the response to Comment #CHLA12.

Comment #CHLA42: The ISOR and the related documents contradict themselves as to whether the proposed rule establishes any requirements. For example, the ISOR states the proposed rule "does not mandate specific hazard-analysis, technologies, tools, or equipment." Similarly, according to the Attachment to Economic and Fiscal Impact Statement Standard Form 399, "[t]his proposal does not mandate specific equipment, cleaning tools or technologies such as fitted sheets, ergonomic cleaning tools or motorized carts." While it may be literally true that the proposed rule itself does not mandate *specific, particular* tools or processes, this is misleading because there will be mandatory tools and processes that result from the implementation of the rule. That distinction is especially important because portions of the ISOR state nothing is required at all. "[T]he option of maintaining the status quo exists" with respect to "specific equipment, cleaning tools or technologies." Due to the direct contradictions in the documents—the rule either mandates certain actions or it does not—the "regulation has more than one meaning" and therefore fails to achieve the clarity that California state law mandates.

Response: The Board believes the ISOR and related documents are consistent and supportive of one another and do not contradict themselves. The ISOR is correct in that the proposed rule does not mandate any tools, technologies or equipment. Please also see the responses to Comments #CHLA12 and CHLA21. The Board believes some lodging establishments may maintain the status quo with regard to existing equipment and tools. Such determinations, however, will be decided by establishments through the procedures established in the proposal.

Comment #CHLA43: In conclusion, CH&LA opposes the proposed rule, but it does not oppose continued efforts to improve the wellbeing of its members' employees. In fact, part of its commitment to employees is its opposition to the proposed rule: the industry does not want to be forced to fire employees for not following rigid work specifications. CH&LA supports the current regulatory regime and robust enforcement of sections 3203 and 5110, and it would also welcome non-mandatory guidelines that supplement those existing rules. As mentioned above, the proposed rule occasionally purports to inquire into *potential* hazards. CH&LA supports utilizing objective experts to assess potential hazards and to remedy actual hazards, to the extent they exist. CH&LA would support renewed efforts to develop industry-specific guidelines, which is the mechanism that Federal OSHA employs to address the potential for workplace- or occupation-specific hazards. Indeed, CH&LA and its members would offer full cooperation in developing and disseminating guidelines on hotel housekeeping safety. The first step in that productive process is the Board declining to submit section 3345 to the Office of Administrative Law.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 155 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 26 of 56*

Response: The proposal does not require rigid work specifications. Please see the response to Comment #CHLA13. Regarding sections 3203 and 5110, please see the responses to Comments #CHLA2 through CHLA5. The proposal allows employers to use experts to assess potential hazards if they wish. Please see the response to Comment #CHLA21. The Board does not believe that voluntary guidelines should be used to address musculoskeletal injuries to housekeepers in lieu of the proposal. Please see response to Comment #CHLA14.

The Board is confident that the requirements of the Labor Code and the Government Code have been met with respect to this rulemaking. Additionally, the Board is confident that its efforts to reduce musculoskeletal injuries among housekeepers are appropriate.

The Board thanks Ms. Mohrfeld and Mr. Epner for their comments and participation in the rulemaking process.

## 2. **Pamela Vossenas, UNITE HERE (UH), letter dated May 15, 2017**

Comment #UH1: UNITE HERE supports the proposed standard as written in its entirety with the addition of a few suggested changes. Except for the suggested changes, the commenter requests all other proposed language remains intact. If implemented correctly by employers and with the participation of hotel housekeepers as stated in the proposed language, this proposed standard will significantly reduce the risk of musculoskeletal injuries from hotel housekeeping work.

Response: The Board acknowledges the commenter's strong support of the proposal and takes notice of their specific recommendation to keep the proposed language intact.

Comment #UH2: UNITE HERE supports the key components of the proposed standard, which will ensure that housekeepers will be involved in designing and conducting worksite evaluations of housekeeping hazards, identifying causes of musculoskeletal injuries, identifying and evaluating possible corrective measures, establishing and updating a program to prevent musculoskeletal injuries and training. The commenter supports the inclusion of excessive work-rate as a risk factor because hotel housekeeping work is commonly structured as a room quota per shift.

Response: The Board acknowledges UNITE HERE's support for these aspects of the proposal.

Comment #UH3: UNITE HERE strongly reiterates their support of the proposed standard, specifically for the definitions of housekeeping tasks and control measures; the inclusion of forceful whole body or hand exertions and excessive work-rates as risk factors; the involvement of hotel housekeepers along with their union representatives in the worksite evaluation, injury investigation process, corrective measures and in reviewing and updating the MIPP; making readily available appropriate housecleaning equipment, protective equipment, and tools to each housekeeper, including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate housecleaning tools and equipment; a means by which appropriate equipment or other corrective measures will be identified, assessed, implemented, and then reevaluated after introduction and while used in the workplace; and the training and records section in their entirety.

Case 3:19-cv-01232-WHO Document 27-1 Filed 05/10/19 Page 156 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 27 of 56*

**Response:** The Board acknowledges UNITE HERE's support for these aspects of the proposal.

**Comment #UH4:** UNITE HERE recommends a change on page 2 of the proposed regulation.

> (c) Housekeeping musculoskeletal injury prevention program.
> (4) Procedures for identifying and evaluating housekeeping hazards through a worksite evaluation:
> (C) Housekeepers shall be notified ***within 14 days*** of the results of the worksite evaluation in writing or by posting it in a location readily accessible to them. The results of the worksite evaluation shall be in a language easily understood by housekeepers.

This will serve as a way to increase the timeliness of employers notifying housekeepers of the evaluation results and as a benchmark for enforcement of this section of the proposed standard.

**Response:** The Board declines UNITE HERE's request to complicate the proposed regulation by adding specific dates that may or may not be realistic depending on the complexity of the evaluation. Rather, the Board prefers to allow the flexibility needed to address all types of work situations and believes the evaluation of the timeliness for the employee notification should be made on a case-by-case basis.

**Comment #UH5:** UNITE HERE recommends a change on pages 2-3 of the proposed regulation.

> D. The worksite evaluation shall be reviewed and updated:
> 1. ***Within 30 days***, whenever new processes, procedures, equipment or renovation of guest rooms are introduced that may change or increase housekeeping hazards;
> 2. ***Within 30 days***, whenever the employer is made aware of a new or previously unrecognized housekeeping hazard based on information such as, but not limited to, the findings and recommendations of injury investigations conducted in accordance with subsection (c)(5);

The suggested language will increase the timeliness of employers performing the worksite evaluation and as a benchmark for enforcement of this section of the proposed standard.

**Response:** The Board declines UNITE HERE's request to complicate the proposed regulation by adding specific dates that may or may not be realistic depending on the complexity of the review and updates needed. Rather, the Board prefers to allow the flexibility needed to address all types of work situations and believes the determination of the timeliness for the review of the worksite evaluation should be made on a case-by-case basis.

**Comment #UH6:** UNITE HERE recommends a change on page 4 of the proposed regulation.

> d. Training. The employer shall provide training to housekeepers and their supervisors in a language easily understood by these employees.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 157 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 28 of 56*

1. (E) When new equipment or work practices are introduced or whenever the employer becomes aware of a new or previously unrecognized hazard. ~~The additional training may be limited to addressing the new equipment or work practices.~~

The last sentence should be removed because it negates the intent of the following language: "or whenever the employer becomes aware of a new or previously unrecognized hazard."

Response: This language has been part of all versions of the discussion draft throughout the advisory committee process. Additionally, this restriction was set to minimize the disruption and cost to employers and is reasonable considering the frequency of training that is provided to housekeepers. The Board does not believe that the current wording eliminates or negates the requirement to retrain housekeepers whenever the employer becomes aware of a new or previously unrecognized hazard, and declines the commenter's recommendation.

Comment #UH7: UNITE HERE recommends a change on page 5 of the proposed regulation.

(e) Records
Add a new item between (1) and (2) so that this becomes Item (2) that says:

***Training records shall be created and maintained for a minimum of one year and include the following information: training dates; contents or a summary of the training sessions; types and models of equipment practiced during training; names and qualifications of persons conducting the training; and names and job titles of all persons attending the training sessions.***

The above suggested language comes from the Healthcare Violence standard, Section 3342(h) recordkeeping, Item 2. It is also applicable for new section 3345, and this text would help ensure effective trainings and be a benchmark for enforcement.

Response: The effectiveness of worker training is determined during the employee interviews conducted by the Cal OSHA inspector rather than by information provided in a training record. Thus, the Board declines UNITE HERE's request for additional details on the training records and sees no need for cumbersome requirements that go beyond the requirements of section 3203.

Comment #UH8: UNITE HERE believes the term 'appropriate' is used mistakenly; see listed instances below.

Recommend change on page 3 of the proposed regulation.

(c)(5) Procedures to investigate musculoskeletal injuries to housekeepers, including the following:

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 158 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 29 of 56*

(B) If required tools or other control measures were not used, or not used ~~appropriately~~ ***correctly,*** a determination of why those measures were not used or were not used ~~appropriately~~ ***correctly***; and

In this context, the term 'use' of cleaning tools is performance-based and either the tools are being used correctly or not; so, 'correct' applies here and the term 'appropriate' does not. In other instances, appropriately is used to describe the tool and 'appropriately' in that context applies.

Response: The intent of subsection (c)(5)(B) is to ensure that tools or equipment used are appropriately suited or fitting for a particular task. The term "correctly" does not eliminate the possibility that an inappropriate or unsafe tool is used. Even an inappropriate tool can be used correctly. Additionally, the term "correctly" would distract housekeepers or supervisors into believing that a single person will judge or determine the correct use rather than focus on selecting and utilizing tools or equipment that are appropriately suited for the task. Thus, the Board declines the commenter's recommendation.

Comment #UH9: UNITE HERE recommends changes on page 3 of the proposed regulation.

(c)(6). Methods or procedures for correcting, in a timely manner, hazards identified in the worksite evaluation or in the investigation of musculoskeletal injuries to housekeepers, including procedures for determining whether identified corrective measures are ***effectively*** implemented ~~appropriately~~ ***to minimize or eliminate unsafe conditions or workplace practices that may cause musculoskeletal injuries.'***

Adding this language will help clarify the intent of the standard vis a vis the effective implementation of appropriate tools and corrective measures. The 'effectively implemented' suggested language comes from the Health Care Violence standard section 3342(c)(12)(F): "Reviewing whether appropriate corrective measures developed under the Plan – such as adequate staffing, provision and use of alarms or other means of summoning assistance, and response by staff or law enforcement – were effectively implemented." The additional proposed phrase 'unsafe conditions or workplace practices that may cause musculoskeletal injuries' is combined text from the housekeeping standard; from pages 1-2 of the proposed regulation, in the definition of 'Worksite Evaluation' comes "unsafe conditions or workplace practices," and from page 1 'Control Measures' comes "may cause musculoskeletal injuries."

Response: The Board does not believe that proposed subsection (c)(6) lacks clarity and notes that the term "effectively" is unnecessary. Similarly, repeating language that already exists in the proposed definitions is redundant and not needed. Thus, the Board declines the recommendations to add unnecessary words.

Comment #UH10: UNITE HERE recommends changes on page 5 of the proposed regulation.

(d) Training

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 159 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 30 of 56*

(2)(D) Body mechanics and safe practices including: identified hazards at the workplace, how those hazards are controlled during each housekeeping task, the ~~appropriate~~ **correct** use of cleaning tools and equipment to prevent injuries;

The first use of the term 'appropriate' as it relates to "use of cleaning tools" is performance-based and either the tools are being used correctly or not. Therefore the term 'correct' applies here and the term 'appropriate' does not. In the latter use of "appropriate", the term is used to describe the tools and equipment and 'appropriate' in that context applies.

Response: Please see response to Comment #UH8.

Comment #UH11: The term 'where applicable' should be added regarding housekeepers and union representatives; see instances listed below.

Recommended change on page 2 of the proposed regulation.

(c) Housekeeping musculoskeletal injury prevention program.
(4) Procedures for identifying and evaluating housekeeping hazards through a worksite evaluation:
(B) The procedures shall include an effective means of involving housekeepers and, ***where applicable***, their union representative in designing and conducting the worksite evaluation.

Recommended proposed changes on page 3 of the proposed regulation.

(c)(5) Procedures to investigate musculoskeletal injuries to housekeepers, including the following:
(C) Input of the injured housekeeper, ***where applicable*** the housekeeper's union representative, and the housekeeper's supervisor as to whether any other control measure, procedure, or tool would have prevented the injury.

(6) Methods of procedures for correcting, in a timely manner, hazards identified in the worksite evaluation or in the investigation of musculoskeletal injuries to housekeepers...

(A) An effective means of involving housekeepers and, ***where applicable***, their union representative in identifying and evaluating possible corrective measures;

This suggested text clarifies that all housekeepers, whether they have a union representative or not, are eligible to participate in the activities under subsection (c)(6)(A).

Recommended change on page 4 of the proposed regulation.

(7) Procedures for reviewing, at least annually, the MIPP at each worksite, to determine its effectiveness and make any corrections when necessary, including an effective procedure for obtaining the active involvement of housekeepers and, ***where applicable,*** their union

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 160 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 31 of 56*

representative in reviewing and updating the MIPP. The procedures shall include a review of the Cal/OSHA Form 300 log and other relevant records such as Cal/OSHA Form 301 incident reports.

Response: The proposal as written requires that employers involve housekeepers and their union representative in the development, implementation and maintenance of the musculoskeletal injury prevention program. The term "where applicable" is not necessary to address establishments that do not have a labor union, as such establishments are automatically not covered by the requirement to include union representative participation in the MIPP. Thus, the Board declines to make these modifications.

Comment #UH12: The term 'housecleaning' is used mistakenly; see instances listed below. 'Housecleaning' is not a term defined in this proposed standard and therefore, should not be used. Hotel housekeeping involves housekeepers who perform room cleaning and related housekeeping tasks (see definitions of underlined terms, page 1). Housekeeping is a defined term and therefore, should be used.

Recommended change on page 2 of the proposed regulation. In the last sentence of subsection (c)(2), an additional comma and semi-colons are needed to clarify the meaning of 'substantial compliance.'

(c) Housekeeping musculoskeletal injury prevention program.

(2) A system for ensuring that supervisors and housekeepers comply with the MIPP, follow in the employer's safe workplace ~~housecleaning~~ *practices for performing housekeeping tasks* ~~practices~~, and use the housekeeping tools or equipment deemed appropriate for each housekeeping task. Substantial compliance with this provision includes recognition of employees who follow the employer's safe workplace ~~housecleaning~~ *practices for performing housekeeping tasks*, and use the appropriate tools and equipment; training and retraining programs; disciplinary actions; or other means that ensures employee compliance with the MIPP;

Proposed changes on pages 3-4:

(c)(6) Methods or procedures for correcting, in a timely manner, hazards identified in the worksite evaluation or in the investigation of musculoskeletal injuries to housekeepers, including procedures for determining whether identified corrective measures are implemented appropriately. These procedures shall include:

(C) A means of providing and making readily available appropriate ~~housecleaning~~ equipment, protective equipment, and tools to each housekeeper *for performing housekeeping tasks,* including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate ~~housecleaning~~ tools and equipment *for performing housekeeping tasks*.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 161 of 270

Hotel Housekeeping Musculoskeletal Injury Prevention
Final Statement of Reasons
Public Hearing: May 18, 2017
Page 32 of 56

Response: This language has been part of all versions of the discussion draft throughout the advisory committee process. Additionally, the term housecleaning is a commonly used and well-understood term and the Board does not believe this term is used erroneously, or that it needs a definition. Thus, the Board declines these recommendations. The Board acknowledges Ms. Vossenas' comments and support for this regulatory proposal and thanks her for her participation in the rulemaking process.

**3.** **Christian Rak, UNITE HERE Local 49; Wei-Ling Huber, UH Local 2850; Enrique Fernandez, UH Local 19; Sergio Rangel, UH Local 483; Anand Singh, UH Local 2; Bridgette Browning, UH Local 30; and Thomas Walsh, UH Local 11. Letters dated from May 9 and May 15, 2017**

Comment #UHLS1: On behalf of Local (49, 2850, 19, 483, 2, 30, and 11) members who are hotel housekeepers, the commenters strongly support proposed new section 3345 Hotel Housekeeping Musculoskeletal Injury Prevention Standard as written in its entirety, with some minor but important suggested changes. For those detailed changes, please refer to comments by UNITE HERE International Union's Worker Safety & Health Director Pamela Vossenas.

If implemented correctly, proposed new Section 3345 has the potential to reduce the risk of musculoskeletal injuries from hotel housekeeping work. The commenters strongly reiterate their support for the definitions of housekeeping tasks and control measures; the inclusion of forceful whole body or hand exertions and excessive work-rates as risk factors; the involvement of hotel housekeepers along with their union representative in the worksite evaluation, in the injury investigation process, in identifying and evaluating possible corrective measures and in reviewing and updating the MIPP; making readily available appropriate housecleaning equipment, protective equipment, and tools to each housekeeper, including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate housecleaning tools and equipment; a means by which appropriate equipment or other corrective measures will be identified, assessed, implemented, and then reevaluated after introduction and while used in the workplace; and the training and records sections in their entirety.

Response: The Board acknowledges the commenters strong support for this proposal, as well as their concurrence with the specific definitions, risk factors, and key elements of the proposal. Please see the responses to Comments #UH1 through UH12.

Comment #UHLS2: The commenters thank and encourage all relevant government agencies to review the comments in a timely manner and move the process forward to a vote to adopt the proposed standard by the members of the Occupational Safety and Health Standards Board before the end of 2017.

Response: The Board acknowledges UNITE HERE Local 49, UNITE HERE Local 2850, UNITE HERE Local 19, UNITE HERE Local 483, UNITE HERE Local 2, UNITE HERE Local 30 and UNITE HERE Local 11 support for this regulatory proposal and thanks them for their participation in the rulemaking process.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 162 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 33 of 56*

4. **Eric Myers, McCracken, Stemerman & Holsberry, LLP, representing UNITE HERE, letter dated May 18, 2017, including exhibits 1 through 7**

Comment #EM1: This firm represents UNITE HERE, and is resubmitting the exhibits to Petition No. 526 for inclusion in the rulemaking record because the exhibits are referred to in the ISOR; however, I am unable to locate them on the Standards Board's website. I wish to make certain they are part of the rulemaking record.

Response: The Board acknowledges receipt of these exhibits for inclusion in the rulemaking package. The Board thanks Mr. Myers for his participation in the rulemaking process.

5. **Carisa Harris Adamson, Robert Harrison, and 15 other medical and health professionals, University of California, San Francisco, University of California, Davis, and University of California, Los Angeles, letter dated May 12, 2017.**

Comment #CA1: As occupational and public health professionals, many of whom are directly involved in the treatment and prevention of work-related injuries, we strongly support the proposed Hotel Housekeeping Musculoskeletal Injury Prevention Program Standard as written in its entirety and including new section 3345, with one minor addition.

Under Section (b) Definitions, we suggest adding examples of specific recommended controls, all highlighted in Cal/OSHA publications, such as adjustable/long-handled cleaning tools, mops, fitted sheets, lightweight vacuum cleaners and light-weight or motorized carts. These tools, and others that reduce physical workloads, should not only be made available but should be implemented as appropriate following the required worksite evaluation.

Response: The Board acknowledges the commenters strong support for this proposed regulation. However, the Board declines the request to specify cleaning tools, equipment or control measures as this is a performance-oriented regulation that is not meant to limit or prescribe the measures that employers are to use.

Comment #CA2: The commenters support keeping all language consistent with the promotion of a participatory approach to musculoskeletal injury prevention programs. The literature firmly supports the effectiveness of participatory ergonomics programs; thus, housekeepers should be involved in all aspects of the program such as the evaluation of workplace hazards and implementation of controls.

Response: The Board acknowledges the commenters support for this aspect of the proposal as well as their concurrence with the requirement to include housekeepers in this development, implementation and maintenance of the musculoskeletal injury prevention program.

Comment #CA3: Since this process began, there continues to be a high incidence and prevalence of work-related musculoskeletal disorders (MSDs) among hotel room cleaners, and as indicated in

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 163 of 270

Hotel Housekeeping Musculoskeletal Injury Prevention
Final Statement of Reasons
Public Hearing: May 18, 2017
Page 34 of 56

prior letters, the basis for support is as follows: 1) Scientific and medical research conclusively shows that the type of ergonomic hazards faced by hotel housekeepers are associated with work-related MSDs; 2) The ergonomic hazards faced by hotel housekeepers include forceful exertions, lifting, awkward posture, repetition and excessive work pace; 3) Studies performed among hotel housekeepers document that these ergonomic hazards increase the risk of work-related MSDs; 4) Job hazard analyses (including the work rate) in the hotel and hospitality industry are important methods that can identify ergonomic risk factors and implement effective solutions to prevent further workplace injuries; 5) Engineering and other solutions to prevent work-related MSDs in hotel housekeepers are feasible and, in many instances, can be implemented without significant cost to the employer; and 6) Early symptom reporting, training and program evaluation are essential elements of a comprehensive ergonomic program for hotel housekeepers. These elements can reduce the cost of medical care, disability and employee turnover.

Response: The Board acknowledges the commenters support for this proposal as well as their concurrence with the findings, risk factors identified and conclusion that engineering and corrective solutions are feasible and can be implemented without significant cost to the employer.

Comment #CA4: The aforementioned standard, new section 3345, if implemented correctly, has the potential to reduce the risk of preventable work-related MSDs and associated disability among hotel housekeepers.

Response: The Board acknowledges the commenters support for this proposal and thanks them for their participation in the rulemaking process.

## 6. Helena Worthen, former University of Illinois Labor Educator, e-mail dated May 15, 2017, and Joe Berry, Labor Educator, letter received May 16, 2017

Comment #HW1: The language about employee involvement in identifying and solving problems should remain intact. The commenter emphasizes the importance of the language in the proposed standard that ensures that employers of housekeepers: involve housekeepers in the various aspects of the prevention program including the worksite evaluation; corrective measures; plan updates; and in the injury investigation procedures; the causes of musculoskeletal injuries, and possible corrective measures. Workers are extremely knowledgeable about their jobs, related tasks and their workplaces. Cal/OSHA has proposed language that ensures worker knowledge is a central part of the employer's Musculoskeletal Injury Prevention Program (MIPP) thereby increasing the likelihood that this proposed standard will be effective.

Response: The Board acknowledges the commenters support for this proposal, as well as their concurrence with these specific aspects of the proposal.

Comment #HW2: The proposed standard's language about providing training for housekeepers and supervisors on risk factors, safe practices, and the elements of the employer's program to prevent musculoskeletal injuries is also essential. Worker and supervisor training is necessary to ensure that the MIPP is based on accurate information and knowledge. It is encouraging to see the progress that

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 164 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 35 of 56*

has been made but only if a strong standard is adopted by the vote of the Occupational Safety and Health Standards Board before March 2018.

Response: The Board acknowledges the commenters support for these aspects of the proposal and thanks Ms. Worthen and Mr. Berry for their participation in the rulemaking process.

### 7. James Howe, Safety Solutions, letter dated May 16, 2017

Comment #JH1: One of the most important factors leading to the reduction of acute, repetitive and chronic musculoskeletal injuries is the implementation of a program by the employer. Therefore, the commenter supports the inclusion of the Musculoskeletal Injury Prevention Plan as part of the proposed standard as written.

Musculoskeletal injuries are preventable and it is the responsibility of employers to provide a safe workplace under the OSH Act. There is no reason why hotel housekeepers should have to retire early due to injuries or become permanently disabled and suffer resultant pain, injury and hardship.

Response: The Board acknowledges Mr. Howe's support for this proposal.

Comment #JH2: The UAW regularly held joint labor-management training on how to modify workstations so that MSD injuries could be prevented. A worksite evaluation was a key component of this training, performed together by workers and the employer. I applaud Cal/OSHA's language in the proposed new section 3345 that requires a worksite evaluation performed by employers and hotel housekeepers together and recommend that this language remains intact in the final standard.

Response: The Board acknowledges Mr. Howe's support for this proposal and his concurrence with these specific aspects of the proposal.

Comment #JH3: Worker participation is essential for the success of any injury control program. Worker participation is highlighted in ANSI Z10, the current draft of ISO 45001 and OSHA's Injury Illness Prevention Program. Without worker participation, employers cannot understand how work is actually performed, the organizational factors that influence it, goal conflicts and resource constraints that influence hazards and potentially increase risk. Worker participation is also necessary to ensure that corrective measures address hazards and risk and are appropriate for the work to be performed.

Therefore, I strongly suggest that the following language from the proposed standard also remains intact in the final standard, ensuring that employers of housekeepers: involve housekeepers in designing and conducting the worksite evaluation; in identifying and evaluating possible corrective measures; in reviewing and updating the musculoskeletal injury prevention plan; identifying causes of musculoskeletal injuries, and include input of the injured housekeeper about whether any control measure, procedure, or tool would have prevented the injury;

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 165 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 36 of 56*

<u>Response:</u> The Board acknowledges Mr. Howe's support for this proposal and his concurrence with these specific aspects of the proposal.

<u>Comment #JH4:</u> Cal/OSHA has proposed language that ensures worker knowledge is a central part of the employer's MIPP thereby increasing the likelihood that this proposed standard will be effective, which the commenter supports.

<u>Response:</u> The Board acknowledges Mr. Howe's support for this proposal.

<u>Comment #JH5:</u> It is essential that the proposed standard's language remains intact about providing training for housekeepers and supervisors on risk factors, safe practices, and the elements of the employer's program to prevent musculoskeletal injuries. Worker and supervisor training is necessary to ensure that the MIPP is a process where workers and supervisors alike are engaged in making real progress on injury prevention in the workplace.

<u>Response:</u> The Board acknowledges Mr. Howe's support for this proposal, as well as his concurrence with these specific aspects of the proposal.

<u>Comment #JH6:</u> The commenter strongly supports this proposed standard because of its key components and because it will significantly reduce the risk of musculoskeletal injuries to hotel housekeepers, if enacted as written and implemented correctly by employers with housekeeper involvement. The Commenter would like to see the adoption of the standard before March 2018.

<u>Response:</u> The Board acknowledges Mr. Howe's support for this aspect of the proposal. The Board thanks Mr. Howe for his participation in the rulemaking process.

8. **<u>Mitch Seaman, California Labor Federation; Chloe Osmer, Southern California Coalition for Occupational Safety and Health (SoCalCOSH); Jessica Martinez, National COSH, letters dated May 17 and May 18th, 2017</u>**

<u>Comment #CLF1:</u> The California Labor Federation strongly supports the proposed hotel housekeeping musculoskeletal injury prevention standard. This version includes a variety of protections critically important to preventing these conditions and will, in practice, allow both affected workers and employers to minimize the human and financial toll of such crippling injuries.

<u>Response:</u> The Board acknowledges the commenters support for this proposal.

<u>Comment #CLF2:</u> The commenters support all changes detailed in the UNITE HERE letter submitted on May 15, 2017, and believe these recommendations will dramatically improve worker safety and enforceability while offering clarity for employers. The commenters strongly urge the Board to adopt these reforms while preserving the remainder of the proposed language as is.

<u>Response:</u> The Board acknowledges the commenters support for this proposal, as well as their concurrence with these aspects of the proposal. See responses to comments #UH1 through #UH12.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 166 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 37 of 56*

Comment #CLF3: The commenters applaud the work of both Cal/OSHA and the Standards Board in producing this proposal and look forward to continued collaborative efforts on this landmark standard.

Response: The Board acknowledge the support of the California Labor Federation, the Southern California Coalition for Occupational Safety and Health and National COSH for this regulatory proposal and thanks them for their participation in the rulemaking process.

### 9. Nicole Marquez, WORKSAFE, letter dated May 18, 2017

Comment #WS1: Worksafe strongly supports proposed new section 3345 Hotel Housekeeping Musculoskeletal Injury Prevention Standard as written in its entirety, with some minor but important suggested changes. Except for the language the commenter suggests, the commenters request all other proposed language remain intact.

Response: The Board acknowledges Worksafe's support of the proposal and takes notice of their specific recommendation to keep proposed language intact.

Comment #WS2: This proposed standard is strongly supported by hotel housekeepers and credible public health professionals alike.

Response: The Board concurs that many hotel housekeeping employees and public health professionals support the proposed regulation.

Comment #WS3: If implemented correctly by employers and with the participation of hotel housekeepers as stated in the proposed language, this proposed standard will significantly reduce the risk of musculoskeletal injuries from hotel housekeeping work. Worksafe encourages all relevant government agencies to review the comments in a timely manner and move the process forward to adopt the proposed standard before the end of 2017.

Response: The Board acknowledges that the purpose of the proposal is to reduce the number of musculoskeletal injuries to hotel housekeepers using a flexible performance-based regulation.

Comment #WS4: Worksafe supports the key components of the proposed standard taken from pages 3 of the ISOR: involvement of housekeepers in designing and conducting worksite evaluations of housekeeping hazards, identification of the causes of musculoskeletal injuries, corrective measures, program updating and training.

Response: The Board acknowledges Worksafe's support of these aspects of the proposal.

Comment #WS5: Worksafe supports the inclusion of excessive work-rate as a risk factor because hotel housekeeping work is commonly structured as a room quota per shift.

Response: The Board acknowledges Worksafe's support of this aspect of the proposal.

Comment #WS6: Worksafe strongly supports the following language of the proposed standard: the definitions of housekeeping tasks and control measures; the inclusion of forceful whole body or hand exertions and excessive work-rates as risk factors; the involvement of hotel housekeepers along with their union representative in the worksite evaluation, in the injury investigation process, in identifying and evaluating possible corrective measures and in reviewing and updating the MIPP; making readily available appropriate housecleaning equipment, protective equipment, and tools to each housekeeper, including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate housecleaning tools and equipment; a means by which appropriate equipment or other corrective measures will be identified, assessed, implemented, and then reevaluated after introduction and while used in the workplace; and the training and records sections in their entirety.

Response: The Board acknowledges Worksafe's support for this proposal, as well as their concurrence with these aspects of the proposal.

Comment #WS7: Worksafe strongly supports the language requiring meaningful worker participation in this standard. The commenter supports the language requiring worker input and involvement of hotel housekeepers along with their union representative in the worksite evaluation, in the injury investigation process, in identifying and evaluating possible corrective measures and in reviewing and updating the MIIPP. Worksafe fully supports this language remaining intact.

Response: The Board acknowledges Worksafe's support of these aspects of the proposal and takes notice of their specific recommendation to keep proposed language intact.

Comment #WS8: Worksafe strongly supports adding a mechanism by which hotel housekeepers who do not have a recognized or certified collective bargaining can designate a representative to guide them through key components of the standard: involvement in designing and conducting a worksite evaluation, input on whether control measures, input on procedures or tools would have prevented an injury, involvement in identifying possible corrective measures, and active involvement in reviewing and updating the MIIPP to determine its effectiveness and make any corrections.

Hotel housekeepers from non-union hotels face the same health hazards at work. Many hotel housekeepers may encounter fear or intimidation about using their right to be involved in the development of a strong MIIPP. If we do not incorporate a mechanism by which they are able to designate a representative, we essentially limit an equally, if not more, vulnerable population of hotel housekeepers.

Most unrepresented hotel housekeepers are unlikely to take concerns of health and safety to their employer. A power dynamic exists when you do not have a union and you interface with an employer. The ability for an unrepresented work force to designate a representative to help them with that process is crucial to ensuring fairness and transparent worker input.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 168 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 39 of 56*

With union density being at an all-time low and continuously declining, these non-traditional groups, such as legal aid, worker centers, and other labor advocacy groups fill in the gaps. Non-profit worker centers and other community-based organizations have been key partners to educate and advocate for non-union, vulnerable workforces with different state agencies. They have a certain level of trust and legitimacy, just like that of a union, established with the workers they serve.

Worksafe recommends adding a definition for designated employee representative and inserting the following language in each of the following sections where union representative appears:

*"Designated Employee Representative" means an authorized employee representative designated by two or more employees which representative shall be an attorney, a health or safety professional, union representative, or a representative of a community organization such as a worker center or worker advocacy organization.*

(c)(4)(B)The procedures shall include an effective means of involving housekeepers and their union representative, *or if there is no union representing employees of the employer, then involving a designated representative,* in designing and conducting the worksite evaluation.

(c)(5)(C) Input of the injured housekeeper, the housekeeper's union representative, *or if there is no union representing employees of the employer, then involving a designated representative agreed to by the injured housekeeper,* and the housekeeper's supervisor as to whether any other control measure, procedure, or tool would have prevented the injury.

(c)(6)(A) An effective means of involving housekeepers and their union representative, *or if there is no union representing employees of the employer, then involving a designated representative* in identifying and evaluating possible corrective measures;

(c)(7) Procedures for reviewing, at least annually, the MIPP at each worksite, to determine its effectiveness and make any corrections when necessary, including an effective procedure for obtaining the active involvement of housekeepers and their union representative, *or if there is no union representing employees of the employer, then involving a designated representative* in reviewing and updating the MIPP. The procedures shall include a review of the Cal/OSHA Form 300 log and other relevant records such as Cal/OSHA Form 301 incident reports.

Response: The Board notes that nothing on this proposed regulation prohibits an employee or employees from obtaining assistance or consultation from a third party. The Board declines the recommendations because the suggested addition would complicate the proposal and limit the professions of persons allowed to be employee representatives.

Comment #WS9: Employee involvement is extremely important. Therefore, as stated in previous comments, subsection (c)(4)(A) should be changed from 3 months to 90 days in two places in this clause, which is consistent with other Cal/OSHA standards.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 169 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 40 of 56*

Response: Subsection (c)(4)(A) states the following:

(c) Housekeeping musculoskeletal injury prevention program…
* * * * *
(4) Procedures for identifying and evaluating housekeeping hazards through a worksite evaluation:
(A) The initial worksite evaluation shall be completed within three months after the effective date of this section or within three months after the opening of a new lodging establishment.

The Board notes that the commenter probably intended to recommend a change from three months to a period substantially less than three months rather than a change from three months to 90 days because three months is roughly equivalent to 90 days.

The Board declines to reduce the time period allowed for employers to conduct an initial worksite evaluation, as some employers may need the time to schedule the initial evaluation.

Comment #WS10: Worksafe recommends including a posting requirement, which promptly notifies workers of the results of the work-site evaluation in subsection (c)(4)(C). The posting language should include: "Housekeepers shall be notified *within 14 days* of the results of the worksite evaluation in writing or by posting it in a location readily accessible to them. The results of the worksite evaluation shall be in a language easily understood by housekeepers."

Response: Please see the responses to Comments #UH4 and UH5.

Comment #WS11: Other standards, such as the lead standard, include an employee notification process. (Section 5198, subd. (8)(A).) Again, the lead standard requires employers to notify each employee in writing of the exposure results within 5 working days after the receipt of monitoring results. (Ibid.) This will also serve as a way to increase the timeliness of employers notifying housekeepers of the evaluation results and as a benchmark for enforcement of this section of the proposed standard.

Response: Please see the response to Comment #UH5.

Comment #WS12: Under subsection (c)(4)(D), a timeframe for employers to complete review and update of the worksite evaluation should be added:

1. *Within 30 days of* whenever new processes, practices, procedures, equipment or renovation of guest rooms are introduced that may change or increase housekeeping hazards;
2. *Within 30 days of* whenever the employer is made aware of a new or previously unrecognized housekeeping hazard based on information such as, but not limited to, the findings and recommendations of injury investigations conducted in accordance with subsection (c)(5);

The suggested language will increase the timeliness of employers performing the worksite evaluation and serve as a benchmark for enforcement of this section of the proposed standard.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 170 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 41 of 56*

Response: Please see response to Comment #UH5.

Comment #WS13: Subsection (d)(1)(E) should be modified as follows: "When new equipment or work practices are introduced or whenever the employer becomes aware of a new or previously unrecognized hazard. ~~The additional training may be limited to addressing the new equipment or work practices.~~" The commenter believes the last sentence should be removed because it negates the intent of the following language: "or whenever the employer becomes aware of a new or previously unrecognized hazard."

Response: See response to Comment #UH6.

Comment #WS14: Worksafe suggests adding a new item between items (1) and (2), so this becomes Item (2), as follow:

> *Training records shall be created and maintained for a minimum of one year and include the following information: training dates; contents or a summary of the training sessions; types and models of equipment practiced during training; names and qualifications of persons conducting the training; and names and job titles of all persons attending the training sessions.*

The above-suggested language comes from the Healthcare Violence standard, section 3342(h)(2). This new language should also apply here to new section 3345. This text would help ensure effective trainings and be a benchmark for enforcement.

Response: See response to Comment #UH7.

Comment #WS15: The term 'appropriate' is used mistakenly; see listed instances below.

Under subsection (c)(5)(B), procedures to investigate musculoskeletal injuries to housekeepers, should be amended as follows:

> "(B) If required tools or other control measures were not used, or not used ~~appropriately~~ *correctly*, a determination of why those measures were not used or were not used ~~appropriately~~ *correctly*; and"

The term 'use' of cleaning tools is performance-based and either the tools are being used correctly or not; so, 'correct' applies here and the term 'appropriate' does not. In other instances, appropriately is used to describe the tool and the commenter believes 'appropriately' in that context applies.

Under subsection (c)(6), the term "appropriately" should be deleted as follows:

> "Methods or procedures for correcting, in a timely manner, hazards identified in the worksite evaluation or in the investigation of musculoskeletal injuries to housekeepers, including procedures for determining whether identified corrective measures are *effectively* implemented

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 171 of 270

Hotel Housekeeping Musculoskeletal Injury Prevention
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 42 of 56*

~~appropriately~~ to *minimize or eliminate unsafe conditions or workplace practices that may cause musculoskeletal injuries."*

Adding this language will help clarify the intent of the standard vis a vis the effective implementation of appropriate tools and corrective measures. The 'effectively implemented' suggested language comes from the Healthcare Violence standard. (See section 3342 (c)(12)(F) "Reviewing whether appropriate corrective measures developed under the Plan - such as adequate staffing, provision and use of alarms or other means of summoning assistance, and response by staff or law enforcement - were effectively implemented;") The additional proposed phrase 'unsafe conditions or workplace practices that may cause musculoskeletal injuries,' is combined text from the housekeeping standard. "Unsafe conditions or workplace practices" is from pages 1-2, in the definition of 'Worksite Evaluation' and "May cause musculoskeletal injuries" comes from page 1 'Control Measures.'

Under subsection (D)(2)(d), appropriate should be replaced with the term correct, as follows:

> "body mechanics and safe practices including: identified hazards at the workplace, how those hazards are controlled during each housekeeping task, the *correct* ~~appropriate~~ use of cleaning tools and equipment, and the importance of following safe work practices and using appropriate tools and equipment to prevent injuries;"

The first use of the term 'appropriate' as it relates to "use of cleaning tools" is performance-based and either the tools are being used correctly or not. Therefore, the term 'correct' should be used here and not 'appropriate.' In the latter use of 'appropriate', the term is used to describe the tools and equipment and they believe 'appropriate' in that context applies.

Response: Please see the responses to Comments #UH8, UH9 and UH10.

Comment #WS16: The term 'housecleaning' is used mistakenly. Please see instances listed below.

Under subsection (c)(2), the term housecleaning should be removed and replaced with the following text:

> "A system for ensuring that supervisors and housekeepers comply with the MIIPP, follow the employer's safe workplace ~~housecleaning~~ *practices for performing housekeeping tasks* ~~practices~~, and use the housekeeping tools or equipment deemed appropriate for each housekeeping task. Substantial compliance with this provision includes recognition of employees who follow the employer's safe workplace ~~housecleaning~~ practices *for performing housekeeping tasks,* and use the appropriate tools and equipment**;** training and retraining programs**;** disciplinary actions**;** or other means that ensures employee compliance with the MIIPP;"

Under subsection, (c)(6)(C), the term 'housecleaning' should be removed and replaced with the following text:

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 172 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 43 of 56*

"A means of providing and making readily available appropriate ~~housecleaning~~ equipment, protective equipment, and tools to each housekeeper *for performing housekeeping tasks,* including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate ~~housecleaning~~ tools and equipment *for performing housekeeping tasks*."

Housecleaning' is not a term defined in this proposed standard and therefore, should not be used. Hotel housekeeping involves housekeepers who perform room cleaning and related housekeeping tasks. Housekeeping is a defined term and therefore, should be used. In the last sentence, an additional comma and semi-colons are needed to clarify the meaning of 'substantial compliance.'

Response: See response to Comment #UH12. The Board acknowledges Worksafe's comments for this regulatory proposal and thanks them for their participation in the rulemaking process.

**10. Mark Sale, e-mail communication dated May 18, 2017**

Comment #MS1: The commenter would like to modify the language to add an ergonomic tool that prevents MDS's. Two-handled disposable poly bags used in housekeeping will allow the ability to perform bag-handling tasks using both hands and distribute the load 50%, reducing the risk of injury.

Response: The Board declines the request to prescribe specific ergonomic tools, equipment or control measures as this is a performance-oriented regulation that is not meant to limit or prescribe the measures that employers are to use. The Board acknowledges Mr. Sale's comments for this regulatory proposal and thanks him for his participation in the rulemaking process.

**II. Oral Comments Received at the May 18, 2017, Public Hearing in Oakland, California:**

**1. Cynthia Gomez, UNITE HERE Local 2; Tatia Midwalick, UNITE HERE Local 2850; and Becky Perrine, UNITE HERE International Union in Oakland**

Comment #CG1: The commenters stated their organizations support the proposal as it is written in its entirety. UNITE HERE provided minor suggested changes in its comment letter to the Board. If employers implement the proposal correctly, it will significantly reduce the risk of musculoskeletal injuries among hotel housekeepers. The commenters stated the following provisions must also remain as written:

- Section (c)(7) regarding procedures for reviewing the MIPP at least annually, and making changes as needed to make it more effective, with the involvement of hotel housekeepers and their union representatives.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 173 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 44 of 56*

- Section (d) regarding training, especially when new equipment or work practices are introduced, as well as training managers and housekeepers on the signs, symptoms, and risk factors commonly associated with musculoskeletal injuries.

<u>Response:</u> The Board acknowledges UNITE HERE Local 2, Local 2850 and UNITE HERE International Union for their support of the proposal and takes notice of their specific recommendation to keep the proposed language intact. Please also see responses to UNITE HERE written Comments #UH1 through #UH12.

<u>Comment #CG2:</u> The commenters said this proposal is long overdue, and asked the Division to move this proposal forward quickly so the Board can vote on it by September 2017, so it can become law before May 2018.

<u>Response:</u> The Board thanks the commenters for their support of the proposal and acknowledges their participation in the rulemaking process.

2. **<u>Hector Azpilcueta, UNITE HERE Local 483 and Sandra Rodriguez, UNITE HERE Local 19 San Jose</u>**

<u>Comment #HA1:</u> The commenters stated that hotel housekeepers face many risks for injury at work. The housekeepers have to work at a fast pace doing things, such as vacuuming and moving furniture, which can result in injury. This proposal requires employers to have an injury control plan that actively involves hotel housekeeper input. Their organizations support the following provisions in the proposal:

- Section (c)(5) requires employers to develop procedures to investigate musculoskeletal injuries, and it requires employers to allow hotel housekeepers and their union representatives to be involved in the investigation. Hotel housekeepers know what they were doing when they were injured, how the injury occurred, and what could have prevented it. It is important to involve housekeepers and their union representatives because their input could prevent the injury from happening again.

- Section (c)(6) will help ensure that hazards are corrected in a timely manner by requiring employers to allow hotel housekeepers and their union representatives to be involved in identifying and correcting hazards and requesting the necessary tools. It will require employers to provide the necessary tools, evaluate how well they work, and ensure that they are kept in good working order.

<u>Response:</u> The Board appreciates UNITE HERE Local 483 and Local 19 concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers. In addition, the Board acknowledges their support for these specific aspects of the proposal and thanks them for their participation in the rulemaking process.

3. **<u>Dina Reese, Housekeeper, UNITE HERE Local 483 and Elena Sanchez, UNITE HERE Local</u>**

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 174 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 45 of 56*

<u>49</u>

<u>Comment #DR1:</u> The commenters stated they support this proposal as it is written because hotel housekeepers continue to get injured on the job. Many hotel housekeepers are immigrant women who do not speak English, and even if there is translation available, employers do not always listen when non-English speaking housekeepers voice their concerns about workplace hazards. The commenters stated many hotel housekeepers worry about being retaliated against by their managers for reporting workplace hazards or injuries. This proposal requires employers to have a system in place to communicate with housekeepers that will allow housekeepers to communicate with them regarding workplace hazards and report injuries without fear of retaliation.

<u>Response:</u> The Board appreciates UNITE HERE Local 483 and Local 49 support of this proposal and concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers. In addition, the Board takes notice of their specific request to keep the proposed language intact and acknowledges their participation in the rulemaking process.

**4.   Irma Perez, Housekeeper, UNITE HERE Local 2850**

<u>Comment #IP1:</u> The commenter stated this proposal will help both union and non-union housekeepers to avoid injury. The rights of non-union housekeepers are the ones that are violated the most by employers. This proposal will require employers to train hotel housekeepers on the cleaning chemicals and tools they use on the job and it will require employers to evaluate the efficacy of these items to see if they hurt or help the hotel housekeeper.

<u>Response:</u> The Board appreciates UNITE HERE Local 2850 support of this proposal and concurrence with our efforts to address reduction of musculoskeletal injuries among housekeepers. In addition, the Board acknowledges their participation in the rulemaking process.

**5.   Eric Myers, McCracken, Stemerman, and Holsberry, LLP**

<u>Comment #EM1:</u> The commenter stated that among hotel workers, hotel housekeepers suffer the highest number of injuries, many of which are musculoskeletal, and the industry recognizes this problem. The commenter said that this proposal will help to eliminate those injuries if properly implemented. Excessive motions, such as handling linens, lifting mattresses, and walking multiple times around beds to make beds, can cause injury. This extra motion can be reduced through training and an organized process of removing and applying linens, as well as by having housekeepers work in teams to clean rooms. Steps to reduce injury must be consistently implemented and communicated to housekeepers to be effective, hotel housekeepers need to be included in the process of developing those procedures, and this proposal does that. This proposal will save $28 million annually in worker's compensation costs, as well as save hotel housekeepers the pain and suffering that comes with being injured.

<u>Response:</u> The Board appreciates Mr. Myers' support of this proposal and concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers. In

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 175 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 46 of 56*

addition, the Board thanks Mr. Myers for participating in the rulemaking process.

6. **Nicole Marquez, Worksafe and Olga Manrique, UNITE HERE Local 19 San Jose**

Comment #NM1: The commenters stated their organizations support the proposal as it is written, in its entirety, with some minor suggested changes in the sections regarding worker participation that are coupled with the ability of an employee to designate an employee representative. The commenters said these portions of the proposal could be strengthened if unrepresented housekeepers are given the opportunity to designate an employee representative.

Response: The Board appreciates Worksafe and UNITE HERE Local 19 support of this proposal and takes notice of their specific request to keep the proposed language intact. With regard to Worksafe's request to provide non-unionized housekeepers with the opportunity to designate a representative, please see response to written Comment #WS8.

Comment #NM2: The commenters stated this proposal is very much needed because it requires employers to involve hotel housekeepers in designing and conducting worksite evaluations, to train housekeepers on how to identify the causes of musculoskeletal injuries, and to involve housekeepers in identifying and evaluating corrective measures. It also requires employers to establish, and keep up-to-date, programs to prevent musculoskeletal injuries, and to provide training to housekeepers and managers on risk factors, safe practices, and elements of the employer's program to prevent musculoskeletal injuries. If this proposal is properly implemented by employers, it will reduce the risk of injury among hotel housekeepers. The Commenters asked the Division to move the proposal forward as soon as possible so that the Board can vote on it before the end of 2017.

Response: The Board appreciates Worksafe and UNITE HERE Local 19 concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers and acknowledges their participation in the rulemaking process.

7. **Carisa Harris-Adamson, University of California San Francisco and University of California Berkeley; Lizzie Keegan, UNITE HERE Local 2 San Francisco; Tatia Midwalick, UNITE HERE Local 2850; and Olga Manrique, UNITE HERE Local 19 San Jose**

Comment #CHA1: The commenters stated that their organizations support the proposal in its entirety, and they feel if it is implemented correctly with hotel housekeeper participation, it will greatly reduce the risk of injury to hotel housekeepers. The commenters stated the provisions regarding employee involvement need to be kept in the proposal.

Response: The Board appreciates Ms. Harris-Adamson, Ms. Keegan, Ms. Midwalick and Ms. Manrique for their support of this proposal and concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers. In addition, the Board takes notice of

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 176 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 47 of 56*

their specific request to keep the proposed language intact and acknowledges their participation in the rulemaking process.

Comment #CHA2: The commenters stated their organizations also support the inclusion of forceful whole body or hand exertions and excessive work rates because they are pertinent risk factors that increase the hotel housekeeper's risk for injury. Tools should be provided and available to housekeepers at all times, and training on how to use them, as well as maintenance programs to keep them maintained, must be ongoing to ensure that their use is feasible and effective. Their organizations also support using examples of specific recommended tools, including those mentioned in Cal/OSHA publications, such as: adjustable long-handled cleaning tools, mops, lightweight vacuums, lightweight or motorized carts, and mattress lift tools. These tools will effectively reduce the housekeeper's physical workload. This proposal will help hotels to save money, and there is ongoing support available to hotels so they can effectively implement this standard. The commenters asked the Division to move this proposal forward quickly so that the Board can vote on it before the end of 2017.

Response: The Board acknowledges the commenters support for specific aspects of the proposal. With regard to the recommendation to use examples of specific tools, please see the responses to written Comments #CHLA12 through CHLA14, CA1 and MS1. The Board thanks Ms. Harris-Adamson, Ms. Keegan, Ms. Midwalick and Ms. Manrique for their participation in the rulemaking process.

## 8. Sam Montross, Cadence Keen Innovations

Comment #SM1: The commenter stated she invented a mattress lift tool that has helped to eliminate workers compensation claims by preventing injuries when lifting mattresses to make beds. It is very difficult to lift the corner of a mattress, hold it up, and tuck in blankets and sheets with the other hand. Some housekeepers have experienced numbness in their fingers from smoothing out blankets, while sharp objects underneath the mattress have injured others. Hotel housekeepers have used the tool to do these tasks, and it has helped them to avoid injury. It is important that hotels train their housekeepers on how to use tools like this so that they know how to use it properly.

Response: The Board appreciates Ms. Montross' support of this proposal and concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers. With regard to the suggestion to recommend or specify one particular tool, please see response to written Comments #CHLA12 through CHLA14, CA1 and MS1. The Board thanks Ms. Montross for participating in the rulemaking process.

## 9. Lizzie Keegan, UNITE HERE Local 2 San Francisco

Comment #LK1: The commenter stated this proposal is long overdue. It is important to keep provisions in the proposal that allow hotel housekeepers and their employee representatives to be involved. Musculoskeletal injury prevention programs are not common in the hotel housekeeping

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 177 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 48 of 56*

industry, training is not regularly provided, and if it is provided, it is not always effective. Her organization feels that subsection (d)(2)(D) of the proposal will go a long way in preventing injuries to housekeepers and will help to keep employer costs low, but that requires the workforce to be trained, including supervisors.

Response: The Board acknowledges Ms. Keegan's support for these specific aspects of the proposal and thanks her for participating in the rulemaking process.

## 10. Mary Banks, Hotel Housekeeper, UNITE HERE Local 2 San Francisco

Comment #MB1: The commenter stated hotel housekeepers are experts at their jobs, and they know what tools and work practices work best for them. She said when they share their ideas with management, management often ignores them. She supports the provisions in the proposal that require management to involve hotel housekeepers in performing worksite evaluations, identifying and evaluating corrective measures to see if they work or not, and developing an MSD prevention plan. When an injury occurs, it is important for management to get input from the injured housekeeper as to how the injury occurred and how it could have been prevented. She asked the Division to move the proposal forward as soon as possible, so that the Board can vote on it by September 2017 and it can become law by April 2018.

Response: The Board acknowledges Ms. Bank's support for these specific aspects of the proposal and thanks her for participating in the rulemaking process.

## 11. Yolanda Barron, Hotel Housekeeper, Hyatt House Emeryville

Comment #YB1: The commenter stated this proposal will help protect hotel housekeepers from injury. It will require supervisors to be trained on how to use cleaning chemicals and tools, and it will require them to train housekeepers on how to use them. Many hotels are remodeling and putting in new items, such as showers with glass doors, that create more work for the hotel housekeeper, but they are not given enough time to do the work. Some injured housekeepers are allowed to work with restrictions on what they can do, but it is hard to get the management to follow those restrictions.

Response: The Board appreciates Ms. Barron's support of this proposal and concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers. In addition, the Board thanks Ms. Barron for her participation in the rulemaking process.

## 12. Tatia Midwalick, UNITE HERE Local 2850 and Olga Manrique, UNITE HERE Local 19 San Jose

Comment #TM1: The commenters stated hotel housekeepers know their jobs well and can provide

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 178 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 49 of 56*

valuable input on how to make their jobs safer, but employers do not always listen to them. The commenters said it is very important the provisions in the proposal regarding hotel housekeeper and union or employee representative participation be kept in place. Their organizations support Section 4 regarding worksite evaluations and allowing hotel housekeepers and their representatives to be involved in them, as well as requiring management to make the results available to housekeepers by posting them.

Response: The Board appreciates Ms. Midwalick's and Ms. Manrique's support of this proposal and takes notice of their specific request to keep the proposed language intact.

Comment #TM2: The commenters said their organizations also support keeping the provision regarding forceful whole body or hand exertion in the list of risk factors to be considered during a worksite evaluation because these are part of doing daily housekeeping tasks. Their organizations are pleased to see that excessive work rates are also included in the list of risk factors because room quotas play a key role in whether or not the work can be done safely. They asked the Division to move the proposal forward so the Board can vote on it by September 2017 and it can become law by April 2018.

Response: The Board acknowledges Ms. Midwalick's and Ms. Manrique's support for these specific aspects of the proposal and thanks them for their participation in the rulemaking process.

## 13. Candy Hu, Hotel Housekeeper, UNITE HERE Local 2 San Francisco and Elizabeth Guzman, UNITE HERE Local 19 San Jose

Comment #CH1: The commenters stated hotel housekeepers come from all over the world and speak many languages other than English. Hotel housekeepers who speak languages other than English feel like employers are not listening to their concerns or suggestions because they do not speak English, even if they can still communicate with them in some form. These housekeepers have valuable input to give to employers regarding their concerns about workplace safety and how to make the job safer, and this input matters. Their organization supports the language in the proposal that requires employers to have a system of communication with hotel housekeepers that is understandable for all housekeepers so that they can communicate effectively with the hotel management about workplace safety and health issues. This proposal will allow hotel housekeepers to tell employers about workplace hazards that they notice, as well as when they are injured on the job, without fear of retaliation or reprisal from the employer.

Response: The Board acknowledges Ms. Hu's and Ms. Guzman's support for these specific aspects of the proposal and thanks them for their participation in the rulemaking process.

## 14. Jeremy Blasi, UNITE HERE Local 11 and Sandra Rodriguez, UNITE HERE Local 19 San Jose

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 179 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 50 of 56*

Comment #JB1: The commenters stated this proposal is a clear, well-conceived, and reasonable approach to protecting housekeepers from injury, and it must remain intact as it is. From 2010 to 2014, the number of housekeepers injured on the job rose from 3,278 to 4,989, with more than 50% of the injuries being MSD injuries. These are substantial underestimates because 50-66% of injured hotel housekeepers do not report when they are injured on the job. Their organizations support all language in the proposal that requires hotel housekeeper involvement, especially in subsection (c)(4) where it requires hotel housekeeper and employee representative involvement in developing an MSD prevention plan.

Response: The Board appreciates Mr. Blasi's and Ms. Rodriquez's support for these specific aspects of the proposal and concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers.

Comment #JB2: The commenters also stated their organizations support the thorough description of the essential elements of a worksite evaluation, including injury risk factors. The fast pace of cleaning rooms to meet demanding room quotas can contribute significantly to causing injuries because it makes using safe lifting, reaching, and pushing techniques impossible. The commenters also stated it is very important to keep the provisions regarding an effective work rate and inadequate recovery time between housekeeping tasks because science has demonstrated there is a need for it. Their organization is glad to see that the proposal includes a clear description of the procedures involved in an injury investigation, and that they require employers to get input from the injured housekeeper as to how the injury occurred and how it could have been prevented. They asked the Division to move the proposal forward so that the Board can vote on it by September 2017 and it can become law by 2018.

Response: The Board acknowledges Mr. Blasi's and Ms. Rodriquez's support for these specific aspects of the proposal and thanks them for their participation in the rulemaking process.

## 15. Marisela Ramos, Hotel Housekeeper, UNITE HERE Local 19 San Jose

Comment #MR1: The commenter stated her organization supports subsection (d) regarding training because housekeepers do not receive sufficient training regarding the tools and work practices they use, and they are not given time to practice how to do these safe work practices or time to practice using the tools they are given. Subsection (d) requires that hotel housekeepers be given sufficient training on how to use new tools and how to do new work practices. This is a good thing because things in hotel rooms are changing all the time. Subsection (d) also requires hotel housekeepers and supervisors to be trained regarding the risk factors for musculoskeletal injuries and their symptoms. This will get injured housekeepers the help they need early and will allow the hotel to make necessary changes to prevent injury.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 180 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 51 of 56*

Response: The Board acknowledges Ms. Ramos' support for these specific aspects of the proposal and thanks her for participating in the rulemaking process.

16. **Mitch Seaman, California Labor Federation**

Comment #MS1: The commenter stated this proposal will require a minimal investment by employers and will help prevent injuries that could result in costly worker's compensation claims. The injuries that hotel housekeepers suffer on the job may be minimal in the beginning, but they can progress to the point that housekeepers are no longer able to work and must file a worker's compensation claim. The worker's compensation claim process is very difficult, and 2/3 of claims involving a cumulative trauma component are denied by employers. These claims require the employee to prove they were injured, and MSD injuries are difficult to prove. While some hotel housekeepers continue working while they are injured, others are forced to quit or find another line of work. It is better to prevent these injuries because they can affect workers for the rest of their lives.

Response: The Board appreciates Mr. Seaman's support for this proposal and concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers. The Board thanks Mr. Seaman for participating in the rulemaking process.

17. **Pamela Vossenas, UNITE HERE**

Comment #PV1: The commenter stated this proposal will make a significant difference in reducing injuries on the job for hotel housekeepers. Language in the proposal should remain intact and implemented as written. It is important for housekeepers to be involved in the process of designing and conducting worksite evaluations, as well as identifying and evaluating corrective measures, because they know their jobs better than anyone.

Response: The Board appreciates Ms. Vossenas' support of this proposal and concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers. Furthermore, the Board takes notice of the specific request to keep the proposed language intact.

Comment #PV2: The commenter said it is important to provide training to housekeepers and supervisors, especially on how to identify the causes of MSD injuries. The commenter's organization is pleased to see excessive work rates are included in the list of risk factors that can cause injury. The commenter's organization provided a letter to the Board with some suggested changes, including recommendations to replace the term "appropriate" to "correct;" to clarify that all housekeepers are required to be involved by adding "where applicable, union representative;" to replace the terms "house cleaning" and "house cleaning practices" which are not in the list of definitions with language that demonstrates the same intent; to mandate a 14 day deadline by which

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 181 of 270

Hotel Housekeeping Musculoskeletal Injury Prevention
Final Statement of Reasons
Public Hearing: May 18, 2017
Page 52 of 56

hotel housekeepers are notified of the results of the worksite evaluation and to require 30 days to review or update worksite evaluations to help facilitate enforcement of the standard.

Response: Please see the responses to written Comments #UH4 through UH12. The Board thanks Ms. Vossenas for participating in the rulemaking process.

18. **Mark Sale, B3 Plastics; Martha Campos, UNITE HERE Local 2 San Francisco; Ana, Hotel Housekeeper, Hyatt House Emeryville; Elsa Portillo, Hotel Housekeeper, Hyatt House Emeryville; Chuck, Hotel Housekeeper, UNITE HERE Local 2 San Francisco; Gregoria Rekealado, Hotel Housekeeper, UNITE HERE Local 19 San Jose; Jim Howe, Safety Solutions; Maria, UNITE HERE Local 49 Sacramento; Maria Garcia, Hotel Housekeeper, UNITE HERE Local 49 Sacramento; Fabiola Benavides, Hotel Housekeeper, UNITE HERE Local 2 San Francisco; and Michael Musser, California Teachers Association**

Comment #MSB3P1: The commenters stated this proposal is needed to protect hotel housekeepers from MSD injuries. It is important that hotel housekeepers have the right tools available to them to do their jobs safely, and a mandate like this is needed because guidelines are not always enough. This proposal will protect all housekeepers, whether or not they are represented by a union or other group.

Response: The Board appreciates the commenters' support of this proposal and thanks them for participating in the rulemaking process.

19. **Jesse Cripps, Gibson, Dunn and Crutcher, representing the California Hotel & Lodging Association**

Comment #JC1: The commenter stated this issue was raised in May of 2012, and at that time, the Board rejected that proposal because the Board felt it would be a bad precedent to create a separate carve-out proposal for hotel housekeeping, and the types of injuries this proposal would address are already addressed in existing standards. The commenter's organization feels this is still the case today. This proposal will create a slippery slope for a very narrow class of people (only hotel housekeepers) and will result in future proposals for all manners of workplaces and jobs, such as nursing homes, assisted living facilities, and hospitals. This will create a patchwork of job- and workplace-specific regulations. A 2013 study by Dr. Steven Wiker, which is the only study that used NIOSH protocols instead of anecdotes, indicates a carve-out regulation for hotel housekeepers is not necessary.

Response: Please see responses to Comments #CHLA1, CHLA2 and CHLA17.

Comment #JC2: The commenter stated existing regulations already address injuries such as MSD injuries for all jobs including hotel housekeeping, and this proposal creates a fundamental conflict

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 182 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 53 of 56*

with these existing rules. Section 3203 already requires employers to conduct an investigation into injuries that occur on the job, and Section 5110 already provides a procedure for evaluating and preventing musculoskeletal injuries. When it comes to determining what tools housekeepers should use, the methods of communication with housekeepers, and work rates, those things should be determined through the collective bargaining process. While Section 5110 requires examination and diagnosis by a licensed physician, this proposal does not. This proposal applies a one-size-fits-all approach of tools and work practices that may not work for every hotel housekeeper, and they should be subject to collective bargaining.

Response: Please see responses to Comments #CHLA2 through CHLA5 and CHLA12 through CHLA14.

Comment #JC3: The commenter said this proposal will mandate employees use certain tools and work practices, and it could result in housekeepers being disciplined if they do not use them, even if those tools and work practices do not work for them. The current standard gives employees flexibility to use the tools and work practices that work best for them.

Response: Please see responses to Comments #CHLA12 through CHLA14.

Comment #JC4: The commenter stated CH&LA performed an economic analysis of this proposal and submitted it to the Division, and the costs associated with this proposal are alarming. Costs listed in the ISOR are in direct conflict to this analysis, and the ISOR does not take certain costs into account. The commenter's organization believes more robust enforcement of existing rules, along with renewed efforts to develop industry-specific guidelines, is a better way to address this issue. The commenter asked the Board to extend the comment period for this proposal so that his organization can further address in writing the comments made today.

Response: Please see responses to Comments #CHLA27 through CHLA32. As stated by the chairperson of the Board at the end of the meeting, the comment period was extended until 5 pm of the day of the public hearing (May 18, 2017). The Board thanks Mr. Cripps for his comments and acknowledges his participation in the rulemaking process.

## 20. John Robinson, California Attractions and Parks Association

Comment #JR1: The commenter stated his organization supports Mr. Cripps' testimony today and the written comments that were submitted by the California Hotel & Lodging Association. Having a carve-out proposal that only applies to hotel housekeepers is concerning. Employers' injury and illness prevention plans, as well as other existing standards, already address many of these issues. The commenter asked the Board to take these things into consideration when deciding whether or not to adopt this proposal.

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 183 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 54 of 56*

Response: Please see responses to Comments #CHLA1 through CHLA43. The Board thanks Mr. Robinson for his comments and acknowledges his participation in the rulemaking process.

## 21. <u>Marti Fisher, California Chamber of Commerce</u>

Comment #MF1: The commenter stated this proposal is duplicative, redundant, and waters down the application of the IIPP to all workplace hazards. The proposal is looking for problems instead of analyzing job tasks and needs to more appropriately mirror the IIPP. Most of the injuries the Board has heard about from hotel housekeepers throughout this process occurred because employers were violating existing regulations and worker's compensation laws, and retaliation from employers is not allowed under the existing law. This proposal does not change anything and will not make working conditions any better for employees.

Response: Please see responses to Comments #CHLA1 through CHLA43. The Board is confident that its efforts to address the reduction of occurrence of musculoskeletal injuries among housekeepers are appropriate.

Comment #MF2: The commenter stated subsection (c)(4)(D)(3) of the proposal regarding conducting annual worksite evaluations is completely unnecessary because there are other similar requirements in the IIPP and the proposal itself, including subsections (c)(4)(D)(1), (c)(4)(D)(2), and (c)(7). Requiring this many reviews is excessive, and listing it twice in the proposal is not necessary.

Response: The Board does not believe subsection (c)(4)(D)(3), which requires an annual worksite evaluation, is unnecessary or excessive. As stated in the ISOR, the goal is to provide the employer with multiple means of discovering potential workplace hazards for the purpose of preventing musculoskeletal injuries. Subsection (c)(4)(D)(1) only requires an evaluation whenever new processes, practices, procedures, equipment or renovation of guest rooms are introduced that may change or increase housekeeping hazards and is not duplicative of subsection (c)(4)(D)(3). Subsection (c)(4)(D)(2) only requires an evaluation whenever the employer is made aware of a new or previously unrecognized housekeeping hazard and is not duplicative of subsection (c)(4)(D)(3). Regarding the IIPP, please see the responses to comments #CHLA2 through CHLA5.

Comment #MF3: In subsection (c)(4)(E), the list of injuries and types of movements assumes that there is a relationship between these activities and injury. It also only lists the risks that employers are supposed to look for, not the job tasks, which is opposite of how worksite evaluations should work. To address this, the Division could do a non-mandatory appendix to advise employers and employees of this information if necessary.

Response: Subsection (c)(4)(E) lists risk factors that pose a risk of injury to housekeepers and as such need to be considered in the worksite evaluation to assist in the identification of unsafe

Case 3:19-cv-01232-WHO   Document 27-1   Filed 05/10/19   Page 184 of 270

*Hotel Housekeeping Musculoskeletal Injury Prevention*
*Final Statement of Reasons*
*Public Hearing: May 18, 2017*
*Page 55 of 56*

conditions, work practices, processes, or operations. Thus, the Board declines the recommendation to move the risk factors listed in subsection (c)(4)(E) to a non-mandatory appendix. Please also see the response to Comment #CHLA14 regarding non-mandatory guidelines.

Comment #MF4: On page 6 of the proposed regulation, in the section pertaining to records being made available to employees, the term "designated representative" should be changed to "union representative."

Response: The term "designated representative" was used for consistency with existing section 3204(e)(1). Thus, the Board declines the recommendation to substitute the term "designated representative" with "union representative." The Board thanks the Ms. Fisher for her comments and acknowledges her participation in the rulemaking process.

22. **Laura Stock, Board Member**

Comment #MSK1: The commenter stated the stories hotel housekeepers have told the Board over the years demonstrate that the current regulations are not working to protect them from injury. This proposal is not one-size-fits-all and does not tell employers what specific solutions they must use in each situation. Instead, it revolves around conducting worksite evaluations, understanding what the hazards are, and implementing the necessary changes to correct them. It only tells employers that they must address these situations. Many regulations are industry-specific and help to apply general principles to specific industries. Some standards, such as the ergonomics standard, are very general and not preventive. This standard will require employers to take action and make changes before injuries occur. She is pleased to see the proposal has many requirements for employee involvement because that is critical, especially in ergonomics, because employees know their jobs best and what works for them to prevent injury.

Response: The Board appreciates Ms. Stock's support for this proposal and concurrence with our efforts to address reduction of occurrence of musculoskeletal injuries among housekeepers. The Board thanks Ms. Stock for her comments and acknowledges her participation in the rulemaking process.

## ADDITIONAL DOCUMENTS RELIED UPON

None.

## ADDITIONAL DOCUMENTS INCORPORATED BY REFERENCE

None.

## DETERMINATION OF MANDATE

This standard does not impose a mandate on local agencies or school districts as indicated in the Initial Statement of Reasons.

## ALTERNATIVES CONSIDERED

The Board invited interested persons to present statements or arguments with respect to alternatives to the proposed standard. No alternative considered by the Board would be (1) more effective in carrying out the purpose for which the action is proposed; or (2) would be as effective as and less burdensome to affected private persons than the adopted action, or (3) would be more cost-effective to affected private persons and equally effective in implementing the statutory policy or other provision of law. Board staff were unable to come up with any alternatives or no alternatives were proposed by the public that would have the same desired regulatory effect.

Exhibit 14

# REGULAR

STATE OF CALIFORNIA—OFFICE OF ADMINISTRATIVE LAW
**NOTICE PUBLICATION/REGULATIONS SUBMISSION**

**(See instructions on reverse)**

For use by Secretary of State only

STD. 400 (REV. 01-2013)

| OAL FILE NUMBERS | NOTICE FILE NUMBER | REGULATORY ACTION NUMBER | EMERGENCY NUMBER |
|---|---|---|---|
| | Z-2017-0321-03 | 2018-0125-03 | |

For use by Office of Administrative Law (OAL) only

**ENDORSED - FILED**
in the office of the Secretary of State
of the State of California

MAR 09 2018
1:40 P.M.

| RECEIVED DATE | PUBLICATION DATE | 2018 JAN 25 P 3: 34 |
|---|---|---|
| MAR 21 '17 | MAR 31 '17 | OFFICE OF ADMINISTRATIVE LAW |
| Office of Administrative Law | | |
| **NOTICE** | | **REGULATIONS** |

| AGENCY WITH RULEMAKING AUTHORITY | AGENCY FILE NUMBER (if any) |
|---|---|
| Occupational Safety and Health Standards Board | |

## A. PUBLICATION OF NOTICE   (Complete for publication in Notice Register)

| 1. SUBJECT OF NOTICE | TITLE(S) | FIRST SECTION AFFECTED | 2. REQUESTED PUBLICATION DATE |
|---|---|---|---|
| GISO New Section 3345 | Title 8 | New Section 3345 | March 31, 2017 |

| 3. NOTICE TYPE | 4. AGENCY CONTACT PERSON | TELEPHONE NUMBER | FAX NUMBER (Optional) |
|---|---|---|---|
| ☒ Notice re Proposed Regulatory Action  ☐ Other | Marley Hart, Executive Officer | (916)-274-5721 | (916)-274-5743 |

| OAL USE ONLY | ACTION ON PROPOSED NOTICE | | | NOTICE REGISTER NUMBER | PUBLICATION DATE |
|---|---|---|---|---|---|
| | ☐ Approved as Submitted | ☐ Approved as Modified | ☐ Disapproved/ Withdrawn | | |

## B. SUBMISSION OF REGULATIONS (Complete when submitting regulations)

| 1a. SUBJECT OF REGULATION(S) | 1b. ALL PREVIOUS RELATED OAL REGULATORY ACTION NUMBER(S) |
|---|---|
| Hotel Housekeeping Musculoskeletal Inj. Prevention | |

2. SPECIFY CALIFORNIA CODE OF REGULATIONS TITLE(S) AND SECTION(S) (Including title 26, if toxics related)

| **SECTION(S) AFFECTED** (List all section number(s) individually. Attach additional sheet if needed.) | ADOPT | New Section 3345 |
|---|---|---|
| | AMEND | |
| TITLE(S) 8 | REPEAL | |

3. TYPE OF FILING

☒ Regular Rulemaking (Gov. Code §11346)
☐ Resubmittal of disapproved or withdrawn nonemergency filing (Gov. Code §§11349.3, 11349.4)
☐ Emergency (Gov. Code, §11346.1(b))

☐ Certificate of Compliance: The agency officer named below certifies that this agency complied with the provisions of Gov. Code §§11346.2-11347.3 either before the emergency regulation was adopted or within the time period required by statute.
☐ Resubmittal of disapproved or withdrawn emergency filing (Gov. Code, §11346.1)

☐ Emergency Readopt (Gov. Code, §11346.1(h))
☐ File & Print
☐ Other (Specify) _____

☐ Changes Without Regulatory Effect (Cal. Code Regs., title 1, §100)
☐ Print Only

4. ALL BEGINNING AND ENDING DATES OF AVAILABILITY OF MODIFIED REGULATIONS AND/OR MATERIAL ADDED TO THE RULEMAKING FILE (Cal. Code Regs. title 1, §44 and Gov. Code §11347.1)

5. EFFECTIVE DATE OF CHANGES (Gov. Code, §§ 11343.4, 11346.1(d); Cal. Code Regs., title 1, §100)
☒ Effective January 1, April 1, July 1, or October 1 (Gov. Code §11343.4(a))
☐ Effective on filing with Secretary of State
☐ §100 Changes Without Regulatory Effect
☐ Effective other (Specify) _____

6. CHECK IF THESE REGULATIONS REQUIRE NOTICE TO, OR REVIEW, CONSULTATION, APPROVAL OR CONCURRENCE BY, ANOTHER AGENCY OR ENTITY
☒ Department of Finance (Form STD. 399) (SAM §6660)
☐ Fair Political Practices Commission
☐ State Fire Marshal
☐ Other (Specify)

| 7. CONTACT PERSON | TELEPHONE NUMBER | FAX NUMBER (Optional) | E-MAIL ADDRESS (Optional) |
|---|---|---|---|
| Marley Hart | 916.274.5721 | 916.274.5743 | mhart@dir.ca.gov |

8. I certify that the attached copy of the regulation(s) is a true and correct copy of the regulation(s) identified on this form, that the information specified on this form is true and correct, and that I am the head of the agency taking this action, or a designee of the head of the agency, and am authorized to make this certification.

For use by Office of Administrative Law (OAL) only

**ENDORSED APPROVED**

MAR 09 2018

Office of Administrative Law

| SIGNATURE OF AGENCY HEAD OR DESIGNEE | DATE |
|---|---|
| Marley Hart | 1/18/18 |

TYPED NAME AND TITLE OF SIGNATORY
Marley Hart, Executive Officer

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

Add new Title 8 Section 3345 to read:

§3345. **Hotel Housekeeping Musculoskeletal Injury Prevention.**

(a) **Scope and Application**. This section is intended to control the risk of musculoskeletal injuries and disorders to housekeepers in hotels and other lodging establishments. It does not preclude the application of other sections of Title 8.

(b) **Definitions.**

"Control measures" means effective tools, equipment, devices, work practices, and administrative controls to correct or minimize workplace hazards that may cause musculoskeletal injuries to housekeepers.

"Housekeeper" means an employee who performs housekeeping tasks and may include employees referred to as housekeepers, guest room attendants, room cleaners, maids, and housepersons.

"Housekeeping tasks" means tasks related to cleaning and maintaining sleeping room accommodations including bedrooms, bathrooms, kitchens, living rooms, and balconies. Housekeeping tasks include, but are not limited to, the following: (1) sweeping, dusting, scrubbing, mopping and polishing of floors, tubs, showers, sinks, mirrors, walls, fixtures, and other surfaces; (2) making beds; (3) vacuuming; (4) loading, unloading, pushing, and pulling linen carts; (5) removing and supplying linen and other supplies in the rooms; (6) collecting and disposing of trash; and (7) moving furniture.

"Lodging establishment" means an establishment that contains sleeping room accommodations that are rented or otherwise provided to the public, such as hotels, motels, resorts, and bed and breakfast inns. For the purposes of this section, "lodging establishment" does not include hospitals, nursing homes, residential retirement communities, prisons, jails, homeless shelters, boarding schools, or worker housing.

"Musculoskeletal injury" means acute injury or cumulative trauma of a muscle, tendon, ligament, bursa, peripheral nerve, joint, bone, spinal disc or blood vessel.

"Union Representative" means a recognized or certified collective bargaining agent representing the employer's housekeepers.

"Worksite evaluation" means the identification and evaluation of workplace hazards including scheduled periodic inspections and the procedures described in subsection (c)(4) to identify unsafe

---

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

---

conditions and work practices in each housekeeping task, process, or operation of work with respect to potential causes of musculoskeletal injuries to housekeepers.

(c) **Housekeeping musculoskeletal injury prevention program.** As part of the Injury and Illness Prevention Program (IIPP) required by Section 3203, each employer covered by this section shall establish, implement, and maintain an effective, written, musculoskeletal injury prevention program (MIPP) that addresses hazards specific to housekeeping. The written MIPP may be incorporated into the written IIPP, or may be maintained as a separate program, and must be readily accessible during each work shift to employees when they are in the lodging establishment where they work. (Electronic access and other alternatives to maintaining paper copies of the MIPP are permitted as long as no barriers to employee access are created by such options.) The MIPP shall include:

(1) Names or job titles of the persons with authority and responsibility for implementing the MIPP at each worksite.

(2) A system for ensuring that supervisors and housekeepers comply with the MIPP, follow the employer's safe workplace housecleaning practices, and use the housekeeping tools or equipment deemed appropriate for each housekeeping task. Substantial compliance with this provision includes recognition of employees who follow the employer's safe workplace housecleaning practices and use the appropriate tools and equipment, training and retraining programs, disciplinary actions, or other means that ensures employee compliance with the MIPP.

(3) A system for communicating with housekeepers in a form readily understandable by all housekeepers on matters relating to occupational safety and health, as required by Section 3203, including provisions designed to encourage housekeepers to inform the employer of hazards at the worksite, and injuries or symptoms that may be related to such hazards without fear of reprisal.

(4) Procedures for identifying and evaluating housekeeping hazards through a worksite evaluation.

(A) The initial worksite evaluation shall be completed within three months after the effective date of this section or within three months after the opening of a new lodging establishment.

(B) The procedures shall include an effective means of involving housekeepers and their union representative in designing and conducting the worksite evaluation.

(C) Housekeepers shall be notified of the results of the worksite evaluation in writing or by posting it in a location readily accessible to them. The results of the worksite evaluation shall be in a language easily understood by housekeepers.

(D) The worksite evaluation shall be reviewed and updated:

**STANDARDS PRESENTATION**                    Page 3 of 6
**TO**
**CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD**

---

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

---

1. Whenever new processes, practices, procedures, equipment or guest room renovations are introduced that may change or increase housekeeping hazards;

2. Whenever the employer is made aware of a new or previously unrecognized housekeeping hazard based on information such as, but not limited to, the findings and recommendations of injury investigations conducted in accordance with subsection (c)(5);

3. At least annually for each worksite.

(E) The worksite evaluation shall identify and address potential injury risks to housekeepers including, but not limited to: (1) slips, trips and falls; (2) prolonged or awkward static postures; (3) extreme reaches and repetitive reaches above shoulder height, (4) lifting or forceful whole body or hand exertions; (5) torso bending, twisting, kneeling, and squatting; (6) pushing and pulling; (7) falling and striking objects; (8) pressure points where a part of the body presses against an object or surface; (9) excessive work-rate; and (10) inadequate recovery time between housekeeping tasks.

NOTE TO (C)(4)(E): Additional information regarding worksite evaluations can be found in the publications listed in Appendix A.

(5) Procedures to investigate musculoskeletal injuries to housekeepers. Injury investigations shall include, at a minimum:

(A) The procedures or housekeeping tasks being performed at the time of the injury and whether any identified control measures were available and in use;

(B) If required tools or other control measures were not used, or not used appropriately, a determination of why those measures were not used or were not used appropriately; and

(C) Input from the injured housekeeper, the housekeeper's union representative, and the housekeeper's supervisor as to whether any other control measure, procedure, or tool would have prevented the injury.

(6) Methods or procedures for correcting, in a timely manner, hazards identified in the worksite evaluation or in the investigation of musculoskeletal injuries to housekeepers, including procedures for determining whether identified corrective measures are implemented appropriately. These procedures shall include:

(A) An effective means of involving housekeepers and their union representative in identifying and evaluating possible corrective measures;

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

(B) A means by which appropriate equipment or other corrective measures will be identified, assessed, implemented, and then reevaluated after introduction and while used in the workplace; and

(C) A means of providing and making readily available appropriate housecleaning equipment, protective equipment, and tools to each housekeeper, including procedures for procuring, inspecting, maintaining, repairing, and replacing appropriate housecleaning tools and equipment.

(7) Procedures for reviewing, at least annually, the MIPP at each worksite, to determine its effectiveness and make any corrections when necessary, including an effective procedure for obtaining the active involvement of housekeepers and their union representative in reviewing and updating the MIPP. The procedures shall include a review of the Cal/OSHA Form 300 log and Cal/OSHA Form 301 incident reports.

**(d) Training**. The employer shall provide training to housekeepers and their supervisors in a language easily understood by these employees.

(1) Frequency of training. Training shall be provided:

(A) To all housekeepers and supervisors when the MIPP is first established;

(B) To all new housekeepers and supervisors;

(C) To all housekeepers given new job assignments for which training was not previously provided;

(D) At least annually thereafter; and

(E) When new equipment or work practices are introduced or whenever the employer becomes aware of a new or previously unrecognized hazard. The additional training may be limited to addressing the new equipment or work practices.

(2) Training shall include at least the following elements as applicable to the housekeeper's assignment:

(A) The signs, symptoms, and risk factors commonly associated with musculoskeletal injuries,

(B) The elements of the employer's MIPP and how the written MIPP and all records in subsection (e)(1) will be made available to housekeepers;

(C) The process for reporting safety and health concerns without fear of reprisal;

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

(D) Body mechanics and safe practices including: identification of hazards at the workplace, how those hazards are controlled during each housekeeping task, the appropriate use of cleaning tools and equipment, and the importance of following safe work practices and using appropriate tools and equipment to prevent injuries;

(E) The importance of, and process for, early reporting of symptoms and injuries to the employer;

(F) Practice using the types and models of equipment and tools that the housekeeper will be expected to use;

(G) An opportunity for interactive questions and answers with a person knowledgeable about hotel housekeeping equipment and procedures; and

(H) Training of supervisors on how to identify hazards, the employer's hazard correction procedures, how defective equipment can be identified and replaced, how to obtain additional equipment, how to evaluate the safety of housekeepers' work practices, and how to effectively communicate with housekeepers regarding any problems needing correction.

**(e) Records.**

(1) Records of the steps taken to implement and maintain the MIPP, including any measurements taken or evaluations conducted in the worksite evaluation process required by subsection (c) and the training required by subsection (d), shall be created and maintained in accordance with Section 3203(b).

(2) A copy of the MIPP and all worksite evaluation records required by subsection (e)(1) shall be available at the worksite for review in accordance with subsection (c) and copying by housekeepers and their designated representative in accordance with Section 3204(e)(1).

(3) All records shall be made available to the Chief of the Division or designee within 72 hours of request.

(4) Records of occupational injuries and illnesses shall be created and maintained in accordance with Title 8, Division 1, Chapter 7, Subchapter 1 of the California Code of Regulations.

NOTE: Authority cited: Section 142.3, Labor Code. Reference: Section 142.3, Labor Code.

PROPOSED STATE STANDARD,
TITLE 8, DIVISION 1, CHAPTER 4

---

Appendix A (Non-Mandatory)

Reference Materials for Worksite Evaluations

The following are examples of materials that can be used in performing a worksite evaluation for housekeeping:

Ohio State University. Ergonomic Resources for Housekeeping.
https://ergonomics.osu.edu/Housekeeper%20Training%20Materials

State Fund. Tips for Hotel Room Attendants.
https://content.statefundca.com/safety/ErgoMatters/RoomAttendants.asp

Department of Industrial Relations. Working Safer and Easier for Janitors, Custodians and Housekeepers, 2005. www.dir.ca.gov/dosh/dosh_publications/janitors.pdf

British Columbia, Injury Prevention Resources For Tourism and Hospitality- Accommodation.
https://www2.worksafebc.com/Portals/Tourism/Prevention-Accommodation.asp

Ergonomics Study of Custodial, Housekeeping and Environmental Services Positions at University of California. May 2011. The UC System-wide Ergonomics Team.
http://ucanr.org/sites/ucehs/files/97141.pdf

Government of Western Australia, Checklist and information- Accommodation industry.
https://www.commerce.wa.gov.au/sites/default/files/atoms/files/accommodation_2016.pdf

NOTE: Authority cited: Section 142.3, Labor Code. Reference: Section 142.3, Labor Code.

# Exhibit 15

## Chapter 5.93 - HOTEL MINIMUM WAGE AND WORKING CONDITIONS

### 5.93.010 - Definitions.

"Additional-Bed Rooms" means a room with additional beds such as cots or roll-aways.

"Checkout" means a room occupied by guests who are ending their stay at the hotel.

"Guest" means registered guests, others occupying guest rooms with registered guests, and visitors invited to guest rooms by a registered guest or other occupant of a guest room.

"Guest Room" means a room made available by a hotel for transient occupancy, within the meaning of Oakland Municipal Code section 4.24.020.

"Hotel" means structures as defined by Oakland Municipal Code Section 4.24.020, and containing fifty (50) or more guest rooms, or suites of rooms. "Hotel" also includes any contracted, leased, or sublet premises connected to or operated in conjunction with the building's purpose, or providing services at the building.

"Hotel Employee" means any individual:

(1)     Who is employed directly by the hotel employer or by a person who has contracted with the hotel employer to provide services at a hotel in the City of Oakland; and

(2)     Who was hired to or did work an average of five (5) hours/week for four (4) weeks at one (1) or more hotels.

"Hotel Employer" means a person who owns, controls, and/or operates a hotel in the City of Oakland, or a person who owns, controls, and/or operates any contracted, leased, or sublet premises connected to or operated in conjunction with the hotel's purpose, or a person, other than a hotel employee, who provides services at the hotel.

"Panic Button" means an emergency contact device carried by the hotel employee which allows him or her in the event of an ongoing crime, threat, or other emergency to alert another employee or security guard responsible for providing immediate on-scene assistance.

"Person" means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust,

association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign.

"Room Cleaner" means a hotel employee whose principal duties are to clean and put in order residential guest rooms in a hotel, regardless of who employs the person.

"Workday" means a twenty-four-hour period beginning at 12:00 a.m. and ending at 11:59 p.m.

(Res. No. 87287, § 1, 7-24-2018)

5.93.020 - Measures to protect hotel employees from threatening behavior.

A.    Purpose. Hotel employees who work by themselves are vulnerable to crimes and other threatening behavior, including sexual assault. This Chapter enables hotel workers to protect their safety by, among other measures, requiring that hotel employers provide workers who clean guest rooms with panic buttons which they may use to report threatening conduct by a hotel guest and other emergencies. Many instances of sexual assault go unreported to the police. This Chapter also includes provisions that support hotel employees' ability to report criminal and threatening guest behavior to the proper authorities.

B.    Each hotel employee assigned to work in a guest room or bathroom without other employees present shall be provided by the hotel employer, at no cost to the hotel employee, a panic button.

1.    If a hotel employee encounters a situation necessitating his or her use of the panic button as described above, the hotel employee may cease working and remove him/herself from the situation to await the arrival of the employee or security guard responsible for providing immediate assistance. No hotel employee may be disciplined for ceasing work under these circumstances.

2.    No hotel employee may be disciplined for use of a panic button absent clear and convincing evidence the hotel employee knowingly and intentionally made a false claim of emergency.

C.    A hotel employee who brings to the attention of a hotel employer the occurrence of violence or threatening behavior, including but not limited to indecent exposure, solicitation, assault, or coercive sexual conduct by a guest, shall be afforded the following rights.

1.    If the hotel employee reasonably believes that his or her safety is at risk and so requests, the hotel employee shall be reassigned to a different floor,

or, if none is available for his or her job classification, a different work area, away from the person who is alleged to have engaged in the violence or threatening behavior, for the entire duration of the person's stay at the hotel;

2.   The hotel employer shall immediately allow the affected hotel employee sufficient paid time to contact the police and provide a police statement and to consult with a counselor or advisor of the hotel employee's choosing; the hotel employer will permit, but may never require, the complaining hotel employee to report an incident involving alleged criminal conduct by a guest to the law enforcement agency with jurisdiction; and

3.   The hotel employer shall cooperate with any investigation into the incident undertaken by the law enforcement agency and/or any attorney for the complaining hotel employee.

D.   Each hotel shall place a sign on the back of each guestroom door, written in a font size of no less than eighteen (18) points, that includes the heading "The Law Protects Hotel Housekeepers and Employees From Threatening Behavior," a citation to this Chapter of the Oakland Municipal Code, and notice of the fact that the hotel is providing panic buttons to its housekeepers, room servers, and other hotel employees assigned to work in guest rooms without other employees present, in compliance with this Chapter.

(Res. No. 87287, § 1, 7-24-2018)

5.93.030 - Humane workload.

A.   Purpose. Hotel employees who clean guest rooms are frequently assigned overly burdensome room cleaning quotas and unexpected overtime, which undermines the public interest in ensuring that hotel room cleaners can perform their work in a manner that adequately protects public health and interferes with their ability to meet family and personal obligations. This provision assures that workers receive fair compensation when their workload assignments exceed proscribed limits and prohibits hotel employers from assigning hotel employees overtime work when their shifts exceed ten (10) hours in a day, except in emergency situations, without obtaining workers' informed consent.

B.   A hotel employer shall not require a room cleaner to clean rooms amounting to more than four thousand (4,000) square feet of floor space, or more than the maximum floor space otherwise specified in this Section, in any one (1), eight-hour workday unless the hotel employer pays the room cleaner twice his or her

regular rate of pay for all hours worked by the room cleaner during the workday. If a room cleaner works fewer than eight (8) hours in a workday, the maximum floor space shall be reduced on a prorated basis. When a room cleaner during a workday is assigned to clean any combination of seven (7) or more checkout rooms or additional-bed rooms, the maximum floor space to be cleaned shall be reduced by five hundred (500) square feet for each such checkout or additional-bed room over six (6). The limitations contained herein apply to any combination of spaces, including guest rooms and suites, meeting rooms or hospitality rooms, and apply regardless of the furniture, equipment or amenities in any rooms.

C.    A hotel employer shall not suffer or permit a hotel employee to work more than ten (10) hours in any workday unless the hotel employee consents. Consents must be written and signed by the hotel employee or communicated electronically through an account or number particular to the hotel employee. No consent is valid unless the hotel employer has advised the hotel employee in writing not more than thirty (30) days preceding the consent that the hotel employee may decline to work more than ten (10) hours in any workday and that the hotel employer will not subject the hotel employee to any adverse action for declining. Such notice shall be provided in each language spoken by more than ten (10) percent or ten (10) hotel employees at the hotel, whichever is less. An assignment in excess of ten (10) hours in a workday due to an emergency situation shall not violate this Section. For purposes of this Section, an "emergency situation" shall mean an immediate threat to public safety or of substantial risk of property loss or destruction.

(Res. No. 87287, § 1, 7-24-2018)

5.93.040 - Hotel employee minimum wage.

A.    Effective July 1, 2019, hotel employers shall pay hotel employees a wage of no less than fifteen dollars ($15.00) per hour with health benefits, not including gratuities, service charge distributions, or bonuses, or twenty dollars ($20.00) per hour without health benefits, not including gratuities, service charge distributions, or bonuses.

B.    Health benefits under this Section shall consist of the payment of the difference between the higher wage and lower wage under Section 5.93.040(A) towards the provision of health care benefits for hotel employees and their dependents. Proof of the provision of these benefits must be kept on file by the hotel employer, if applicable.

C.    The wage rates set forth in this Section shall be adjusted for inflation annually in the manner set forth in Section 5.92.020(B).

(Res. No. 87287, § 1, 7-24-2018)

5.93.050 - Preservation of records.

A.    Each hotel employer shall preserve for at least three (3) years:

1.    For each room cleaner, a record of his or her name, pay rates received, and the rooms (or at the hotel employer's option, total amount of square footage) each cleaned each workday;

2.    A record of the written consents it received from hotel employees to work more than ten (10) hours during a shift; and

3.    For each hotel employee, a record of his or her name, hours worked, pay rate, and proof of health benefits consistent with Section 5.93.040(B) (if applicable).

B.    The hotel employer shall make such records available to hotel employees or their representatives for inspection and copying, except that hotel employees' names (and any addresses and social security numbers) shall be redacted unless the requester is a hotel employee requesting his or her own records. Where a hotel employer does not maintain or retain adequate records consistent with this Section, or does not permit reasonable access to such records, it shall be presumed, in any administrative or judicial proceeding enforcing this Chapter, that:

1.    The hotel employer required the room cleaner to clean total square footage in excess of four thousand (4,000) square feet on the day for which records are missing or inadequate, absent clear and convincing evidence otherwise;

2.    No written consent to work more than ten (10) hours during a shift exists for a hotel employee for days on which written consents are missing or inadequate, absent clear and convincing evidence otherwise; and

3.    The hotel employer paid the hotel employee no more than the applicable federal or state minimum wage, absent clear and convincing evidence otherwise.

(Res. No. 87287, § 1, 7-24-2018)

5.93.060 - No retaliation.

A hotel employer shall not discharge, reduce the compensation of nor otherwise discriminate against any person for making a complaint to the City, participating in any of its proceedings, using any civil remedies to enforce his or her rights, or otherwise asserting his or her rights under this Chapter. Within one hundred twenty (120) days of a hotel employer being notified of such activity, it shall be unlawful for the hotel employer to discharge any person who engaged in such activity unless the hotel employer has clear and convincing evidence of just cause for such discharge.

(Res. No. 87287, § 1, 7-24-2018)

5.93.070 - Waiver.

The provisions of this Chapter may not be waived by agreement between an individual hotel employee and a hotel employer. All of the provisions of Section 5.93.030 and 5.93.040, or any part thereof, may be waived in a bona fide collective bargaining agreement but only if the waiver is explicitly set forth in such agreement in clear and unambiguous terms.

(Res. No. 87287, § 1, 7-24-2018)

5.93.080 - Enforcement and miscellaneous provisions.

A.   This Chapter shall be enforced in accordance with the procedures set forth in Oakland Municipal Code Section 5.92.050, and the remedies set forth in that Section shall apply to violations of this Chapter, except that for a willful violation of Section 5.93.060, the amount damages attributable to lost income due to the violation shall be trebled.

B.   No hotel employer may fund increases in compensation required by this Chapter, nor otherwise respond to the requirements of this Chapter, by reducing the compensation of any non-management hotel employees nor by reducing the pension, vacation, or other non-wage benefits of any such hotel employees, nor by increasing charges to them for parking, meals, uniforms or other items. If a hotel employer makes such adverse changes after the filing of the notice to circulate the petition giving rise to this Chapter but before this Chapter has become effective, then upon this Chapter's effective date, such hotel employer shall restore the conditions of the status quo ante.

C.   Each hotel employer shall give written notification to each current hotel employee, and to each new hotel employee at time of hire, of his or her rights

under this Chapter. The notification shall be in each language spoken by more than ten (10) percent or ten (10) hotel employees at the hotel, whichever is less.

D.   A hotel employer that contracts with another person, including, without limitation, another hotel employer, a temporary staffing agency, employee leasing agency or professional employer organization, to obtain the services of hotel employees shall share all civil legal responsibility and civil liability for violations of this Chapter by that person for hotel employees performing work pursuant to the contract. For the purposes of this subsection, the term "person" shall not include:

(1)   A bona fide nonprofit, community-based organization that provides services to workers;

(2)   A bona fide labor organization or apprenticeship program or hiring hall operated pursuant to a collective bargaining agreement.

(Res. No. 87287, § 1, 7-24-2018)

5.93.090 - No preemption of higher standards.

The purpose of this Chapter is to ensure minimum labor standards for hotel employees. This Chapter does not preempt or prevent the establishment of superior employment standards (including higher wages) or the expansion of coverage by ordinance, resolution, contract, or any other action of the City or Port of Oakland. This Chapter shall not be construed to limit a discharged hotel employee's right to bring a common law cause of action for wrongful termination.

(Res. No. 87287, § 1, 7-24-2018)

Exhibit 16

# RULES AND REGULATIONS
# FOR IMPLEMENTATION OF THE
# LIVING WAGE ORDINANCE
# FOR THE CITY OF OAKLAND AND
# THE REDEVELOPMENT AGENCY OF THE CITY OF OAKLAND

The Oakland Living Wage Ordinance (the "Ordinance"), codified as Oakland Municipal Code provides that certain employers under contracts for the furnishing of services to or for the City that involve an expenditure equal to or greater than $25,000 and certain recipients of City financial assistance that involve receipt of financial assistance equal to or greater than $100,000 shall pay a prescribed minimum level of compensation to their employees for the time their employees work on City of Oakland contracts. The Redevelopment Agency of the City of Oakland adopted the City's Living Wage policy as its own policy by Agency Resolution No. 98-13 C.M.S.

## REGULATION #1: DECLARATION OF COMPLIANCE WITH THE LIVING WAGE ORDINANCE

The form and content of the Declaration of Compliance to be obtained from prospective contractors and CFARs pursuant to the Ordinance is attached hereto. The Declaration shall be included in all bid documents and contracts to which the Ordinance applies.

## REGULATION #2: DEFINITIONS

The following definitions shall apply in these regulations:

a) "Agency" means that subordinate or component entity or person of the City (such as a department, office, or agency) that is responsible for solicitation of proposals or bids and responsible for the administration of service contracts or financial assistance agreements.

b) "City" means the City of Oakland and all City agencies, departments and offices. References to the "City" in these regulations shall also be deemed to apply to the Redevelopment Agency of the City of Oakland.

c) "City financial assistance recipient"  or "CFAR" means any person who receives from the City financial assistance in an amount of $100,000 or more in a 12 month period.

   1) Financial assistance shall not include generalized financial assistance such as that provided through tax legislation.  City staff assistance alone shall not be regarded as financial assistance.

   2) Categories of covered City financial assistance include, but are not limited to, grants, rent subsidies, bond financing, loans (subject to the criteria below), financial planning, tax increment financing, land writedowns, the provision of on-site improvements, and tax

**Revision Date: 3/15/00**

credits and rebates. Assistance shall include contingent obligations taken on by the City, such as a guaranty.

3) A loan provided at below market interest rate and terms shall be regarded as financial assistance to the extent of any differential between the principal amount of the loan and the present value of the payments thereunder, discounted over the life of the loan by the applicable federal rate as set forth in 26 USC §§1274(d) and 7872(f).  The forgiveness of a loan, to the extent of the amount forgiven, shall be regarded as financial assistance. Indirect loan related assistance and contingent funding commitments by the City such as loan guaranties, completion guaranties, credit enhancements, letters of credit, indemnity agreements, standby commitments, suretyship agreements, etc., shall also be regarded as financial assistance, to the extent of the value of the subsidy attached to such assistance as determined by the agency administering the assistance.

4) The sale of City real property for less than the property's fair market value shall be considered City financial assistance, to the extent of the difference between the actual sales price and the property's fair market value.  An installment sale shall be treated as a seller financed loan for purposes of these regulations.  A lease of City real property for less than the property's fair rental value shall be considered financial assistance, to the extent of the difference between the present value of the actual lease payments and the present value of the fair market rental payments during the lease term, as determined by agency administering the assistance.

5) The provision of off-site improvements by the City to a development project, such as street improvements or the installation of public facilities, utilities or other infrastructure not located on the project property, shall not be considered City assistance for purposes of these regulations.

6) The date a CFAR is deemed to receive the assistance shall be the date that the City enters into a legally binding agreement to provide the assistance.

7) A tenant, lessee, or licensee of a CFAR, or a subtenant or sublessee of such person, who occupies real property or uses equipment or real or personal property that is improved or developed as a result of the assistance awarded to the CFAR by the City, and who will employ at least twenty employees for each working day in each of twenty or more calendar weeks in the twelve months after occupying or using said property, shall be considered a "City financial assistance recipient" for purposes of these regulations, and shall be covered for the same period as the CFAR who is their landlord, lessor, or licensor.

8) For purposes of these regulations, "City financial assistance recipient" shall also include the assignees and successors in interest of the person directly receiving the assistance from the City, and in the case of City assistance to projects involving the improvement or development of real property, shall include any person who subsequently acquires  fee title to any or all of the property developed with City assistance during the compliance period.

**Revision Date: 3/15/00**

9) "Financial assistance" shall include assistance provided through the City from sources other than City funds, such as federal or state grants or loans, but only where the application of the Ordinance is consonant with the terms and conditions of the outside funding source.

d) "Contractor" means any person that enters into a service contract with the City in an amount equal to or greater than $25,000.

e) "Contract Compliance" means the City's Office of Contract Compliance

f) "Employee" means (1) any natural person who performs services related to a city service contract, including a person employed under the authority of a service contract by a contractor or subcontractor; or (2) any natural person who performs services for a CFAR and who expends at least half of his or her time on the funded program or business, or in the case of a development project, at least half of his or her time on the project site or on project related work, or (3) any natural person who performs services for a service contractor of a CFAR and who expends at least half of his or her time on the premises of the CFAR, or in the case of a development project, at least half of his or her time on the project site or on project related work, and is directly involved with the funded project/program or property which is the subject of City financial assistance. Any person who is a managerial, supervisory or confidential employee is not an employee for purposes of this definition. Persons who qualify as independent contractors under IRS standards and persons who provide uncompensated, volunteer services to an employer, are not employees for the purposes of this section.

g) "Employer" means any person who is a contractor, subcontractor, or City financial assistance recipient (CFAR) and who employs persons in the course of a business operation.

h) "Person" means any individual, proprietorship, partnership, joint venture, corporation, limited liability company, trust, association, public agency, or other entity that may employ individuals or enter into contracts.

i) "Service contract" means (1) a contract let to a contractor by the City or a CFAR that involves an expenditure equal to or greater than twenty-five thousand dollars ($25,000), in a twelve (12) month period, for the furnishing of services, to or for the City or the CFAR, except contracts where services are incidental to the delivery of products, equipment or commodities or (2) a lease or license under which services contracts are let by the lessee or licensee. A contract for the purchase or lease of goods, products, equipment, supplies or other property is not a "service contract" for the purposes of this definition. Services provided under a construction contract for which the payment of prevailing wages is required shall not constitute the "furnishing of services" as used in this section. Said construction services shall be paid at the rate required by the City pursuant to Resolution No. 57103 C.M.S. or Redevelopment Agency Resolution No. 87-4 C.M.S.

j) "Subcontractor" means any person who enters into a contract with (1) a contractor to assist the contractor in performing a service contract or (2) a CFAR to assist the CFAR in performing the work for which the assistance is being given or to perform services on the

**Revision Date: 3/15/00**

property which is the subject of city financial assistance.  Service contractors of CFARs shall not be regarded as subcontractors except to the extent provided in subsection C.

k) "Trainee" means a person enrolled in a job training program which meets the City of Oakland job training standards.

## REGULATION #3: PAYMENT OF MINIMUM COMPENSATION TO EMPLOYEES

Employers subject to these regulations are required to provide the compensation, health benefits compensated days off and uncompensated days off set forth below to their employees, as defined herein,:

1) Minimum compensation – Employees shall be paid an initial hourly wage rate of $8.00 with health benefits or $9.25 without health benefits. These initial rates will be upwardly adjusted each year no later than April 1 in proportion to the increase at the immediately preceding December 31 over the year earlier level of the Bay Region Consumer Price Index as published by the Bureau of Labor Statistics, U.S. Department of Labor.

2) Health benefits – Full-time and part-time employees paid at the lower living wage rate shall be provided health benefits as defined herein.  Employers shall provide proof that health benefits are in effect for those employees no later than 30 days after execution of the contract or receipt of City financial assistance

3) Compensated days off. – Employees are entitled to twelve compensated days off per year for sick leave, vacation or personal necessity at the employee's request, and ten uncompensated days off per year for sick leave. Employees shall accrue one compensated day off per month of full time employment. Part-time employees shall accrue compensated days off in increments proportional to that accrued by full-time employees. The employees shall be eligible to use accrued days off after the first six months of employment or consistent with company policy, whichever is sooner.  Paid holidays, consistent with established employer policy, may be counted toward provision of the required 12 compensated days off.  Ten uncompensated days off shall be made available, as needed, for personal or immediate family illness after the employee has exhausted his or her accrued compensated days off for that year.

## REGULATION #4:  COMPLIANCE PERIOD

(a)     Service contractors.  For covered service contractors and subcontractors, the period for compliance with the Living Wage requirements shall be for the term of the contract.

(b)     City financial assistance recipients. For covered CFARs, the period for compliance with the Living Wage requirements shall be as follows:

(1)     Real estate development project assistance, i.e., City assistance with the purchase of real property and the construction or rehabilitation of real property facilities:

**Revision Date: 3/15/00**

five years from the date construction of the project commences, as such date is determined by the agency administering the project.

(2)     Business development assistance, i.e., City assistance to a for profit business recipient to purchase tangible personal property, such as materials, equipment, fixtures, merchandise, inventory, machinery, and the like, to purchase a facility, and/or to pay for the operational costs of such recipients, including assistance with working capital: five years from the first disbursement of City assistance to the recipient.  For City assistance in the form of contingent commitments, compliance shall begin on the date the City enters into the commitment.

(3)     Program assistance, i.e., City assistance to fund the ongoing program operations of a recipient who is a nonprofit service provider: the term of the agreement under which the assistance is given.

(4)     For forms of City assistance that do not fit into any of the above categories, the agency which administers the assistance shall determine the appropriate commencement date for the compliance period.

(5)     To the extent that City assistance falls into multiple categories, the compliance period shall start at the earliest of the dates specified above.

(6)     For City assistance used to acquire or develop real property, the Living Wage requirements shall be imposed in the form of a recorded encumbrance on the property binding any transferees or successors in interest to the property as a covenant running with the land for the entire compliance period.

**REGULATION #5: CONTRACT REVIEW PROCESS**

Each contract under which Living Wage requirements may apply will be subject to the following:

a)  Administering agencies shall impose the requirements of this Ordinance to all service contracts and CFARs UNLESS a determination is made by Contract Compliance that the Ordinance is not applicable.  When an administering agency believes the Ordinance is not applicable or is uncertain as to its applicability to a particular service contract or CFAR, it shall submit a request for determination to Contract Compliance.

b)  Contract Compliance shall provide to City agencies standard notices or language which set forth the requirements of this Ordinance and the Declaration of Compliance for inclusion in the solicitation of proposals, bids or applications for City financial assistance.  The administering agency shall include said notices in its RFPs, RFQs, specifications, application materials, notices of funding availability, notices inviting bids or any other solicitations for contracts or notices for applications or other processes related to the application for City financial assistance.

**Revision Date: 3/15/00**

c)  In the case of an RFP or an RFQ Contract Compliance will schedule and convene a pre-proposal meeting of responsible agency team members at least 3 weeks prior to the proposal due date.

d)  The day following proposal submittal, the administering agency will send copies of the proposals to Contract Compliance for review to determine compliance with Living Wage requirements or eligibility for any of the exemption provisions of the Ordinance.

e)  Contract Compliance will conduct a post award meeting with the contractor and subcontractors to review Living Wage compliance including data requirements, format and deadlines.

f)  An employer who wishes to contest a determination that this Ordinance is applicable to its business operation may file an appeal within seven calendar days of the date of the City's written determination.

The matter will be heard by a Hearing Officer designated by the City Manager. Decisions of the Hearing Officer shall be rendered in writing to the administering agency and employer, and shall be final.


## REGULATION #6: EXEMPTIONS

The following entities or persons are exempt from these regulations:

a)  An employer that employs or employed fewer than five employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

b)  An employee who is a trainee, as defined herein, for the period of training as specified under the City approved training standards.

c)  An employee who is under 21 years of age, employed by a nonprofit corporation for after school or summer employment  for a period not longer than 90 days.

d)  Persons who provide volunteer services that are uncompensated, except for the reimbursement of expenses such as meals, parking or transportation.

e)  Individuals who qualify under IRS standards as independent contractors.

Prior to executing the assistance contract, the awarding agency must obtain from each proposed contractor or CFAR seeking exemption under this ordinance, documentation sufficient to certify the specific exemption.

Parties otherwise subject to Living Wage requirements by a bona fide collective bargaining agreement, waive the Living Wage requirements, but only if the waiver is explicitly set forth in such agreement in clear and unambiguous terms.  If a collective bargaining exemption is claimed,

6

the employer shall provide a copy of the pertinent agreement to the administering agency for review.

## REGULATION #7: WAIVERS

The City Council may grant a waiver under the following conditions:

1) To a CFAR upon a finding and determination of economic hardship and that the waiver will further the interests of the City in creating training positions which enable employees to advance into jobs paid at a living wage or better when recommended by the City Manager, provided:

- the CFAR has submitted a detailed, written explanation of its economic hardship;

- that said explanation states the reasons for the CFAR's inability to pay a living wage and includes a complete cost accounting of the work to be performed with the assistance sought, stating wages and benefits to be provided to all employees, and itemizing wages and benefits paid to the five highest paid employees.

- That the CFAR will create training positions which will enable employees to advance into permanent jobs, paid at living wage rates or better rates;

- that existing positions or employees will not be replaced or displaced and that wages of existing employees will not be lowered by said training positions

2) Where the balance of competing interests weighs clearly in favor of granting the waiver. Partial waivers are favored over blanket waivers.

3) Waivers shall be limited to one year, but are subject to renewal thereafter upon yearly applications and determinations, which shall be based on the same criteria as the original waiver.

4) Upon a finding and determination of the City Council that waiver is in the best interests of the City, e.g. when the City has declared an emergency due to natural disasters and needs immediate services.

## REGULATION #8: EMPLOYER NOTICE AND DOCUMENTATION REQUIREMENTS

a) All proposed contractors and CFAR's subject to the provisions of these regulations shall submit a completed Declaration of Compliance form, signed by an authorized representative, with each proposal, bid or application. The Declaration of Compliance form shall be made a part of the executed contract, and will be made available for public inspection and copying by the City during its regular business hours.

7                    **Revision Date: 3/15/00**

b)  Contractors and CFAR's shall require their subcontractors and tenants/leaseholders who are covered by these requirements to comply with the provisions of these regulations. Contractors and CFARs shall be responsible for including language committing the subcontractor's or tenants/leaseholder's agreement to comply in their contract with their subcontractor or tenants/leaseholders. Contractors and CFARs shall submit a copy of such subcontracts or other such agreements to Contract Compliance.

c)  Employers shall maintain a listing of the name, address, date of hire, occupation classification, rate of pay and benefits paid for each of its employees and submit a copy of the list to Contract Compliance by March 31, June 30, September 30, and December 31 of each year during the applicable compliance period. Failure to provide this list within five days of the due date will result in a penalty of $500 per day. Covered contractors, subcontractors and CFARs shall maintain payrolls for all employees and basic records relating thereto and shall preserve them for a period of at least four years after the expiration of the compliance period.

d)  Employers shall give written notification to each current and new employee, at time of hire, of his or her rights to receive the benefits under the provisions of these regulations. The notification shall be provided in English, Spanish and other languages spoken by a significant number of the employees, and shall be posted prominently in communal areas at the work site. A copy of said notification shall be forwarded to Contract Compliance.  The notification must include the following information

Minimum compensation – Employees are entitled to an initial hourly wage rate of $8.00 with health benefits or $9.25 without health benefits for time worked on City of Oakland contracts or projects. The initial rates will be upwardly adjusted each year no later than April 1 in proportion to the increase at the immediately preceding December 31 over the year earlier level of the Bay Region Consumer Price Index as published by the Bureau of Labor Statistics, U.S. Department of Labor.

Health benefits.  Full-time and part-time employees paid at the lower living wage rate shall be provided health benefits.   Employers shall provide proof that health benefits are in effect for those employees no later than 30 days after execution of the contract, "Health benefits" means such medical, dental or other health benefits provided by employer.

Compensated days off. – Employees are entitled to twelve compensated days off per year for sick leave, vacation or personal necessity at the employee's request, and ten uncompensated days off per year for sick leave.  Employees shall accrue one compensated day off per month of full time employment. Part-time employees shall accrue compensated days off in increments proportional to that accrued by full-time employees.  The employees shall be eligible to use accrued days off after the first six months of employment or consistent with company policy, whichever is sooner.  Paid holidays, consistent with established employer policy, may be counted toward provision of the required 12 compensated days off.  Ten uncompensated days off shall be made available, as needed, for personal or immediate family illness after the employee has exhausted his or her accrued compensated days off for that year.

**Revision Date: 3/15/00**

Federal Earned Income Credit (EIC) – Employers must inform employees earning less than $12 per hour of their possible right to EIC and provide them forms to apply for advance EIC payments to the eligible employees in English, Spanish and other languages spoken by a significant number of their employees within 30 days of employment under the subject agreement.

e)  Employers shall permit authorized City representatives access to work sites and, with employee consent, relevant payroll records for the purpose of monitoring compliance with these regulations, investigating employee complaints of non-compliance and evaluating the operation and effects of these regulations, including the production for inspection and copying of its payroll records for any or all of its employees for the applicable compliance period.

f)  Employers who fail to submit documents, declarations or information required to demonstrate compliance with these regulations shall be deemed noncompliant or nonresponsive and subject to the remedies set forth herein.

## REGULATION #9: REPORTING AND RECORD KEEPING BY THE CITY

a)  The City Manager shall submit periodic reports to the City Council which shall include the following information at minimum:

   1)  A listing and the status of all RFP's and RFQ's, service contracts and lease agreements executed and financial assistance awarded, to which these regulations apply including the term, dollar amount and the service performed or assistance provided;

   2)  A description of every instance where an exemption or waiver was granted by action of the City Manager or the City Council.

b)  The City Manager shall maintain records pertaining to all complaints, hearings, determinations and findings, and shall submit a regular report on compliance with these regulations no less than annually to the City Council. Special reports and recommendations on significant issues of interest to the Council will be submitted as deemed appropriate.

## REGULATION #10: PENALTIES FOR NONCOMPLIANCE

Non-compliance may result in the assessment of a penalty of $500 for each week of non-compliance, or debarment from bidding on or participating ein future City contracts or projects for a period of one (1) year.

## REGULATION #11: MONITORING AND INVESTIGATION

The provisions of these regulations will augment the City's' normal and customary procedure for administering its contracts.The City will take the following steps to determine compliance with these regulations for contracts under which the City makes periodic payments:

a) The administering agency shall submit payment requisitions to Contract Compliance along with certified payroll reports (if applicable) fringe benefit statements (if applicable), and time cards.

b) Contract Compliance will review payroll reports, fringe benefit statements, and time cards and determine compliance within five (5) working days.

c) If compliance is determined, Contract Compliance will sign off on the payment requisition.

d) If non-compliance is determined, Contract Compliance will notify the administering agency and the employer, by written notice, that a violation of these regulations has occurred. Said notice shall include a summary analysis of what was paid, what should have been paid and what is owed to the affected employee(s), the basis for the determination of noncompliance, and notice that the employer is entitled to an administrative hearing prior to withholding.

e) If the employer fails to request a hearing within 10 days of the notice of noncompliance, it shall be deemed to have waived the right to hearing, and Contract Compliance shall issue a notice to withhold compensation owed and penalties to the administering agency, and thereafter direct payment to the employee or employees determined to have been underpaid.

## REGULATION #12: EMPLOYEE COMPLAINT PROCESS

An employee who alleges violation of any provision of these regulations may report such acts to the City and, at the employee's discretion, exhaust available employer internal remedies. The complaint to the City shall be handled as follows:

To file a complaint, an employee must complete complaint questionnaire and submit it along with copies of check stubs.  Contract Compliance shall provide the complaint forms in English , Spanish and/or any other language spoken by a predominance of the employees.

(a) Contract Compliance shall notify the agency and the employer of the complaint and seek resolution within five days from receipt of the complaint form. If resolution is not accomplished, Contract Compliance shall investigate the complaint, conducting employee interviews performing site visits if necessary, and make a determination regarding the alleged violation.

(b) If Contract Compliance determines that there has not been a violation of these requirements, the employee and administrating agency will be notified in writing of its determination and the investigation will be concluded.

(c) If a violation is found and corrected, Contract Compliance will promptly issue a written notice.

(d) If a violation is found and not corrected, Contract Compliance will issue a written notice of noncompliance which sets forth the basis for its decision, the amount owed the employee and

Revision Date: 3/15/00

notice that the employer is entitled to an administrative hearing as provided for under Section 11 above.

(e) The complainant's or witness' identity will not be divulged to the employer without the individual employee's written consent.  Complainant employees shall be advised, however, that such confidentiality may hinder the City's ability to successfully enforce their claims.

(f) Employers shall not discharge, reduce the compensation of, or otherwise discriminate against any employee for making a complaint to the City, participating in any of its proceedings, using any civil remedy to enforce his or her rights, or otherwise asserting his or her rights under these regulations.

(g) An employee claiming retaliation (such as, termination, reduction in wages or benefits or adverse changes in working conditions) for alleging non-compliance with these regulations may report the alleged retaliation in the same manner as the initial complaint.


## REGULATION #13: ENFORCEMENT

Where a violation of any provision of these regulations has been determined, the City will give the employer a written notice. Should the violation continue and/or no resolution is imminent, the City may pursue all available legal remedies, including but not limited to any or all of the following penalties and relief:

1) Suspend and/or terminate the contract, subcontract or financial assistance agreement for cause;

2) Require the employer to pay back of any or all of the contract amount or financial assistance disbursed by the City;

3) Deem the employer ineligible for future City contracts and/or financial assistance until all penalties and restitution have been paid in full;

4) Impose a fine or liquidated damages payable to the City in the sum of $500 for each week for each employee found not to have been paid in accordance with these regulations;

5) Order wage restitution for each affected employee.


## REGULATION #14: SAMPLE RFP AND CONTRACT LANGUAGE

This Agreement is subject to the Living Wage Ordinance of the Oakland Municipal Code and its implementing regulations if it is for an amount of $25,000 or more, or if it is amended to increase the contract amount by $25,000 in any twelve month period thereafter.  The Ordinance requires among other things, submission of the Declaration of Compliance attached and incorporated herein and made part of this agreement, unless specific exemptions apply or a waiver is granted,

**Revision Date: 3/15/00**

that Contractor provide the following to its employees who perform services under or related to this Agreement:

1.  Minimum compensation - said employees shall be paid an initial hourly wage rate of $8.00 with health benefits or $9.25 without health benefits.  These initial rates shall be upwardly adjusted each year no later than April 1 in proportion to the increase at the immediately preceding December 31 over the year earlier level of the Bay Region Consumer Price Index as published by the Bureau of Labor Statistics, U.S. Department of Labor.

2.  Health benefits - said full-time and part-time employees paid at the lower living wage rate shall be provided health benefits of at least $1.25 per hour.  Contractor shall provide proof that health benefits are in effect for those employees no later than 30 days after execution of the contract or receipt of City financial assistance.

3.  Compensated days off - said employees shall be entitled to twelve compensated days off per year for sick leave, vacation or personal necessity at the employee's request and ten uncompensated days off per year for sick leave.  Employees shall accrue one compensated day off per month of full time employment.  Part-time employees shall accrue compensated days off in increments proportional to that accrued by full-time employees.  The employees shall be eligible to use accrued days off after the first six months of employment or consistent with company policy, whichever is sooner.  Paid holidays, consistent with established employer policy, may be counted toward provision of the required 12 compensated days off. Ten uncompensated days off shall be made available, as needed, for personal or immediate family illness after the employee has exhausted his or her accrued compensated days off for that year.

4.  Federal Earned Income Credit (EIC) - Contractor shall inform said employees who earn less than $12.00 per hour that he or she may be eligible for EIC and shall provide forms to apply for advance EIC payments to eligible employees.

5.  Contractor shall provide to all employees and to the Office of Contract Compliance, written notice of its obligation to eligible employees under the City's Living Wage requirements. Said notice shall be posted prominently in communal areas of the work site(s) and shall include information set forth in sections 1 through 4 above.

6.  Contractor shall provide all written notices and forms required above in English, Spanish or other languages spoken by a significant number of employees within 30 days of employment under this Agreement.

7.  Reporting - Contractor shall maintain a listing of the name, address, date of hire, occupation classification, rate of pay and benefits paid for each of its employees and submit a copy of the list to Contract Compliance by March 31, June 30, September 30, and December 31 of each year during the applicable compliance period. Failure to provide this list within five days of the due date will result in liquidated damages of five hundred dollars ($500.00) for each day that the list remains outstanding. Covered contractors, subcontractors and CFARs shall maintain payrolls for all employees and basic records relating thereto and shall preserve them for a period of at least four (4) after expiration of the  compliance period.

**Revision Date: 3/15/00**

8.  Contractor shall require subcontractors that provide services under or related to this Agreement to comply with the above Living Wage provisions. Contractor shall include the same or similar provisions as those set forth in sections 1 through 7 above in its subcontracts. Copies of said subcontracts shall be submitted to the Office of Contract Compliance.

Furthermore, contractor shall include the above requirements in its subcontracts for services related to this Agreement.

**Request for Proposals**

This contract is subject to the Living Wage Ordinance of the Oakland Municipal Code and its implementing regulations.  The Ordinance requires that, unless specific exemptions apply or a waiver is granted, all service contractors who receive contracts for $25,000 or more in any twelve month period, and recipients of City financial assistance of $100,000 in any twelve month period or more shall provide payment of a minimum level of compensation to employees who perform services under or related to the contract, project or program of $8.00 per hour if health benefits of at least $1.25 per hour are offered, or $9.25 per hour if no health benefits are offered. Such rate shall be adjusted annually pursuant to the terms of the Ordinance.

Under the provisions of the Living Wage Ordinance, the City shall have the authority, under appropriate circumstances, to terminate this contract and seek other remedies as set forth therein for violations of the Ordinance.

**REGULATION # 15:  AMENDMENTS**

These regulations may be modified or amended by the City Manager or his or her designee as he or she deems appropriate, consistent with the terms of the Ordinance.

**Revision Date: 3/15/00**

Exhibit 17

PORT OF OAKLAND

## Rules and Regulations for the Implementation and Enforcement of Port of Oakland Living Wage Requirements

## 1.    REGULATORY AUTHORITY

On October 16, 2001, the Board of Port Commissioners ("Board") adopted Port Ordinance 3666, requiring certain Port service contractors to pay "living wage" rates to their employees who work at the Port.  On March 5, 2002, voters of Oakland adopted Measure I, which enacted Section 728 of the Oakland City Charter to extend the Living Wage Laws to tenants of the Port and setting forth other requirements.  On October 22, 2002, the Board adopted Port Ordinance 3719 to amend Ordinance 3666 to incorporate the requirements of the Charter Provisions.

Section 10 of the Port Ordinance authorizes the Executive Director to adopt and promulgate regulations to implement and enforce the Port Ordinance.  The Social Responsibility Division (SRD) of the Port administers, monitors and enforces the Living Wage Laws.  When necessary to carry out its function, SRD may conduct inquiries and investigations to determine compliance with the Living Wage Laws.

## 2.    DEFINITIONS

The definitions set forth in the Living Wage Laws are incorporated herein. In addition, the following definitions shall apply for purposes of these Rules and Regulations (these "Regulations"):

2.1.    **"Charter Provisions"** shall mean Section 728 of Article VII of the City of Oakland City Charter.

2.2.    **"Complaint"** shall mean a report of an alleged violation of the Living Wage Laws.

2.3.    **Complainant"** shall mean a Person who files a Complaint under the Living Wage Laws.

2.4.    **"Contracting Division"** shall mean the Division at the Port entering into or amending an Agreement with a Port Contractor.

2.5.    **"Covered Employer"** shall mean a Port Assisted Business ("PAB") or a Service Contractor, which must pay living wage, unless other wise exempted.

2.6.    **"Eligible Employee"** shall mean an employee of a Covered Employer and who is not otherwise exempt from coverage by the Living Wage Laws.

2.7.    **"Health Benefits"** shall mean payment of or contribution towards medical, dental, optical, mental, death or disability insurance premiums or expense account made available to an Eligible Employee by a Covered Employer as part of employment compensation.

2.8.    **"Hearing"** shall mean hearing held of an appeal filed of a determination of violation or of remedial action pursuant to Section 20 of these Regulations.

2.9.    **"Living Wage Laws"** shall mean collectively, provisions of Section 728 of the Oakland City Charter and Port Ordinance 3666, as amended by Port Ordinance 3719, as well as all other resolutions of the Board of Port Commissions and rules and regulations of the Port for the implementation of said laws.

2.10.   **"Person"** shall include any natural person, corporation, partnership, limited liability company, joint venture, sole proprietorship, association, trust or any other entity.

2.11.   **"Port"** shall mean the Port of Oakland.

2.12.   **"Port-Assisted Business" or "PAB"** shall mean: (1) any Person involved in a Port Aviation or Port Maritime Business receiving in excess of $50,000 worth of financial assistance from the Port, and (2) any Port Contractor involved in a Port Aviation or Port Maritime Business if the person employs more than 20 employees per pay period in Port-Related Employment, unless in the prior 12 pay periods the person has not had more than 20 such employees and will not hire more than 20 persons in the next 12 pay periods.  A PAB shall be deemed to employ more than 20 persons if it is part of an 'enterprise' as defined under the Fair Labor Standards Act employing more than 20 persons.

2.13.   **"Port Aviation or Port Maritime Business"** shall mean any business that principally provides services related to maritime or aviation business related services or whose business is located in the maritime or aviation division areas as defined by the Port.

2.14.   **"Port Contract"** shall mean: (1) Any Service Contract; (2) Any contract, lease or license from the Port requiring payments to the Port expected to exceed $50,000 either (a) over the term of the contract, lease or license, or (b) during the next 5 years if the current term is less than 1 year but may be renewed or extended, either with or without amendment; (3) any subcontract, sublease, sublicense, management agreement or other transfer or assignment of any right, title or interest received from the Port pursuant to any of the foregoing contracts, leases or licenses.  A contract, lease or license with the Port or any agreement derived therefrom shall not be deemed a Port Contract unless entered into after April 25, 2002, or amended after April 25, 2002 to benefit in any way the party contracting with the Port. A tenancy agreement that was entered into on or before April 25, 2002 that has become a month-to-month tenancy agreement after November 1,

2002 shall be deemed a Port Contract if it meets the other minimum threshold requirements listed by Living Wage Laws.

2.15. **"Port Contractor"** shall mean a Person with a Port Contract.

2.16. **"Port-Related Employment"** shall mean employment by a PAB in providing service related to Port Maritime or Aviation Operation or working in Port Maritime or Aviation Areas.

2.17. **"Port Ordnance"** shall mean Port Ordinance No. 3666, as amended by Port Ordinance No. 3719.

2.18. **"Service Contract"** shall mean a contract with the Port to provide services to the Port under which services are to be performed on Port property and payments the Port is required to pay the contractor exceeds $50,000. A contract for the purchase or lease of goods, equipment, supplies, commodities or other property, or any services incidental to such property, is not a "service contract" for purpose of these regulations.

2.19. **"Service Contractor"** shall mean a Person with a Service Contract or any subcontractor to the Service Contractor to perform services under the Service Contract, who employs more than 20 persons per pay period in Port-Related Employment, unless in the prior 12 pay periods the Employer has not more than 20 such employees and will not hire more than 20 persons in the next 12 pay periods. A Person who is not a PAB subject to the provisions of the Charter Provisions may nonetheless be a Service Contractor subject to the Port Ordinance.

✓ *Example: A janitorial service company contracts with the Port to clean the Port Administration building, which is located on Port property but in neither the Aviation nor the Maritime operations areas. The company is a Service Contractor required to pay living wage under the provisions (and applicable exemptions) of the Port Ordinance even though the company is not a PAB involved in a Maritime or Aviation business.*

2.20. **"SRD"** shall mean the Social Responsibility Division of the Port.

2.21. **"Tenant"** shall mean an entity that enters into a Lease or other tenancy agreement with the Port of Oakland, for land under the jurisdiction of the Port.

2.22. **"Valid Collective Bargaining Agreement"** shall mean a collective bargaining agreement entered into between Port Contractor and a labor organization lawfully serving as the exclusive collective bargaining representative for such Port Contractor's employees.

2.23. **"Wages"** shall mean the amount paid to an employee as compensation for labor performed. This term does not include any amount paid to an employee not

directly related to the labor performed, such as allowances for parking, uniforms, and contributions to retirement plans. This term also does not include employer contributions through profit-sharing plans. Aside from an employee's hourly wages, wages may include commissions or tips earned by an employee only if the employer keeps accurate records verifying the amount paid to an employee for each pay period and reports such commission or tips for income tax purposes pursuant to the regulation of the Internal Revenue Service.

**3.     WHEN ARE THE LIVING WAGE LAWS EFFECTIVE?**

The Port Ordinance became effective October 16, 2001, and was later amended to conform to the Charter Provisions on October 22, 2002.  The Charter Provisions became effective April 25, 2002.

**4.     WHO ARE EXAMPLES OF "COVERED EMPLOYERS" THAT MUST COMPLY WITH LIVING WAGE LAWS?**

"Covered Employers" are defined under Section 2.5 of these Regulations.  Examples of Covered Employers include:

4.1.    An employer who receives direct assistance in the form of grants or financial subsidies from the Port in an amount exceeding $50,000 in any given fiscal year;

4.2.    A Service Contractor as defined in Section 2.18 of these Regulations;

4.3.    An employer with a Port Contract involved in a Port Aviation or Port Maritime Business who has more than 20 employees per pay period working on Port-Related Employment, including, but not limited to

- a tenant holding an eligible lease with the Port (see Section 5.2 of these Regulations) and any subtenant under the lease, and
- a concessionaire holding an eligible concession of the Port (See Section 5.3 of these Regulations) and any subconcessionaire under the concession.

**5.     WHAT ARE EXAMPLES OF THE TYPES OF CONTRACTS USUALLY COVERED BY THE LIVING WAGE LAWS?**

The types of contracts entered into by a PAB or a Service Contractor that are usually covered by the Living Wage Laws are:

5.1.    A Service Contract and any subcontract under such contract, if the contract or subcontract is
- for performance of services for the Port and at the Port, and
- one for which the Port is expected to pay more than $50,000 over the term of the contract.

5.2.  A lease (or sublease thereunder), tenancy agreement, use permit, right of entry or license (collectively, "Lease") for rent, occupancy or use of property under the Aviation or Maritime Division Jurisdiction, if the Lease is

- entered into, amended, renewed or extended (including holdover extensions and month-to-month tenancies) for the material benefit of the lessee after April 25, 2002 , and
- expected to pay more than $50,000 to the Port either over the life of the term of the Lease or, if the current term is less than one year with options to renew or extend, then during the next five years.

5.3.  Any other types of contract such as franchise or concession agreements with the Port's Aviation or Maritime divisions, or any subcontract under the contract, if the contract or subcontract is

- entered into, amended, renewed or extended (including holdover extensions and month-to-month renewals) for the material benefit of the contractor after April 25, 2002, and
- expected to pay more than $50,000 to the Port either over the life of the term of the contract or, if the current term is less than one year with options to renew or extend, them during the next five.

# 6.  WHAT TYPES OF CONTRACTUAL RELATIONSHIP WITH THE PORT WOULD NORMALLY *NOT* BE COVERD BY THE LIVING WAGE LAWS?

Considering the intent and provision of the Living Wage Laws and the general factual patterns of certain types of contracts, the following categories of agreements and contracts with the Port are generally not within the coverage of the Living Wage Laws. Notwithstanding the above, SRD in consultation with the Port Attorney's office, may determine that a particular contract in one of the following general categories is nonetheless subject to the Living Wage Laws for reasons that SRD in consultation with the Port Attorney's office shall provide in such determination.

### 6.1.  **Agreements Less Than $50,000.**

If a Person has entered into an agreement with the Port, the amount of which equals $50,000 or less payable from or to the Port, this agreement is generally not covered by Living Wage Laws.   In determining whether an agreement exceeds the $50,000 threshold, the SRD shall calculate the total amount of the agreement by adding together the amount provided for in the original agreement and all amendments, modifications, renewals, or extensions. An agreement previously exempt because it did not meet the monetary threshold may become subject to Living Wage Laws because an amendment, modification, renewal, or extension increases the total amount of the agreement. Such an amendment, however, must be for the purpose of conferring a benefit on the party contracting with the Port, and an increase in rent will not trigger coverage unless the amendment also confers a benefit to the party contracting with the Port.  If an agreement specifies a maximum amount to be expended, then SRD shall use the maximum amount

stated in the agreement to determine whether the agreement meets the monetary threshold.

6.2. **Agreements for Purchase of Goods, Equipment and Supplies**

The Living Wage Laws generally do not apply to the purchase of goods, equipment, supplies, commodities or other property or for guarantees, warranties, shipping, delivery, or initial installation of such goods. If a contract is for the purchase of both goods and services, then SRD shall make a determination whether the contract is primarily a goods contract or a service contract. If the former, Living Wage Laws do not apply; if the latter, the Living Wage Laws may apply. In determining what a contract is primarily for, SRD will consider the general nature of the contract, as well as how much of its cost is for goods, and how much for services.  If a contract's service and product components are clearly differentiated in the budget for a contract that includes both goods and services, then the Living Wage Laws may apply to the service component only.

6.3. **Legal Proceedings**

Contracts for the settlement of legal proceedings are exempt from the Living Wage Laws, and those for urgent or specialized litigation advice may be exempt from Living Wage Laws if it is in the best interests of the Port to exempt such contracts. The Port Attorney shall determine whether a contract is for the settlement of legal proceedings or for urgent or specialized litigation advice, and whether it would be in the best interests of the Port not to exempt such contracts from Living Wage Laws.

6.4. **Grant or Special Fund Expenditures**

Agreements involving the expenditure of grant or special funds received by the Port shall be considered not covered if the application of Living Wage Laws would violate the terms of the grant or any rule of the grantor agency that requires compensation lower than the living wage requirement; and/or, if the Port would be required to use Port's own monies to supplement the grant or special funds in order to maintain the current level of services, such agreement is generally not covered.

6.5. **Prevailing Rate of Wage**

Agreements under which the payment of prevailing rate of wage is required are generally not covered under Living Wage Laws if each Eligible Employee receives the prevailing rate, and if the prevailing rate is higher than the wage required by Living Wage Laws.

6.6.　**Trust Assets**

Agreements for the investment, management, or other use of investment account or bond trust funds is considered not covered by Living Wage Laws.

6.7.　**Port Employee Benefits**

Agreements to provide benefits to Port employees are not covered by Living Wage Laws where the Executive Director has determined that application of Living Wage Law to such an agreement would render the Port unable to provide a legally required employee benefit.

6.8.　**Investments With Fiduciary Requirements**

Agreements for the investment of Port monies where the Treasurer finds that requiring compliance with Living Wage Laws will violate the Treasurer's fiduciary duties and, for the investment of retirement, health or other funds held in trust pursuant to Charter, statute, ordinance or MOU, where the official or officials responsible for investing or managing such funds finds that requiring compliance with Living Wage Laws will violate their fiduciary duties, shall be considered not covered by Living Wage Laws. To effect this determination, the fiduciary must make its finding in writing and submit it to SRD.

6.9.　**Agreements Prior to Effective Date**

Agreements executed prior to April 26, 2002, are not covered under Living Wage Laws. A tenancy agreement that was entered into on or before April 25, 2002 that has become a month-to-month tenancy agreement after November 1, 2002 shall be covered under Living Wage Laws if it meets the requirements outlined in Regulation #5 of these Regulations.

**7.　HOW DOES A PORT CONTRACTOR OR SERVICE CONTRACTOR DETERMINE HOW MANY EMPLOYEES IT HAS FOR THE PURPOSE OF QUALIFYING AS A COVERED EMPLOYER?**

7.1.　The number of employees for the purpose of applying the Living Wage Laws is the number of employees in the current pay period.

7.2.　An employer may be deemed to not employ more than 20 employees in a pay period if that employer has not employed more than 20 employees over the last 12 pay-periods *and* will not have more than 20 employees in the next 12 pay periods. SRD is to make this determination based on payroll reports gathered from the business and to confirm the determination annually.

7.3.　If an employer has more than one Port Contract, but fewer than 21 employees working under any one of these contracts, the number of employees is the

aggregate of the number of employees working for the same employer under all of its contracts that would in all other respects qualify as a Port Contract covered under the Living Wage Laws.

7.4. For the purposes of this Section 7, an "employee" shall include any part-time or temporary employees working for the Port Contractor or Service Contractor (either employed directly or through an employment service).

## 8. FOR THE PURPOSE OF DETERMINING WHO IS A "PAB", WHAT DOES "INVOLVED IN A PORT AVIATION OR PORT MARITIME BUSINESS" MEAN?

A Person is involved in a Port Aviation or Port Maritime Business if:

- It is a business that *principally* provides services related to maritime or aviation operations, *or*
- It is located in the maritime or aviation division areas as defined by the Port.

✓ *Example:  An advertising company enters into a space use agreement to install advertising boards throughout aviation properties.  Installation and maintenance of these boards will require the employment of more than 20 employees who will commute onto Port Property job sites from the Company's off-airport offices in company cars and trucks.  The company will pay the Port more than $50,000 a year for the rental of the spaces.  The advertising company also enters into a space use agreement for an office space at airport division property where it maintains a small administrative staff to coordinate on the maintenance and installation of the boards.  The company is "located" on the Port's Aviation Division area.  Living Wage Laws applies.*

## 9. WHICH EMPLOYEES OF A COVERED EMPLOYER ARE EXEMPTED FROM COVERAGE BY THE LIVING WAGE LAWS OR ARE NOT "ELIGIBLE"?

The Charter Provisions and the Port Ordinance provide respective exemptions from coverage of certain classes of employees.  Therefore, even a Covered Employer generally need not pay wages required by the Living Wage Laws to employees exempted as follows:

9.1. An employee who spends less than 25 percent of his work time with the employer on Port-Related Employment, provided that a Covered Employer may not split an employee's working time between Port-Related Employment and non-Port Related Employment or place an employee on temporary employment for the purpose or with the intent of making the employee ineligible for coverage by the Living Wage Laws.

9.2. An employee younger than 21 years old employed by a nonprofit entity for after-school or summer employment or for training for a period not longer than 90 days.

9.3.   An employee participating in a bona fide temporary job training program in which a significant component of the employee's compensation consists of acquiring specialized knowledge, abilities or skills in a recognized trade;

9.4.   An employee of a Service Contractor on Port public works projects subject to the requirements of Division 2, Part 7, of the California Labor Code, or subject to the provisions of a comparable federal, state or local prevailing wage requirement.

## 10.   HOW IS A DETERMINATION MADE WHETHER AN EMPLOYER IS A "COVERED EMPLOYER"?

10.1.   SRD will assist a prospective Port Contractor in making the initial self-determination whether its Port Contract is subject to Living Wage Laws. The prospective Port Contractor shall notify SRD of its determination. SRD will review the prospective Port Contractor's Employer Self-Evaluation and Certificate of Compliance.   If SRD finds the prospective Port Contractor's determination correct, SRD will confirm and process the determination using the Living Wage Laws Determination form.

10.2.   In the event of a disagreement between SRD and the prospective Port Contractor, the prospective Contractor may request a conference with SRD.

10.3.   A Port Contract is presumed to be covered by the Living Wage Laws unless otherwise determined.

10.4.   If SRD and the prospective Port Contractor are unable to come to an agreement after the conference, the Executive Director will make a final determination. A prospective Port Contractor that refuses to agree to comply with Living Wage Laws after the Executive Director has determined that the prospective Port Contract is subject to Living Wage Laws shall be disqualified from entering into the Port Contract.

## 11.   DO THE LIVING WAGE LAWS AND REGULATIONS APPLY TO SUBCONTRACTORS?

A Person who is a subcontractor, sublessee, sublicensor or subconcessionaire to a Covered Employer, or who has a management contract or any other agreement that transfers to it any rights, title or interest received from the Port in order to do work on Port property or to occupy Port Property may also be a Covered Employer even though it has no direct contractual relationship with the Port. Covered Employers are required to inform all of its subcontractors and sublessees of Living Wage Laws obligations and to notify SRD of such subcontracts that are subject to the Living Wage Laws within 30 days of entering into such subcontracts.  A Covered Employer shall be responsible for insuring that its subcontractors or sublessees comply with the Living Wage Laws and these Regulations, reporting requirements and reporting to SRD and the cure of any violations.

12.    **WHAT IS THE REQUIREMENT FOR THE PAYMENT OF LIVING WAGE?**

12.1.    **Hourly Wage**

As of July 1, 2016, a Covered Employer must pay Eligible Employees either $14.86 per hour worked if the Employer does not claim credit for the provision of health benefits or at least $12.93 per hour worked if the employer does claim credit for the provision of health benefits.

12.2.    **Annual Adjustments to Living Wage Hourly Rate**

The minimum hourly wage is adjusted annually in accordance with the Living Wage Laws.  The City of Oakland publishes the adjusted Living Wage rate. The Covered Employer shall provide written notification of the rate adjustments to all of its eligible employees and make the necessary payroll adjustments by July 1st immediately following the publication of the adjusted wage rate. SRD will provide the adjusted Living Wage rates and the form of notice to be provided by the Covered Employers to their Eligible Employees.

12.3.    **Health Benefits Credit**

12.3.1. If the Covered Employer provides Health Benefits to the employee (or the employee's dependent(s)) of at least $1.93 per hour worked, the Covered Employer may pay at a lower hourly wage set for health benefits credit.  If an employee refuses or elects not to accept the Health Benefits provided, the Covered Employer may nonetheless claim the credit.

✓    *Example 1: Company A which contracts with the Port to provide security services to the Port hires at least 20 employees every month to patrol.  It is a Covered Employer that provides Health Benefits by paying the entire cost of health insurance.  For every employee, Company A pays an average of at least $2.00 per hour worked.  Company A is eligible for the health benefits credit and may pay the health benefit credit wage rate to each Eligible Employee.*

✓    *Example 2: Same as Example 1, except that Company A does not offer Health Benefits to recently-hired employee for a 3-months probationary period. During the probation period, Company A does not get the Health Benefits credit for the probationary period, and therefore must pay the full living wage rate to the probationary Eligible Employees.*

✓    *Example 3: Same as Example 1, except that Company A only pays for partial cost of the health insurance coverage and the employees must contribute the rest.  For certain Eligible Employees, Company A's contribution to the Health Benefits average less than $1.93 per hour worked as of July 1, 2016.  As to these employees, Company A must pay the full living wage rate.*

✓    *Example 4: Same as Example 1, except that employee B declines the Health Benefits because he receives better health care coverage under his wife's employer health care plan. Company A may claim the Health Benefit credit and pay Employee B the health benefit credit wage rate.*

  12.3.2. If a Covered Employer provides Health Benefits to Eligible Employees but does not pay for them on a per-hour basis, then upon the Covered Employer's request, the amount of the hourly credit against its wage obligation shall be the Port's reasonable estimate of the Covered Employer's average hourly cost to provide Health Benefits to its Eligible Employees in Port-related employment. The Covered Employer shall support its request with such documentation upon the reasonable request of the Port.

### 12.4.   Compensated Days Off

Employees shall be entitled to at least twelve (12) compensated days off for sick leave, vacation or personal necessity upon reasonable request.  Employees who work part time shall be entitled to accrue compensated days off in increments proportional to that accrued by full-time employees. Employees shall be eligible to use accrued days off after the first 6 months of satisfactory employment or consistent with employer policy, whichever is sooner.  Paid holidays, consistent with established employer policy, may be counted toward provision of the required 12 compensated days off.

## 13.   WHAT ARE THE "WORKER RETENTION" REQUIREMENTS OF THE CHARTER PROVISIONS?

The Charter Provisions require a Port-Assisted Business that replaces a prior PAB to offer employment to the "service employees" (not including managerial, supervisory, professional, paraprofessional, and confidential employees) of the replaced PAB. A PAB need only retain the employees of a prior PAB. If a PAB replaces a prior business that is not covered under the Charter Provision, the worker retention provision does not apply.

### 13.1.   Replacing a prior PAB

A PAB "replaces" another if it:

(1)  (a) assumes all or part of the lease, contract or subcontract of a prior PAB employer; or, (b) obtains a new lease or sublease within the same structure as the prior PAB's leasehold within 180 days after the prior PAB ceases to operate within the same structure or at the same location being occupied by the new PAB; or, (c) obtains a new contract for the same service provided to the Port by the prior PAB;

AND

(2)  Offers employment which employees of the prior PAB can perform.

Many of the Sections include "examples" for guidance in interpreting the language of the Section.  The following examples are proposed for inclusion into the Regulations after Section 13.1:

Example 1.  "same structure."  A new PAB in a structure unattached to the structure that contained a prior PAB does not "replace" the prior PAB.  Structures attached to one another are deemed to be the "same structure."  For example, Terminal One and Terminal Two at the Oakland International Airport are attached and, as such, are deemed to be the "same structure."

Example 2.  "ceases to operate."  A PAB does not qualify as a "prior" PAB unless and until it "ceases to operate."  A PAB "ceases to operate" when it permanently stops providing products or services in exchange for money within the subject structure or location.

Example 3.  "within 180 days after the prior PAB ceases to operate."  Where a lease or sublease is finally executed for an otherwise qualifying replacement PAB, that PAB would be deemed to "replace" a prior PAB if such execution occurs 180 days or less after the prior PAB ceases to operate.  Under certain circumstances, variances from the final lease execution date as the trigger for "replacement" timing is appropriate.  For example, where no lease or sublease is ever executed or where an otherwise qualifying replacement PAB commences to operate before a lease or sublease is executed, that PAB would be deemed to "replace" a prior PAB if such commencement of operations occurs 180 days or less after the prior PAB ceases to operate.  (A PAB "commences to operate" when it begins providing products or services in exchange for money within the subject structure or location.   An otherwise qualified replacement PAB would not "replace" a prior PAB if it finally executed its lease or sublease (or, where no lease or sublease has been executed, commenced operating) 181 days or more after the prior PAB ceased to operate).  Similarly, where the Port or an existing PAB announces that such existing PAB will cease operations (and become a "prior" PAB) in a matter of weeks or months, and an otherwise qualifying replacement PAB commences operations after the prior PAB ceases operations, the fact that the new PAB may have finally executed its lease before the prior PAB ceased operations, in reliance on representations the prior PAB would cease operations, should not preclude the new PAB from being considered as a replacement for the prior PAB.

Example 4.  "same location."  As discussed above, an otherwise qualified PAB may "replace" a prior PAB where the prior PAB ceases operations in the "same structure."  The "same location" language is designed to address those instances where the prior PAB may operate at multiple locations in the same structure, cease operations at one or more of those locations, but continue operating at one or more locations in the same structure.  For example, Prior PAB A operates 4 kiosks in the same structure.  Prior PAB A ceases operations at 1 of its kiosks but continues operating the other 3 kiosks in the same structure.  Replacement PAB B assumes operations of the 1 closed kiosk.  Assuming Replacement PAB B is an otherwise qualified replacement PAB, Replacement PAB B

would "replace" Prior PAB A at that 1 kiosk because it is operating at the "same location" as Prior PAB A, even though Prior PAB A has not ceased to operate at all locations within the same structure.

Example 5.  "contract for the same service."  This language is intended to cover PABs with contracts to provide services to the Port that do not have leases, subleases, or other agreements with the Port associated with the occupation of a specific space at the Port.

### 13.2. **90 Day Rule**

Only those service employees who have worked for the prior PAB for at least 90 calendar days must be retained.  The new PAB may not terminate the retained employees for 90 workdays except for just cause.

### 13.3. **Preferential Reinstatement List**

The new PAB may operate at lower staffing levels than its predecessor PAB.  In such instance, the new PAB shall place the employees of the predecessor PAB who are not retained on a preferential reinstatement list based on seniority and shall notify SRD in writing of the number of employees comprising the lower staffing levels.  The new PAB will be responsible for notifying SRD promptly of any change in its anticipated staffing levels and SRD will work with the PAB to determine ongoing compliance with the Charter Provision's worker retention policy.

In the instance that the new PAB has its own current employees to perform the work for which it is replacing the predecessor PAB, the new PAB must hire from a combined reinstatement list of both its own employees and those of the predecessor PAB in order of seniority.  The new PAB must hire the employees with the most seniority first.

## 14.   WHAT ARE THE REPORTING AND RECORD-KEEPING REQUIREMENTS?

Each Covered Employer must maintain and keep payroll records for each Eligible Employee, submit quarterly payroll reports to the Port, and provide labor representatives certain access to work sites and information.

### 14.1. **Covered Employer Maintenance of Payroll Records**

Each Covered Employer shall maintain for each Eligible Employee records and information to demonstrate compliance with the Living Wage Laws.  For each Eligible Employee, the Covered Employer shall maintain the following information for at least three years:
- Name
- Address
- Date of hire

- Job classification
- Rate of pay
- Paid and unpaid time off (accrued and taken)
- Hours worked on a Living Wage Laws contract, for each pay period in which an employee works.
- Hourly value of health benefits provided.

## 14.2.  Covered Employer Reporting to Port

Each Covered Employer shall submit a copy of payroll records for Eligible Employees to the Port's Social Responsibility Division on a quarterly basis at least by March 31, June 30, September 30 and December 31st of each year unless the Covered Employer has employed less than 20 persons during the preceding quarter, in which case the Covered Employer need only submit a copy of such records every December 31st or at the end of any quarter in which the number of employees rises above 20. For purposes of Living Wage Laws and these Regulations, the "preceding quarter" means the quarter immediately preceding the relevant payroll report deadline. Failure to provide a copy of such records within five days of the due date will result in a penalty of five hundred dollars ($500.00) per day, levied and assessed by the Port, and collected by SRD pursuant to procedures set forth in Section 20 of these Regulations.

14.2.1. SRD may allow a Covered Employer to submit required payroll schedules with numerical codes instead of employee names and addresses to protect the privacy of the Eligible Employees, upon request from the Covered Employer or Eligible Employees. A Covered Employer is required to maintain the key to any such codes used and to provide this list upon reasonable request from an authorized Port representative if the key is necessary in any monitoring or investigation of the Covered Employer's compliance with Living Wage Laws.

14.2.2. Upon the reasonable request of the Port, a Covered Employer shall permit access to work sites and relevant payroll records to authorized Port representatives for the purpose of monitoring compliance with Living Wage Laws and these Regulations or investigating Complaints and evaluating the operation and effects of these Regulations, including the production for inspection and copying of its payroll records for any or all persons employed by the Covered Employer.

14.2.3. For purposes of Living Wage Laws and these Regulations, a "reasonable request" for documents or inspection shall include those requests that give the Covered Employer a reasonable amount of time for a response, and that allow a Covered Employer to protect employee confidentiality without interfering with information necessary to respond to the request.

### 14.3.   PAB permitting labor representatives access to workforce

Upon reasonable request, each PAB shall permit a representative of the labor organizations in its industry to have access to its workforce at the Port during non-working time and in non-work areas for the purpose of ensuring compliance with the Living Wage Laws.

## 15.   NOTICE OF EMPLOYEE RIGHTS ARE REQUIRED

Each PAB shall give written notification to each current employee working at Port-Related Employment, and to each new employee working at Port-Related Employment at time of hire, of his or her rights under the Living Wage Laws and these Regulations. The notification shall be in the form provided by the Port in English, Spanish and other languages spoken by a significant number of the employees working at Port-Related Employment, and shall also be posted prominently in areas at the work site where it will be seen by all such employees. The notice shall also inform each employee who makes less than twelve dollars ($12.00) per hour of his or her possible right to the federal Earned Income Credit ("EIC") under Section 2 of the Internal Revenue Code of 1954, 26 U.S.C. §32.

## 16.   RETALIATION AND DISCRIMINATION ARE PROHIBITED

A Covered Employer shall not discharge, reduce the compensation of or otherwise discriminate against any person for making a Complaint to the Port, participating in any of its proceedings, using any civil remedies to enforce his or her rights, or otherwise asserting his or her rights under the Living Wage Laws and these Regulations. Should an authorized Port representative find that a Covered Employer has retaliated or discriminated against an employee for using the remedies as set forth in the Living Wage Laws, the Covered Employer will be found to be in violation of Living Wage Laws and subject to any penalties that may be assessed against a Covered Employer under the Living Wage Laws. The Port may also find the Covered Employer to be in breach of its Port Contract with the Port and subject to any penalties assessed pursuant to the terms of the Port Contract, termination of such agreement or other remedies available in law or equity.

## 17.   MAY AN EMPLOYEE WAIVE HIS OR HER OF RIGHTS UNDER LIVING WAGE LAWS?

Any waiver by an Eligible Employee of any of the provisions of the Living Wage Laws or these Regulations shall be deemed contrary to public policy and shall be void and unenforceable, except that employees shall not be barred from entering into a written Valid Collective Bargaining Agreement waiving a provision of the Living Wage Laws if such waiver is set forth in clear and unambiguous terms. Any request to an Eligible Employee by a Covered Employer to waive his or her rights under this Section shall constitute a violation of Living Wage Laws.

18.    **HOW MAY A COVERED EMPLOYER APPLY FOR A WAIVER OF THE LIVING WAGE REQUIREMENTS?**

The Board of Commissioners, in its discretion, may grant waiver of the living wage requirements upon application by a Covered Employer in accordance with Living Wage Laws and with these Regulations.

18.1.    **Waiver Procedures**

If a Covered Employer contends it is unable to pay all or part of the living wage, it shall submit an application for waiver and all required documents to support its request for waiver.  The Executive Director may then recommend to the Board as to whether to grant the waiver.

18.2.    **Criteria for Grant of Economic Hardship Waiver**

The Living Wage Laws sets forth the requirements under which a Covered Employer may qualify for a waiver from the application of Living Wage Laws' provisions. These are:

18.2.1.    A Covered Employer requesting a waiver must provide a detailed explanation in writing to the Executive Director. The explanation must set forth the reasons for the employer's inability to comply, including a complete cost accounting for the proposed work to be performed with the financial assistance sought, including wages and benefits to be paid all employees, as well as an itemization of the wage and benefits paid to the five highest paid individuals employed by the employer.   The employer must also demonstrate that the waiver will further the public interests in creating training positions which will enable covered employees to advance into permanent living wage jobs or better and will not be used to replace or displace existing positions or employees or to lower the wages of current employees.

18.2.2.    The Board will grant a waiver only upon a finding and determination that the Covered Employer has demonstrated the necessary economic hardship and that waiver will further the public interests in providing training positions which will enable employees to advance into permanent living wage jobs or better.   No waiver will be granted, however, if the effect of the waiver is to replace or displace existing positions or employees or to lower the wages of current employees.

18.2.3.    Waivers are disfavored, and will be granted only where the balance of competing interests weighs clearly in favor of granting the waiver.  If waivers are to be granted, partial waivers are favored over blanket waivers.  Moreover, any waiver shall be granted for no more than one year.  At the end of the year the employer may reapply for a new waiver

which may be granted subject to the same criteria for granting the initial waiver.

### 18.3. Emergency Waivers

If a Port Contract is one for service in response to a public emergency, the Executive Director of the Board may waive the requirements of Living Wage Laws if and only if there is no contractor willing to comply with Living Wage Laws who is capable of responding to the emergency.

### 18.4. Bulk Purchasing Waiver

If the services to be purchased under a Port Contract are part of a bulk purchasing arrangement with another governmental entity, the arrangement will substantially reduce the cost to the Port, and such arrangement is in the best interests of the Port or the public, then the Executive Director may waive the requirements of Living Wage Laws.

### 18.5. Collective Bargaining Waiver

Employees who are parties to a valid Collective Bargaining Agreement may collectively waive their rights under the Living Wage Laws.  Such waiver must be evidenced by explicit statement of waiver in the collective bargaining agreement or other written instrument.

### 18.6. Appeal of a Waiver Decision

Any party who objects to the grant of a waiver by the Board may appeal such decision to the City/Port Liaison Committee, who may deny such waiver. Similarly, any party who objects to the rejection of a waiver may appeal such decision to the City-Port Liaison Committee, who may grant such waiver.

## 19.   WHAT IS THE EFFECT OF AMENDMENTS OR RENEWALS OF AGREEMENTS OR CONTRACTS THAT HAVE NOT BEEN SUBJECT TO LIVING WAGE LAWS?

In some cases, an agreement that is not subject to Living Wage Laws may become subject to the Living Wage Laws when that agreement is amended or renewed. If an Agreement is amended or renewed, the amended or renewed agreement shall be reviewed by SRD in the same manner set forth above for reviewing all other Agreements for determining applicability of the Living Wage Laws; provided however "amendment" for the purposes of the Living Wage Laws shall trigger review for applicability only if the amendment confers some benefit on to the party contracting with the Port that the party would not have received without the amendment.

**20.    WHAT STEPS WILL SRD TAKE TO MONITOR, INVESTIGATE AND ENFORCE COMPLIANCE?**

It is the policy of SRD that Complaints be resolved through informal consultation, conflict resolution and continued monitoring.  Contracting divisions, Covered Employers and Eligible Employees shall notify SRD of any Complaints and any proposed resolution of said Complaint. SRD may investigate Complaints whether on referral or on its own initiative.

20.1.    **Employer Monitoring**

SRD will monitor the operations of employers with Port Contracts with the Port to ensure compliance by conducting on-site visits and payroll audits. Employers shall cooperate with SRD when a meeting, a site visit, or documentation is requested by SRD as part of its review by providing (1) full access to the work site for employer and employee interviews; (2) full access to certified payrolls, timesheets, benefit statements, employee policy manuals, and any other document that would assist SRD in determining if an employer is providing or has provided the wages and benefits required by Living Wage Laws.

20.2.    **Complaint**

Any employee of a Covered Employer (or a representative of an union legally representing the employee) may file a Complaint in writing with the Living Wage Compliance Officer in SRD for any alleged violation of the Living Wage Laws by a Covered Employer.  The Complaint must be filed within one years after the occurrence of the last alleged violation and shall contain:

- name and contact information of Complainant,
- name of employer allegedly in violation of Living Wage Laws,
- identification of the provision of the Living Wage Laws allegedly violated,
- attestation and signature that the Complaint is true and accurate, and
- specific allegation of facts that constitute violation of the Living Wage Laws.

SRD may determine a Complaint filed after one year after the occurrence of the last violation is timely filed if the Complainant provide in writing good cause for a late submission.  Reasons for good cause may include but are not limited to, failure to comply by the Covered Employer with Living Wage Laws notice requirements, or a reasonable fear of retaliation.

20.3.    **Investigation**

SRD will investigate any Complaint SRD deems to be complete and timely pursuant to Section 20.2, or may initiative investigation on its own, in the following manner:

20.3.1. SRD will notify in writing the subject Covered Employer of the Complaint and investigation (including the nature of the investigation and the specific violations being investigated) and will take any reasonable step, including reviewing records and information provided for under Section 14 of these Regulations, interviewing the Covered Employer, Complainant, the Contracting Division, employees of the Covered Employer and other Persons as reasonably necessary.  The Investigator shall provide the Covered Employer an opportunity to respond to the Complaint or investigation.

20.3.2. The Covered Employer against whom a Complaint is lodged or an investigation initiated, may respond to the Complaint or the investigation in writing within 30 days from the date that SRD informs it in writing of the Complaint and investigation.

## 20.4.  Determination of Violation

Upon the conclusion of the investigation, SRD will make a report of finding as to whether a violation of Living Wage Laws has occurred and facts supporting such findings. The report shall be in writing and shall include recommendations as to the appropriate remedial action that SRD should take:

## 20.5.  Employer's Failure to Reasonably Cooperate with Investigation

If an employer unreasonably fails to produce requested documentation, fails to allow access to the work site or the employees for employee interviews, or otherwise unreasonably fails to cooperate with SRD in any investigation, then SRD may consider it to be out of compliance with Living Wage Laws. In addition to the remedies provided in Living Wage Laws, SRD may request that the Port withhold any payments due to the employer until the employer cooperates.

## 20.6.  Notice to Employer and Complainant

Within 30 days of SRD's issuance of its report of finding pursuant to Section 20.4 of these Regulations, SRD issues a "Notice of Determination" to the Complainant and the alleged violator of its determination and of each party's right to administrative appeal.  If SRD determines that a Covered Employer has violated the Living Wage Laws and these Regulations, the notice shall provide that the Covered Employer has 30 working days to correct the violation, including payment of back wages to any Eligible Employee or restitution of benefits owing to the Eligible Employee under the Port Ordinance and these Regulations. SRD may, at its discretion, allow the Covered Employer additional time beyond the 30 working days to make the corrections if the Covered Employer demonstrates in writing to SRD that it has made a good faith effort to comply. SRD will notify the Contracting Division of the Covered Employer's failure to comply with Living Wage Laws and of the deadline by which corrections must be made.

20.7.   **Failure to Correct or Comply**

If the violation or failure to comply continues beyond the 30 working days (with any applicable extensions) and SRD has determined that the Covered Employer in violation has not made a good faith effort to remedy the violation, SRD will issue a "Notice of Remedial Action" to Covered Employer and the Complainant informing each Party of SRD's intention to take remedial action and each party's right of appeal.  Remedial Actions may include:

As to all Port Contractors:

- Suspension and/or termination of  any Port Contract;
- $500 per day that a Covered Employer fails to submit records required to be submitted to the Port pursuant to §13.2 of these Regulations; or

As to Service Contractors only:

- Withholding from the Service Contractor of all sums due to the Covered Employer from Port under the Service Contract subject to the Port Ordinance;
- Deeming any Service Contractor ineligible for future Port contracts;
- Imposition of a fine of $500 per week per Employee that any Service Contractor subject to the Port Ordinance is found to be in violation of the Living Wage Laws;
- Payment of wages to affected Eligible Employees of any Service Contractor subject to the Port Ordinance or back wages or restitution of benefits that Eligible Employees of any Service Contractor are entitled to under the Port Ordinance.

SRD shall determine the appropriate remedial action, taking into consideration the length and extent of the violations, the number of Eligible Employees affected, the Covered Employer's efforts to correct the violations and other relevant factors.

20.8.   **Administrative Appeal and Review**

20.8.1. A Covered Employer and/or the Complainant may file an appeal of SRD's determination of violation within 30 days of the date of the Notice of Determination of Violation or Notice of the Remedial Actions.  The appeal must be in writing setting forth the name, address, and phone number of the appellant, the date of the initial Complaint, the date of the Notice of Determination or Notice of Remedial Actions appealed, summary of the specific facts and provisions of the Living Wage Laws that support the appeal, and, if applicable, a proposed restitution and/or remedy.

20.8.2. A determination of violation or remedial action shall be final if no appeal is filed within the appeal period permitted under subsection 20.8.1 above.

20.9. **Appeal Hearing**

20.9.1. Within 30 days of the receipt of a written appeal that SRD deems to be complete, SRD shall make reasonable attempts to schedule an appeal Hearing at a time that is convenient to all parties. SRD shall notify the Complainant, the employer that is the subject of the Complaint and Contracting Division of the time and place of scheduled Hearing. Such notification shall be made in writing no later than 10 days before the date of the Hearing.

20.9.2. SRD shall appoint a Hearing Officer who shall be capable of conducting the hearing and rendering a decision in any impartial manner (who may be an employee of the Port, but not of SRD or the Contracting Division). Attendance by the appellant or a representative of the appellant designated in writing by the appellant shall be mandatory. If the appellant or designated representative fails to attend a Hearing without good cause, the appellant shall be deemed by the Hearing Officer to have withdrawn the request for a Hearing and the appealed determination by SRD shall be upheld. If any other noticed party other than the appellant fails to attend a properly-noticed Hearing without good cause, the hearing may be held in the party's absence and the absent party shall be deemed to have waived its right to attend and testify at the Hearing.

20.9.3. The Hearing Officer shall open the Hearing, stating the date and time, and identifying the parties present. The Hearings shall be conducted informally for the purpose of accurately determining the facts of the dispute. Each noticed party shall have the opportunity to present documentation to the Hearing Officer who will set forth the procedure for the presentation of evidence. The Hearing Officer shall have the discretion to allow evidence that may not be admitted in a court of law, but may disallow testimony or evidence that he or she deems in his or her discretion to be irrelevant, prejudicial, inflammatory or otherwise not probative of the issues relevant to the appeal. The Hearing Officer may in his or her discretion continue the Hearing to another time in order to receive further evidence or testimony he or she deems relevant to the disposition of the appeal.

20.9.4. Within 30 days of the close of the Hearing, the Hearing Officer shall issue to the appellant, the Complainant, the employer that is the subject of the Complaint and Contracting Division a written decision granting or denying the appeal and issuing any appropriate remedy for any violation by a Covered Employer.

20.9.5. The decision of the Hearing Officer shall be final and shall designate a deadline for compliance with the decision, if any compliance is needed. Failure to comply with a determination made by a Hearing Officer within the time period given in the decision may subject the noncompliant party to further fines or penalties.  Further actions by parties other than the Port may only be taken at the discretion of the Board of Commissioners or as provided for in Living Wage Laws, through the Superior Court of the State of California.

Exhibit 18

# DAVIS MUNICIPAL CODE

**Davis Municipal Code**

## 15.20.060 Compensation.

Except as otherwise provided in this article, an employer subject to this article shall provide its covered employees the following minimum compensation:

(a)  **Living wages.** The employer shall pay each employee an hourly wage of not less than eleven dollars, provided that the employer also provides a minimum of one dollar and fifty cents per hour per employee towards an employee health benefits plan or equivalent. If the employer does not provide employees with such a health benefits plan, the employer shall pay each employee an hourly wage of not less than twelve dollars and fifty cents. The hourly wage rate will be adjusted annually pursuant to subsection (d) below.

(b)  **Time-off.** Employees shall be entitled to at least twenty-two days off per year for sick leave, vacation, or personal necessity in addition to any other time off granted employees under federal and/or state leave laws. Twelve of the required days off shall be compensated at the same rate as regular compensation for a normal working day. Ten of the required twenty-two days may be uncompensated days off. Employees who work part-time shall be entitled to accrue compensated days off in increments proportional to that accrued by full-time employees. Employees shall be eligible to use accrued days off after the first six months of satisfactory employment or consistent with employer policy, whichever is sooner. Paid holidays, consistent with established employer policy, may be counted toward provision of the required twelve compensated days off. Compensation for paid leave for part-time on-call employees, pro-rated as described herein above, shall be provided as premium pay twice a year to employees who worked a minimum of five hundred and twenty hours in the previous six months.

(c)  **Additional compensation permissible.** Nothing in this article shall be construed to limit an employer's discretion to provide greater wages or time-off to its employees.

(d)  The initial rates set forth in subsection (a) above shall increase annually, effective July 1st, in accordance to reflect increases during the preceding year in the Consumer Price Index for All Urban Consumers in the San Francisco-Oakland-San Jose (CPI-U), as published by the U.S. Department of Labor, Bureau of Labor Statistics. (Ord. 2327 § 1, 2008; Ord. 2390 § 36, 2012)

View the mobile version.

# EMERYVILLE MUNICIPAL CODE

**5-32.1.1 Minimum Requirements.**

No corporation, entity or person may operate a large hotel (as defined in Section 5-32.1.3) without annually obtaining a permit from the City, which shall be granted upon a showing that the following conditions will be followed:

(a)   Minimum Wages. Large hotels shall ensure that employees receive compensation of at least the following:

(1)   Minimum Compensation. The minimum compensation for each employee shall be at least nine dollars ($9.00) per hour.

(2)   Minimum Average Compensation. The average compensation of all employees in the hotel during a calendar year shall be at least eleven dollars ($11.00) per hour.

(3)   Credit for Health Benefits. "Compensation" shall be defined herein as wages (or salary) and health benefits. If employer contributions for health benefits are not paid on an hourly basis but the hotel nonetheless wishes a credit for such payments, the hotel shall present data to the City concerning hours worked and health contributions made, and the City Manager or his designee shall estimate the value of such benefits on an hourly basis.

(4)   Inflation Adjustments. The above rates shall be upwardly adjusted annually, no later than March 1, in proportion to the increase during the preceding calendar year in the region's Consumer Price Index published by the U.S. Bureau of Labor Statistics. No later than February 1 each year, the City shall distribute a notice reporting the amount of such increase to any person who has filed with the City a request for such notice.

(b)   Protection of Employees from Unjust Discharges When a New Employer Takes Over.

(1)   If there is a sale of the hotel or other change resulting in a new person or entity taking over as an employer at the hotel (such as subcontracting, subleasing, or replacement of subcontractor, lessee or sublessee), then the new employer shall retain all employees of the prior employer for at least ninety (90) calendar days unless there is reasonable and substantiated cause not to hire or to discharge such employee based on that employee's performance or conduct. The fact that an employee previously enjoyed certain wages, benefits or working conditions does not provide cause for not employing him or her.

(2)   In the event of layoff during the first ninety (90) days of the new employer's operation, the laid-off employee shall be entitled to reinstatement should any position open up at the hotel within the following twenty-four (24) months which the employee can perform. Upon reinstatement, such employee must be given a trial period of at least ninety (90) days during which he or she can only be discharged for cause as defined in subsection (b)(1) of this section.

(3)   A finding of cause for an employee's discharge made in a grievance procedure established by collective bargaining agreement shall be binding under subsection (b)(1) of

this section, and the term "cause" in subsection (b)(1) of this section shall be construed in accordance with judicial and arbitral precedent defining "just cause" for discharge.

(4)   The right to retention herein does not include the right to retain supervisory or management responsibilities.

(c)   Workload Standards for Room Cleaners. Employees working as room cleaners shall be paid at least time-and-a-half the minimum average compensation set forth above for all time worked in a day if required to clean rooms amounting to more than five thousand (5,000) square feet of floor space in an eight (8) hour workday. For any room cleaner working less than eight (8) full hours per day, this maximum floor space shall be prorated evenly according to the actual number of hours worked. When a room cleaner is assigned in an eight (8) hour workday to clean any combination of seven (7) or more checkout rooms or rooms with additional beds such as cots or rollaways, this maximum floor space shall be reduced by five hundred (500) square feet for each such checkout or additional bedroom over six (6).

(d)   Paid Leave for Jury Duty. Each large hotel shall ensure that employees are provided with paid leave for jury duty. The pay during such leave shall be at least the employee's regular rate of pay as defined by the Fair Labor Standards Act.

(e)   Compliance with Enforcement Provisions. Hotel compliance with the enforcement provisions set forth in Section 5-32.1.4 shall also be a condition for a permit.

(Sec. 3 (part), Ord. 08-005, eff. Sep. 18, 2008)

# FAIRFAX MUNICIPAL CODE

## § 8.56.020  LIVING WAGE REQUIREMENT.

(A)  Covered employees shall be paid a living wage.

(B)  The "living wage" to be paid to employees pursuant to the requirements of this chapter shall be a minimum hourly wage of $13 with employer sponsored benefits or $14.75 without employer sponsored benefits, until adjusted by further action of the Town Council annually after consideration of the annual cost of living increase as measured by the San Francisco Bay Area Consumer Price Index.  Any adjustments made to the minimum hourly wage shall become effective the following July 1.

(C)  (1)  "Benefits," as used in this section, means all of the following at a minimum, provided by employer:  12 days compensated sick and vacation leave (combined) annually for full-time employees, prorated for employees working less than full-time; payment of at least $1.75 per hour toward health insurance for the employee.

     (2)  No covered employer will fund wage increases required by this chapter, or otherwise respond to the provisions of this chapter, by reducing the health insurance, pension, vacation or other non-wage benefits of any of its employees.

(D)  Amendments to this chapter concerning the definition of living wage shall apply to contracts entered into or extended following the effective date of the amendments.

(Ord. 691, passed 8-6-2002)

# HAYWARD MUNICIPAL CODE

Hayward Living Wage Ordinance (Hayward Muni. Code §§ 2-14.010 et seq.

SEC. 2-14.010 - TITLE AND DEFINITIONS.

The regulations in this Article may be referred to as the Hayward Living Wage Ordinance (hereafter "Ordinance"). The terms used herein are subject to the following definitions:

(a) "City" means the City of Hayward and its employees and officials, including those City employees authorized to award a service contract on the City's behalf.

(b) "City Manager" means the City Manager and his/her delegates and representatives.

(c) "Employee" means any individual employed by a service contractor on or under the authority of any contract for services with the City or proposal for such contract.

(d) "Health Benefits" means the payment of no less than one dollar and twenty-five cents ($1.25) per hour toward the cost of health and medical care insurance for employees and their dependents.

(e) "Person" means any individual, proprietorship, partnership, joint venture, corporation, limited liability company, trust, association, or other entity that may employ individuals or enter into contracts.

(f) "Service Contract" means any contract with the City, including a purchase order, for an expenditure in excess of twenty-five thousand dollars ($25,000.00), for any of the following services:

(i) Automotive repair and maintenance,

(ii) Facility and building maintenance,

(iii) Janitorial and custodial,

(iv) Landscaping,

(v) Laundry services,

(vi) Temporary personnel,

(vii) Pest control,

(viii) Security services, or

(ix) Social Service Agencies.

(g)    "Service Contractor" shall mean any contractor who seeks or has been awarded a Service Contract subject to this Ordinance. For the purposes of this Ordinance, the term "Service Contractor" shall include all subcontractors retained by a contractor to perform any or all of the functions covered by a Service Contract subject to the herein contained regulations.

(h)    "Social Service Agency" shall mean any organization receiving funds from the City as a result of a process involving the Human Services Commission.

# LOS ANGELES MUNICIPAL CODE

**SEC. 184.04.  ENFORCEMENT.**

A.    A Hotel Worker claiming violation of this article may bring an action in the Superior Court of the State of California, as appropriate, against a Hotel Employer and may be awarded:

    1.    For failure to pay Service Charges required by this article - Service Charge reimbursement for each violation.

    2.    For retaliatory action - reinstatement, back pay, Service Charge reimbursement or other equitable relief the court may deem appropriate.

    3.    For Willful Violations, the amount of monies to be paid under Paragraphs 1 and 2 shall be trebled.

B.    If a Hotel Worker is the prevailing party in any legal action taken pursuant to this article, the court shall award reasonable attorney's fees and costs as part of the costs recoverable.

C.    Notwithstanding any provision of this Code or any other ordinance to the contrary, no criminal penalties shall attach for violation of this article.

# MARIN COUNTY CODE

**Marin County Code of Ordinances 2.50 *et seq*. (Living Wage)**

2.50.050 - Living wage rate.

(a)     The County of Marin, contractors and subcontractors shall pay employees a living wage for services financed by county funds for the time those employees are engaged in providing services to the county. As used in this section, the "living wage" means, for the period January 1, 2015 through December 31, 2015, no less than eleven dollars and forty cents per hour with health benefits, otherwise no less than thirteen dollars per hour, if the contractor or subcontractor does not provide health benefits. The living wage shall adjust annually thereafter in accord with subsections (c), (d) and (e) of this section. Because in-home supportive services (IHSS) providers are paid by the state of California, any increase in the living wage for IHSS providers shall be effective for the period January 1, 2015, or at the earliest possible date thereafter that the change may be implemented by the IHSS public authority.

(b)     Health benefits required by this section shall consist of the payment of at least one dollar and fifty cents per hour towards the provision of health care benefits for the employee and his/her dependents. The contractor or subcontractor must provide written proof of the provision of such benefits to the county purchasing agent or other awarding authority during the procurement or contracting process.

  (1)     Health benefits and wages for IHSS providers are governed by agreement between the In-Home Supportive Services Public Authority of Marin and Service Employees International Union Local 2015, in consultation with the county of Marin, which certifies available funds.

(c)     The wage rates required in subsection (a) of this section shall be adjusted annually, effective January 1, to reflect the increase during the preceding year in the Consumer Price Index for all urban consumers in the San Francisco-Oakland-San Jose Consolidated Metropolitan Statistical Area, as published in October of each year by the U.S. Department of Labor, Bureau of Labor Statistics. These annual Consumer Price Index adjustments to the wage rate will be increased up to a wage rate of fifteen dollars per hour. The adjustment shall be rounded to the nearest five cent increment; shall become effective every January 1 without need for the board of supervisors to annually adopt an ordinance; and shall be posted by the county administrator on its website for the notice of all county departments, contractors and subcontractors.

(d)     Notwithstanding the foregoing, based upon financial conditions the county administrator may recommend, and the board of supervisors may take action to

direct, that a wage adjustment per subsection (c) above will not occur for the ensuing calendar year, applicable to all eligible workers. For any calendar year for which a COLA were not to occur, any COLA adjustment applicable to the following calendar year shall be limited to the annual consumer price index change related to cost increases over the previous one-year period consistent with subsection (c) of this section.

(e)     In addition, if the state of California or the federal government significantly reduces or modifies its percentage of participation in the IHSS program, resulting in a significant increase in net county cost, the board of supervisors may take action to direct that the living wage ordinance be adjusted by reducing or modifying the living wage.

(Ord. 3465 § 1 (part), 2006; Ord. 3460 § 1, 2006; Ord. 3435 (part), 2005)

(Ord. No. 3507, § I, 2008; Ord. No. 3621, § I, 2014; Ord. No. 3657 , § I, 2016)

# OAKLAND MUNICIPAL CODE

Oakland Living Wage Ordinance (Oakland Municipal Code § 2.28 *et seq.*)

2.28.030 - Payment of minimum compensation to employees.

A.    Wages. Employers shall pay employees a wage to each employee of no less than the hourly rates set under the authority of this chapter. The initial rate shall be eight dollars ($8.00) per hour worked with health benefits, as described in this chapter, or otherwise nine dollars and twenty-five cents ($9.25) per hour. Such rate shall be upwardly adjusted annually, no later than April 1st in proportion to the increase immediately preceding December 31st over the year earlier level of the Bay Region Consumer Price Index as published by the Bureau of Labor Statistics, U.S. Department of Labor, applied to nine dollars and twenty-five cents ($9.25). The city shall publish a bulletin by April 1st of each year announcing the adjusted rates, which shall take effect upon such publication. Such bulletin will be distributed to all city agencies, departments and offices, city contractors and CFARs upon publication. The contractor shall provide written notification of the rate adjustments to each of its employees and to its subcontractors, who shall provide written notices to each of their employees, if any, and make the necessary payroll adjustments by July 1st.

B.    1.    Compensated Days Off. Employers shall provide at least twelve (12) days off per year for sick leave, vacation, or personal necessity at the employee's request. Employees shall accrue one compensated day off per month of full-time employment. Part-time employees shall accrue compensated days off in increments proportional to that accrued by full-time employees. The employees shall be eligible to use accrued days off after the first six months of employment or consistent with company policy, whichever is sooner. Paid holidays, consistent with established employer policy, may be counted toward provision of the required twelve (12) compensated days off.

2.    Employers shall also permit employees to take at least an additional ten days a year of uncompensated time to be used for sick leave for the illness of the employee or a member of his or her immediate family where the employee has exhausted his or her compensated days off for that year. This chapter does not mandate the accrual from year to year of uncompensated days off.

C.    Health Benefits. Health benefits required by this chapter shall consist of the payment of at least one dollar and twenty five-cents ($1.25) per hour towards the provision of health care benefits for employees and their dependents. Proof of the provision of such benefits must be submitted to the agency not later than

thirty (30) days after execution of the contract to qualify for the wage rate in subsection (A) of this section for employees with health benefits.

(Ord. 12050 § 3, 1998)

# PASADENA MUNICIPAL CODE

## Pasadena Living Wage Ordinance (Pasadena Muni. Code §§ 4.11 *et seq.*)

4.11.010 - Definitions.

The following definitions shall apply throughout this chapter:

A.    "City" means the city of Pasadena and all those employed by the city who are authorized to award a service contractor on behalf of the city, including those city departments which exercise independent control over their expenditure of funds, but excludes the Rose Bowl Operating Company ("RBOC") and the Pasadena Center Operating Company ("PCOC"). The RBOC and PCOC are urged, however to adopt a policy similar to that set forth in this chapter.

B.    "Employee" means any individual employed by a service contractor on or under the authority of one or more service contracts and who expends any of his or her time providing labor or delivering services to the city of Pasadena, including but not limited to: restaurant, food service or banquet employees, janitorial employees, security guards, parking attendants, health care employees, gardeners, waste management employees, and clerical employees; except that "employee" shall not include part-time, seasonal or trainee workers when the city specifies that the employees may be part-time, seasonal or trainee workers.

C.    "Health benefits" means the payment of no less than $1.25 per hour toward the cost of health and medical care insurance for employees and their dependents.

D.    "Person" means any individual, proprietorship, partnership, joint venture, corporation, limited liability company, trust, association, or other entity that may employ individuals or enter into contracts.

E.    "Service contractor" means any person that enters into a contract directly with the city primarily for the furnishing of services or labor to or for the city (as opposed to the purchase of goods, material or other property or the leasing of property), that involves an expenditure in excess of $25,000 and that is to be performed in the city of Pasadena. Government entities which enter into a contract directly with the city shall not be considered service contractors for purposes of this chapter.

(Ord. 6955 § 1, 2003: Ord. 6763 § 4 (part), 1998)

4.11.020 - Payment of minimum compensation to employees.

Wages. Service contractors shall pay their employees a wage of no less than eight dollars and twenty cents ($8.20) per hour if health benefits, as defined in this chapter, are paid to the employees, or a wage of no less than nine dollars and sixty-one cents ($9.61) per hour, if no such health benefits are paid. The wages in this section shall be adjusted by the Cost of Living Index set forth in Section 4.11.030.

(Ord. 6955 § 2, 2003: Ord. 6928 § 2, 2003: Ord. 6763 § 4 (part), 1998)

# PETALUMA MUNICIPAL CODE

**8.36.060 Compensation required to be paid to employees.**

Except as otherwise provided in this chapter, an employer subject to this chapter shall provide its covered employees the following minimum compensation:

A.   Living Wages. If the employer pays at least one dollar and fifty cents per hour per employee toward an employee medical benefits plan which allows employees to receive employer-compensated care from a licensed physician, the employer shall pay employees an hourly rate of not less than eleven dollars and seventy cents per hour. If the employer does not provide the employees with such medical benefits, the employer shall pay employees an hourly wage of not less than thirteen dollars and twenty cents. This provision does not require that the employer pay more than one dollar and fifty cents per hour or the entire cost per employee for such medical benefits plan or compensate the employee for the full cost of medical care.

B.   Time Off. Employees shall be entitled to at least twenty-two days off per year for sick leave, vacation, or personal necessity. At least twelve of the required days off shall be compensated at the same rate as regular compensation for a normal working day. Ten of the required twenty-two days may be uncompensated days off. Employees who work part-time shall be entitled to accrue compensated days off in increments proportional to that accrued by full-time employees. Employees shall be eligible to use accrued days off after the first six months of satisfactory employment or consistent with employer policy, whichever is sooner. Paid holidays, consistent with established employer policy, may be counted toward provision of the required twelve compensated days off. Compensation for paid leave for part-time on-call employees, prorated as described hereinabove, shall be provided as a lump sum payment twice a year to employees who worked a minimum of five hundred twenty hours in the previous six months.

C.   Additional Compensation Permissible. Nothing in this chapter shall be construed to limit an employer's discretion to provide greater wages or time off to its employees.

D.   The initial rates set forth in subsection (A) of this section shall increase annually on July 1st, in accordance with any increase due to a cost of living adjustment for city employees, equal to the average cost of living adjustment (excluding equity pay increases) for all city nonsafety, nonmanagement employees as of the date of the most recent adjustment of the pay of nonsafety, nonmanagement employees, but no more than the most recent December to December Consumer Price Index for San Francisco-Oakland-San Jose (CPI-U), published by the Bureau of Labor Statistics. The city council may review the impact of the COLA on an annual basis to assess any potential adverse impact and may modify or suspend adoption of a COLA otherwise allowed by this subsection.

(Ord. 2259 NCS §1 (part), 2007.)

# RICHMOND MUNICIPAL CODE

**Richmond Living Wage Ordinance (Richmond Muni. Code §§ 2.60 *et seq*.)**

2.60.060 - Compensation required to be paid to specific employees

Except as provided in Section 2.60.080, an employer subject to this chapter pursuant to Section 2.60.040 shall provide to its covered employees the following minimum compensation terms for the duration of the covered period:

(a)     Wages. If the employer pays at $1.50 per hour per employee towards an employee's medical benefits plan, which allows the employees to receive employer-compensated care from a licensed physician, the employer shall pay employees an hourly rate of not less than $11.42. If the employer does not provide the employees with such a medical benefit plan, the employer shall pay employees an hourly wage of not less than $12.92. The hourly wage rate required by this section may be adjusted or modified by resolution of the City Council.

(b)     Time-off. Employees shall be entitled to at least 22 days off per year for sick leave, vacation, or personal necessity. Twelve (12) of the required days off shall be compensated at the same rate as regular compensation for a normal working day. Ten (10) of the required 22 days may be uncompensated days off. Employees who work part-time shall be entitled to accrue compensated days off in increments proportional to that accrued by full-time employees. Employees shall be eligible to use accrued days off after the first six (6) months of satisfactory employment or consistent with employer policy, whichever is sooner. Paid holidays, consistent with established employer policy, may be counted toward provision of the required 12 compensated days off.

(c)     Additional compensation permissible. Nothing in this chapter shall be construed to limit an employer's discretion to provide greater wages or time-off to its employees.

(d)     The wage rates required in (a), above, shall be adjusted annually, effective January 1, to reflect the average percent of wage increases embodied within the City of Richmond's employee labor agreements for the immediately preceding calendar year.

# SACRAMENTO CITY CODE

Sacramento City Code

**3.58.030 Living wage and health benefits.**

    A.        Except as provided in subsection B of this section, a covered employer must pay its covered employees no less than the following rates for all hours worked for the city or while performing under a city contract:

    1.        If health benefits are provided to covered employees and the covered employer's contribution for the benefits is at least one dollar and fifty cents for each hour the covered employee is entitled by this chapter to a living wage, then the rates are as follows:

    a.        During 2007, the greater of ten dollars ($10.00) an hour or nine dollars adjusted by the increase in the Consumer Price Index for all Urban Consumers, San Francisco/Oakland/San Jose area (1982—1984=100) from January 1, 2004, through December 31, 2006.

    b.        For each year after 2007, the rate shall be based on the rate from the immediately preceding year adjusted by the increase in the Consumer Price Index for all Urban Consumers, San Francisco/Oakland/San Jose area (1982—1984=100) from January 1st through December 31st of the immediately preceding year.

    2.        If health benefits are not provided to covered employees or if health benefits are provided but the covered employer's contribution for the benefits is less than one dollar and fifty cents for each hour a covered employee is entitled by this chapter to a living wage, then the rates are as follows:

    a.        During 2007, the greater of eleven dollars and fifty cents ($11.50) an hour or ten dollars and fifty cents ($10.50) adjusted by the increase in the Consumer Price Index for all Urban Consumers, San Francisco/Oakland/San Jose area (1982—1984=100) from January 1, 2004, through December 31, 2006.

    b.        For each year after 2007, the rate shall be based on the rate from the immediately preceding year adjusted by the increase in the Consumer Price Index for all Urban Consumers, San Francisco/Oakland/San Jose area (1982—1984=100) from January 1st through December 31st of the immediately preceding year.

    3.        In February of each year, the city manager shall determine the appropriate rate as practicable. Each city department that has city contracts shall give written notice of the rate so determined to the covered employers.

    B.        Notwithstanding subsection A of this section, the city council may waive, modify or alter the requirements of this chapter when amending a contract that has a remaining term of ten (10) years or more. (Ord. 2010-005 § 1; Ord. 2007-087 § 1; Ord. 2003-082)

# SANTA CRUZ MUNICIPAL CODE

## 5.10.040 PRESCRIPTION OF MINIMUM LIVING WAGE.

1.   The minimum living wage to be paid to employees pursuant to the requirements of this chapter shall be prescribed annually by the city council pursuant to resolution. The city council shall consider a recommendation regarding adjustments to the wage rate and benefits no later than its first regularly scheduled meeting in February of each year, and shall adopt a resolution to be effective on July first of each year.

2   The resolution shall prescribe a minimum living wage to be paid where the employer provides minimum vacation leave, sick leave and health insurance benefits for its employees and an alternate higher minimum living wage to be paid where the employer does not provide each of those minimum benefits for its employees.

3.   The minimum vacation leave and sick leave that must be provided and the minimum amount paid toward health insurance to qualify for the lower minimum living wage shall be prescribed in the annual resolution.

4.   At a minimum, the prescribed minimum living wages shall be upwardly indexed each year by an amount which corresponds to the cost of living increase as measured by the San Francisco-Oakland-San Jose area Consumer Price Index for urban wage earners and clerical workers. The annual adjustment shall be with reference to the CPI for the twelve-month period ending on October thirty-first.

5.   Where an employer intends to pay the minimum living wage applicable to employers who provide the requisite sick leave, vacation leave and health insurance benefits, proof of the requisite benefit package must be submitted to the city within ten days of the award of the contract for services, related subcontract, grant funding or financial assistance which creates the living wage requirement.

(Ord. 2002-28 § 2, 2002: Ord. 2000-25 § 1 (part), 2000).

# WEST HOLLYWOOD MUNICIPAL CODE

**West Hollywood Municipal Code**

Title 3 Revenue and Finance
Chapter 3.20 Living Wage Requirements for Service Contracts

## 3.20.040 Payment of Living Wage and Benefits.

a.  *Wages.* Employers shall pay employees a wage of no less than the living wage established pursuant to subsection (d) of this section.

b.  *Compensated Days Off.* Employers shall provide at least twelve compensated days off per year for sick leave, vacation, or personal necessity at the employee's request.

c.  *Uncompensated Days Off.* Employers shall provide employees at least ten uncompensated days off per year for sick leave for the illness of the employee or his or her immediate family where the employee has exhausted his or her compensated days off for that year.

d.  *Establishment of and Adjustment to Living Wage Rates.* The living wage rate paid to an employee shall be set and adjusted by resolution of the City Council. The rates shall be adjusted annually each July 1st to reflect increases during the preceding year in the Consumer Price Index (CPI) for all urban consumers in the Los Angeles-Riverside-Orange County area, as published in January each year by the U.S. Department of Labor, Bureau of Labor Statistics.

e.  *Health Benefits.* Health benefits required by this chapter shall consist of the payment of at least one dollar and twenty-five cents ($1.25) per hour towards the provision of health care benefits for employees and their dependents. Proof of the provision of such benefits must be submitted to the City Manager or designee to qualify for the wage rate for employees with health benefits set forth in the City Council resolution pursuant to subsection (d) of this section.

(Ord. 11-868 § 1, 2011; Ord. 04-693 § 2, 2004; Ord. 97-505 § 2, 1997; prior code § 2718)

---

View the mobile version.